1

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF RICHMOND - CRIMINAL TERM PART 12

------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK

       -against-

TALIYAH TAYLOR,

                  Defendant.

------------------------------------------------x

HEARING            Richmond Supreme Court
IND. #335/06      18 Richmond Terrace
                 Staten Island, N.Y.
                 September 29, 2008

B E F O R E:

      HONORABLE ROBERT COLLINI,

               Justice of the Supreme Court

A P P E A R A N C E S:

     DANIEL DONOVAN, ESQ.
     District Attorney - Richmond County
     BY:  MARIO MATTEI, ESQ.
         JANET SILVERS, ESQ.
         Assistant District Attorneys

     CHRISTOPHER RENFROE, ESQ.
     Attorney for the Defendant
     118-35 Queens Boulevard
     Forest Hills, N.Y.  11375

                     NANETTE CANTWELL
                 Senior Court Reporter

```
 1                        Proceedings           2
 2            THE CLERK:  Shall we bring out the
 3    defendant, your Honor?
 4            THE COURT:  Yes.
 5            THE CLERK:  Calendar number one,
 6    Indictment 335 of 2006, Taliyah Taylor.
 7            Counsel, appearances, please.
 8            MR. RENFROE:  Christopher Renfroe, 118-35
 9    Queens Boulevard, Forest Hills, New York, for Miss
10    Taylor.
11            MR. MATTEI:  Mario Mattei and Janet
12    Silvers for the People.
13            Judge, I have Rosario material --
14            THE COURT:  Mr. Renfroe, sit down if your
15    back hurts.
16            MR. MATTEI:  I have some Rosario material
17    I'll put on the record.
18            THE COURT:  Yes.
19            MR. MATTEI:  Judge, I've turned over the
20    following items.  I've given Mr. Renfroe a copy of
21    the following Rosario material:  A DD5 from
22    Detective John Signorelli;  Grand Jury testimony
23    from Detective John Signorelli, pages 14 to 26; five
24    pages of a steno book notation with regard to the
25    statement that Miss Taylor made from Detective
26    Signorelli; the front page of a PD-301 form, again
```

| | Proceedings 3 |
|---|---|
| 1 | |
| 2 | by Detective Signorelli. |
| 3 | For Police Officer Bartel I've turned over |
| 4 | his memo book which consists of, I believe, six |
| 5 | pages, counting the cover and the Miranda warning |
| 6 | sheet. I've turned over Police Officer Bartel's |
| 7 | Grand Jury testimony; voucher number N135238; an |
| 8 | arrest report by Police Officer Bartel; an |
| 9 | intoxicated driver examination sheet; an intoxicated |
| 10 | driver examination sheet, which is designated sheet |
| 11 | number one, and sheet number two was the same form; |
| 12 | the complaint report worksheet; a request for a |
| 13 | laboratory analysis; a consent form; the intoxicated |
| 14 | driver examination instruction sheet; a chemical |
| 15 | test analysis form; a technician test report and |
| 16 | the arresting officers IDTU form, which I believe |
| 17 | constitutes all the Rosario material for the |
| 18 | hearing, your Honor. |
| 19 | THE COURT: For the purposes of the |
| 20 | Huntley hearing today? These were handed over for |
| 21 | the purpose of the Huntley hearing? |
| 22 | MR. MATTEI: Yes, your Honor. |
| 23 | THE COURT: Acknowledge receipt? |
| 24 | MR. RENFROE: Yes, your Honor, I received |
| 25 | them. |
| 26 | THE COURT: Are both sides ready to |

```
 1                          Proceedings        4

 2      proceed for the Huntley hearing?

 3              MR. MATTEI:  Yes, your Honor.

 4              MR. RENFROE:  Yes, your Honor.

 5              THE COURT:  Just before we begin as a

 6      matter of preliminary, what exactly is the statement

 7      and did the defense receive notice?

 8              MR. MATTEI:  Judge, there are two

 9      statements basically from Police Officers Bartel.

10      It's the questions involved in the intoxicated

11      driver examination sheet, some pedigree information,

12      the consent for the blood test, and that's

13      basically the extent of it with Officer Bartel,

14      your Honor.

15              THE COURT:  Why would pedigree be part of

16      this hearing?  Why is pedigree information part of

17      the hearing?

18              MR. MATTEI:  Well, it's part of the

19      hearing because she gave false pedigree information

20      at first.

21              THE COURT:  Even so --

22              MR. MATTEI:  Judge, I'm giving you the

23      entire statement.

24              THE COURT:  All right.

25              MR. MATTEI:  For Detective Signorelli

26      it's the statement contained in the DD5, which Mr.
```

| | Proceedings 5 |
|---|---|
| 1 | |
| 2 | Renfroe got with the voluntary disclosure form, |
| 3 | which basically details a lot of the defendant's |
| 4 | life and with regard to the incident in question |
| 5 | that she was driving the car. She was driving it |
| 6 | as fast as she could, as fast as the car would take |
| 7 | her. She saw the man crossing street and then he |
| 8 | was gone and she recalls hitting the red car and it |
| 9 | overturning, but there's a lot more detail about |
| 10 | her life history and her life story. |
| 11 | THE COURT: What I was asking for is -- |
| 12 | my understanding is there was a notice pursuant to |
| 13 | 710.30 (1a) to three statements: One made October |
| 14 | 18, 2006 at 11:50 at St. Vincent's; one made on |
| 15 | October 19, 2006 at approximately 5:15 a.m. at St. |
| 16 | Vincent's; and one on October 19, 2006 at |
| 17 | approximately 2 a.m. at St. Vincent's. Are those |
| 18 | the three statements? |
| 19 | MR. MATTEI: Yes, your Honor. |
| 20 | THE COURT: Thank you. |
| 21 | Counsel, you acknowledge receipt of the |
| 22 | notice? |
| 23 | MR. RENFROE: Yes. |
| 24 | THE COURT: Ready to proceed? |
| 25 | MR. RENFROE: Ready to proceed. |
| 26 | MR. MATTEI: Yes. |

| | |
|---|---|
| 1 | Bartel - Direct/Mattei        6 |
| 2 | THE COURT:  Call your first witness. |
| 3 | MR. MATTEI:  The People call Police |
| 4 | Officer William Bartel. |
| 5 | POLICE OFFICER W-I-L-L-I-A-M  B-A-R-T-E-L, having been |
| 6 | called as a witness by and on behalf of the People, |
| 7 | having been duly sworn by the clerk of the court, |
| 8 | was examined and testified as follows: |
| 9 | THE CLERK:  Please be seated. |
| 10 | THE COURT:  Counsel, approach. |
| 11 | Officer, please step out for a moment. |
| 12 | (Whereupon, the witness leaves the |
| 13 | courtroom.) |
| 14 | (Whereupon, an off the record discussion |
| 15 | was held at the bench among the Court and counsel, |
| 16 | after which the proceedings continued as follows:) |
| 17 | THE CLERK:  Ready for the witness, your |
| 18 | Honor? |
| 19 | THE COURT:  Yes. |
| 20 | (Whereupon, the witness enters the |
| 21 | courtroom and resumes the witness stand, after |
| 22 | which the proceedings continued as follows:) |
| 23 | THE CLERK:  Please be seated, officer. |
| 24 | For the record, please state your name, |
| 25 | spell your last name, give your shield number and |
| 26 | your command. |

```
 1                        Bartel - Direct/Mattei      7
 2              THE WITNESS:  William Bartel, B-A-R-T-E-L,
 3         Shield number 5168, Highway Patrol Unit Number
 4         5.
 5                    THE COURT:  Shield number?
 6                    THE WITNESS:  5168.
 7                    THE COURT:  Highway Patrol?
 8                    THE WITNESS:  Yes, sir.
 9                    THE COURT:  Counsel?
10                    MR. MATTEI:  May I inquire, your Honor?
11                    THE COURT:  Yes.
12    DIRECT EXAMINATION
13    BY MR. MATTEI:
14         Q    Officer --
15                    THE COURT:  One second.
16                    Slowly and clearly because I'm taking
17         notes and I don't write that fast.
18                    Counsel?
19                    MR. MATTEI:  Thank you.
20         Q    Officer Bartel, how long have you been on the
21    New York City Police Department?
22         A    Almost eighteen and a half years.
23         Q    And how long have you been at the highway
24    district?
25         A    Highway 5, I've been there for just about
26    three and a half years.
```

1              Bartel - Direct/Mattei        8

2        Q       And where did you work before that?

3        A       Highway 2 for about six or seven months.

4        Q       And how about before that?

5        A       Fourteen years I did in the lower east side,

6   7th precinct.

7        Q       I'd like to direct your attention to October

8   18 of 2006 and ask if were you working on that day.

9        A       Yes, I was.

10       Q       And what was your tour of duty?

11       A       It was 2100 by 0535, which is nine o'clock at

12  night until 5:35 in the morning.

13       Q       And what type of assignment did you have that

14  day?

15       A       DWI enforcement.

16       Q       And what type of auto were you in?

17       A       I was in a yellow taxi cab.

18       Q       A decoy vehicle?

19       A       Yes.

20       Q       I'd like to direct your attention to

21  approximately 11:10 p.m. on the evening of the 18th and

22  ask if you went someplace at that time.

23       A       Yes, I did.

24       Q       And where did you go?

25       A       To the parking lot at Lowe's on Forest

26  Avenue.

1                        Bartel - Direct/Mattei       9

2          Q      And why did you go there?

3          A      There was a motor vehicle accident there.

4          Q      And had you received a radio run?

5          A      I had heard that there was one over there.

6          Q      And where did you go when you got to that

7    parking lot?

8          A      I went into the parking lot at Lowe's.

9          Q      And what did you see when you got into the

10   parking lot at Lowe's?

11         A      I saw an overturned Nissan Maxima and a patrol

12   car with a black female in the back seat.

13         Q      Do you see that female in court today?

14         A      Yes, I do.

15         Q      Indicate her for record, what she's wearing,

16   please.

17         A      She's sitting at the desk with, like, a

18   teal-colored T-shirt.

19                MR. MATTEI:   Indicating the defendant,

20         your Honor?

21                THE COURT:   So indicated.

22         Q      What was the defendant doing in the back of

23   the car when you first saw her?

24         A      She was attempting to kick the door open.

25         Q      And did you observe her do anything else while

26   she was in the back seat of the car?

```
 1                    Bartel - Direct/Mattei      10

 2         A     She would kick the door open and then stop,

 3    get calm, and then try to kick the door again.

 4         Q     Now, was Officer Granda at the scene as

 5    well?

 6         A     Yes.

 7         Q     And at some point --

 8               THE COURT:  Officer who?

 9               MR. MATTEI:  Granda, G-R-A-N-D-A.

10         Q     At some point did Officer Granda take the

11    defendant out of the RMP?

12         A     Yes.

13         Q     Can you tell us what he did with her at that

14    time?

15         A     He asked her to take a portable breath

16    test.

17         Q     And what is a portable breath test?

18         A     It's a hand-held device where the defendant

19    would blow into it to register the blood alcohol

20    level.

21         Q     Was the defendant standing at that time?

22         A     Yes.

23         Q     What was she wearing?

24         A     She just had a blanket on her.  Otherwise, she

25    was naked.

26         Q     And did Officer Granda give her the portable
```

```
 1                      Bartel - Direct/Mattei       11
 2    breath test?
 3         A     Yes.
 4         Q     And how did he do that?  Just explain that.
 5         A     He asked the defendant to take a deep breath
 6    and blow in the PBT until there's enough air to get a
 7    reading.
 8         Q     After Officer Granda asked her to take a deep
 9    breath and blow into the PBT, what did the defendant
10    do?
11         A     She blew into the PBT.
12         Q     She followed his directions?
13         A     Yes.
14         Q     Did she ask him any questions?
15         A     No.
16         Q     What was the result of that?
17         A     0-0-0.
18         Q     And what does that indicate from your
19    experience?
20         A     There was no alcoholic beverage on her
21    breath.
22         Q     Did you speak to anyone at the scene?
23         A     Yes, I did.
24         Q     And what did they tell you?
25               MR. RENFROE:  Objection, your Honor.
26               THE COURT:  Sustained.
```

```
 1                         Bartel - Direct/Mattei      12

 2                  MR. RENFROE:  I know hearsay is allowed --

 3                  THE COURT:  Sustained.

 4                  MR. RENFROE:  Just the question of who.

 5                  THE COURT:  Sustained.

 6         Q     At some point did an ambulance arrive?

 7         A     Yes.

 8         Q     And did the defendant leave in an ambulance?

 9         A     Yes.

10         Q     And what hospital did she go to?

11         A     Richmond University Medical Center.

12         Q     And did you ride in the ambulance with her?

13         A     Yes, I did.

14         Q     And while in the ambulance, did you take

15    pedigree information from the defendant?

16         A     Yes, I did.

17         Q     And what, if anything, did you ask her?  Did

18    you ask her her name?

19         A     Yes, I did.

20         Q     And when you were in the ambulance, what did

21    she tell you?

22         A     Can I get my memo book to look at?

23                  THE COURT:  If you need it to refresh your

24         recollection.

25                  THE WITNESS:  Yes.

26                  (Short pause.)
```

```
 1                    Bartel - Direct/Mattei      13

 2     A      She told me her name was Tricia Matthews.

 3     Q      And did you ask her her address?

 4     A      She said 173 Pine Place.

 5     Q      And did she give you a zip code?

 6     A      10303.

 7     Q      Did you ask her how old she was?

 8     A      Yes.

 9     Q      And what did she tell you?

10     A      She told me she was eighteen.

11     Q      Now, at some point in the ambulance did you

12  read the defendant her Miranda warnings?

13     A      Yes, I did.

14     Q      And where did you read them from?

15     A      From my memo book.

16            MR. MATTEI:   Judge, if I could have this

17     marked as Exhibit 1 for identification?

18            THE COURT:   We'll deem it marked for

19     purposes of the hearing.

20            (Whereupon, the item mentioned above is

21     deemed marked as People's Exhibit 1 for

22     identification.)

23            THE COURT:   What information did she give

24     you as far as pedigree was concerned?

25            THE WITNESS:   That her name was Tricia

26     Matthews.
```

```
 1                    Bartel - Direct/Mattei       14

 2                THE COURT:  And what else?

 3                THE WITNESS:  That she was eighteen years

 4        old, and her address.

 5                THE COURT:  Go ahead.

 6        Q     You recognize what's been deemed marked as

 7    People's Exhibit number 1 --

 8        A     Yes.

 9        Q     -- for identification?

10        A     Yes.

11        Q     What is that?

12        A     That is the Miranda warnings from my memo

13    book.

14        Q     Is that an exact copy of the Miranda warnings

15    that you read?

16        A     Yes.

17                MR. RENFROE:  Just one moment, your Honor.

18                (Short pause.)

19                THE COURT:  Counsel, anybody here going to

20        be one of your witnesses?

21                MR. MATTEI:  Not offhand, judge.  There's

22        no fact witnesses here except if someone identified

23        Mr. Simons' body.

24                THE COURT:  That's my point.  Maybe they

25        should step out too.

26                (Short pause.)
```

```
 1                      Bartel - Direct/Mattei      15

 2              THE COURT:  Let the record reflect that

 3         several people entered the courtroom during

 4         questioning.  Mr. Renfroe had indicated that

 5         there were people who were going to be in the

 6         courtroom -- he indicated at a bench conference

 7         shortly before we began that there were people who

 8         may be coming into the courtroom who would be

 9         trial witnesses, and his position was that they

10         should be excluded in the hearing.  The Court agreed

11         with him.

12              Also, there were several witnesses that

13         the People may call, and those people have been

14         excluded from the courtroom too.  These witnesses

15         will be trial witnesses.

16              Now that they have been excluded, counsel,

17         proceed.

18              MR. MATTEI:  Yes, your Honor.

19    Q    Officer, I'll ask you to look at what's been

20    marked as People's Exhibit 1 or deemed marked as People's

21    Exhibit 1 for identification and again ask you if you

22    recognize that xerox copy?

23    A    Yes, I do.

24    Q    And what is that?

25    A    That's the Miranda warnings from my memo

26    book.
```

```
 1                   Bartel - Direct/Mattei       16
 2        Q     And is that a copy of the Miranda warnings
 3   from your memo book as you read them to Miss Taylor the
 4   evening of the 18th?
 5        A     Yes.
 6                   MR. MATTEI:  Judge, I would ask that that
 7        be moved into evidence as Exhibit 1.
 8                   THE COURT:  Counsel?
 9                   MR. RENFROE:  No objection.
10                   THE COURT:  Deemed marked 1 in evidence.
11                   (Whereupon, the item previously deemed
12        marked for identification is deemed marked as
13        People's Exhibit 1 in evidence.)
14        Q     Officer, I'm going to ask you to read to us,
15   as did you that evening, what you told the defendant and
16   what, if anything, she responded to each question.
17        A     Question number one:  You have the right to
18   remain silent and refuse to answer questions.  Do you
19   understand?  She said yes.
20              Question number two:  Anything you do say
21   may be used against you in a court of law.  Do you
22   understand?  She said yes.
23              You have the right to consult an attorney
24   before speaking to the police and have an attorney
25   present during any questioning now or in the future.
26   Do you understand?  She said yes.
```

```
 1                  Bartel - Direct/Mattei        17

 2              If you cannot afford an attorney, one will be

 3      provided for you without cost?  Do you understand?  She

 4      said yes.

 5              If do you not have an attorney available, you

 6      have the right to remain silent until you've had an

 7      opportunity to consult with one.  Do you understand?  She

 8      said yes.

 9              Now that I have advised you of your rights,

10      are you willing to answer questions?  She said yes.

11      Q     And where did this take place that you read

12      her these warnings?

13      A     In the ambulance.

14      Q     And what was she doing at that time?

15      A     She was laying on the gurney.

16      Q     And was an ambulance --

17                  THE COURT:  I want to stop you for a

18          second.

19                  When she was laying on the gurney, was she

20          strapped to the gurney?

21                  THE WITNESS:  She was on the backboard, I

22          believe.

23                  THE COURT:  Did she have restraints on

24          her?

25                  THE WITNESS:  She had handcuffs.

26                  THE COURT:  Not handcuffs.  Was she
```

```
 1                    Bartel - Direct/Mattei        18
 2       otherwise restrained?
 3                    THE WITNESS:  I believe the ambulance crew
 4       straps them in so they don't fall off during
 5       transport.
 6                    THE COURT:  You indicated she was in the
 7       back seat of the police car?
 8                    THE WITNESS:  That's correct.
 9                    THE COURT:  And she was kicking the door?
10                    THE WITNESS:  Yes.
11                    THE COURT:  Describe how she was kicking
12       the door.
13                    THE WITNESS:  She was -- she turned
14       around and her back legs were trying to kick the
15       door open.
16                    THE COURT:  Was she kicking the glass
17       too?
18                    THE WITNESS:  Yes.
19                    THE COURT:  And you let her out?
20                    THE WITNESS:  She would do that and then
21       she would be calm.  She would calm down.  She would
22       gaze off and then she'd try to kick the door and
23       then she got calm.
24                    THE COURT:  When you took her out of
25       the back seat of the police car, how was she
26       behaving?
```

```
 1                          Bartel - Direct/Mattei        19
 2                    THE WITNESS:  She wasn't agitated at that
 3           time.
 4                    THE COURT:  Was she agitated when the
 5           ambulance came?
 6                    THE WITNESS:  No.
 7                    THE COURT:  Was she acting rationally or
 8           did she appear to act rationally to you?
 9                    THE WITNESS:  She was calm.  She wasn't
10           combative at that point.  When she was laid down on
11           the gurney, she wasn't combative at that point.
12                    THE COURT:  Continue, counsel.
13           Q      Did she answer your questions right after you
14      asked them?
15           A      Yes.
16           Q      Did she have any hesitation in answering
17      them?
18           A      No.
19           Q      And again, was an ambulance attendant there?
20           A      Yes, there was.
21           Q      And after you read her her Miranda warnings,
22      did the ambulance attendant ask her questions in your
23      presence?
24           A      Yes.
25           Q      Did you ask her any further questions in the
26      ambulance?
```

```
 1                    Bartel - Direct/Mattei      20

 2       A     No, I did not.

 3       Q     Did she complain of any physical pain while in

 4  the ambulance?

 5       A     Not that I remember.

 6       Q     And how about when she was standing outside

 7  the police car, did she complain of any physical pain?

 8       A     Not that I remember.

 9             THE COURT:  Did she appear to be bleeding

10       in any way?

11             THE WITNESS:  Maybe a scratch or two, but

12       I didn't see more than that.

13             THE COURT:  Okay.

14             Her physical condition, could you describe

15       how she appeared to you.

16             THE WITNESS:  She appeared incoherent at

17       times where she was, like, gazing off and she had

18       watery eyes.

19             THE COURT:  She had watery eyes and

20       appeared to you to be incoherent at times?

21             THE WITNESS:  At times, and then calm,

22       but when I asked her questions she answered them.

23             THE COURT:  Did she appear to be coming in

24       and out of that incoherent state?  Is that what she

25       appeared like to you?

26             THE WITNESS:  I'm going to say that
```

1

2       she -- yeah, that she would be incoherent as if she

3       were gazing off, but then she was focused when

4       Officer Granda asked her to do that.

5                   THE COURT:  To do what?

6                   THE WITNESS:  Take the portable breath

7       test.

8                   THE COURT:  I'm talking about when she was

9       in the ambulance too.

10                  THE WITNESS:  In the ambulance when I

11      asked her the questions on the Miranda she answered

12      them quickly.

13                  THE COURT:  But she had the same

14      appearance, the dazing in and out?

15                  THE WITNESS:  She was just calm at that

16      point, just laying there.

17                  THE COURT:  And what did you mean then

18      when you said she was dazing in and out?

19                  THE WITNESS:  With the watery eyes, the

20      way she would look off when she was in the back of

21      the patrol car.

22                  THE COURT:  You said she was like that in

23      the ambulance.  That's how she appeared to you in

24      the ambulance too.  I want to know how she looked to

25      you in the ambulance.

26                  THE WITNESS:  She was laying down, and

```
 1                    Bartel - Direct/Mattei      22

 2       when I asked her questions she answered them.

 3                 THE COURT:  A few seconds ago you said she

 4       seemed to be dazed and dozing in and out.  I want to

 5       know what you mean by that.

 6                 MR. MATTEI:  I think it was dazing in and

 7       out, not dozing.

 8                 THE COURT:  Thank you.

 9                 I still want to know what you meant by

10       that.

11                 THE WITNESS:  Meaning she was just looking

12       up in the ambulance.

13                 THE COURT:  Counsel, continue.

14       Q     Other than the questions that you asked her,

15   the Miranda warnings and the questions that the ambulance

16   person asked her, was she saying anything, rambling on

17   about anything at all?

18       A     Not that I remember.

19       Q     When you say dazed, do you mean that she was

20   in the ambulance just laying there looking off?  Is that

21   what you mean?

22       A     That's what I meant.

23       Q     But when you asked her questions and when the

24   ambulance attendant asked her questions, she responded

25   right away?

26       A     Yes.
```

```
 1                      Bartel - Direct/Mattei      23
 2              THE COURT:  When you said dazed, did you
 3         say dazed meaning that she appeared to be on
 4         drugs?
 5              THE WITNESS:  That's what I meant, yes.
 6              THE COURT:  And that was the whole dazing
 7         in and out?  That's what you meant, right, that she
 8         appeared to be --
 9              THE WITNESS:  To be under the influence of
10         drugs, yes.
11              THE COURT:  Continue, counsel.
12    Q    With regard to her physical --
13              MR. MATTEI:  Judge, if I could just
14         backtrack.
15    Q    With regard to her physical condition, what
16    did people tell you at the scene with regard to what the
17    defendant did after she got out of the car, if I can
18    narrow it down?
19    A    I was told that she was running around the
20    parking lot naked talking about lyrics from a rap
21    song.
22    Q    As far as her physical condition, she was
23    running around?
24    A    That's correct.
25    Q    And, in fact, did you see a video of her
26    getting out of the car at some point after this night?
```

2          A      No, I did not.

3          Q      You haven't seen the video?

4          A      No.

5          Q      Now, did she have any ID with her?

6          A      No.

7          Q      Any pocketbook?

8          A      No.

9          Q      Now, tell us what happened when you got to the

10    hospital.

11         A      I got to the hospital -- she apparently gave

12    somebody her social security number and the registrar

13    came and said that the social security number came back

14    to Taliyah Taylor.

15         Q      And at that time did you -- up to that time

16    did you think her name was Tricia Matthews?

17         A      Yes.

18         Q      At that time did you then ask the defendant

19    for her pedigree information again?

20         A      Yes.

21         Q      And what, if anything, did she tell you?

22         A      She told me that her date of birth was

23    February 28, 1982.

24         Q      What did she tell you her name was?

25         A      Taliyah Taylor.

26         Q      Did she spell her name for you?

```
 1                        Bartel - Direct/Mattei      25

 2        A      Yes.

 3        Q      Did she give you an address?

 4        A      173 Pine Place.

 5        Q      Did she give you a zip code?

 6        A      10303.

 7        Q      So at that time you asked her what her name

 8   was and she told you Taliyah Taylor?

 9        A      Yes.

10        Q      And she spelled Taliyah for you?

11        A      Yes.

12        Q      Was there any hesitation in how she spelled

13   the name or in her answer to your question?

14        A      No.

15        Q      How about with regard to her address?  Did she

16   give you the address or was there some hessitation?

17        A      There was no hesitation.

18        Q      And how about the zip code and the date of

19   birth?  Any hesitation?

20        A      No, sir.

21               THE COURT:  I just want to ask you this,

22        officer.

23               Initially she told you one name, one

24        address, one age?

25               THE WITNESS:  Yes.

26               THE COURT:  When she went to the hospital
```

1               Bartel - Direct/Mattei       26

2        she gave a social security number to the people who

3        were admitting her into the hospital?

4               THE WITNESS:  She gave it to somebody.

5        I'm not sure exactly who.

6               THE COURT:  The people admitting her into

7        the hospital?  Is that the people she gave the

8        number too?

9               THE WITNESS:  Someone had that social

10       security number.

11              THE COURT:  Somebody from the hospital?

12              MR. MATTEI:  Well, judge, it could have

13       been the ambulance attendant.

14              THE COURT:  Well, that's somebody from the

15       hospital.

16              She gave the social security number to the

17       other people in the hospital and then somebody else

18       came to you and told you that that social security

19       number did not match up to the name that you had?

20              THE WITNESS:  That's correct.

21              THE COURT:  And then did you immediately

22       tell that to the defendant?

23              THE WITNESS:  Then I believe I asked

24       her what her name was and that's when --

25              THE COURT:  Did you tell her that the name

26       doesn't match up to the one you gave us?

```
 1                    Bartel - Direct/Mattei      27
 2              THE WITNESS:  I believe that's what I told
 3         her.
 4              THE COURT:  And then right after that she
 5         said, Well, my name is the name -- did she admit her
 6         name was the name that you have?
 7              THE WITNESS:  Taliyah Taylor.
 8              THE COURT:  And then she told you a
 9         different address and a different age?
10              THE WITNESS:  Well, the same address, but
11         different date of birth.
12              THE COURT:  A different date of birth,
13         but it was the same address that she originally
14         gave you?
15              THE WITNESS:  Yes.
16              THE COURT:  Continue, counsel.
17              MR. MATTEI:
18    DIRECT EXAMINATION
19    BY MR. MATTEI:  (Continued)
20         Q    I'd like to direct your attention to 2350 in
21    military time, which is approximately 11:50 p.m., and ask
22    if at that time you asked the defendant to submit to a
23    blood test?
24         A    That's correct.
25         Q    And how did you do that?
26         A    I read from a script.
```

```
 1                          Bartel - Direct/Mattei       28
 2         Q      And what did you read to her?
 3         A      Can I get the sheet out to refresh my memory?
 4                THE COURT:   Yes.
 5                THE WITNESS:   Thank you.
 6                (Short pause.)
 7         A      I read to her:  "You've been arrested for
 8   operating a motor vehicle while under the influence of
 9   alcohol or drugs.  I would like you to take a blood test.
10   Will you take the test?"
11         Q      What did she say?
12         A      She said yes.
13         Q      Was there any hestation in her answer?
14         A      No.
15         Q      Was she coherent in your opinion?
16         A      At that time I believe she was.
17         Q      When you -- when she responded yes, that she
18   would take it, what's your next step?  What did you do
19   next?
20         A      I have to ask one of the nursing staff to draw
21   the blood.
22         Q      And was the blood drawn at approximately
23   12:20?
24         A      Approximately, yes, sir.
25         Q      And did the defendant offer any resistance?
26         A      No.
```

```
 1                   Bartel - Direct/Mattei      29
 2        Q     Now, prior to drawing the blood while the
 3   nurse is there -- do you have what is called a consent
 4   form in that kit?
 5        A     Yes.
 6        Q     And explain what the consent form is?
 7        A     The consent form is the defendant has to read
 8   it, what it's saying, that they want the defendant to
 9   give blood and that she agrees to willingly give blood,
10   and then she has to sign it.
11        Q     Did you give her the consent form?
12        A     Yes, I did.
13        Q     Did she read it in front of you?
14        A     Yes.
15        Q     And then did she sign it?
16        A     Yes.
17        Q     And did she sign it in the appropriate
18   place?
19        A     Yes.
20              THE COURT:  Did she read it out loud in
21        front of you?
22              THE WITNESS:  That, I don't remember.
23        Q     Did she provide you with information again --
24              MR. MATTEI:  Well, judge, if I could have
25        this deemed marked?
26              THE COURT:  We'll deem it marked People's
```

```
 1                     Bartel - Direct/Mattei      30

 2         2 for purposes of the hearing.

 3                     Show it to counsel, unless he has a copy

 4           of it.

 5                     MR. RENFROE:  I think I have a copy of it,

 6           judge.

 7                     (Whereupon, the item mentioned above is

 8           deemed marked as People's Exhbit 2 for

 9           identification.)

10         Q     Do you recognize People's Exhibit 2 for

11     identification?

12         A     Yes.

13         Q     Is that an exact copy of the consent form you

14     gave to the defendant?

15         A     Yes.

16         Q     And is that the one that she read and then

17     signed?

18         A     Yes.

19                     MR. MATTEI:  Judge, I'll move that into

20           evidence as Exhibit 2 at this time.

21                     THE COURT:  Counsel?

22                     MR. RENFROE:  No objection, your Honor.

23                     THE COURT:  All right.  Deemed marked 2

24           for purposes of the hearing.

25                     (Whereupon, the item previously deemed for

26           identification is deemed marked as People's Exhibit
```

1                    Bartel - Direct/Mattei        31

2        2 in evidence.)

3        Q     What does the form say as far as where the

4     defendant is directed to read?

5        A     It says, "I have granted permission for blood

6     samples to be taken."

7        Q     And then she signed it?

8        A     That's correct.

9        Q     She signed it in the appropriate spot?

10       A     Yes.

11                 THE COURT:  Can I see it and give me the

12             memo back too, the other item that we deemed

13             marked.

14                 MR. MATTEI:  That's over here, your Honor.

15             He doesn't have it.

16                    (Handing to Court.)

17       Q     And what was her physical condition like at

18    that time?  Was she complaining of pain?

19       A     No, not that I remember.

20       Q     And did she appear to be alert to you at that

21    time?

22       A     Yes.

23       Q     Was she on any drugs at that time provided by

24    the hospital?

25       A     Not that I know.

26       Q     Did you leave the hospital and then return

```
 1                    Bartel - Direct/Mattei        32
 2   sometime later?
 3        A     Yes, I did.
 4        Q     I'd like to direct your attention to
 5   approximately 5:15 in the morning and ask if you had
 6   occasion to meet with the defendant again at that time.
 7        A     Yes, I did.
 8        Q     And why did you meet with her at that time?
 9        A     To ask her the questions on the PD 244.
10                  THE COURT:  And that is?
11                  THE WITNESS:  The intoxicated driver
12        examination sheet.
13                  THE COURT:  Thank you.
14                  MR. MATTEI:  Judge, if I could have this
15        marked as People's Exhibit 3 for identification?
16        I've shown -- counsel has a copy.
17                  (Whereupon, the item mentioned above is
18        deemed marked as People's Exhibit 3 for
19        identification.)
20        Q     When you went back and spoke to Miss Taylor,
21   what, if anything, did you tell her when you reentered
22   the emergency room and spoke to her?
23        A     That I had a list of questions to ask her and
24   that I reminded her that I had read her her Miranda
25   warnings earlier in the night and that if she wanted to
26   answer these questions, she could, and if she didn't, she
```

```
 1                     Bartel - Direct/Mattei       33
 2   didn't have to.
 3                 THE COURT:  When you say you reminded
 4        her of the Miranda warnings, what exactly did you
 5        say?
 6                 THE WITNESS:  I reminded her of the
 7        Miranda warnings, that I read her her rights
 8        earlier, and if she wanted to answer the questions,
 9        she could, and if she didn't want to, she didn't
10        have to.
11                 THE COURT:  You didn't really reread them
12        to her?  You paraphrased them to her?
13                 THE WITNESS:  I just reminded her that I
14        read them to her.  I didn't reread them to her.
15                 THE COURT:  What words did you say to her?
16        Did you say, Do you remember when I read your
17        Miranda warnings earlier?
18                 THE WITNESS:  I said  --
19                 THE COURT:  What did you say?
20                 THE WITNESS:  I said, Do you recall I read
21        your Miranda warnings earlier?
22                 THE COURT:  Did you use the term Miranda
23        warnings?
24                 THE WITNESS:  Yes, I said I read you your
25        rights earlier.  If you want to answer these
26        questions, you can answer them.  If you don't, then
```

```
 1                      Bartel - Direct/Mattei      34
 2         you don't have to.
 3                    THE COURT:  Did you remind her of the
 4         substance of the Miranda warnings; in other
 5         words, that she would have a right to counsel,
 6         et cetera?
 7                    THE WITNESS:  Did I rephrase each
 8         question?  No, I did not.
 9                    THE COURT:  You simply said I read you
10         your Miranda warnings, do you still want to talk to
11         me?
12                    THE WITNESS:  Yes.  I believe in substance
13         that's what I said.
14                    THE COURT:  Thank you.
15                    Continue, counsel.
16         Q     Do you recognize what's been marked as exhibit
17    number 3 for identification?
18         A     Yes.
19         Q     What is that?
20         A     This is the intoxicated driver examination
21    sheet.
22         Q     And are those the questions that you asked the
23    defendant?
24         A     Yes.
25                    THE COURT:  Just so I'm clear, what time
26         was it -- when you were initially in the ambulance,
```

```
 1                    Bartel - Direct/Mattei     35
 2         what time was that?
 3                    THE WITNESS:  Around 2330, around.
 4                    THE COURT:  About 11:30?
 5                    THE WITNESS:  About 11:30.
 6                    THE COURT:  And that's when you initially
 7         read the Miranda warnings to her?
 8                    THE WITNESS:  That is correct, sir.
 9                    THE COURT:  And those are the warnings
10         you're referring to when you said, I reminded her
11         that I read her her warnings before?
12                    THE WITNESS:  Correct.
13                    THE COURT:  Just so I'm clear, what was
14         her response to that?
15                    THE WITNESS:  That she'd answer the
16         questions.
17                    THE COURT:  Go ahead, counsel.
18         Q     Did you record her answers to the intoxicated
19    drivers examination sheet as she gave them to you?
20         A     Yes.
21         Q     And that's what's depicted on People's
22    Exhibit -- included in exhibit number 3 for
23    identification?
24         A     Correct.
25                    MR. MATTEI:  Judge, at this time I'll
26         move that into evidence as People's Exhibit number
```

```
 1                    Bartel - Direct/Mattei      36

 2          3.

 3                    THE COURT:  Counsel?

 4                    MR. RENFROE:  No objection.

 5                    THE COURT:  Deemed marked 3 in evidence.

 6                    (Whereupon, the item previously deemed

 7          marked for identification is deemed marked as

 8          People's Exhibit 3 in evidence.)

 9                    THE COURT:  For purposes of the hearing.

10          Q     Officer, can you tell us what's contained on

11     the top of the form?

12          A     My information and the defendant's

13     information.

14          Q     And can you tell us whether this indicates

15     that Miranda warnings were given or not given?

16          A     There is a spot that says interrogation

17     warnings given, yes, and the date and time.

18          Q     And what's the date and time?

19          A     The date is October 18, '06.  The time is

20     2330.  By whom?  I wrote down A/O, which is arresting

21     officer.

22                    THE COURT:  Was that you?

23                    THE WITNESS:  That was me.

24                    THE COURT:  And then?

25          Q     And then you signed it?

26          A     It says Bartel and I signed it.
```

Bartel - Direct/Mattei          37

Q     And then did you fill in the date and time of
this question and answer session with the defendant?

A     Yes, I did.

Q     And when was that?

A     10/19/06 at 0515.

Q     5:15 a.m.?

A     5:15 a.m.

Q     Now, can you tell us the first question that
you asked the defendant and what her answer was?

A     "Were you driving this motor vehicle or
motorcycle?  Yes."

Q     And what was the next question?

A     "Where were you going?  To the light with my
dad."

      "Where did you start from?  Home.  When did
you start?  Daytime.  Where are you now?  St. Vincent's
Hospital.  What time is it now?  Hell no.  Have you been
drinking or using intoxicants?  Yes.  If yes, what kind?"
She said, One Heineken."  Then I said, "Quantity?  One
Ecstasy pill, one purple Haze, weed.  Time you started?
Hell no."

      I asked her what time you stopped?  She didn't
give me an answer.

      "Where did you drink intoxicants?  The studio.
Have you been drinking intoxicants since the officer

1        Bartel - Direct/Mattei      38

2   first saw you?  No.  Have you been using drugs?  Yes.  If

3   yes, what kind?  Ecstasy, purple haze, weed.  Time you

4   started?  No.  Time you stopped?"  She didn't give me an

5   answer.

6           Have you been using medication?  No.  When

7   did you last take medication or drugs?  I don't remember.

8   When did you last eat?  Today.  What did you eat?

9   Lobster, crabs, clams, salad.  How much sleep did you

10  have last night?  I don't remember.  How much sleep did

11  you have today?  No.  Are you ill?  No.  Are you injured?

12  Yes.  If yes, explain.  Involved in a motor vehicle

13  accident.  Have you been to a doctor, dentist, druggist,

14  hospital or clinic recently?  No."

15          And then it says:  "If the subject answers yes

16  to the following two questions or is unable to answer the

17  questions and a zero reading is obtained from the

18  chemical breath test, the desk officer shall summons an

19  ambulance."

20          Then it says:  "Do you require medical

21  treatment now?  Yes.  Do you desire an ambulance to be

22  summoned?"  She didn't have an answer.  We were already in

23  the hospital.

24      Q    Did she actually tell you that she required

25  medical treatment or is it that you checked off yes

26  because were you already in the hospital?

```
 1                         Bartel - Direct/Mattei       39
 2        A     She was already receiving the treatment.
 3        Q     You recorded these answers as she gave them to
 4   you?
 5        A     Yes.
 6        Q     Was there any hesitation in her answers
 7        A     No.
 8        Q     Are those the actual answers that she gave
 9   you?
10        A     Those are her answers.
11        Q     The questions you asked her about her drinking
12   and using drugs and where she drank and where she was,
13   did her answers match the questions you gave her?
14        A     Yes.
15        Q     What was her physical condition like at that
16   time that were you doing this question and answer
17   session?
18        A     She was calm and she had a few scratches on
19   her, but other than that she looked fine.
20        Q     Was she on any drugs from the hospital?
21        A     Not that I know of.
22        Q     Did she have any questions for you when you
23   asked her the questions?  Did she ask you to repeat them
24   or did she ask you to say them more slowly?
25        A     No, sir.
26        Q     What was her conversational tone?
```

```
 1                    Bartel - Direct/Mattei        40

 2        A       She was pretty calm.

 3        Q       At any time from the first time you

 4   encountered Miss Taylor in the parking lot of the Lowe's

 5   until you concluded the intoxicated driver examination

 6   sheet, did you or any officer in your presence or to your

 7   knowledge force her to answer any questions?

 8        A       No, sir.

 9        Q       Did you threaten her or anybody else threaten

10   her to answer questions?

11        A       No, sir.

12        Q       Do you coerce her to answer any questions?

13        A       No, sir.

14        Q       And at any time did she complain of any pain

15   to you?

16        A       No, sir.

17        Q       When you were asking her the questions, did

18   she seem to not understand the question you were asking

19   her?

20        A       When I asked the questions, she seemed to

21   answer quickly and know what I was asking.

22                MR. MATTEI:  No further questions of this

23        witness.

24                THE COURT:  Counsel?

25                MR. RENFROE:  Yes.  Thank you, your

26        Honor.
```

1                    Bartel – Cross/Renfroe     41

2     CROSS-EXAMINATION

3     BY MR. RENFROE:

4          Q     Officer, how are you today?

5          A     All right, sir.

6          Q     You responded to the northwest corner of

7     Samuel Place and Forest Avenue; is that correct?

8          A     I responded to the parking lot of Lowe's.

9          Q     And when you responded to the parking lot,

10    Miss Taylor was already in the police car; is that

11    correct?

12         A     She was in the back seat of an RMP.

13         Q     When you got there you made some observations

14    of her; is that correct?

15         A     That's correct.

16         Q     And did she look incoherent to you?

17         A     She looked incoherent and out of it at times

18    and combative.

19         Q     And when you saw her she was kicking the

20    door of the police car; is that correct?

21         A     That's correct.

22         Q     And when you saw her, did she have any

23    clothing on?

24         A     No, sir.

25         Q     And if you could tell us, what time did you

26    arrive at that location?

```
 1                        Bartel - Cross/Renfroe     42

 2         A     Approximately 2310, approximately.

 3         Q     So that's 11:10?

 4         A     Around that time, yes.

 5         Q     And what time did you give the Miranda

 6    warnings?

 7         A     In the ambulance on the way to the hospital.

 8         Q     Now, when you saw her, you didn't see any

 9    physical injuries that required you to take her to the

10    hospital; is that correct?

11         A     Well, she had been in a car that overturned,

12    so that's --

13         Q     My question is, initially she was not in the

14    ambulance when you saw her, she was in a police car; is

15    that correct?

16         A     That's correct.

17         Q     So initially -- someone had told yourself

18    that she had been involved in this motor vehicle

19    accident; is that correct?

20         A     That's correct.

21         Q     She was under arrest at that time when you saw

22    her; is that correct?

23         A     At that time she was being restrained.   She

24    had not been placed under arrest, no.

25         Q     She was being restrained --

26               THE COURT:   Hold on.
```

1                   Bartel - Cross/Renfroe      43

2                   When you say she had not been placed under

3         arrest, she hadn't been placed under arrest by you.

4                   THE WITNESS:  By me.

5                   THE COURT:  But she was in police custody?

6                   THE WITNESS:  No.

7                   THE COURT:  Was she free to leave?

8                   THE WITNESS:  No.

9                   THE COURT:  Did she have handcuffs on her?

10                  THE WITNESS:  Yes.

11                  THE COURT:  They were the officer's on the

12        scene, correct?

13                  THE WITNESS:  That's correct.

14                  THE COURT:  But right before that the

15        officer told you she was running around the parking

16        lot naked?

17                  THE WITNESS:  I was told by witnesses

18        that she was running around the parking lot naked.

19                  THE COURT:  And then after that she was

20        restrained and placed --

21                  THE WITNESS:  In the back of the patrol

22        car.

23                  THE COURT:  And that's what you were

24        told?

25                  THE WITNESS:  That's what I was told.

26                  THE COURT:  Counsel, continue.

```
 1                       Bartel - Cross/Renfroe     44
 2         Q     At the time when you got there, would it be
 3    safe to say she was naked, acting incoherent and being
 4    combative?
 5         A     When I got there, yes.
 6         Q     Now, was the ambulance at the scene at that
 7    time?
 8         A     I'm not sure what exact time the ambulance
 9    rolled up.
10         Q     Well, you arrived at 11:10; is that
11    correct?
12         A     That's correct.
13         Q     And you saw Miss Taylor exhibiting this
14    behavior that you just testified to, right?
15         A     Yes.
16         Q     What time did you give the Miranda warnings?
17         A     I believe sometime -- I wrote down 11:30.
18         Q     So, twenty minutes after the time when she was
19    incoherent, combative and trying to kick out the windows
20    of the police car, twenty minutes after that you gave her
21    the warnings; is that correct?
22         A     Approximately, yes.
23              THE COURT:  Was that before or after you
24         had asked her for the pedigree information?
25              THE WITNESS:  I asked her pedigree before
26         I asked her the Miranda.
```

```
 1                        Bartel - Cross/Renfroe     45
 2                  THE COURT:  So you asked her the pedigree
 3            information and that's when she told you the false
 4            name?
 5                  THE WITNESS:  That's correct.
 6                  THE COURT:  And then you read her Miranda
 7            warnings?
 8                  THE WITNESS:  That's correct.
 9                  THE COURT:  Continue, counsel.
10       Q     Was she also making statements initially on
11     that scene that didn't make any sense?
12                  MR. MATTEI:  Objection.
13                  THE COURT:  Rephrase the question.
14       Just rephrase the question so it would be more
15            specific.
16       Q     Was she making statements that were difficult
17     for you to understand?
18       A     She did not make any statements to me.  She
19     made them to other people.
20       Q     And if you know, what were those statements?
21                  MR. MATTEI:  Objection, judge.
22                  THE COURT:  If you know.
23       Q     What was she saying?
24       A     I believe she made a statement to Officer
25     Granda.  If I could look in my notes, I could refresh
26     what he said to me.
```

```
 1                      Bartel - Cross/Renfroe     46
 2               THE COURT:  Go ahead.
 3               Are you going to call him as a witness for
 4      the hearing?
 5               MR. MATTEI:  No.
 6               THE COURT:  What are you looking for?
 7               THE WITNESS:  The complete one, sir.
 8               (Short pause.)
 9               THE WITNESS:  I have it.
10               THE COURT:  To refresh your recollection?
11               THE WITNESS:  The exact -- I believe she
12      told Officer Granda that God told her to drive
13      naked.
14               THE COURT:  Counsel, continue.
15      A     And she told one of the civilian witnesses
16 that tried to get her out of the car, he overheard her
17 saying, God, power, respect, or money and power, some
18 kind of lyric from a 'Lil Kim song.
19      Q     Basically she said God told her to drive
20 naked; is that correct?
21      A     I believe that's what she told Officer
22 Granda.
23      Q     And she was in the patrol car; is that
24 correct?
25      A     That's correct.
26      Q     And can you describe how she exited the patrol
```

```
 1                        Bartel - Cross/Renfroe    47
 2    car and got into the ambulance?  What happened?
 3        A    We asked her -- we opened the door and she
 4    stepped out.
 5        Q    And what time was that, do you know?
 6        A    I got there 11:10.  At this time I don't
 7    recall exactly what time.
 8                   THE COURT:  Approximately.
 9                   THE WITNESS:  11:10, 11:15.
10        Q    You got there at 11:10, so a little bit after
11    you got there?
12        A    A little bit after I got there.
13        Q    So at this point when you get ready to give
14    her her Miranda warnings, you've just been informed by
15    another officer that she said God told her to drive
16    naked; is that correct?
17        A    That's correct.
18        Q    And you see that she's incoherent; is that
19    correct?
20        A    That's correct.
21        Q    And at some point I think you said she would
22    be -- at some point she was incoherent and at some point
23    she seemed sort of lethargic?
24        A    Yes.
25        Q    She sort of went between the two, correct?
26        A    That's correct.
```

```
 1                    Bartel - Cross/Renfroe     48
 2        Q     So at this point she comes out of the police
 3   car; is that correct?
 4        A     That's correct.
 5        Q     And can you tell me how much time transpired
 6   between the time that she was kicking the windows and
 7   stuff and the time that you asked her to come out of the
 8   police car?
 9        A     A couple of minutes.
10        Q     And would it be safe to say that she was
11   handcuffed at that time; is that correct?
12        A     That's correct.
13        Q     And did someone help her walk to the police
14   car?  Did the police surround her?  What happened?
15        A     I don't know how she got into the back of the
16   patrol car.
17        Q     The ambulance, I'm sorry.
18        A     They had the gurney right there and she laid
19   down on the gurney.
20        Q     And then when she laid down on the gurney, was
21   she strapped to the gurney then?
22        A     Yes.
23              THE COURT:  I'm going to stop you one
24        moment.
25              Was she resisting?
26              THE WITNESS:  No, sir.  She was calm at
```

```
 1                      Bartel - Cross/Renfroe    49
 2         that point.
 3                  THE COURT:  Did they ask her to lay down
 4         on the gurney?
 5                  THE WITNESS:  I don't remember if they
 6         asked her to, but she did without a fight.
 7                  THE COURT:  So at that point she was not
 8         combative?
 9                  THE WITNESS:  She was not combative, no.
10                  THE COURT:  Did she appear to you to
11         understand that she should lay down on the
12         gurney?
13                  THE WITNESS:  She appeared to me, yes.
14                  THE COURT:  She did it right away?
15                  THE WITNESS:  She did it right away.
16                  THE COURT:  Go ahead, counsel.
17         Q     So at this point she was taken to the
18    ambulance; is that correct?
19         A     That's correct.
20         Q     And you were not the first officer on the
21    scene, but how were you selected to get into the
22    ambulance with her?
23         A     I was the arresting officer.  I was going to
24    be the arresting officer.
25         Q     And with that in mind, you went in the
26    ambulance; is that correct?
```

1                    Bartel -- Cross/Renfroe      50

2         A      That's correct.

3         Q      And when you got in the ambulance, she was

4    there along with the ambulance personnel; is that

5    correct?

6         A      That's correct.

7         Q      Is it then that you gave her the Miranda

8    warnings?

9         A      After the doors closed, yes.

10        Q      So as soon as she leaves the patrol car and

11   is put into the ambulance you gave her the Miranda

12   warnings; is that correct?

13        A      Well, I asked her her name and then I gave

14   them to her, yes.

15        Q      So, how much time do you think transpired

16   between the time that you gave her those Miranda warnings

17   and the time she got into the ambulance?

18        A      Can you repeat that question, sir?

19        Q      She was taken to the ambulance; is that

20   correct?

21        A      Yes.

22        Q      How much time transpired between the time that

23   you and she got into the ambulance and the time you

24   asked the pedigree information and gave her the Miranda

25   warnings?

26        A      Probably in the ambulance -- we were in there

1                       Bartel - Cross/Renfroe      51

2      for a couple of minutes.

3          Q      And how much time transpired between the time

4      when she was taken out of the police car and taken to

5      the ambulance?

6          A      A few minutes.

7          Q      So, a couple of minutes?

8          A      So, it's two or three minutes.

9          Q      This whole process is two or three minutes;

10     is that correct?

11         A      Maybe five.  I really couldn't put an exact

12     number on it.

13         Q      And at the time -- would it be safe to say

14     when you arrived at the scene that's the time when you

15     saw her in the police car; is that correct?

16         A      When I arrived there, yes.

17         Q      And at the time that's when you made the

18     observation that she was incoherent; is that correct?

19         A      That's correct.

20         Q      And that she was saying things like God told

21     her to drive naked?  You got that information; is that

22     correct?

23         A      Correct.

24                       THE COURT:  Hold on.

25                       Did she ever say that in your presence,

26         officer?

1              Bartel - Cross/Renfroe     52

2              THE WITNESS:  Not in my presence, no.

3         Q     So would it be safe to say your estimation is

4    about five minutes before you gave the Miranda warnings

5    and you had made an observation that you thought she was

6    incoherent; is that correct?

7         A     I couldn't say five minutes.

8         Q     How much time would you say, seven minutes?

9         A     From the first time I saw her to the time she

10   got in the ambulance?  Maybe it was a total of fifteen

11   minutes or so, twenty minutes tops.

12             THE COURT:  Mr. Renfroe, are these your

13        witnesses?

14             MR. RENFROE:  No, your Honor.

15             THE COURT:  Mr. Mattei?

16             MR. MATTEI:  They are not witnesses, your

17        Honor.

18             MR. RENFROE:  Just one second, your Honor.

19             (Short pause.)

20        Q     Now, even when you were at St. Vincent's

21   Hospital, some of the answers that she gave you didn't

22   make sense; is that correct?  Like you asked her what

23   time is it now, and what did she respond?

24        A     Hell no.

25        Q     You asked her where she was at and she said

26   St. Vincent's Hospital, right?

```
 1                    Bartel - Cross/Renfroe    53
 2        A     That's correct.
 3        Q     But when you asked her the time she said, Hell
 4   no?
 5        A     That's what I have written down, correct.
 6        Q     And basically she was cooperating with you
 7   though?
 8        A     That's correct.
 9        Q     And would it be safe to say that you would
10   characterize that as kind of a strange answer; yes
11   or no?
12        A     That's what she said.  I'm told whatever
13   she says to write down.
14        Q     Did you make -- as the arresting officer,
15   did you make the decision to remove her from the RMP and
16   put her in the ambulance?
17        A     That was because she was involved in a motor
18   vehicle accident.  Because of the accident, she was going
19   to have to be checked out.
20              THE COURT:  You don't put everybody who's
21         involved in a motor vehicle accident in an
22         ambulance, do you?
23              THE WITNESS:  I don't make that call.
24         That's EMS's call.  I believe with overturned
25         vehicles that everybody has to get checked out.  Not
26         every accident, but I don't make that call.  If EMS
```

1             Bartel - Cross/Renfroe     54

2        wants to take them, yes.

3             THE COURT:  Listen to the question.

4             You don't call ambulances for every

5        automobile accident, do you?

6             THE WITNESS:  No.

7             THE COURT:  And you do it for accidents

8        that appear to be serious accidents?

9             THE WITNESS:  That's correct.

10            THE COURT:  Such as overturned vehicles?

11            THE WITNESS:  That's correct.

12            THE COURT:  So when there's an overturned

13       vehicle, someone calls an ambulance?

14            THE WITNESS:  That's correct.

15            THE COURT:  And then EMS makes a

16       determination as to whether or not they should go

17       to the hospital?

18            THE WITNESS:  Yes, they make the call.

19            THE COURT:  You don't make that call?

20            THE WITNESS:  I don't make that call.

21            THE COURT:  But you do make the call as to

22       whether or not you believe there should be an

23       ambulance at the scene?

24            MR. MATTEI:  Objection.

25            THE COURT:  I'll ask you, do you make the

26       call?  Who makes the call?

```
 1                    Bartel - Cross/Renfroe      55
 2              THE WITNESS:  If I feel there has to be
 3          an ambulance, I'll call one.
 4              THE COURT:  And that's because of the
 5          serious nature of the accident?
 6              THE WITNESS:  True.
 7              THE COURT:  Go ahead, counsel.
 8              MR. RENFROE:  Thank you.
 9              THE COURT:  You're objecting to my
10          question?
11              MR. MATTEI:  Yes, judge.
12              THE COURT:  Go ahead.
13      Q     Now, you asked her her name -- first of all,
14  initially you saw her in this incoherent state.  Would
15  that be safe to say?
16      A     That's correct.
17      Q     So you were asking her questions a short time
18  thereafter, right?
19      A     Approximately.
20      Q     So when you asked her her name, she said Miss
21  Matthews; is that correct?
22      A     Originally, yes.
23      Q     And later on in the morning being the next day
24  she told you her name was Taliyah Taylor; is that
25  correct?
26              MR. MATTEI:  Objection, judge.
```

```
 1                    Bartel - Cross/Renfroe      56
 2                    THE COURT:  Overruled.
 3               MR. MATTEI:  It was at the hospital.
 4        Q    Later on at the hospital.
 5               MR. RENFROE:  I withdraw that question.
 6        Q    Later on at the hospital did she indicate that
 7   her name was Taliyah Taylor?
 8        A    Yes, she did.
 9        Q    Did she tell you -- you have a question that
10   you asked.  I think the form is in evidence.  You asked,
11   Where were you going?  It's on the intoxicated driver
12   examination form.
13        A    Yes.
14        Q    And what was her answer to that?
15        A    To the light with my dad.
16        Q    When you heard that, would you say that's a
17   traditional response to that question?
18               MR. MATTEI:  Objection.
19               THE COURT:  Sustained.
20        Q    How long have you been a police officer?
21        A    Almost eighteen and a half years.
22        Q    And I guess you also asked her what time is it
23   now and that's when she said, Hell no; is that correct?
24        A    That's correct.  She answered that.
25               THE COURT:  I'm going to stop you for a
26        second.
```

```
 1                         Bartel - Cross/Renfroe      57
 2              Did you take that -- did you believe that
 3        to mean that she didn't know what time it was?
 4              THE WITNESS:  That's what I believed, that
 5        she didn't know what time it was.
 6        Q      After the time when she was placed in the
 7   ambulance, did there come a time when she was combative
 8   again?
 9        A      She was pretty calm after that.
10        Q      Did she appear lethargic to you?
11        A      She seemed alert.
12        Q      Now, the questions that you asked her on the
13   scene, you then subsequently wrote them down; is that
14   correct?
15        A      What answers were those?
16        Q      Like you asked her about what name she
17   initially gave you.  Did you write that down on the scene
18   or later in your memo book?
19        A      I wrote that down in the memo book while we
20   were in the ambulance.
21        Q      Did you fill out the technician test report?
22        A      Yes.
23              MR. RENFROE:  May I have this shown to the
24        witness?
25                   (Handing to witness.)
26        Q      Officer, do you recognize that?
```

Bartel - Cross/Renfroe      58

1

2      A      Yes.

3      Q      That's a police report kept in the regular

4  course of business by the New York City Police

5  Department; is that correct?

6              THE COURT:  Why don't we have that deemed

7         marked Defense A for identification?

8              MR. RENFROE:  Okay.

9              (Whereupon, the item mentioned above is

10        deemed marked as Defendant's Exhibit A for

11        identification.)

12             THE COURT:  You can answer the question.

13     A      This is a business record, yes.

14     Q      And you have a duty to be accurate when you

15  fill out that report; is that correct?

16     A      Yes, sir.

17     Q      And you filled that out as you were speaking

18  to Miss Taylor, is that correct, on the date of the

19  incident?

20     A      If I filled this out while I was talking to

21  her?

22     Q      Yes.

23     A      This is part of the paperwork that I do on the

24  side after I --

25     Q      How much time transpired between the time

26  you filled that out and the time you spoke with Miss

```
 1                      Bartel - Cross/Renfroe     59
 2    Taylor?
 3        A    I don't remember when I filled this out.
 4        Q    The same day?
 5        A    Yes.
 6             MR. RENFROE:  Your Honor, I move that into
 7        evidence.
 8             THE COURT:  Counsel?
 9             MR. MATTEI:  No, objection, judge.
10             (Whereupon, the item previously deemed
11        marked for identification is deemed marked as
12        Defendant's Exhibit A in evidence.)
13        Q    You noted that she was speaking unintelligibly
14    at times.  I think it's on the bottom of that form.  Did
15    you note that?
16        A    Yes.
17        Q    And I think you indicated that some officers
18    had told you that she had said God told her to drive
19    naked; is that correct?
20        A    Yes.
21        Q    You noted though that she was speaking
22    unintelligibly at times; is that correct?
23        A    Yes.
24        Q    Was that something that you, in fact,
25    personally observed and that's why you put it in that
26    form?
```

```
 1                       Bartel - Cross/Renfroe     60
 2          A     I think it was just as part of my
 3    investigation at the scene I put that in there.
 4          Q     And --
 5                THE COURT:  Well, did you observe it?
 6                THE WITNESS:  I don't remember her talking
 7          unintelligibly to me.
 8                THE COURT:  Counsel?
 9          Q     And you indicated that the officers told you
10    that God told her to drive naked.  You used that as an
11    example; is that correct?
12          A     Yes.
13          Q     Was there anything else that you remember
14    them telling you?
15          A     Well, that she was running around naked
16    quoting a lyric from a rap song.
17          Q     And this is off the other form that's in
18    evidence.
19                When you asked her where were you going and
20    she said "to the light with my dad," did you interpret
21    that to mean anything?
22                MR. MATTEI:  Objection, judge.
23                THE COURT:  Rephrase the question,
24          counsel.
25          Q     What did you take the statement to mean when
26    Miss Taylor said that she was going "to the light with my
```

```
 1                    Bartel - Cross/Renfroe      61
 2   dad"?
 3                  MR. MATTEI:  Judge, same objection.
 4                  THE COURT:  It's the same question,
 5        counsel.
 6        Q    Did you ask Miss Taylor where her father
 7   was?
 8        A    No.  When she answered that, I didn't ask
 9   her.
10                  MR. RENFROE:  Your Honor, I have no
11        further questions for this witness.
12                  THE COURT:  Counsel?
13                  MR. MATTEI:  No further questions, judge.
14                  THE COURT:  You can step down.  Thank you.
15                  (Witness excused.)
16                  THE COURT:  We'll reconvene at 2:15 and
17        continue the hearing.
18                  (Whereupon, a luncheon recess was taken.)
19                         * * * * * *
20
21
22
23
24                  (Continued on next page.)
25
26
```

1    Signorelli - Direct/Mattei    62

2         A-F-T-E-R-N-O-O-N  S-E-S-S-I-O-N

3              THE CLERK:  Remain seated and come to

4         order.

5              This is a continued hearing under

6         Indictment 335 of 2006, The People of the State of

7         New York against Taliyah Taylor.

8              THE COURT:  Hearing continued.

9              Counsel, call your next witness, please.

10             MR. MATTEI:  Thank you.

11             The People call Detective John Signorelli,

12        your Honor.

13   DETECTIVE J-O-H-N  S-I-G-N-O-R-E-L-L-I, having been

14        called as a witness by and on behalf of the People,

15        having been duly sworn by the clerk of the court,

16        was examined and testified as follows:

17             THE CLERK:  Please be seated.

18             Please state your name, spell your

19        last name, give your shield number and your

20        command.

21             THE WITNESS:  Detective John Signorelli,

22        S-I-G-N-O-R-E-L-L-I, shield number 1046, command

23        Highway District Accident Investigation Squad.

24             THE CLERK:  Thank you.

25             MR. MATTEI:  May I inquire?

26             THE COURT:  Yes.

1          Signorelli - Direct/Mattei    63

2     DIRECT EXAMINATION

3     BY MR. MATTEI:

4          Q     Detective, how long have you been on the New

5     York City Police Department?

6          A     Twenty-one and a half years.

7          Q     And how long have you been a detective?

8          A     Just about five years.

9          Q     How long have you been at the Accident

10    Investigation Squad?

11         A     Since -- six and a half years.

12         Q     And where have you worked as a member of the

13    NYPD prior to that?

14         A     My initial training was in the Police Academy.

15    After that I was assigned to the 79th precinct in Bedford

16    Stuyvesant.

17              Then I was transferred to Staten Island where

18    I became a member of the Staten Island Highway Patrol.

19    Then I was transferred to Highway 2, the Accident

20    Investigation Squad, where I was promoted to detective

21    and transferred back to Staten Island where I'm

22    presently assigned.

23         Q     I'd like to direct your attention to October

24    18th of 2006 and ask if you had occasion to go to Forest

25    Avenue sometime that evening.

26         A     Yes, I did.

1

2     Q     And what part of Forest Avenue did you go to,

3   detective?

4     A     The vicinity of Samuel Place by the Lowe's

5   and Kohl's shopping center.

6     Q     Do you recall approximately what time you got

7   there?

8     A     Around 2315 hours, 11:15 p.m.

9     Q     Where did you go when you first got there?

10    A     When I turned off the service road of the

11  Staten Island Expressway, which is Goethals Road, I made

12  the right onto Forest Avenue and I realized they had

13  detoured all the traffic, so I pulled into the Kohl's

14  entrance of the shopping plaza and made a right

15  continuing to go further to the entrance of the Lowe's

16  hardware storefront.

17    Q     Kohl's and Lowe's share the same parking lot?

18    A     That's correct.

19    Q     And what, if anything, did you observe after

20  you went into the parking lot of Kohl's/Lowe's?

21    A     When I made the right-hand turn into the

22  parking lot, I initially noticed a blue Nissan Maxima on

23  its rooftop right at the fence line.

24          As I proceeded forward, I noticed that there

25  was a female occupant in the back of that car.   There

26  were two uniformed police officers outside having a

1

2  discussion.   There were a few bystanders also standing

3  around the vehicle.

4       I noticed that there seemed to be much more

5  emergency personnel by the Lowe's entrance, so I

6  continued forward to the Lowe's entrance/exit onto

7  Forest Avenue.

8       Q     And what did you see when you went to the

9  Lowe's entrance?

10      A     I observed a red Toyota in the middle of the

11 intersection that had been involved in a collision.

12 There was damage to the front of the vehicle.   There

13 were a few uniformed police officers, as well as a

14 civilian, standing by the vehicle.   There was also an

15 ambulance in that vicinity.

16      Then just about to the left of the entrance

17 there was a white sheet in the roadway.   There was

18 another white sheet at the curb line and further down by

19 Samuel Place where the initial crime scene seemed to have

20 the perimeter set up.

21      Q     And what was under those white sheets?

22      A     I had gotten out of the vehicle and I had

23 walked out to Forest Avenue and there were a few

24 firefighters, as well as emergency medical technicians,

25 and they informed me that they were body parts, as well

26 as a torso.

```
 1                    Signorelli - Direct/Mattei    66

 2        Q     How many different major body parts were

 3   there?

 4        A     There was a total of three.  I could plainly

 5   see two of them, which was --

 6                    THE COURT:  Were they attached together?

 7                    THE WITNESS:  No, they weren't.  They were

 8        all separated.

 9                    THE COURT:  What did you see?

10                    THE WITNESS:  The obvious one was the

11        torso, which was in the middle of the roadway.

12        Q     When you say torso, you mean approximately

13   from the waist up?

14        A     Correct.

15              There was also a leg, which was at the curb

16   line.

17              As I observed this, emergency medical

18   technicians informed me that there was a third sheet in

19   the bank parking lot at the rear of a Toyota that was in

20   the parking lot, which I found to be another leg.

21        Q     And the torso that was in the street and the

22   leg that was also in the street, were they some distance

23   apart?

24        A     Yes, they were.

25        Q     And the leg in the bank parking lot, was that

26   some distance away from the other two major body parts in
```

```
 1                     Signorelli - Direct/Mattei    67
 2    the street?
 3         A     Yes, that was the furthest one away.
 4         Q     And that was off the roadway?
 5         A     Yes.
 6               The parking lot has front end parking
 7    against the curb line for Forest Avenue.  Then there's
 8    the lane for the parking lot, which would be wide enough
 9    to have two cars passing, and then there was a series of
10    parking spots right up against the front of the bank.
11    At that sidewalk, at the rear of that vehicle that was
12    parked, there was where the leg was.
13         Q     Were there other smaller pieces of flesh
14    and body parts --
15               THE COURT:  Counsel, let's move on.
16         Q     Did you become part of the accident
17    investigation upon arrival?
18         A     Yes, I did.
19         Q     And were you able to determine anything about
20    what caused the person to be in that condition?
21         A     Yes, we did.
22               THE COURT:  Come on up.
23               (Whereupon, an off the record discussion
24         was held at the bench among the Court and counsel,
25         after which the proceedings continued as follows:)
26         Q     Detective, I'd like to direct your attention
```

Signorelli - Direct/Mattei     68

1
2   to a few hours later now in the morning of October 19,
3   2006, at about 1:45, 1:50 a.m., and ask you if you had
4   occasion to go to St. Vincent's Hospital at about that
5   time.

6       A    Yes, I did.

7       Q    And why did you go there?

8       A    I was informed by my supervisor that the
9   operator of the blue Maxima that was overturned in the
10  Lowe's parking lot was in police custody over at the
11  hospital being medically treated and he wanted me to
12  respond over there to interview her.

13      Q    When you got to the hospital, did you see any
14  members of the Highway Unit there?

15      A    Yes, I did.

16           As I walked into the emergency room of St.
17  Vincent's Hospital, I was greeted by Police Officer
18  William Bartel of the Highway 5 Unit, as well as Police
19  Officer Henry Granda, also of the Highway Unit.

20      Q    Did you speak to Officer Bartel when you got
21  into the emergency room?

22      A    Yes, I did.

23      Q    And what, if anything, did he tell you when
24  you got there?

25      A    I told him my purpose for being there was to
26  interview his defendant and he informed me of some

```
 1              Signorelli - Direct/Mattei    69
 2    pedigree information that he was able to obtain because
 3    there was a little -- not confusion, but we didn't
 4    have -- I didn't have the proper name of the motorist.
 5              He also had told me that she had been
 6    cleared medically and that she was very cooperative
 7    with him.
 8        Q    Did you speak to him about Miranda warnings?
 9        A    Yes, I did.
10        Q    And what, if anything, did he tell you about
11    Miranda warnings?
12        A    When I informed him that I was going to
13    interview her, the defendant, I had asked if he had read
14    her her Miranda warnings and he said yes, at which time
15    I just told him that I was going to probably read them
16    again and I was going to conduct an interview.
17        Q    Now, did you see the person that you now know
18    to be the defendant in this case at that time?
19        A    Yes.
20        Q    And where was she when you first saw her?
21        A    When I walked in, Police Officer Bartel was in
22    the left-hand side of the emergency room entrance by the
23    emergency room phone and the defendant was to my right
24    and kind of behind me in a cubicle for the emergency room
25    trauma.
26        Q    When you say a cubicle, you mean with the
```

1                    Signorelli - Direct/Mattei     70
2     curtains as they separate patients in the hospital?
3          A      That's correct.  Whether it's a long -- it's
4     actually one large room that's subdivided into, I
5     believe, four smaller rooms and they are divided by just
6     the typical hospital curtains that have the tracks on the
7     ceiling.
8          Q      Do you see the person that you saw in the
9     hospital in court today?
10         A      Yes, I do.
11         Q      Could you identify her for us and tell us what
12    she's wearing?
13         A      Certainly.  She's wearing a light green
14    shirt.
15                    THE COURT:  Indicating the defendant.
16                    MR. MATTEI:  Thank you, your Honor.
17         Q      Did you speak to the defendant at that time?
18         A      Yes, I did.
19         Q      Why don't you tell us what you initially told
20    her when you first approached them.
21         A      When I walked into the cubicle, I had walked
22    in and I introduced myself.  I told her that I was
23    Detective Signorelli of the Highway Patrol Unit and that
24    I was there to interview her regarding the collission
25    that had happened over by the Lowe's home improvement
26    store, at which time I asked her if she was okay, which

```
 1                    Signorelli - Direct/Mattei      71
 2    she replied yes.
 3              I told her that I had known that she had
 4    been read Miranda and that I wanted to read her her
 5    Miranda warnings again before I did any questioning,
 6    which I did.
 7         Q     Did you have a sheet with you?
 8         A     Actually, I didn't have a sheet with me, and
 9    what I did was I stepped back out -- I kind of peaked out
10    of a partially opened curtain and I asked Police Officer
11    Bartel to borrow his memo book so I could read Miranda
12    from that.
13         Q     Did he give you his memo book?
14         A     Yes, he did.
15              MR. MATTEI:   Judge --
16              THE COURT:   It's what's been deemed marked
17         People's 1.
18              MR. MATTEI:   Could I have that shown to
19         the witness?
20                   (Handing to witness.)
21         Q     Do you recognize Exhibit 1?
22         A     Yes, I do.
23         Q     Is that an exact copy of Officer Bartel's memo
24    book that you read from to the defendant?
25         A     Yes, it is.
26         Q     Tell us what, if anything, you said to her and
```

1          Signorelli - Direct/Mattei     72

2    what she responded.

3          A     Certainly.

4               The first thing I said to her was that you

5    have the right to remain silent and refuse to answer any

6    questions, and I asked, do you understand?  She replied

7    yes.

8               Anything you do say may be used against you

9    in a court of law.  Do you understand?  Again she replied

10   yes.

11              You have the right to consult an attorney

12   before speaking to the police and have an attorney

13   present during any questioning now or in the future.

14   Do you understand?  She said yes.

15              If you cannot afford an attorney, one will

16   be provided for you without cost.  Do you understand?

17   Again she said yes.

18              If do you not have an attorney available,

19   you have the right to remain silent until you've had

20   the opportunity to consult with one.  Do you understand?

21   She said yes.

22              Now that I have advised you of your rights,

23   are you willing to answer questions?  And again she said

24   yes.

25        Q     And did she say anything about wanting to

26   actually talk to you?

1                Signorelli - Direct/Mattei    73

2     A    Yes.

3     Q    What?

4     A    She had said to me that no one had listened

5 to her, and that's when I said to her, That's what I'm

6 here for.  I want to know what's going on.  If you're

7 willing to talk to me, I'm willing to listen to you.

8     Q    How were you dressed at that time?

9     A    I was wearing a pair of tan dockers, just

10 black shoes, a white buttondown shirt.  I had my shield

11 on my belt, which was a black belt, and I had my gun on

12 an ankle holster.

13     Q    Was your gun visible?

14     A    No.

15     Q    What was the defendant's -- where was the

16 defendant when you actually read her the Miranda

17 warnings?

18     A    She was sitting on a hospital gurney with

19 her legs crossed.  She had her right arm loosely

20 handcuffed to the gurney on the right side.  She was

21 able to kind of move back and forth.  She had an IV lead

22 in which it wasn't attached to an IV but which was

23 capped off, and she was wearing just a hospital gown

24 that she had kind of just around her.

25     Q    And when you asked her these questions,

26 what was her physical condition like when you were

1                Signorelli - Direct/Mattei     74

2  asking her the questions and she was giving you the

3  answers?

4      A     Well, when I first observed her and I was,

5  you know, asking her the original questions as far as

6  Miranda and even pedigree, I was amazed at how unscathed

7  she was.  There was no bumps or bruises that were

8  visible for someone that was involved in a car accident

9  of that magnitude.

10      Q     And what was her demeanor like when you spoke

11  to her?

12      A     It was fine, as far as I was concerned.  It

13  appeared to be normal to me.  She answered questions in

14  a normal fashion where if I asked her a question, the

15  answer seemed to match up with my question.  There was

16  no great pause or delay or any thought in it.  Just

17  answering questions.  It was a conversation.

18      Q     And particularly with the Miranda warnings

19  that you read to her, was there any hesitation in her

20  answers to you?

21      A     No.

22              THE COURT:  Did she seem incoherent to

23      you?

24              THE WITNESS:  Not at all.

25              THE COURT:  Did she seem to be lethargic

26      in any way?

1

2              THE WITNESS:  Not at all.

3         Q    She was coherent when you spoke to her?

4              THE COURT:  I said did she seem

5         incoherent.

6              MR. MATTEI:  I'm sorry, I didn't hear

7         that.  I assume that means she seemed coherent.

8         I didn't hear what you said.

9         Q    So she was coherent?

10        A    Yes.

11        Q    Did she complain of any pain when you spoke to

12   her?

13        A    No.

14             When I spoke to her, in the latter part of the

15   conversation she just asked for a glass of water.

16        Q    And was she on any medications, as far as you

17   could tell, from the hospital?

18        A    There was no IV attached to it.  When I had

19   asked Police Officer Bartel, he had just indicated to me

20   that she had been cleared medically.

21             THE COURT:  Did you give her the water?

22             THE WITNESS:  At the end of the

23        conversation, yes.

24             Well, actually, one of the nurses did,

25        but I informed one of the nurses to give her the

26        water.

1               Signorelli - Direct/Mattei     76

2               THE COURT:  And she went and got her a

3        glass of water?

4               THE WITNESS:  Right.

5        Q     Can you tell us what, if anything, you said to

6    her and then what she said to you after the Miranda

7    warnings were concluded?

8        A     Okay.

9               What I had said to her is that I have a

10   pre-formatted form, which is known as a witness

11   statement form, which is issued by the Police

12   Department.  This form, what it does is it follows

13   the report paperwork to Albany regarding the collision,

14   and I actually held up one and I showed it to her.

15              I had the secondary form on the clipboard,

16   which I started to ask her pedigree information, which is

17   the top of the form.

18       Q     And what did you start to ask her?

19       A     The first thing I asked her was her name.  I

20   had never spelled Taliyah before, so I asked her to spell

21   it.  She spelled her name.  She also gave me her last

22   name.

23              I asked her where she lived.  She informed me

24   she lived at 173 Pine Place, Staten Island, New York.

25              I asked for the zip code and she told me it was

26   10304.

2          I asked her for her home phone number, which

3    she told me was 718-524-5186.

4          I asked her for a secondary contact number

5    such as a cell phone or a relative's house where I could

6    contact her if I needed to talk to her after that day.

7    She gave me a secondary number of 718-954-2245.

8          I marked off on the witness statement that

9    the location of the interview was other, under the

10   emergency room, St. Vincent's.

11             THE COURT:  Are you using something to

12        refresh your recollection at this point?

13             THE WITNESS:  Yes, I am.  I apologize,

14        your Honor.

15             THE COURT:  What are you using?

16             THE WITNESS:  Which is the copy of the

17        witness statement.

18             THE COURT:  Let Mr. Mattei ask you

19        questions.

20             THE WITNESS:  I'm sorry.

21             THE COURT:  Go ahead, counsel.

22   Q    Well, do you recognize --

23             MR. MATTEI:  Could we have that deemed

24        marked?

25             THE COURT:  We'll have it deemed marked

26        as 4.

```
 1                    Signorelli - Direct/Mattei      78
 2                 (Whereupon, the item mentioned above is
 3          deemed marked as People's Exhibit 4 for
 4          identification.)
 5                    THE COURT:  Do you recognize that
 6          document?
 7                    THE WITNESS:  Yes, I do.
 8                    THE COURT:  Counsel?
 9          Q     And does that fairly and accurately contain
10     some of the questions that you asked her on the witness
11     form and her responses to them?
12          A     Yes, it does.
13                    THE COURT:  What is it?
14                    THE WITNESS:  It's a Police Department
15          form 301-061.  It's a witness statement.
16                    What that does is this is a supplemental
17          form that would follow the accident report to
18          Albany.  It's also used in any accident
19          investigation that we would conduct.
20                    THE COURT:  It's a witness statement
21          form?
22                    THE WITNESS:  Correct.
23                    THE COURT:  Do you have that form,
24          counsel?
25                    MR. RENFROE:  Yes.
26                    MR. MATTEI:  It's a 301, your Honor.  I'll
```

1            Signorelli - Direct/Mattei    79

2        make sure Mr. Renfroe has it.

3               MR. RENFROE:  Yes, I have it.

4               THE COURT:  Are you moving that into

5        evidence, counsel?

6               MR. MATTEI:  Yes.

7               THE COURT:  Any objection?

8               MR. RENFROE:  No, your Honor.

9               THE COURT:  So moved.  4 in evidence.

10               (Whereupon, the item previously deemed

11        marked for identification is deemed marked as

12        People's Exhibit 4 in evidence.)

13               THE COURT:  Now you can read it.  Go

14        ahead.

15        Q     Can you tell us the questions you asked her --

16   well, I guess we can start with the questions for

17   operator of the vehicle that you asked her.

18        A     The first question was on the right-hand

19   middle portion of the form and the question is:  How

20   many years have you been a driver?  She informed me that

21   she had gotten her permit when she was about sixteen and

22   that she had gotten her legal driver's license in her

23   twenties.

24               THE COURT:  I want to stop you for one

25        second.

26               Just so I'm clear as to what exactly took

1                Signorelli - Direct/Mattei     80

2          place, you went into the cubicle and you read the

3          Miranda warnings to the defendant?

4                     THE WITNESS:  Yes, correct.

5                     THE COURT:  And then you had that form in

6          your hand also?

7                     THE WITNESS:  Yes.

8                     THE COURT:  And then you started reading

9          the questions off of that form?

10                    THE WITNESS:  Correct.

11                    THE COURT:  And as she gave you the

12         answers or as she answered the questions, did you

13         then contemporaneously write down answers onto the

14         form?

15                    THE WITNESS:  Yes, I did.

16                    THE COURT:  Continue, counsel.

17         Q    What is the next question after how long have

18    you driven?

19         A    The next question was:  How long have you been

20    driving the vehicle involved in the accident?  And she

21    just answered no.

22              I went to the next question which was:  Was

23    there any mechanical failure or defect with the

24    vehicle you were driving?  And she responded, I don't

25    remember.

26              The next question was:  Did you drink any

1        Signorelli - Direct/Mattei      81
2   intoxicants prior to the accident?  Her response was no.
3   I marked off the appropriate box.

4           And then another question was:  Where were
5   you coming from or going to?  She informed me that she
6   was at the studio, which was at Dave's mother's
7   basement located at 54 New York Avenue and she was going
8   to 225 Seymour, which she indicated as Granny's.  I
9   later found out that 225 Seymour was actually her
10  mother's apartment house and that she just referred to
11  it as Granny's.

12      Q      And did you ask her some more questions that
13  you recorded on the front of this statement?

14      A      Yes, I did.

15          The next portion of the form says:  "The
16  below questions will be answered in all cases," and it
17  says, "Will you briefly describe the accident," which is
18  basically what I asked her.

19          And she responded:  "The last thing I remember
20  I was trying to do a song.  I couldn't remember the last
21  verse."  She said that it started around 4:30.  "It was
22  the end of the session and the session is about five
23  hours."

24          Realizing that I didn't have enough
25  information to carry on a conversation with her, I had
26  to kind of pause her and ask her all of the participants

Signorelli - Direct/Mattei     82

2  that were at the recording studio and get a little bit

3  more background information of where the story took

4  place.  She said that her friend Dave was there, her

5  girlfriend Tricia, a girl named Moniquewa who she had

6  met at Temptations and another girl Maliya who was a

7  cousin of hers and her brother's son, her nephew

8  Kashawn.

9       Once I recorded that, I had kind of taken up the

10  portion of the form as far as describing the accident, so

11  I felt it was appropriate to continue it on a different

12  piece of paper, which is what I did.

13       Q    Tell us what else you asked her after that and

14  what she responded.

15       A    The next portion of this is going to be

16  recorded or was recorded on a different form or just,

17  actually, a stenography notebook.  It's kind of

18  lengthy.

19       Q    You had taken notes on the back of this

20  witness form?

21       A    Yes, I did.

22       Q    Do you know where the original witness form is

23  now?

24       A    Not right now, no.

25       Q    How did the writings on the steno book come

26  into existence?

1                    Signorelli - Direct/Mattei      83

2          A     Well, after I had written everything on the

3     back of the form, being that it had taken up the front

4     portion of it I wrote it on the back, and once the

5     interview concluded I had gone out to the police car

6     and I transcribed everything from the back of this into

7     more legible and understandable notes, which is what I

8     did.

9          Q     So those are the steno book notes?

10         A     Yes.

11         Q     And they were done at the hospital?

12         A     Yes.

13         Q     Right at the conclusion of this interview?

14         A     Correct.  It was done after I interviewed her

15    and when I went to speak to her family which was present

16    at the hospital.

17         Q     Tell us what else she told you after you got

18    done -- after she told you who was at the studio.

19         A     This is about four pages, so I'm going to

20    have to refer to it to refresh my recollection, if

21    that's okay.

22               THE COURT:  If you need it, tell us.  If

23         you're going to read the whole thing, that's a

24         different story.  If you want to just tell us what

25         she said, fine.

26         Q     Are these the notes -- that steno pad, are

```
 1                    Signorelli - Direct/Mattei    84
 2   those your recollections of what she told you?
 3                    THE COURT:  Hold on.
 4                    Are those steno form -- are those steno
 5           notes part of the witness statement form?
 6                    THE WITNESS:  Yes.
 7                    THE COURT:  So then they are already in
 8           evidence as number 4.  So if you want to read them,
 9           that's fine.
10   Q      Why don't you read to us the notes.
11   A      Okay.
12           Miss Taylor started to say that she had gone
13   to the recording studio at about 4:30 p.m.  She tried
14   doing a song and she had gotten frustrated because she
15   couldn't remember the last verse of the song.  It was
16   apparently -- she had told me it was a five hour
17   recording session and that the song was to immortalize
18   her father's memory.
19           She informed me that she was getting
20   frustrated that no one was listening to her, that her
21   friend Dave was on the phone trying to make money and he
22   was in and out of the recording studio on the phone.  It
23   was distracting to her.
24           Her girlfriend Tricia said that she wanted
25   to get going, but Taliyah wanted Tricia to stay and
26   listen to her, at which time I interrupted her and I
```

asked her how she had gotten to the recording session
and she replied that she was in the blue Max.  Later on
she informed me the blue Max was the blue Maxima.

Taliyah continued about how she likes to
watch movies and TV and how it's not real life and,
you know, the action movies that she likes to watch
are, you know, not reality and how her nephew was being
brought up the right away because he never had the
chances.  She was informing me that she wanted Kashawn
to be brought up in the right way different than the way
she was brought up, and she felt she didn't have the
chances like she would like to give Kashawn because her
father had passed away when she was seven and that her
mom was getting on her about quitting and not working in
the Banana Republic anymore.

She had gone on to describe how she was raped
when she was younger and that she felt that she had to
get her message out.  That her message would get out
through her songs and that she was a moneymaker, so
that's where the frustration came from of people not
paying attention to her, or Dave specifically during
this part of the conversation, that he was on the phone
trying to make money, and she felt frustrated because
if Dave had just stuck by her she believed she could
make all the honest money that he would ever need.

1

2       She referred to evil trying to enter her and

3   everybody trying to make body decisions, influencing her

4   and other people.

5       She said that the rappers of today have a

6   good message but they have the wrong delivery; that, you

7   know, out on the streets the drugs and the crime and

8   anything shouldn't be part of rappers.  She would really

9   send out a message in a positive way.

10      She had gone on to say that she was distancing

11  herself from her friends that do drugs and alcohol.  I

12  asked her if she did drugs and alcohol.  She informed me

13  that she was like her father who was known as a Heineken

14  man and she liked Heineken also.  She stated she did a

15  little bit of drugs and alcohol and it wasn't bad

16  because it made her feel she could talk to her father.

17  She would feel closer to him and remember him a little

18  more to get the message out being that the song was about

19  her father.

20      She told me that she told Tricia to go and

21  get her a naked lady pill.  She informed me that a naked

22  lady pill was known as E, Ecstasy.  She informed me that

23  it was Ecstasy and she had told her girlfriend Tricia to

24  get her a six pack of Heineken for her also.  When I

25  asked directly where she got the "E" from, she told me

26  her girlfriend Tricia.  And Tricia brought it back

1     Signorelli - Direct/Mattei     87
2     around -- she couldn't remember the time, but she said
3     it wasn't before 6:30.  Tricia had wanted to leave but
4     Kashawn didn't want to go yet.  Then Dave got on his
5     cell phone again and was in and out once again and she
6     felt that the evil was trying to come into her life
7     and how it was kind of frustrating her.  That she
8     should be like Jesus with no clothes and walking
9     through her trials and tribulations, so she decided to
10    leave the session.  And she took her nephew Kashawn to
11    Granny's house to get him away from all the evil and
12    everything that was just around and influencing
13    different people.

14            Once she had gotten over to Granny's, this is
15    when I asked her where is Granny's.  She told me Seymour
16    Street and that the actual residence was 654 Port
17    Richmond Avenue, apartment 3A, and that she felt she had
18    to get away from everybody, all of her problems, the
19    hate, all the confusion, all the bad influence.  And when
20    she was there she had gotten into a dispute with her
21    mother and also with Tricia and that Tricia had left the
22    room and her mother and her continued to have a dispute
23    and she felt that she had nothing to prove to her mother
24    because her mother was saying that she should not have
25    left the Banana Republic, that she's not working, that
26    she didn't agree with the relationship she was having

1

2    with her girlfriend Tricia.

3        So Taliyah informed me she had nothing to

4    prove to her mother and she took off all of her clothes

5    to prove to her she had nothing to hide and nothing to

6    prove and that she had continued that argument.

7        She further explained to me that she had left

8    the building and as she had gotten outside Tricia was in

9    the car but wouldn't let her in the car and Tricia had

10   drove away.  So Taliyah had tried to go back up into the

11   apartment house, but either the door was locked or for

12   whatever reason wasn't able to regain entry.

13       Tricia had come back and had gotten out of

14   the car and Taliyah had jumped into the driver's seat

15   and left.  She informed me that she drove around Port

16   Richmond Avenue over to Forest Avenue, and I said to

17   her, When you got onto Forest Avenue, do you remember

18   the accident?  You know, what do you remember about

19   that?  I asked her to be a little bit more specific.

20   That was when she informed me that things were going

21   by her so fast then.  Things were going by her so fast

22   and then she was trying to do hand motions.  I mean,

23   one arm was handcuffed, but she was motioning things

24   going by her in a rapid motion.

25       Then I asked her -- she actually said that

26   she wanted the car to take her as fast as it would go.

She drove down as fast as the car would take her, and I asked her if she saw the pedestrian. That's when she replied, "I saw him and then he was gone." After that she said that she remembers striking the other car and turning over, and then she kind of compared it to it being in a movie, but she knew it wasn't, that it was real.

She asked what was going to happen to her. She asked about her girlfriend Tricia and started to talk to me about how Tricia stood by her and how she wants to marry Tricia.

She gave me a story as far as the other day she was feeling down and she knew Tricia's mom was a Christian lady so she asked Tricia if she could sit down with her mother. And that Tricia and her mom had gone into downtown Brooklyn and Tricia's mom got her a bible and outlined a few passages and they read them together.

Taliyah further explained that she feels strongly about the church but doesn't like that they won't accept her because she's a lesbian. She went on to say that she should be able to go to church naked if she wants to.

She had gone on to explain -- her and I had gone on to talk about how lucky she was to actually

1

2  survive the actual car accident and that I had to go

3  and tell the pedestrian's family of the accident and

4  how he had died, and she said that she couldn't believe

5  she did this and she wishes she could go back and take

6  him from the street.

7      She asked me what's going to happen to her

8  and I explained to her that each case is different,

9  that I really didn't know, but that in the immediate

10  future that Police Officer Bartel was going to take her

11  down to the precinct and she would probably be in there

12  overnight and she would see the judge in the morning and

13  the court process from there would go on.

14      I told her that I would go outside -- and

15  I knew that her family was outside and I told her I was

16  going to go outside and tell her family that she was

17  okay.

18      At this time she reminded me that she wanted

19  a glass of water, which I asked one of the nurses if

20  they wouldn't mind bringing her a glass of water.  I

21  thanked her, I wished her luck and I left.

22      Q      Approximately how long did you speak to her?

23      A      About an hour and a half.  A little bit

24  more.

25      Q      And can you describe the flow of the

26  conversation with her?

1

2   A     It was -- it flowed very normally.  It was a

3   normal conversation.  There was no real strain to

4   retrieve information.  She did a lot of the talking.  The

5   questions that I did ask I kind of interjected and asked

6   her specifics.

7   Q     I mean, did you ask her specifically about

8   her family relationships or her relationship with a

9   girlfriend or a boyfriend or a male, anything like that?

10  Did you ask her any of those particular questions or she

11  just volunteered them to you?

12  A     I had no reason to ask her about those

13  questions.  She volunteered them.

14  Q     And, I mean, did you know anything about

15  the studio or her recording a rap album or did you know

16  where the studio was that she started out from or did she

17  just volunteer that to you?

18  A     I had no idea about the studio or the dispute

19  with her mother prior to that.

20        I had no idea what route she had taken from

21  the mother's house, which later on I looked at a map

22  and it was a reasonable route that she had taken.  She

23  was able to recall that and tell me which way she had

24  come from.

25  Q     Did she ever appear to be in pain during this

26  interview?

1                    Signorelli - Direct/Mattei    92
2          A     No.

3          Q     Did she ever ask for a nurse or medical
4     attention?

5          A     No.

6          Q     And can you describe her voice for the judge
7     when she was talking to you about this whole series of
8     events?

9          A     They were normal pitch changes when she had
10    spoken to me and explained certain portions of the
11    incident.  You know, her voice would get a little
12    agitated as far as trying to explain her frustration as
13    far as the recording studio.

14              When she explained about wanting to take it
15    all back, it appeared to me like it was a reflective
16    kind of thing.  She quieted down a little bit.

17              As far as her explaining if she was injured
18    or anything, the nurse had popped her head in, I think,
19    twice during our interview, Is everything okay, and just
20    kind of turned around and walked back.

21         Q     At any time did she not talk to you and go
22    off into silence or gaze off or do anything other than
23    speak to you while you were there?

24         A     No.

25              I would probably say that the longest pause
26    that she had during the conversation was the beginning of

1           Signorelli - Cross/Renfroe      93

2    it, what happened.  The incident was kind of like a deep

3    breath and then all of a sudden this whole story started

4    to come out and just flow.

5         Q     Did you threaten her at any time?

6         A     No.

7         Q     Coerce her?

8         A     Not at all.

9         Q     Did you offer her anything to tell you this

10   story?

11        A     No.

12        Q     And did she appear to understand the questions

13   that you asked her when you asked them?

14        A     Yes.

15        Q     Did her answers match your questions?

16        A     Yes.

17             MR. MATTEI:  I have no further questions

18        at this time, judge.

19             THE COURT:  Mr. Renfroe?

20             MR. RENFROE:  Thank you.

21   CROSS-EXAMINATION

22   BY MR. RENFROE:

23        Q     Good afternoon, detective.

24        A     Good afternoon, counselor.

25        Q     That day was the first day you spoke with Miss

26   Taylor; is that correct?

```
 1                    Signorelli - Cross/Renfroe      94
 2          A      Correct.
 3          Q      What time was it that you spoke to her?
 4          A      It was in the early morning.  It was about
 5     1:45 in the morning.
 6          Q      And did she mention to you when you were
 7     taking the statement that she had a deceased father?
 8          A      She just said that her father was killed.
 9          Q      And did she indicate to you that her father
10     would help take her into a positive direction?  Do you
11     remember that?
12          A      She said that the song which was attributed
13     to her father, if she got that message out it would be
14     positive and she'd be able to make money off of that.
15          Q      Did she ever say that the father would
16     influence her in a positive direction?  Do you remember
17     that?  Did she ever say that?
18          A      I don't recall that, no.
19          Q      Now, she indicated that at some point she took
20     off her clothing?
21          A      Correct.
22          Q      And at some point she stripped her nephew of
23     his clothing?
24          A      Yes.
25          Q      Did she ever tell you something about that
26     there were all these evil influences that she had to
```

```
 1                    Signorelli - Cross/Renfroe      95
 2   deal with?
 3        A     Yes.
 4        Q     And at some point she said you were an
 5   angel?
 6        A     That was at the end of the conversation.
 7              You know, the way I interpreted it was --
 8   what she said at the end of the conversation was, You
 9   know, you're like an angle.  I said, Well, you know,
10   this is what has to be done.  It has to be done the
11   right way.
12              THE COURT:  I'm sorry, I don't understand
13         that.
14              THE WITNESS:  You know, it was kind of
15         like -- my interpretion of it was when she had
16         finished talking she felt better about talking
17         about it.  That she had been frustrated that no
18         one listened to her.
19              THE COURT:  When she said you were an
20         angel, did you think that she meant you were really
21         an angel?
22              THE WITNESS:  No.
23              THE COURT:  What you're trying to say --
24              THE WITNESS:  I interpreted it as being
25         figuratively.
26              THE COURT:  Did you interpret it to mean
```

```
 1                    Signorelli - Cross/Renfroe    96
 2          that you were being kind to her, in that sense an
 3          angel to her?
 4                    THE WITNESS:  Correct.
 5                    THE COURT:   To give her an opportunity to
 6          talk about the things she wanted to talk about?
 7                    THE WITNESS:  Yes.
 8          Q     Did she ever say to you that she felt when she
 9     took a little alcohol and took Ecstasy her father was
10     able to influence her in a positive direction?  Do you
11     remember that?
12          A     A little bit of it, yes.
13          Q     And when she said that, she had just before
14     that told you her father was dead though?
15          A     Yes.
16          Q     Now --
17                    THE COURT:   Just so I'm clear on that,
18          when she was talking about that, when she was
19          talking about it, did you believe that she was
20          talking about it in the sense that her father
21          actually was with her and appeared to her?
22                    THE WITNESS:  No.
23                    I interpreted it as being spiritual, you
24          know, that the memory --
25                    THE COURT:   Like a guidance, the memory
26          was like a guidance to her?
```

1

2          THE WITNESS:  Yes.

3          THE COURT:  Continue, counsel.

4      Q      Before you spoke to Miss Taylor, did you speak

5   to any of the other officers?

6      A      I spoke to Police Officer Bartel -- well, I

7   spoke to a lot of officers before I spoke to her.

8   Pertaining to what?

9      Q      Well, let's start with who did you speak to?

10  The ones you remember.

11     A      Okay.

12          I spoke to my supervisor.  I spoke to my

13  partner.  I spoke to a few of the precinct officers that

14  were at the scene.  I spoke to Police Officer Bartel.  I

15  briefly spoke to Police Officer Granda.

16          And that's about all that I can really recall

17  right now, but I'm sure along the way --

18     Q      When you spoke to them, did they tell you at

19  the time that at some point she had appeared incoherent?

20     A      No.

21     Q      They told you she was naked at the scene?

22     A      Yes.

23     Q      Did they tell you at some point that she was

24  agitated and combative?

25     A      Yes.

26     Q      And when you saw her she didn't exhibit any of

```
 1                         Signorelli - Cross/Renfroe    98
 2    those symptoms; is that right?
 3         A    No.
 4         Q    How long was it after the accident that you
 5    saw her?
 6         A    Probably about two hours.
 7                   THE COURT:  What time did you see her?
 8                   THE WITNESS:  I saw her about 1:45.  I
 9         started the questioning about 2 o'clock.
10                   THE COURT:  Go ahead.
11         Q    Now, you indicated that you gave her the
12    Miranda warnings; is that correct?
13         A    Correct.
14         Q    Did she sign the form or you just read them to
15    her?
16         A    I just read it to her.
17         Q    And did you have a blank form with you or
18    just --
19         A    What it was is that I usually have a blank
20    form with me.  I just didn't have it present and that
21    was why I asked Police Officer Bartel for his memo
22    book.
23         Q    So you have no notations that she signed the
24    form and indicated that she would talk to you; is that
25    fair?
26         A    Yes.
```

1

2        If she had made any answers other than a

3   yes answer, I would have made a notation of it.  Just

4   normal -- my normal course of business is if it's

5   anything other than a yes, I would write no and any

6   questioning is no longer going to take place.

7        Q     And you were called to the scene based on

8   the seriousness of the case?

9        A     Correct.

10       Q     And that was to see if she wanted give a

11  statement; is that correct?

12       A     No, I was called to the scene to conduct an

13  accident investigation.  Then my partner -- earlier in

14  the night we had come to an accident on the Staten Island

15  Expressway.  We were all at an accident investigation.

16  From leaving that scene, within fifteen minutes we were

17  called to the secondary location.  I just happened to be

18  the first one that responded and got onto the scene and

19  that's how it all transpired.

20       Q     And because you were first on the scene, you

21  were selected to go to the hospital to interview her?

22              MR. MATTEI:  Objection.

23              THE COURT:  Why did you go to the

24       hospital?

25              THE WITNESS:  Well, I had the case

26       earlier then on the Staten Island Expressway and

1   now it just alternates.  I was the lead investigator

2   on that.  My partner would be the lead investigator

3   on the Forest Avenue job.  So he remained at the

4   scene to collect all the evidence, interview any

5   witnesses that might have been in any of the stores

6   or businesses and which is easy entry to leave

7   because he was talking to a lot of different people.

8            Not that I wasn't doing anything, but I

9   wasn't doing anything that was of paramount

10  importance.  The sergeant just said, You just go to

11  the hospital.

12           MR. RENFROE:  Your Honor, can I take one

13  second to speak with the District Attorney?

14           THE COURT:  Certainly.

15           MR. RENFROE:  May I see the form 301 that

16  was put into evidence?

17           THE COURT:  What's been deemed marked

18  Exhibit 4.

19           MR. RENFROE:  Yes.

20           THE COURT:  I assume, Mr. Renfroe, you

21  received these documents?

22           MR. RENFROE:  Yes, I believe I have.  I

23  just wanted to double check.

24           MR. MATTEI:  I believe I put it on the

25  record this morning, your Honor.

Signorelli - Redirect/Mattei     101

THE COURT:  I understand that.  I just
want to make sure he received this.

MR. RENFROE:  I'm just double checking.

(Short pause.)

Q     And after you spoke with Miss Taylor --

THE COURT:  What's been introduced as
Exhibit 4, the original documents.

THE WITNESS:  Yes.

THE COURT:  As opposed to copies that
you received.

MR. RENFROE:  Yes.

Q     After you spoke to her at St. Vincent's
Hospital, did you speak to her again?

A     No.

MR. RENFROE:  I have no further questions
of the witness.

THE COURT:  Counsel?

REDIRECT EXAMINATION

BY MR. MATTEI:

Q     With regard to how the defendant was situated
when you saw her, she was handcuffed, I believe you
indicated.

A     Correct.

Q     Did the hospital place any other restraints
on her?

1    Signorelli - Redirect/Mattei    102

2    MR. RENFROE:  Objection.

3    THE COURT:  Sustained, counsel.

4    MR. MATTEI:  Okay.  No further questions,

5    judge.

6    THE COURT:  You can step down, unless you

7    have any other questions.

8    MR. RENFROE:  No, your Honor.

9    (Witness excused.)

10    THE COURT:  Counsel, approach.

11    (Whereupon, an off the record discussion

12    was held at the bench among the Court and counsel,

13    after which the proceedings continued as follows;)

14    THE COURT:  We had a bench conference, at

15    which time there was -- that would be in the nature

16    of an offer of proof with respect to the testimony

17    of Dr. Wang.

18    Even though the People haven't rested

19    with respect to their burden of going forward

20    during the course of the hearing, I believe they

21    don't have any objection to calling Dr. Wang out

22    of order in the sense that he is here and there may

23    be some financial situation with respect to his job

24    that could be a hardship to him if he had to come

25    back.  So even though we are not there yet, do the

26    People have any objection to calling him out of

|   |   |   |
|---|---|---|

```
 1                           Proceedings           103

 2         order?

 3                    MR. MATTEI:  No, judge.

 4                    THE COURT:  In which case the objection

 5         the People have, I suspect, would be the relevance

 6         of his testimony with respect to the issue I have

 7         before me now, that being the Huntley issues?

 8                    MR. MATTEI:  Yes, your Honor.

 9                    THE COURT:  So, Mr. Renfroe, you want to

10         call Dr. Wang?

11                    MR. RENFROE:  Yes, your Honor.

12                    THE COURT:  Just so the record is clear,

13         I'm going to allow you to call him.  I'm going to

14         briefly question him myself to see whether or not

15         the information that he would be testifying to

16         would, in fact, be relevant to the issues that we

17         have before us for the purpose of this hearing.

18                    Now, this obviously is not an offer of

19         proof dealing with what he may or may not testify

20         to at trial, but specifically what we are dealing

21         with now.

22                    So we can send Dr. Wang in, please.

23    DR. R-I-C-H-A-R-D  W-A-N-G, having been called as a

24         witness by and on behalf of the defendant, having

25         been duly sworn by the clerk of court, was examined

26         and testified as follows:)
```

|   |   |
|---|---|
| 1 | Proceedings          104 |
| 2 | THE CLERK:  For the record, please state |
| 3 | your name, spell your last name and provide your |
| 4 | professional affiliations. |
| 5 | THE WITNESS:  My name is Richard Wang, |
| 6 | W-A-N-G.  I'm an attending psychiatrist on the |
| 7 | faculty of the New York Medical College and I work |
| 8 | as a psychiatrist at the Westchester County jail. |
| 9 | THE COURT:  Slowly and clearly so that I |
| 10 | can understand you, okay? |
| 11 | THE WITNESS:  Yes. |
| 12 | THE COURT:  Who do you work for? |
| 13 | THE WITNESS:  I'm hired by the New York |
| 14 | Medical College in Valhalla, New York, and I work at |
| 15 | the Westchester County jail. |
| 16 | THE COURT:  So you work for the state? |
| 17 | THE WITNESS:  I work for a private |
| 18 | medical school that contracts with the County of |
| 19 | Westchester to provide psychiatrists for treatment |
| 20 | of inmates. |
| 21 | THE COURT:  And that's the issue that you |
| 22 | have with respect to whether or not you would be |
| 23 | paid for today if you took the day off? |
| 24 | THE WITNESS:  Yes. |
| 25 | THE COURT:  So you're not a state employee |
| 26 | per se? |

1                           Proceedings         105

2                  THE WITNESS:  No.

3                  THE COURT:  You would be considered an

4         independent contractor of the state?

5                  THE WITNESS:  Not even of the state, of

6         the County of Westchester.

7                  THE COURT:  Okay.

8                  Well, you're here to testify with respect

9         to Miss Taylor, the defendant in this case.

10                 THE WITNESS:  Yes.

11                 THE COURT:  I assume you're aware of

12        that?

13                 THE WITNESS:  Yes.

14                 THE COURT:  The questions I have for you

15        deal with whether or not any testimony you would

16        provide to me for purposes of this hearing would

17        have to do with what her mental state was at the

18        time that this incident occurred, and also by that

19        mean not only when the accident occurred but when

20        she was in the hospital speaking to the police

21        officers.

22                 Do you have any direct testimony with

23        respect to that?

24                 THE WITNESS:  I could only testify to what

25        I examined in Miss Taylor starting on October 23rd

26        of '06, although I believe the accident happened

1                              Proceedings              106

2          several days before.

3                    THE COURT:  So then the answer to do you

4          have any direct testimony with respect to that would

5          be what?

6                    THE WITNESS:  No.

7                    THE COURT:  And then what I would like to

8          know is whether or not your examinations of her

9          could give me any insight as to what her mental

10         state was at the time she was in the hospital

11         speaking to the police officers.

12                   THE WITNESS:  I don't believe she spoke to

13         the police officers in the hospital.

14                   THE COURT:  You don't believe she spoke to

15         the police officers in the hospital?

16                   THE WITNESS:  I don't think so.

17                   THE COURT:  So my question is:  Is there

18         anything you could testify to with respect to what

19         her mental state was when she spoke to the police

20         officers in the hospital?

21                   THE WITNESS:  I can only deduce, but I

22         have no direct contact with any conversation she had

23         with the police.

24                   THE COURT:  You don't even have any

25         information that she even had a conversation in the

26         hospital with the police?

1                    Proceedings        107
2                THE WITNESS:   That's correct.   I'm
3      not aware that she had any conversation with the
4      police.
5                THE COURT:   Obviously, you weren't there?
6                THE WITNESS:   Right.
7                THE COURT:   And none of your conversations
8      with her would indicate to you that she indicated --
9      strike that.
10               None of the conversations you had and none
11     of the things she told you would even indicate
12     to you there even was such a conversation?
13               THE WITNESS:   That's correct.
14               THE COURT:   To ask you whether or not you
15     can tell me about her mental state when she had
16     those conversations would be irrelevant because you
17     don't even know of those conversations?
18               THE WITNESS:   I can only tell you of her
19     mental state on the days that I examined her.   If
20     those happened to coincide with the days she was
21     seen by the police, maybe it has some relevance.
22               THE COURT:   The days we are talking about
23     are October 18th and October 19th of 2006.
24               THE WITNESS:   I hadn't even met Miss
25     Taylor at that point.
26               MR. RENFROE:   May we approach?

1

Proceedings          108

2                    THE COURT:  I'll give you an opportunity

3          to ask some questions in a moment, but I want to

4          satisfy my own curiosity and understanding of what

5          the relevance might be.

6                    The other two things I wanted to know,

7          just so the record is absolutely clear, is how many

8          examinations of Miss Taylor did you perform or

9          conduct?

10                   THE WITNESS:  I saw her every day she was

11         in the hospital, Monday through Friday.  I did a 730

12         examination for her.

13                   THE COURT:  Well, you did two, didn't

14         you?

15                   THE WITNESS:  I did one and a colleague

16         did the second.

17                   THE COURT:  How many reports did you

18         prepare?

19                   THE WITNESS:  One report.

20                   THE COURT:  And in your report you found

21         her unfit to proceed?

22                   THE WITNESS:  That's correct.

23                   THE COURT:  Did you subsequently find her

24         fit to proceed?

25                   THE WITNESS:  No, I did not.

26                   THE COURT:  But one of your colleagues

```
 1                    Proceedings        109
 2    did?
 3              THE WITNESS:  I believe another doctor
 4    did.
 5              MR. MATTEI:  Judge, could we approach?
 6              THE COURT:  You'll have an opportunity
 7    to ask a few questions.  We'll start with Mr.
 8    Renfroe.
 9              MR. MATTEI:  Judge, could we just
10    approach before that?
11              THE COURT:  Yes.
12              (Whereupon, an off the record discussion
13    was held at the bench among the Court and counsel,
14    after which the proceedings continued as follows:)
15              THE COURT:  Doctor, you're still under
16    oath.
17              Doctor, did you ever evaluate the
18    defendant as to whether she would have or not have
19    had the capacity to make a knowing and voluntary
20    statement to the police?
21              THE WITNESS:  No.
22              THE COURT:  Counsel?
23              MR. RENFROE:  Thank you.
24              May we step up again?
25              THE COURT:  Go ahead.
26              (Whereupon, an off the record discussion
```

```
 1                        Wang - Cross-Mattei        110
 2        was held at the bench among the Court and counsel,
 3        after which the proceedings continued as follows:)
 4                   MR. RENFROE:  I have no questions for Dr.
 5        Wang at this time.
 6                   THE COURT:  Thank you, counsel.
 7                   Do you have a couple of questions you
 8        wanted to ask the doctor with respect to what he's
 9        testified to?
10                   MR. MATTEI:  Yes.
11                   THE COURT:  Go ahead.
12   CROSS-EXAMINATION
13   BY MR. MATTEI:
14        Q     Doctor, were you contacted at any time in
15   early 2007 to come here for a hearing with regard to
16   her 730 exam that you had done?
17        A     I don't believe so.
18        Q     So, it would be incorrect to say that you
19   found that she was fit at some point after the 730 exam
20   you conducted with Dr. Pabon?
21        A     Can you restate the question?
22        Q     Did you ever tell anybody in anticipation of
23   coming to testify at a 730 hearing that you now thought
24   she was fit?
25        A     I don't recall.
26        Q     You don't recall or you didn't say that?
```

1                    Wang - Cross-Mattei          111

2    You might have said that?

3         A     I don't recall saying it.   It's possible that

4    I did say it.

5               THE COURT:   If you said something like

6          that, would you have written it down or made any

7          notes about it?

8               THE WITNESS:   I'm not sure.  Possibly.

9               THE COURT:   Do you keep notes about your

10         diagnoses?

11              THE WITNESS:   Yes.

12              THE COURT:   Is whether or not somebody is

13         fit or unfit to proceed a diagnosis?

14              THE WITNESS:   No.

15              THE COURT:   Some sort of finding of some

16         sort?

17              THE WITNESS:   Not in the medical record

18         usually.

19              THE COURT:   So you would not keep a note

20         with respect to that?

21              THE WITNESS:   Typically not.

22              THE COURT:   That seems quite odd, doctor,

23         that you would have that kind of position about

24         someone and not write it down anywhere.

25              There's no place you would write that

26         down?

1                Wang - Cross-Mattei     112

2          THE WITNESS:  As the treating

3     psychiatrist, our interests are in diagnosis and

4     treatment.  However, the question of competency to

5     proceed with trial is not really of our utmost

6     concern.

7          If a judge was to ask us to give an

8     opinion and to write a report, we may do that.

9          THE COURT:  That's not my point.

10         THE WITNESS:  Well, if --

11         THE COURT:  Stop.

12          You've already testified you wrote a

13     report finding her unfit.  If at some point you

14     would change that position and say that she was now

15     fit, you don't think it would be important to

16     memorialize that at any point?  That simply off the

17     cuff mentioning of it to someone where you now don't

18     even remember if you did or didn't is the proper way

19     to memorialize that?

20          I'm just incredulous as to that being the

21     situation.  If that's your normal practice, then I

22     guess it is.  It just seems to me to be somewhat

23     incredulous.

24         THE WITNESS:  It's not the normal practice

25     to put that in a medical record.

26         THE COURT:  Doctor, that's not what I'm

```
 1                          Wang - Cross-Mattei          113

 2          asking you.

 3                    I'm asking you whether or not you would

 4          turn to a colleague and say that someone that you

 5          previously found unfit to proceed is now fit to

 6          proceed and never think of memorializing that in any

 7          way to anyone to such an extent that you currently

 8          come in here and tell me under oath that you have no

 9          recollection of ever having said it or not said it.

10          That's what seems to be somewhat incredulous.

11          That's the question.

12                    THE WITNESS:  Okay.

13                    I don't recall it.  That's really the

14          answer.

15                    THE COURT:  Counsel, any further

16          questions?

17                    MR. MATTEI:  Yes.

18    CROSS-EXAMINATION

19    BY MR. MATTEI:  (Continued)

20          Q     You did a 730 exam?

21          A     Yes.

22          Q     On December 6 of 2006?

23          A     That's correct.

24          Q     And did you take notes during the course of

25    that 730 exam?

26          A     I did.
```

```
 1                    Wang - Cross-Mattei        114

 2        Q      Where are they?

 3        A      At Elmhurst Hospital.

 4        Q      Were you asked by Mr. Renfroe prior to today

 5   if you had taken notes?

 6        A      No, he asked if I had records in my

 7   possession.

 8        Q      He didn't ask you if you had taken any

 9   notes?

10        A      No.

11        Q      So, you did a 730 exam and --

12               THE COURT:  Doctor, do you have any

13        notes?

14               THE WITNESS:  I do not.

15               THE COURT:  Not in your possession.  At

16        all.  Do you have notes about this case?

17               MR. RENFROE:  Your Honor, may we approach

18        very briefly?

19               THE COURT:  No.

20               Do you have notes about this case?

21               THE WITNESS:  Yes.

22               THE COURT:  You are ordered to produce

23        those notes to the Court.  I want a copy of all of

24        those notes.

25               THE WITNESS:  Your Honor --

26               THE COURT:  No, you're ordered to produce
```

1        Wang - Cross-Mattei   115

2  them to the Court.

3      THE WITNESS:  I have no access to those

4  notes.  I don't work at that facility.

5      THE COURT:  Then you'll call someone up

6  there and get them.  I want a copy of your notes.

7      THE WITNESS:  Those notes are protected

8  health information that I don't own.  They are owned

9  by Miss Taylor herself.

10     THE COURT:  It's a statutory protection.

11  I'm not divulging those notes to anyone.  I'm asking

12  you to produce your notes to me so I can review them

13  and see if there's anything in those notes that

14  might be very important in a murder case.

15     THE WITNESS:  Your Honor, I will try.

16  However, I can tell you that it's going to be very

17  difficult.  They will not produce them to me.

18     MR. RENFROE:  May we approach?

19     THE COURT:  Yes.

20     (Whereupon, an off the record discussion

21  was held at the bench among the Court and counsel,

22  after which the proceedings continued as follows:)

23     THE COURT:  Back on the record.

24     MR. RENFROE:  Doctor, the records from

25  Elmhurst Hospital, the little notations which are

26  what I gave you, are those the notes we are talking

1                    Wang - Cross-Mattei          116

2          about?

3                    THE WITNESS:   No.  You didn't give me

4          records from Elmhurst.  You gave me records from

5          Rikers Island.

6                    MR. RENFROE:   Are the notes you're talking

7          about different from those?

8                    THE WITNESS:   Yes.

9          Q     Those are your handwritten notes taken

10    contemporaneously while you interviewed the defendant on

11    December 6, 2006 for her 730 exam?

12         A     Those were not produced to me.

13         Q     But those are the notes that I'm asking you

14    if you took.

15               Did you take notes contemporaneous with your

16    interview of the defendant on December 6, 2006 so as to

17    prepare your 730 report?

18         A     Yes.

19         Q     Where are those notes now?

20         A     They are at Elmhurst Hospital.

21         Q     And is there any reason that those notes are

22    not in the records from Elmhurst Hospital?

23                    MR. RENFROE:   Judge, how is he -- I'm

24          going to object.  First of all, he's yelling at the

25          witness.

26                    THE COURT:   Let's not yell at any

```
 1                      Wang - Cross-Mattei          117
 2      witnesses.
 3          Q     On December 6th of 2006 when you did this
 4      exam, the 730 exam, did you make any notes in the records
 5      of Elmhurst Hospital, the initial records?
 6          A     No.
 7          Q     So you did not put anything about your
 8      questions and her answers --
 9                     THE COURT:  Stop.  Stop.
10                     When you interviewed Miss Taylor at
11              Elmhurst Hospital, you took notes for the 730
12              examination?
13                     THE WITNESS:  Yes.
14                     THE COURT:  Did you leave those notes in
15              the file of the hospital?
16                     THE WITNESS:  They are in a separate file
17              from the regular medical records.
18                     THE COURT:  Where are those notes?
19                     THE WITNESS:  On the forensic unit of
20              Elmhurst Hospital.
21                     THE COURT:  Are they under Miss Taylor's
22              name?
23                     THE WITNESS:  Yes.
24                     THE COURT:  So if the hospital was
25              supposed to turn over all the notes on Miss
26              Taylor, they are supposed to turn over those
```

1     Wang - Cross-Mattei   118

2  records because you're saying they have them?

3     THE WITNESS:  Yes.

4     THE COURT:  So then they are in the

5  forensic unit and maybe they didn't get handed

6  over because the forensic unit is a different

7  unit.

8     In any event, the hospital already

9  received a subpoena.  They were already ordered by

10  this Court to turn them over.  There's no HIPAA

11  violation with respect to that.  That's been decided

12  already.  There's no confidentiality or privilege

13  that prevents that from being handed over here.

14  That's been decided.

15     So if those notes are in a different

16  portion of the hospital than where they keep their

17  general medical file, then the hospital will have

18  to be contacted and those notes, which should have

19  been handed over when the original so-ordered

20  subpoena was served on the hospital, should now

21  then be handed over to you.  And then if you

22  wanted to hand up another so-ordered subpoena,

23  I'd be happy to sign it, although the original

24  subpoena should cover that.

25     MR. RENFROE:  I don't want you to

26  think --

```
 1                    Wang - Cross-Mattei          119
 2              THE COURT:  Counsel, am I suggesting
 3         that --
 4              MR. RENFROE:  Or that Dr. Wang is doing
 5         anything.
 6              THE COURT:  I'm not suggesting you did and
 7         I'm not suggesting the doctor did.  It appears that
 8         the hospital didn't nkow where they keep their
 9         notes.
10              MR. RENFROE:  That's my point.
11              THE COURT:  But if Dr. Wang had the
12         notes, I would have wanted to know where they
13         were.
14              Apparently, you don't have them.
15              THE WITNESS:  I do not have them.
16              THE COURT:  They would be in the forensic
17         unit, and if the forensic unit has them, counsel,
18         give me a subpoena and I'll sign it.  They probably
19         were ordered to do it.  If you want to call them up
20         and tell them that they should, you can.  But if
21         you want to serve another subpoena, go ahead.  We
22         have time before we are going to begin the jury
23         selection in this case.  If those notes indicate
24         something that's either relevant to this hearing,
25         although I don't think there will be anything in
26         that that would be, but if in fact there is, or
```

```
 1                       Wang - Cross-Mattei        120
 2          something relevant to any defenses or examinations,
 3          you'll bring it to my attention and we'll deal
 4          with that.
 5                    But at this point, how many pages of notes
 6          are we talking about, doctor?
 7                    THE WITNESS:  Possibly two or three.
 8    CROSS-EXAMINATION
 9    BY MR. MATTEI:  (Continued)
10        Q    Did Doctor Pabon take notes at the same
11    time?
12        A    I believe he took notes.  I don't know where
13    they are.
14                    THE COURT:  Sustained.  I don't know if he
15          would know if Dr. Pabon took notes.
16        Q    Did you do a joint interview with Dr. Pabon?
17        A    We examined her at the same time in the same
18    room.
19        Q    Did one of you read the charges to her?
20        A    Yes.
21        Q    Either you read them or Dr. Pabon read them?
22        A    Yes.
23        Q    You asked a question and Dr. Pabon asked the
24    same question.  It was a joint interview, correct?
25        A    It was a joint interview.
26        Q    And Dr. Pabon is a psychologist, correct?
```

Wang – Cross–Mattei        121

1

2          A       Yes.

3          Q       He took his own notes in this meeting?

4          A       I believe he did.

5          Q       They would also be part of Elmhurst Hospital's

6    records?

7          A       They should be.

8          Q       What other records are generated in the

9    forensic department with regard to a patient such as

10   Miss Taylor that do not appear in the general record?

11         A       In the forensic unit there are separate files

12   kept for things such as the 730 order, the copy of any

13   730 examination, the notes from any 730 examination and

14   any police records we may have received.

15         Q       Anything else?

16         A       Depending on the case.  It could be a

17   different type case that has nothing to do with 730,

18   but those are generally court records that are kept

19   separate from the medical record.

20         Q       When you did your 730 exam, did you do it all

21   in one shot or did you have one draft or two drafts of

22   the report before you did it?

23         A       It was done in one shot.

24         Q       All five, six, seven pages, whatever it was?

25         A       Yes.

26                 THE COURT:  Hold on a moment.

1

2          The point is, doctor, I have to make some

3     serious decisions about certain things in this case

4     and I need help to do that.  So I need all the

5     information that I could find to make sure that I

6     make the right decision, the same way you would need

7     all the information when you try to make the right

8     decision in what you do.  So, when I don't have all

9     the notes that I need to help me make decisions or

10    when I don't have proper guidance, it makes it much

11    more difficult.

12          I don't mean to seem curt to you in any

13    way or disrespectful, but it's just that I need all

14    the help that I can get to make sure I do the right

15    thing, the same way you need all the information to

16    do the right thing.

17          I assume you understand.

18          THE WITNESS:  I understand.

19          THE COURT:  I don't want you to think we

20    are being curt.  It's just we need all this

21    information.  The People have been looking for this

22    information for months and months and months.  They

23    received, after a long while, some information from

24    the hospital.  But apparently now they haven't

25    received it all and it's necessary to proceed with

26    this that they receive everything.

```
 1                        Wang - Cross-Mattei        123
 2              THE WITNESS:  I would like to help you,
 3         however, I'm limited as I do not work at the
 4         hospital and I don't own the records.
 5              THE COURT:  I understand that.  You're
 6         not there now, but you did work there at one
 7         point.
 8              THE WITNESS:  Yes.
 9              THE COURT:  I understand that you've moved
10         on to a different situation.
11              In any event, counsel, proceed.
12    Q      With regard to the questions that your
13    Honor asked you before, did you ask her at any time
14    any questions with regard to a waiver of rights?
15    A      I did not.
16    Q      Did you ask her at any time --
17              THE COURT:  Well, I think we've been over
18         that, counsel.
19              MR. MATTEI:  Okay.
20    Q      So, did you ask her or did she tell you
21    anything with regard to the incident in question?
22    A      She told me that she did not recall the
23    incident.
24    Q      And did you do separate toxicology reports
25    on her at your hospital?
26    A      I don't recall.
```

1                      Wang - Cross-Mattei           124

2          Q      You were the director at that time of the

3     forensic unit, right?

4          A      Yes.

5          Q      And is it the normal course to do testing for

6     the forensic unit, toxicology testing or any type of

7     testing?

8          A      Typically, when someone comes in through the

9     emergency room to psychiatry, they have urine tested

10    for toxicology.

11         Q      Would that be the forensic department records

12    or the general medical records?

13         A      General medical records.

14         Q      What else would there be that is generated by

15    the hospital, in particular by the forensic unit, which

16    you were in charge of?  What else would there be?  What

17    else would be in their records?

18                You said there might be three files.  What

19    are those files?

20         A      I'm sorry, I don't recall saying there were

21    three files.

22         Q      How many files are there?

23         A      There's the general medical record and then

24    there's a record kept on the forensic unit for court-

25    ordered evaluation.

26         Q      Inside the forensic unit that's the only file

```
 1                    Wang - Cross-Mattei        125
 2   you keep?
 3        A    Yes.
 4        Q    So if there was no court-ordered examination,
 5   the forensic unit would not have any separate files or
 6   records?
 7        A    If there was no court-ordered evaluation,
 8   there might be a record showing what the person was
 9   arrested for and which court they went back to.
10        Q    And how about other things generated by
11   doctors in the forensic unit?
12        A    No, there are no other separate filing systems
13   for those records.
14        Q    Did you give --
15             THE COURT:  I'm going to stop you.
16             Did you ever receive a court order or a
17        subpoena to produce all your notes?
18             THE WITNESS:  For this case?
19             THE COURT:  Yes.
20             THE WITNESS:  Yes, about two weeks ago.
21             THE WITNESS:  When you received that
22        subpoena and that subpoena said to you to produce
23        all your notes on this case, did you think that it
24        was something other than all your notes?
25             THE WITNESS:  Your Honor --
26             THE COURT:  Answer the question.  I'm
```

```
 1                          Wang - Cross-Mattei         126
 2        starting to feel like maybe --
 3                  MR. RENFROE:  May we approach for a
 4        second?
 5                  THE COURT:  No.  I have a feeling that
 6        we are being a little semantic here because I don't
 7        think the term -- I ordered all your notes to be
 8        handed over.  To violate my order is a crime, and
 9        I'm sure you understand.
10                  THE WITNESS:  I do.
11                  THE COURT:  But to violate my order is a
12        crime.  I will assume you're aware of that.
13                  THE WITNESS:  Yes.
14                  THE COURT:  So when I ordered all of your
15        notes, what part of the "all of your notes" did you
16        not understand that you were to produce?
17                  THE WITNESS:  I'm in possession of --
18                  THE COURT:  No, no, no.  Which part of
19        "all of your notes" did you not understand?
20                  THE WITNESS:  None.  I understood.
21                  THE COURT:  So then you believed that the
22        notes you had somewhere else that were your notes
23        were not all of them?  Explain to me because I'm
24        trying to get to the bottom of this.
25                  When I sign an order to tell someone to
26        produce all of something, it doesn't mean part of
```

1

2    something.  It means all of something.  And to not

3    obey my order, doctor, is a crime.

4                 You're going to leave here today and

5    you're going to assist this District Attorney in

6    getting all of your notes to him as quickly as

7    possible.

8                 THE WITNESS:  I will.

9                 THE COURT:  That means today.  Is that

10   clear?

11                THE WITNESS:  I will do the best of my

12   ability.

13                MR. RENFROE:  Your Honor, may we approach

14   for one second?

15                THE COURT:  Yes.

16                (Whereupon, an off the record discussion

17   was held at the bench among the Court and counsel,

18   after which the proceedings continued as follows:)

19                THE COURT:  Doctor, why didn't you hand

20   over those other records?

21                THE WITNESS:  I believed what you

22   were asking for was if I had any records in my

23   possession, which I did not.

24                THE COURT:  So you're going to help the

25   D.A. and the defense counsel get those other

26   records?

1                    Wang - Cross-Mattei        128
2                    THE WITNESS:  I certainly will.  I'll
3          direct them to the correct person to call and
4          direct them to those records.
5                    THE COURT:  Doctor, you can leave.
6                    We will get those records.  If I need
7          Dr. Wang for any further portion of this hearing,
8          fine.
9                    Dr. Wang, I want you to make yourself
10         available in case we need you.  We are going to
11         continue this hearing tomorrow at 2.
12                   MR. MATTEI:  Can I ask if we have a
13         schedule here or an idea of what Dr. Wang is
14         actually going to do or not do?
15                   THE COURT:  He's going to get us those
16         records.
17                   MR. RENFROE:  He can't do it.  We have to
18         do it because he doesn't work at the hospital.
19                   THE COURT:  He'll tell you who to call.
20                   MR. RENFROE:  You can't put the onus on
21         Dr. Wang to get the records.
22                   THE COURT:  Mr. Renfroe, he just told me
23         he's going to help you the best he can.
24                   MR. RENFROE:  That's different than --
25                   THE WITNESS:  The best I can.  Whether or
26         not they listen to me is another thing.

```
 1                        Wang - Cross-Mattei        129
 2              MR. RENFROE:  Since I know this, I'll
 3      bring an order to show cause on the director of
 4      Elmhurst Hospital, but he has nothing to do with
 5      that.
 6              THE COURT:  Mr. Renfroe, you have a HIPAA
 7      waiver.  If you give the doctor the HIPAA waiver, he
 8      can go down there and pick them up right now.  He
 9      can just go there and get them.  Or if he faxes a
10      copy of the HIPAA waiver, they can fax them to him.
11      I don't want this dragged out.
12              MR. RENFROE:  Judge, I understand.
13              THE COURT:  Right, doctor?  If you have a
14      HIPAA waiver, can you go to the hospital now and
15      pick up those records?
16              THE WITNESS:  I've never tried.  I will
17      try.
18              THE COURT:  Thank you.
19              We are going to work on this right now.
20      We will come back tomorrow at 2 and hopefully at
21      that point everybody will have the records that
22      they need.
23              Thank you, doctor.  I appreciate it.
24              THE WITNESS:  You're welcome.
25              (Witness excused.)
26              THE CLERK:  Same bail conditions, your
```

1                    Wang - Cross-Mattei          130

2          Honor?

3                    THE COURT:   Same bail conditions.

4                    (Whereupon, the hearing was adjourned to

5          September 30, 2008.)

6                         * * * * * * *

7

8

9

10

11

12

13

14          Certified to be a true and accurate transcription of

15          the original stenographic record.

16

17          *Nanette Cantwell*

18          NANETTE CANTWELL, Senior Court Reporter

19

20

21

22

23

24

25

26