1  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF RICHMOND - CRIMINAL TERM - PART 12
2  ------------------------------------------X
   THE PEOPLE OF THE STATE OF NEW YORK,
3
                     -against-                    Indictment
4                                                   335/06
5  TALIYAH TAYLOR,
                                  Defendant.
6
   ------------------------------------------X
7  Witnesses: V. Cavalieri
   J. Cavalieri, L. Franklyn-Zaidi
8  D. White, Ricardo Corretjer,
   C. Sullivan, J. Housman,
9  E. Saldivias, P.O. Albano

10                                 County Courthouse
                                   Staten Island, New York
11
                                   October 15, 2008
12
   B E F O R E:
13
14         HONORABLE ROBERT COLLINI,
                              Justice and a jury.
15

16 A P P E A R A N C E S:
17
18         DANIEL DONOVAN, ESQ.,
           Appearing for the People
19         District Attorney - Richmond County
       BY:  MARIO MATTEI, ESQ.,
20         JANET SILVERS, ESQ.,
           Assistant District Attorney
21
22         CHRISTOPHER RENFROE, ESQ.
           For the Defendant
23
24
25

              *ELIZABETH W. CRUZ     PRINCIPAL COURT REPORTER*

1            THE CLERK:  Calendar number two on

2      the trial calendar, indictment 335/06,

3      People of the State of New York against

4      Taliyah Taylor.

5            Appearances, please.

6            MR. MATTEI: Mario Mattei.

7            MS. SILVERS:   Janet Silvers for

8      the People.

9            MR. RENFROE:  For Miss Taylor,

10     Christopher Renfroe.

11           Good morning, your Honor.

12           THE COURT:  Counsel, is there

13     anything anybody wants to put on the record

14     before I bring in the panel this morning?

15           MR. MATTEI:  No, your Honor.

16           THE COURT:  Mr. Renfroe?

17           MR. RENFROE:  No.

18           THE COURT:  Bring in the panel,

19     please.

20           (Whereupon, the jury enters the

21     Courtroom.)

22           THE CLERK:  Do both sides stipulate

23     to the presence and proper seating of the

24     official sworn jury and waive reading of

25     the roll?

*ELIZABETH W. CRUZ    PRINCIPAL COURT REPORTER*

1                MR. MATTEI:  Yes.

2                MR. RENFROE:  Yes.

3                THE COURT:  Thank you.

4                Counsel, you can be seated.  Thank

5        you, ladies and gentlemen.

6                It is still morning.

7                I told you yesterday, before we

8        broke, that I know when everybody gets into

9        the jury room, and I do.  I know when

10       somebody is missing.

11               It's now eleven o'clock.  I did

12       want to start about an hour ago.  I know

13       sometimes it is my fault, but when it's not

14       I will let you know.

15               So, tomorrow whatever time it is

16       that we have to come back, I want everybody

17       to make their best effort to be here on

18       time.

19               All right?  This way we don't have

20       to wait around.  If one person is late,

21       then we start late.

22               That is all right.  I know you will

23       make your best effort tomorrow, right?

24               Call your next witness, please.

25               MS. SILVERS:  The People call

*ELIZABETH W. CRUZ    PRINCIPAL COURT REPORTER*

1      Vincent Cavalieri.

2  V I N C E N T   C A V A L I E R I,  called as a

3     witness, having been first duly sworn, was

4     examined, and testified, as follows:

5                THE CLERK:  Please be seated.

6                For the record, please state your

7          name and spell your last name.

8                THE WITNESS:  Vincent Cavalieri,

9          C A V A L I E R I.

10               MS. SILVERS:   May I inquire, your

11         Honor?

12               THE COURT:  Yes.

13  DIRECT EXAMINATION

14  BY MS. SILVERS:

15     Q.    Good morning, Mr. Cavalieri?

16     A.    Good morning, Janet.

17     Q.    Please keep your voice up so all the

18  jurors can hear you, okay?

19     A.    Sure.

20     Q.    Mr. Cavalieri, where do you reside?

21     A.    Staten Island, New York.

22     Q.    How long have you lived in Staten

23  Island?

24     A.    35 years.

25     Q.    Are you married?

1     A.     Yes, I am.

2     Q.     How long have you been married?

3     A.     47 years.

4     Q.     What is your wife's name?

5     A.     Jeanette.

6     Q.     Do you have children?

7     A.     Yes, three.

8     Q.     Do you have any grandchildren?

9     A.     Nine.

10    Q.     Mr. Cavalieri, I am going to direct

11    your attention to October 18, 2006, approximately

12    10:30, 10:40 p.m. Where were you then?

13    A.     I was on Forest Avenue about that time.

14    I just left the movies on Forest Avenue.  I was

15    headed home.

16    Q.     In what direction were you heading home

17    on Forest Avenue?

18    A.     I was headed from South Avenue towards

19    Richmond Avenue.  I am not sure east or west.

20    Q.     That is fine.

21           Mr. Cavalieri, what type of vehicle do

22    you drive?

23    A.     At that time I was driving a 2005

24    Toyota Avalon.

25    Q.     Where was your wife?

*ELIZABETH W. CRUZ     PRINCIPAL COURT REPORTER*

1         A.     She was -- I was driving.  She was a

2    passenger in the passenger seat.

3         Q.     Mr. Cavalieri, where were you at about

4    that time on Forest Avenue?

5         A.     I was stopped at a red light on Forest

6    Avenue right by the entrance to Lowes, the

7    department store.

8         Q.     Can you describe that area of Forest

9    Avenue for us?

10        A.     Yeah.  It is a large commercial area.

11   There is Kohls, Lowes and mini mall, large

12   commercial area, mostly.

13        Q.     Could you describe the roadway?

14        A.     It was two lanes in each direction on

15   Forest Avenue.

16        Q.     Mr. Cavalieri, while you were stopped

17   at the red light, did you notice any vehicles --

18             Which lane were you in when you stopped

19   at the red light?

20        A.     I was in the left hand lane.  There was

21   a lane to the right of me.  No one was in that

22   lane.

23        Q.     Did you notice any vehicles across from

24   you?

25        A.     Yes.  There was -- there was at least

1    one vehicle stopped in the other direction at the

2    red light.

3        Q.    In what direction would that vehicle be

4    going, heading towards?

5        A.    It would be heading towards South

6    Avenue from Richmond Avenue.

7        Q.    Mr. Cavalieri, while you were sitting

8    at the red light on Forest Avenue, what happened?

9        A.    I looked up and saw a dark car with no

10   headlights heading in my lane towards me, very

11   fast rate of speed.  I don't know how fast, but

12   very fast.

13            I attempted to turn to the right.  I

14   didn't get too far.  I just turned a fraction and

15   I was hit on my side, and the passenger side.

16            My air bags went off, and I think there

17   was four air bags went off in my car.  After that

18   I couldn't see much.

19       Q.    Could you describe the vehicle that you

20   saw coming at you?

21       A.    It was a dark vehicle.  I am not sure

22   of the color, but dark colored vehicle.  No

23   headlights.  I couldn't tell much more than that.

24   I only had a second or two.

25       Q.    Did you hear anything before the

*ELIZABETH W. CRUZ    PRINCIPAL COURT REPORTER*

1   vehicle, that dark vehicle struck you?

2        A.    Nothing.

3        Q.    Did you hear a horn?

4        A.    No horn.

5        Q.    Did you hear any braking?

6        A.    No, no screeching, nothing.

7        Q.    At any point in time did you see that

8   vehicle try to move out of your line?

9        A.    No.  It was coming directly at me.

10       Q.    Mr. Cavalieri, after you -- what part

11  of your vehicle was struck by the dark vehicle?

12       A.    My side, the driver's side, the whole

13  left hand side of the car.  I turned a fraction to

14  the right, so it caught my whole side.

15       Q.    After you were struck, what happened?

16       A.    Well, I checked on my wife first to see

17  how she was.  And, like I said, the air bags were

18  all up in my car.  I couldn't see too much after

19  that.  It was full of smoke and air bags.

20             Then after that a civilian had come

21  over to the car to see how we were and police,

22  fire, EMS.  They took me out of the car on the

23  other side because they couldn't open my door.

24       Q.    How was your wife?

25       A.    She was -- she had hurt her knee and I

 1    had hurt my shoulder.  We had our seat belts on,

 2    thank God.

 3         Q.    Did there come a time when an ambulance

 4    arrived?

 5         A.    Ambulance, Fire Department, PD

 6    everybody.  Everybody arrived.

 7         Q.    Were you placed in the ambulance?

 8         A.    Yeah, they took us out.  Put us on

 9    back boards.  Put us on the ambulance.  Took us to

10    Saint Vincent's.

11         Q.    Was your wife also placed in the

12    ambulance?

13         A.    Yes, she was taken out first.

14         Q.    What kind of injuries were you treated

15    for at St. Vincents?

16         A.    I had a shoulder injury, like a

17    shoulder injury from -- I was banged up.  My knees

18    were banged up and my shoulder.

19         Q.    Were you admitted to the hospital that

20    evening?

21         A.    No.

22         Q.    Or released?

23         A.    I stayed and took x-rays and stuff and

24    I stayed until early in the morning, three or four

25    o'clock in the morning and I was released.

V. Cavalieri - direct - Silvers          100

1      Q.    Mr. Cavalieri, did you have to receive

2  any treatment for the injuries you sustained --

3      A.    Yes.

4      Q.    -- when you were struck by the vehicle

5  that evening?

6      A.    I went to therapy, doctors for a while

7  after.  It still bothers me to this day, my

8  shoulder.  I don't know what it is.

9      Q.    Mr. Cavalieri, I want to show you what

10 is in evidence as People's number 3.

11          Do you recognize that?

12     A.    Yes, I do.  This is the Forest Avenue

13 and the front of Lowes, where the accident

14 happened.

15     Q.    Could you just hold that up so the jury

16 can see it?

17     A.    Sure.

18          (Witness complies.)

19     Q.    Can you indicate on that photograph

20 where your car was stopped at the red light?

21     A.    My car would be right here where this

22 car is now.

23          THE COURT:  Indicating?

24          Show the jury.

25     Q.    Indicating the right side of the photo,

1  first vehicle by the crosswalk, right under the

2  light.

3         A.    Right, was stopped right there.

4         Q.    That is the lane that your car was in?

5         A.    Yes.  I was in the left hand lane.

6  There was another lane to the right.

7         Q.    Could you indicate, just by moving your

8  finger across the photo, in what direction did the

9  dark car come?

10        A.    The dark car would have come from this

11  lane right down into my -- right at me in my lane.

12        Q.    Mr. Cavalieri, what direction, give me

13  a street, in what direction was the dark --

14                   THE COURT:  One second.

15                   Indicating from left to right as

16        you are facing the photograph.

17                   THE WITNESS:  Sure.

18                   THE COURT:  I can only tell from

19        the back, but that is the way his hand

20        went.

21                   THE WITNESS:  Yes.

22        A.    The other car would be coming from

23  Richmond Avenue towards South Avenue which was

24  behind me.

25        Q.    From what you indicated, did she stay

1    in that lane?

2              Was she in that lane on the other side

3    of the crosswalk?

4         A.    Yes.  She stayed in that lane until I

5    got hit.

6         Q.    Thank you.

7              Mr. Cavalieri, I would like to show

8    you --

9              MS. SILVERS: I would like to have

10        this marked as People's 4 for

11        identification.

12              (Whereupon, People's Exhibit 4, was

13        marked for identification, as of this date.)

14        Q.    Do you recognize that?

15        A.    Yes.

16        Q.    What do you recognize that to be?

17        A.    That is my car after eleven o'clock

18    that night.

19        Q.    Was it actually showing the condition

20    of your car in the location your car wound up on

21    October 18, 2006?

22        A.    Yes.

23              MS. SILVERS:   I ask to move that

24        in evidence as People's number 4.

25              MR. RENFROE:   No objection.

1              THE COURT:  So moved, four in

2         evidence.

3              (Whereupon, People's Exhibit 4, was

4         marked in evidence, as of this date.)

5    BY MS. SILVERS:

6         Q.    Mr. Cavalieri, would you show that to

7    the jury?

8         Q.    Mr. Cavalieri, could you just indicate

9    on that photo where your car was stopped at the

10   light prior to being struck by the dark car?

11        A.    My car would have been over in this

12   lane after it got hit, wound up in the right hand

13   lane.  I was actually in the left hand lane before

14   I got hit.

15             MS. SILVERS:   I have no further

16        questions of this witness.

17             THE COURT:  Counsel, come up.

18             (A side bar discussion was held off

19        the record.)

20             THE COURT:  Mr. Renfroe?

21             MR. RENFROE:   I have no questions

22        for Mr. Cavalieri.  Thank you.

23             THE COURT:  Thank you, Mr.

24   Cavalieri.  You can step down.

25             (Witness excused.)

 1                    THE COURT:  Call your next witness,

 2          please?

 3                    MS. SILVERS:   The People call

 4          Jeanette Cavalieri.

 5                    THE COURT:  Counsel, come up.

 6                    (A side bar discussion was held off

 7          the record.)

 8  J E A N E T T E    C A V A L I E R I,  called as a

 9     witness, having been first duly sworn, was

10     examined, and testified, as follows:

11                    THE CLERK:  For the record, please

12          state your name and spell your last name.

13                    THE WITNESS:  Okay.  Jeanette

14          Cavalieri, C A V A L I E R I.

15                    THE CLERK:  Thank you.

16  DIRECT EXAMINATION

17  BY MS. SILVERS:

18      Q.    Good morning.

19      A.    Good morning.

20      Q.    Miss Cavalieri, do you reside on Staten

21  Island?

22      A.    Yes, I do.

23      Q.    How long have you lived on Staten

24  Island?

25      A.    35 years.

*ELIZABETH W. CRUZ     PRINCIPAL COURT REPORTER*

J. Cavalieri - direct - Silvers          105

1    Q.    Are you married?

2    A.    Yes.

3    Q.    What is your husband's name?

4    A.    Vincent.

5    Q.    How long have you been married to

6    Vincent?

7    A.    47 and a half years.

8    Q.    Miss Cavalieri, I am going to direct

9    your attention to October 18, 2006 approximately

10   10:30, 10:40 that evening?

11   A.    Right.

12   Q.    Where were you on that night?

13   A.    We were at the movies, coming out of

14   the movie theatre, the UA 16 on Forest Avenue.

15         We had just come out of the movie.

16   Q.    Where were you going?

17   A.    We were going to go home and when he

18   made the turn.  We were out on Forest Avenue.  We

19   made the right going down like towards Richmond

20   Avenue.

21   Q.    What type of vehicle were you in?

22   A.    We had, it was a 2005 Toyota, maroon

23   colored Toyota.  I think they call -- an Avalon.

24   Q.    Who was driving that night?

25   A.    My husband, Vinny.

1      Q.    Did there come a time that you stopped
2    at a traffic light?
3      A.    Yes.
4      Q.    Where was that located?
5      A.    It was -- we were right at the
6    intersection of like where Kohls and Lowes is,
7    right at that light.
8      Q.    What color was the light at that point?
9      A.    It was red.  We were stopped, right.
10     Q.    What happened when you were stopped at
11   that red light?
12     A.    We were stopped and then after a little
13   bit I looked up and all of a sudden it was the
14   scariest thing.  I saw a car coming right at us.
15           By the time I -- it was so close, like
16   a little past that clock I want to say, back,
17   that's how fast --
18              THE COURT:  Indicating the clock on
19        the back of the Courtroom wall.
20              THE WITNESS:  Excuse me?
21              THE COURT:  I said --
22              THE WITNESS:  I am saying like a
23        little further, that is how --
24              THE COURT:  You reference
25        something, so I have to write it down.  I

1       have to tell them what you are referencing.

2               THE WITNESS:  Okay.

3       A.      It was so scary because to see this car

4    coming so fast right in our lane, right in front,

5    right in front and all I had time for, I had time

6    to say Oh my God and that was it.

7               It was so, so, you know, fast and kind

8    of surreal.  Like I couldn't believe what I was

9    seeing.

10      Q.      Could you describe the vehicle you saw

11   coming straight at you?

12      A.      It was a dark car and it didn't have

13   any headlights on.  I think that's why I could see

14   it a little better because if it had headlights, I

15   think the glare -- you know.

16      Q.      Did you hear anything before the car

17   struck your vehicle?

18      A.      No.

19      Q.      Did you hear a horn?

20      A.      No.

21      Q.      Did you hear any braking?

22      A.      No.  Nothing.

23      Q.      Where did the dark car strike your

24   vehicle?

25      A.      Well, we found out after that it hit

1    more on the left because I guess Vinny maybe tried

2    to turn --

3              MR. RENFROE:  I object to --

4              THE COURT:  Sustained.

5        Q.    Mrs. Cavalieri, do you know if the dark

6    car struck the driver's side or the passenger

7    side?

8        A.    It struck more, we found out, the

9    driver's side after the fact.  But looking at it,

10   it was coming right towards us.

11       Q.    After the dark colored vehicle struck

12   your vehicle, what happened?

13       A.    First thing I remember after it

14   happened, I turned to my husband, you know how the

15   car has that divider thing, you know, and I

16   grabbed each other, like our hands, and I said Are

17   you all right?  Are you all right?  Like that.

18            Then, you know, naturally I was very

19   nervous to say the least.  I couldn't believe what

20   was going on.  It was the first time for me that I

21   was ever in a car where the air bags went off, and

22   that was kind of a scary feeling because there

23   was --

24            I didn't realize what happened when an

25   air bag goes off.  There was smoke all over that

1   you really couldn't see anything.

2            Then after awhile we were there and

3   somebody later on come over to the car on my side,

4   on the passenger side write was sitting, and a

5   young man, he said, Don't worry, he says, the car

6   is not on fire.  It's funny, like --

7            MR. RENFROE:  Objection.

8            THE COURT:  Sustained.

9            MR. RENFROE:  Ask that is struck.

10           THE COURT:  Don't say that.

11           THE WITNESS:  That is no good?

12           THE COURT:  Don't say what anybody

13       else said.

14   A.    He calmed -- he was trying to say the

15   policemen and the ambulance were coming and don't

16   worry, the car is okay, that's all, the smoke.

17   That's what I was getting at.

18   Q.    Did there come a time when the

19   ambulance arrived at the scene?

20   A.    Yes.

21   Q.    What happened when they arrived at the

22   scene?

23   A.    Well, to tell you the truth, an

24   officer, the way I remember, an officer come first

25   and said the ambulance will be here.

1          Then at that point time had passed, the

2     air bags went down and that's when I looked up and

3     like across the intersection to the right I

4     noticed a covered body, and that's --

5          I was more nervous because I got

6     hysterical saying Vinny, Vinny, I said, somebody

7     was killed.

8               MR. RENFROE:  Objection.

9               THE COURT:  Overruled.

10    A.    I said "Vinny, somebody was killed.

11    Somebody's dead," and that's what I remember.

12          But the ambulance hadn't come yet, you

13    know, the policeman was there first.  Then the

14    ambulance, you know, came eventually.

15    Q.    How did they get your husband out of

16    the car?

17    A.    They had to get him out on my side, the

18    firemen and whoever was there.  They were working

19    on his side but they couldn't get the door open on

20    my husband's side.

21          So, I remember them saying we'll have

22    to get me out first, which they did, put me in the

23    ambulance, and then they took Vinny out after they

24    got me out.

25    Q.    Did they place you and your husband in

1   the ambulance?

2          A.     Yes.

3          Q.     Where did they take you?

4          A.     To Saint Vincent's Hospital.  The old

5   Saint Vincent's Hospital.

6          Q.     Were you treated for any injuries?

7          A.     Yes.  You know, banged up a lot, you

8   know, and so, you know --

9          Q.     What kind of injuries did you sustain?

10         A.     Well, I got what they call like a torn

11  meniscus in my left knee, you know, for awhile I

12  was starting to go for the therapy but then when

13  they took MRIs, by the time they did that it

14  wouldn't have mattered because I wasn't going to

15  get fixed through therapy.

16         Q.     So, were you released that evening from

17  the hospital?

18         A.     Yes.

19         Q.     And have you had to receive any

20  treatment concerning these injuries since then?

21         A.     I have been going to the orthopedic

22  doctor every so often, but I really don't -- I am

23  trying to not get it operated on if I don't have

24  to, you know.

25                There is so much other stuff that goes

1    on in our lives with Vinny and everything and I am

2    trying to live with it.

3         Q.    So, you still have pain from these

4    injuries?

5         A.    Yes, I have to be careful.  Don't go up

6    the steps a lot.  I can't kneel.  I have to watch

7    with my grandchildren, you know, but I am trying,

8    you know, I do the best I can because sometimes

9    the knee operations aren't always -- so that's

10   what it is.  Time goes very quickly.  Before you

11   know it, you know, another year.

12             So that's how --

13             MS. SILVERS:   I have no further

14        questions.

15             MR. RENFROE:  No questions, your

16        Honor.

17             THE COURT:  Thank you, ma'am.

18             You can step down.

19             THE COURT:  Just for the record,

20        the clock in the back is approximately 35

21        to 40 feet from the witness stand.

22             Call your next witness, please.

23             MS. SILVERS:   The People call Lisa

24        Franklyn.

25   L I S A    F R A N K L Y N - Z A I D I, called as a

1        witness, having been first duly sworn, was

2        examined, and testified, as follows:

3                    THE CLERK:  For the record, please

4            state your name and spell your last name.

5                    THE WITNESS:  Certainly.  L I S A

6            F R A N K L Y N   -   Z A I D I.

7                    MS. SILVERS:   May I inquire?

8                    THE COURT:  Yes.

9    DIRECT EXAMINATION

10   BY MS. SILVERS:

11        Q.    Good morning.

12              Lisa, do you reside on Staten Island?

13        A.    I used to live in Staten Island.  I

14   moved a year ago.

15        Q.    Are you married?

16        A.    Yes, I am.

17        Q.    Do you have any children?

18        A.    Yes, I have three.

19        Q.    Do you have any siblings?

20        A.    Yes, I do.  I have Larry Simon, Dr. Sue

21   Ellen Franklyn, and I have two half siblings,

22   Belinda and Sosha Franklyn.

23        Q.    How old was Larry in October of 2006?

24        A.    He was 41.

25        Q.    What was his occupation?

1        A.      He was an attorney.

2        Q.      Did Larry own a vehicle on October 18,

3    2006?

4        A.      Yes, he did.

5        Q.      What type of vehicle did he own?

6        A.      It was a 2003 Ford Expedition.

7        Q.      What color was it?

8        A.      Silver.

9               MS. SILVERS: I am just going to

10          have these marked as People's number 5 and

11          6.

12              THE COURT:  5 A and B.

13              (Whereupon, People's Exhibits 5A and

14          5B, were marked for identification, as of

15          this date.)

16       Q.      I am showing you what has been marked

17   as People's number 5 A and B for identification.

18   Do you recognize it?

19       A.      Yes, I do.

20       Q.      What do you recognize them to be?

21       A.      I recognize it to be my brother Larry

22   Simon's car.

23       Q.      How do you know that that's his car?

24       A.      I don't recognize the license plate,

25   but I recognize the make of the car and I

1    recognize his rims.

2                    MS. SILVERS:   I ask that it be

3           moved in evidence as People's 5 A and B.

4                    MR. RENFROE:  No objection.

5                    THE COURT:  So moved, 5 A and B in

6           evidence.

7        Q.    After they are marked, could you just

8    hold them up to the jury to show the vehicle.

9                    (Whereupon, People's Exhibits 5A and

10          5B, were marked in evidence, as of this

11          date.)

12       Q.    Could you just hold them up?

13                   (Witness complies)

14       Q.    Lisa, was Larry married?

15       A.    Yes.

16       Q.    Did he have any children?

17                   MR. RENFROE:  Objection, your

18          Honor.

19                   THE COURT:  Overruled.

20       Q.    Did he have any children?

21       A.    Yes, he does.  He has one daughter.

22       Q.    I am going to direct your attention to

23    October 18, 2006.

24                   Approximately 11:00 p.m., what, if

25    anything, happened at that time?

1       A.    I was awoken from a phone call.  I had

2    fallen asleep with my one year old and I was

3    awoken to someone telling me, wishing me

4    condolences.  That some --

5           I didn't understand what the

6    condolences was about.

7       Q.    After you received that phone call,

8    what did you do?

9       A.    At that point I called Audrey to find

10   out where Larry was.

11      Q.    Who was Audrey Simon?

12      A.    Audrey Simon is Larry's wife.

13      Q.    What happened after that?

14      A.    Several phone calls between Audrey and

15   myself, and trying to figure out his whereabouts,

16   calling his cell phone multiple times.

17           And another friend of the family

18   finally came by and let me know, confirmed that he

19   had passed to me, but I still didn't believe it

20   until the police showed up.

21      Q.    When did the police show up?

22      A.    The police showed up approximately

23   anywhere between three and four a.m.  At that

24   point, I kind of lost track of time.

25      Q.    Would that be on the 19th of October?

Zaidi - direct - Silvers          117

1        A.      That would be the 19th, yes.

2        Q.      Who did they come with?

3        A.      They came with Audrey and Alex.

4        Q.      Who is Alex?

5        A.      Larry's daughter.

6        Q.      Why did they come to you?

7        A.      They came because they wanted to inform

8    me, and Audrey was distraught, that --

9                She wanted to come to my house to be

10   with my family, to let us know that he had passed

11   away officially.

12       Q.      Lisa, later that day, October 19, 2006,

13   did you go somewhere?

14       A.      Yes, I did.

15       Q.      Where did you go?

16       A.      I went to the morgue.

17       Q.      I am sorry?

18       A.      I went to the morgue to identify his

19   body.

20       Q.      Is that here on Staten Island?

21       A.      That is here on Staten Island.

22       Q.      When you arrived there, what happened?

23       A.      They asked us why we were there and I

24   told them that I came in to identify Larry Simon

25   and a possible victim of a homicide, and I wanted

1      to find out --

2                      MR. RENFROE:  Objection.

3                      THE COURT:  Sustained.

4                      MR. RENFROE:  May we approach

5           briefly?  Very briefly?

6                      THE COURT:  Sure.

7                      (A side bar discussion was held off

8           the record.)

9      Q.     Lisa, while you were at the Medical

10     Examiner's office, did you have to fill out any

11     paperwork?

12     A.     We did sign and my cousin Randy Simon

13     came with me and he is the one who officially

14     signed.  He had ID  with him.  I had not brought

15     my ID that day.

16     Q.     Did somebody from the Medical

17     Examiner's office show you something?

18     A.     Yes, they showed me a picture.

19     Q.     Who was that picture of?

20     A.     Of my brother Larry Simon

21     Q.     Was there a medical examiner number

22     assigned to Larry's case?

23     A.     Yes, there was.

24     Q.     Can you tell me what that was, please?

25     A.     That was RO601028.

1          MS. SILVERS:   No further

2      questions.

3               THE COURT:  Mr. Renfroe?

4               MR. RENFROE:  No further questions.

5               THE COURT:  Call your next witness

6      please.

7               MS. SILVERS:   The People call

8      Derrick White.

9  D E R R I C K    W H I T E, called as a witness,

10     having been first duly sworn, was examined, and

11     testified, as follows:

12               THE CLERK:  For the record, please

13          state your name and spell your last name.

14               THE WITNESS:  Derrick White,

15     W H I T E.

16               MS. SILVERS:   May I inquire, your

17     Honor?

18               THE COURT:  Yes.

19  DIRECT EXAMINATION

20  BY MS. SILVERS:

21     Q.    Mr. White, do you live on Staten

22  Island?

23     A.    Yes.

24     Q.    How long have you lived on Staten

25  Island?

White - direct - Silvers                     120

1    A.    About 32 years.

2    Q.    Are you employed?

3    A.    Yes.

4    Q.    Who are you employed by?

5    A.    Health and Hospital Corporation.

6    Q.    Did you know someone by the name of

7    Larry Simon?

8    A.    Yes.

9    Q.    How did you know Larry?

10   A.    He was a childhood friend.

11   Q.    I want to direct your attention to the

12   evening of October 18, 2006.

13         Approximately about 9:00 p.m. in the

14   evening, where were you at that time?

15   A.    I was at Chick'n Bones sports bar.

16   Q.    Where is that located?

17   A.    Forest Avenue.

18   Q.    Who were you there with?

19   A.    A friend of mine, Frank Cox.

20   Q.    Did you make any phone calls while you

21   were in Chick'n Bones?

22   A.    Yes, I did.

23   Q.    Who did you phone?

24   A.    Larry Simon.

25   Q.    Why did you call Larry?

1       A.      Just to meet with us and watch the

2   game.

3       Q.      Did you get to speak to Larry at that

4   time?

5       A.      No.

6                   MR. RENFROE:  Objection, relevance.

7                   THE COURT:  Sustained.

8       Q.      Did there come a time when you did

9   speak to Larry?

10      A.      Yes.

11      Q.      Approximately what time was that?

12      A.      About 10:22.

13      Q.      In the evening?

14      A.      Yes.

15      Q.      What did Larry tell you?

16                  MR. RENFROE:  Objection.

17                  THE COURT:  Sustained.

18      Q.      What were the plans that you had with

19  Larry that evening?

20      A.      He said he was going to meet me --

21                  MR. RENFROE:  Objection.

22                  I will withdraw the objection, your

23          Honor.

24                  THE COURT:  You can answer.

25      A.      He was going to meet me at Chick'n

1   Bones in about a half hour.

2       Q.   I am going to direct your attention to

3   about eleven p.m.

4       Did you see Larry at that time?

5       A.   No.

6       Q.   Did anybody approach you at Chick'n

7   Bones?

8       A.   Yes.

9       Q.   Who approached you?

10       A.   Two detectives.

11       Q.   After they approached you, what did you

12   do?

13       A.   They asked me am I waiting for

14   someone?

15          MR. RENFROE:  Objection.

16          THE COURT:  Sustained.  Just ask --

17       Q.   Where did the detectives take you at

18   eleven p.m.?

19       A.   They pulled me to the side and let me

20   know that Larry was killed.

21          MR. RENFROE:  Objection.

22          THE COURT:  Sustained.  Come up.

23       Q.   Mr. White, what did you do at that

24   time?

25       A.   When the detectives came to me or --

1          THE COURT:  Without saying what

2      anybody said to you, just say what you did?

3      A.    Well, we walked outside, came outside,

4  I looked to my left and I noticed a white sheet

5  and then across the street I noticed Larry's

6  vehicle.

7      Q.    Where was Larry's vehicle parked at

8  that time?

9      A.    Across the street.

10      Q.    Can you give me, describe the area that

11  he was parked?

12      A.    It was almost by the corner.  It was to

13  the right of me as I walked out of the Forest

14  Avenue -- out of Chick'n Bones.

15      Q.    Is there any business that's across the

16  street from Chick'n Bones, just to give us a

17  landmark?

18      A.    Yes, Lowes.  Lowes  was there.

19      Q.    Larry's car was parked near the corner

20  of Lowes?

21      A.    Right.

22      Q.    I am going to show you is what already

23  in evidence as People's number 2.

24          Do you recognize that?

25      A.    Yes.

1      Q.    Could you just hold that up for the

2   jury to see?  Could you just indicate what is in

3   that photo?

4      A.    Excuse me?  Say that again.

5      Q.    What is in that photo?  What does that

6   photo show?

7      A.    This is a photo of Lowes here, the

8   parking area and over here is Chick'n Bones.

9      Q.    Just point again to the jurors so they

10  can see where Chick'n Bones is located in that

11  photo?

12     A.    Okay.  In this plaza here.

13     Q.    When you stated --

14           THE COURT:  Indicating?

15     Q.    Indicating the center of the photo, the

16  middle store there.

17           After you left Chick'n Bones -- you

18  testified that the detectives -- you stepped

19  outside with the detectives?

20     A.    Yes.

21     Q.    Where were you standing when you

22  noticed the white sheet?

23     A.    About right here.

24           (Indicating.)

25     Q.    Just indicate, right in front of

1    Chick'n Bones central, right in the middle of that

2    photograph.

3                    THE WITNESS:  Right in the middle

4           of the photograph.

5                    (Indicating.)

6                    THE COURT:  It is because they

7           write it down.  Where you point to

8           something, they have to write down where

9           you are pointing to.

10                   Not you, but the person asking the

11          question has to say where you are pointing

12          to on the photograph.

13                   Go ahead.

14   Q.    Can you indicate on the photo where you

15   saw Larry's car parked?

16   A.    Yes.  On this side by the corner.

17                   THE COURT: Indicating the left side

18          front of the photo.

19                   MS. SILVERS:   Thank you.

20   Q.    After you had a discussion with the

21   detectives outside of Chick'n Bones, what did you

22   do?

23   A.    I phoned --

24                   MR. RENFROE:  Objection.

25   Q.    Did you go someplace?

1        A.     Yes.

2        Q.     Where did you go?

3        A.     To Larry's house to meet up with his

4    wife.

5        Q.     After you went to Larry's house and met

6    up with his wife, where did you go after that?

7        A.     We went to his sister's house.

8        Q.     Who is his sister?

9        A.     Lisa Zaidi.

10              MS. SILVERS:   I have no further

11         questions of this witness.

12              THE COURT:  Counsel?

13              MR. RENFROE:  No questions of this

14         witness, your Honor.

15              THE COURT:  Thank you, Mr. White.

16         You can step down.  Call your next witness.

17              MR. MATTEI: We call Ricardo

18         Corretjer.

19   R I C A R D O    C O R R E T J E R,  called as a

20      witness, having been first duly sworn, was

21      examined, and testified, as follows:

22              THE CLERK:  Please be seated.

23              For the record, please state your

24         name, spell your last name.

25              THE COURT:  Counsel.

1   DIRECT EXAMINATION

2   BY MR. MATTEI:

3        Q.    Please tell the members of the jury

4   where you are employed right now?

5        A.    I am employed with First Coast Energy

6   in Florida.

7        Q.    Can the microphone move over?

8        A.    I am not sure if it can move.

9               THE COURT:  Come up anyway,

10          counsel, please.  Come up, gentlemen.

11               (A side bar discussion was held off

12          the record.)

13               THE COURT:  Ladies and gentlemen,

14          we are going to take about a ten minute

15          recess.

16               Don't discuss the case during the

17          course of the recess or any time when we

18          have a break.

19               We will call you back in a few

20          minutes.

21               (The jury is excused from the

22          Courtroom.)

23               THE COURT:  I am going to ask that

24          you step outside.  Be back in ten minutes.

25               (Witness excused.)

1              THE COURT: Jury is out of the room,

2     Mr. Renfroe?

3              MR. RENFROE:  Yes.

4              THE COURT:  The jury is out of the

5     room, the witness is out of the room, the

6     door is closed.

7              We had a bench conference at which

8     time the Court had noticed that two of the

9     witnesses that just testified came back

10    into the Courtroom.

11             What is the defendant's position

12    with respect to that?

13             MR. RENFROE:  Your Honor, because

14    of the nature of the case, I think I would

15    object to the witnesses being in here and

16    being a part of the proceeding.

17             There are a number of family

18    members here.  I understand their right to

19    a public trial, but I would object.

20             THE COURT:  Counsel?

21             MR. MATTEI:  Judge, they have an

22    absolute right to be here once they've

23    testified, if they are not going to be

24    recalled.

25             They were not even cross examined.

Coretjer - Mattei - direct          129

1          The chance of them being recalled is nil,

2          and they have an absolute right to be in

3          this courtroom, Judge.

4               They are the sister of the

5          deceased, they are the childhood friend of

6          the deceased, two other people are victims

7          of this very crime.

8               They have an absolute right to be

9          here after they testify and they are not

10         being recalled.  They weren't even cross

11         examined.

12              THE COURT:  All right.  Give me a

13         few minutes.

14              (Whereupon a recess was taken and

15         Angela Punterno relieved Elizabeth Cruz as

16         Official Court Reporter.)

17              (Continued on next page.)

18

19

20

21

22

23

24

25

PROCEEDING

1          THE CLERK:  Your Honor, case on trial

2    continued.  Indictment 335 of 2006.  People of the

3    State of New York against Taliyah Taylor in the absence

4    of the sworn jurors.

5          THE COURT:  Mr. Renfroe, when we adjourned

6    you had made an application.  You want to reiterate

7    your application?

8          MR. RENFROE: Yes, your Honor.

9          Just based on the nature of the case and

10   the -- I just made an objection to the witnesses after

11   testifying being allowed to remain in the courtroom.

12         THE COURT:  People.

13         MR. MATTEI: Judge, I will stand on the

14   argument we made before.  They are not going to be

15   recalled.

16         THE COURT:  The reason the witnesses are

17   precluded or excluded from the courtrooms is because of

18   the possibility of the witnesses conforming their

19   testimony to that of other witnesses who have already

20   testified, or the likelihood that they may be recalled

21   for further testimony.

22         The basic proposition is that witnesses are

23   excluded because there is a need to combat perjury.

24   And in certain cases, a motion for exclusion of a

25   witness in New York seems to be, at least from what I

AP

PROCEEDING

1      understand, the discretion of the trial judge.

2      However, if a request is made in good faith, there is

3      ordinarily no reason it should be denied.

4            There are a lot of cases that stand for that

5      proposition.  The likelihood of these witnesses being

6      recalled is slim.  However, it's hard to imagine any

7      reason why they would.  In any event, there is always

8      that possibility in the course of a trial that they

9      could be recalled for some particular reason.

10           Certainly, two of the witnesses are actually

11     victims in this case, the Cavalieris and their

12     exclusion I think should be something that we should

13     consider and, in fact, I am going to order.

14           The witness who came in to identify Mr. Simon

15     in the morgue, though, would you withdraw your

16     application with respect to that, Mr. Renfroe, or do

17     you still want that witness?

18           MR. RENFROE: I would withdraw as to the

19     witness who came to the morgue who is just for

20     identification purpose.

21           THE COURT:  That would be Ms. Zaida.  Ms.

22     Zaida can stay.  I don't know what Mr. White's -- the

23     possibility of Mr. White being recalled for either.

24           MR. RENFROE: None.

25           THE COURT:  You withdraw your application

AP

PROCEEDING

1        with respect to that?

2                MR. RENFROE: Yes.

3                THE COURT:  Mr. White and Ms. Zaida can stay

4        in the courtroom.  But the Cavaliers being actual

5        victims will be excluded.  There may be some

6        possibility that they can be recalled, I am not sure.

7        I don't know exactly why that would be, but to err on

8        the side of caution, in the likelihood that they may

9        be, I am going to ask that they remain outside the

10       courtroom for the balance of the testimony.  They would

11       be excluded for the balance of the testimony and that

12       should be explained to them.

13               MS. SILVERS: Your Honor, I explain that had

14       to the Cavalieris.

15               THE COURT:  Obviously, that doesn't carry

16       over to other portions of the trial.

17               MR. MATTEI: Yes, your Honor.  Thank you.

18               THE COURT:  Just so the record is clear, the

19       Cavalieris are excluded because they may possibly be

20       recalled as possible victims in the case.

21               Mr. White and Ms. Zaida, the application to

22       have them precluded from the courtroom has been

23       withdrawn by the defense; is that correct?

24               MR. RENFROE: That's correct.

25               THE COURT:  Let's proceed.  Bring in the

AP

CORRETJER-PEOPLE-DIRECT

1          panel please.

2                    Bring in the witness then the panel.

3                    THE COURT OFFICER:   Ready for the jury?

4                    THE COURT:  Yes, please.

5                    THE COURT OFFICER:   Jury entering.

6                    (Whereupon, the jury enters the courtroom.)

7                    THE CLERK:  Do both sides stipulate to the

8          presence and proper seating of the official sworn jury

9          and waive the reading of the roll?

10                   MR. MATTEI: Yes.

11                   MR. RENFROE: Yes.

12                   MR. MATTEI: So stipulated.

13                   MR. RENFROE: So stipulated.

14                   THE CLERK:  Sir, you remain under oath.

15                   THE COURT:  Thank you.  Counselor.

16     DIRECT EXAMINATION

17     BY MR. MATTEI:

18                   MR. MATTEI: Just start over, your Honor.

19                   THE COURT:  I don't think we did anything.

20          Q    Good afternoon, Mr. Corretjer.

21          A    Good afternoon.

22          Q    I don't think that works.  Keep your voice up so

23     everybody back here can hear you.  And even if you want,

24     you can get that out of the way, it's just a prop.

25                   Could you tell us where you work?

CORRETJER-PEOPLE-DIRECT

1    A    I work for First Coast Energy.

2    Q    What type of job do you have?

3    A    I maintain the gas station facility up and down

4    210.

5              THE COURT:  Speak louder so everybody can

6    hear you.

7    Q    Where is that?

8    A    It's located as the Jacksonville, Florida.

9    Q    How long have you been doing that?

10   A    About three and a half months.

11   Q    Now, in October of 2006, did you have a job up

12   here in New York City?

13   A    Yes, I did.

14   Q    Who did you work for in October 2006?

15   A    S.C.B. Incorporated.

16   Q    What type of company is that?

17   A    Security company.

18   Q    And tell the members of the jury what you did?

19   A    I was a road supervisor.  I was responsible for

20   overseeing fourteen sites within New York City.

21   Q    Where were those sites?

22   A    We had a couple of movie theaters in Long Island,

23   Brooklyn, we had couple of Loews throughout the borough.

24   Q    Did that include the Lowes on Staten Island?

25   A    Yes, it did.

CORRETJER-PEOPLE-DIRECT

1    Q    Did you find yourself on the evening of October

2    18, 2006, at about 10:30 at the Lowes on Staten Island for

3    some business related matter?

4    A    Yes, I did.

5    Q    And can you tell us where you were at about that

6    time in the evening?

7    A    I was about the center of the parking lot in

8    between Kohl's and Lowes.

9    Q    And were you there with another security guard?

10   A    I was there with two other security guards, yes.

11   Q    And after you got done with that business, tell

12   the members of the jury what, if anything, happened up on

13   Forest Avenue?

14   A    I heard tires screeching and I turned around to

15   see another car colliding with another.

16   Q    Where did that happen?

17   A    On the main road right outside Lowes.

18   Q    Do you know that to be now Forest Avenue?

19   A    Yes.

20   Q    And where was -- well, was one car moving?

21   A    Yes.

22   Q    And what kind of car -- describe that car for the

23   jury?

24   A    It was a dark Nissen, I believe it was an Ultima.

25   Q    And the car it struck, did you see where that was?

AP

CORRETJER-PEOPLE-DIRECT

1      A      Was on the opposite side of the road.

2      Q      Do you recall what color that car was?

3      A      Red or burgundy, I believe.

4      Q      Tell us what happened?  Which car struck which?

5      A      The Altima struck the other car.

6      Q      The Nissan?

7      A      Yes.

8      Q      And where did that Nissan go after it struck the

9   maroon or burgundy car that you described?

10     A      Pretty much went tumbling into the Lowes parking

11  lot over the gate.

12     Q      And where did it come to rest?  Where did it stop?

13     A      It was resting in one of the grass islands upside

14  down right over the gate into our parking lot.

15     Q      On its roof?

16     A      Yes.

17     Q      What did you do after you saw this car end up on

18  its roof?

19     A      I went running towards the car to see if anybody

20  was alive inside.

21     Q      And tell the Members of the Jury what happened

22  when you got to that Nissan?

23     A      When I got up to the driver's side door there was

24  a person upside down in the car saying "money, power

25  respect."  And I tried to open the door, the door wouldn't

AP

137

CORRETJER-PEOPLE-DIRECT

1    open, so I went to the passenger side door.  I tried to

2    break the glass with my maglite and it didn't work and I

3    ended up prying the door open with my batten.

4         Q    Can you describe the person in the car it?

5         A    Was a female.

6         Q    And was she conscious at the time?

7         A    Yes, she was.

8         Q    Did you notice anything with regard to the seat

9    belt?

10        A    Seat belt was on and she was upside down in the

11   car.

12        Q    Do you see that person in court today?

13        A    Yes.

14        Q    Can you tell us where she is and what color shirt

15   she is wearing?

16        A    She is seated right there in the green shirt.

17             THE COURT:  Indicating the defendant.

18        Q    How did you actually open the door on the

19   passenger side?

20        A    I stuck my batten in between the door.  It was

21   slightly cracked and I pulled the door open.

22        Q    How were you dressed that evening?

23        A    I was in my uniform.

24        Q    Is that a security uniform?

25        A    Security uniform, blue on blue.

AP

CORRETJER-PEOPLE-DIRECT

1    Q    Did you have any kind of flashlight?

2    A    I had a maglite and small mini defense light.

3    Q    Tell us what happened after you pried that door

4    open?

5    A    I got inside the vehicle and I shined the light on

6    her.  She had her eyes closed, still conscious.  I asked

7    her to open her eyes and that we needed her to get out of

8    the car.  She opened her eyes and looked at me and at that

9    point I, unclipped the seat belt and pulled her out of the

10   car.

11   Q    Which door did you exit out of?

12   A    Passenger side door.

13   Q    Was the passenger side door closer to the road or

14   to the --

15   A    To the road.

16   Q    To the road?

17   A    Yes.

18   Q    Tell the members of the jury what the defendant

19   did after she got out of the car?

20   A    She stood upright and was hiding behind me.  I

21   attempted to give her my jacket to cover herself because

22   she had no clothes on.  Two police officers walked up and

23   started walking towards the car and at that point after

24   they got passed me I was pushed out of the way and started

25   going towards the squad war.

CORRETJER-PEOPLE-DIRECT

1    Q    Pushed out of the way by who?

2    A    The defendant.

3    Q    How did she push you?

4    A    Two hands.

5    Q    Where did you end up?

6    A    Three or four feet away.

7    Q    After she pushed you, describe for the jurors what

8    she did with regards to the police car?

9    A    She ran around the police car and into the

10   driver's seat.

11   Q    After she ran into the driver's seat what, if

12   anything, did you see the defendant do?

13   A    Attempted to put the car in drive.

14   Q    What did the police officers do?

15   A    One police officer ran to the driver's side, the

16   other ran to the passenger's side and attempted to stop her

17   from putting it in drive.

18   Q    Did they, in fact, stop her?

19   A    Yes.

20   Q    What did they do after they stopped the defendant

21   from putting the car in drive?

22   A    They put her in handcuffs and placed her in back

23   of the squad car.

24   Q    Tell the jury the defendants reaction to being

25   placed in the back of squad car?

CORRETJER-PEOPLE-DIRECT

1      A    She began kicking at the glass and the door and

2  the cops just told her to stop a couple of times and she

3  just stopped.

4      Q    And after she stopped, what did she do?

5      A    She sat in the seat.  Just sat there.

6      Q    Did you notice anything about her when she was

7  sitting?

8      A    She looked pretty calm.  She was looking around in

9  the squad car, that's about it.

10            MR. MATTEI: Judge, if I can have this marked

11        as People's 6.

12            (Whereupon, a photograph was marked People's

13        Exhibit Number 6 for identification.)

14     Q    I am going to ask if you recognize what's depicted

15  in that photograph?

16     A    That's the vehicle that I pulled her out of.

17     Q    Is that a fair and accurate representation of how

18  that vehicle appeared after it landed on -- upside down on

19  the grass area inside the Lowes parking lot?

20     A    Yes.

21            MR. MATTEI: Judge, I will ask that that be

22        admitted into evidence as People's Exhibit 6.

23            THE COURT:  Mr. Renfroe.

24            MR. RENFROE: No objection.

25            THE COURT:  So moved 6 in evidence.

CORRETJER-PEOPLE-DIRECT

1           THE COURT OFFICER:   So marked

2               (Whereupon, People's Exhibit Number  6 was

3       received in evidence.)

4       Q     Ricardo, just if you can, show us, explain to the

5    jury which side of the car is depicted in that photograph?

6       A     That's the driver's side door.

7       Q     And that's the side you initially went to?

8       A     Uh-huh.

9       Q     And looked through that window there to see the

10   defendant in the car?

11      A     Yes, I went to the other side of the car.

12      Q     To get her out of the car?

13      A     Yes.

14              MR. MATTEI: Can I have this marked as

15       People's 7.

16              (Whereupon, a photograph was marked People's

17       Exhibit Number 7 for identification.)

18      Q     Do you recognize what's depicted in People's

19   exhibit 7 for identification?

20      A     Yes.

21      Q     What is that a picture of?

22      A     The opposite side the vehicle.

23      Q     Is that a fair and accurate representation of the

24   way the car appeared after you pried the door open to get

25   the defendant out?

142

CORRETJER-PEOPLE-DIRECT

1       A      Yes.

2              MR. MATTEI: Judge, I ask that that be

3       admitted as People's 7 at this time.

4              THE COURT:   Counsel?

5              MR. RENFROE: No objection.

6              THE COURT:   So moved 7 in evidence.

7              THE COURT OFFICER:   So marked

8              (Whereupon, People's Exhibit Number  7 was

9       received in evidence.)

10      Q      Perhaps you can hold that up for the jurors and

11      explain to them -- show them the door and where you walked

12      with the defendant?

13      A      I pulled her out here, started to walk in this

14      direction over here.

15      Q      Indicating by the door and then forward and to the

16      left of the picture as you look at it?

17      A      Yes.

18      Q      And you indicate that you had -- did you offer her

19      some clothing?

20      A      I gave her my jacket.

21      Q      And what did she do with the jacket?

22      A      I am not sure, she was standing behind me.  I am

23      not sure if she put it on or dropped the jacket.  I am not

24      too sure.

25      Q      With regard to either photograph as you can

AP

CORRETJER-PEOPLE-DIRECT

1    describe it, where was the police car?

2       A   It was actually located outside the picture more

3    towards this direction over here on the concrete parking

4    lot.

5       Q   More towards the left in the parking lot itself?

6       A   Yes.

7       Q   I would like to have this marked as People's 8.

8    If I can have it marked with a Sharpie.

9                (Whereupon, a DVD was marked People's Exhibit

10      Number 8 for identification.)

11              THE COURT:  Mr. Renfroe.

12              MR. RENFROE: Your Honor, I actually seen

13      that, I stipulate to that being the video from Lowes

14      and I have no objection if it's played at this time.

15              MR. MATTEI: All right then.

16              THE COURT:  So moved 8 in evidence.

17              (Whereupon, People's Exhibit Number 8 was

18      received in evidence.)

19       Q   Just so it's clear, Ricardo, you seen this DVD

20    initially?

21       A   Yes.

22       Q   Is that a fair and accurate representation of you

23    with the defendant on the evening of October 18, 2006, with

24    her car?

25       A   Yes, it is.

144

CORRETJER-PEOPLE-DIRECT

1        Q    Can you see it from there?

2        A    Yes.

3             (Whereupon, the DVD was played for the jury.)

4        Q    Ricardo, at this point, do you know where you are

5    at this point?

6        A    I am on the other side the vehicle.

7        Q    You are between the fence and the door?

8        A    And the car.

9        Q    Ricardo, did you see that light on the bottom

10   through the car?

11       A    Yes.

12       Q    Do you know what that was from?

13       A    From my flashlight.

14       Q    And you are on the other side and that's your

15   flashlight going through?

16       A    Yes, it is.

17       Q    And you see yourself now?

18       A    Yes, I do.

19       Q    Where are you?  Is that you by the arrow?

20       A    Yes.

21       Q    And is that the defendant behind you?

22       A    Yes, it is.

23       Q    I am just going to back it up an instant so you

24   can tell the jury with the court's permission when you

25   first see yourself and the defendant from behind the car?

CORRETJER-PEOPLE-DIRECT

1    A    Right about  there.

2    Q    I am going to ask to pause it again there and back

3    it up a little bit.

4         Did you now see the defendant in this picture in

5    this scene?

6    A    No, not right now.

7    Q    Do you see her there?

8    A    Yes.

9    Q    And she is naked there?

10   A    Yes.

11   Q    Can you see where she is now on the right-hand

12   side from where you are sitting?

13   A    From where I am sitting, yes.

14   Q    Could you tell the Members of the Jury where the

15   police officers are at that point?

16   A    They are heading towards the car right now.

17   Q    Up on the grass area there?

18   A    Yes.

19   Q    And what is she doing now?

20   A    Right now she is heading towards the squad car.

21   Q    And is it apparent when she jumps in the car and

22   puts it into drive?

23   A    Right there.

24   Q    And that's everybody in the parking lot trying to

25   flee?

AP

CORRETJER-PEOPLE-CROSS

1    A    Yes.

2    Q    What was the defendant's --

3            MR. MATTEI: I am done with this now.  Thank

4    you, your Honor.

5            THE COURT:  Turn the lights on, please.

6    Q    What was the defendant's demeanor like at the time

7    you took her out of the car?

8    A    She seemed pretty calm to me.

9    Q    How about up until the time she got into the

10   police car, what was her demeanor like?

11   A    She seemed pretty calm.

12   Q    When you asked her to open her eyes, did she open

13   her eyes?

14   A    Yes, she responded immediately.

15   Q    When you asked her to do anything, did she do as

16   you asked her to do?

17   A    Yes.

18   Q    I have no further questions at this time?

19           THE COURT:  Mr. Renfroe.

20           MR. RENFROE: Thank you.

21   CROSS EXAMINATION

22   BY MR. RENFROE:

23   Q    Good afternoon.

24   A    Good afternoon.

25   Q    Now, what drew your attention to this location,?

CORRETJER-PEOPLE-CROSS

1    What happened?

2        A    Tires screeching.

3        Q    You looked over and you saw this car coming to a
4    rest?

5        A    I didn't see it come to rest, I seen it striking
6    another car.

7        Q    And then you ran to the dark car; is that correct?

8        A    Yes.

9        Q    And when you got there, that's when you saw Ms.
10   Taylor?

11       A    Yes.

12       Q    And so you noticed a couple of things immediately
13   when you looked inside?

14       A    Uh-huh.

15       Q    You took your flashlight and you had it directed
16   towards her?

17       A    Yes.

18       Q    And that's when you realized that she had no
19   clothes on?

20       A    Yes, at that point.

21       Q    And you said that she was saying something while
22   she was in the car?

23       A    Yes, I heard "money, power, respect" repeated
24   several times.

25       Q    You saw the police officers arrive at the

AP

CORRETJER-PEOPLE-CROSS

1    scene?

2        A    No, I didn't see them until I got her out of the

3    vehicle.

4        Q    You get Ms. Taylor out of the vehicle, you tried

5    to put a coat on her because she is naked, right?

6        A    Yes, sir.

7        Q    And then looking at the tape it doesn't look like

8    she is wearing a coat, is that safe to say?

9        A    Yes.

10       Q    Did you get your coat back?

11       A    Yes, I did.

12       Q    At some point you see her run to the police car?

13       A    Yes.

14       Q    Would it be fair to say the police were actually

15   coming in the direction of where you were with Ms. Taylor?

16       A    They were heading towards the vehicle.  They

17   actually walked passed me on my right.

18       Q    At some point she ran back over to the police car;

19   is that right?

20       A    Yes.

21       Q    And the police went back over and took her out of

22   the car?

23       A    Yes.

24       Q    And your indication was she was trying to start

25   the car and move it?

AP

149

CORRETJER-PEOPLE-CROSS

1       A       She tried to put it in drive.

2       Q       The police take her out the car.  Did you hear her

3       say to the police, "God made me drive naked"?

4       A       I didn't hear to much. There was a lot of

5       commotion going on.

6       Q       They put her in the back of the patrol car; is

7       that correct?

8       A       Yes.

9       Q       From that point on, do you hear what's said?

10      A       No, I don't.  There is a lot of screaming at that

11      point.

12      Q       Now, when you first get her out of the vehicle she

13      is hiding behind you, is that your testimony?

14      A       Yes, she is behind me, taking cover behind me.

15      Q       At some point you say she was kicking the window

16      inside the police car?

17      A       Yeah, she was doing a lot of kicking.  Yes.

18      Q       Is it safe to say when she was kicking the window

19      she wasn't calm?

20      A       At that point no, she was pretty upset.

21      Q       Well, can you describe how she looked when you say

22      she was calmed?  How she looked, her facial features when

23      you say she was upset?

24      A       I couldn't really see her facial features.

25      Q       What could you just see?

CORRETJER-PEOPLE-CROSS

1    A    I saw her kicking at the window.

2    Q    The only part you saw were her legs?

3    A    Yes, I saw her kicking at the window and then they

4  asked her to stop several times and she stopped.

5    Q    Did you see when the ambulance arrived?

6    A    No, I didn't.

7    Q    Now you indicated she went over to the police car

8  and everyone was fleeing; is that correct?

9    A    Yes.

10    Q    Now, the police officers went over to control her;

11  is that correct?

12    A    Yes.

13    Q    And, if you know, what time was it when you first

14  saw Ms. Taylor?

15    A    The first time?

16    Q    Yes, what time?

17    A    Like the exact time?

18    Q    Thereabouts.

19    A    Probably a little bit before 10:30, a little

20  after, I am not too clear on the time.

21    Q    Is it fair to say the whole incident of you

22  getting her out of the car took a couple of minutes?

23    A    Yeah, probably two to three minutes.

24    Q    And did you ask her any questions like, are you

25  all right?  Are you hurt?

CORRETJER-PEOPLE-CROSS

1      A    I asked her if she was okay.  If she could hear
2   me.  If she could please open her eyes when she was inside
3   the vehicle.
4      Q    When you asked her if she was okay, did she
5   respond to you?
6      A    She opened her eyes.  She opened her eyes, she
7   didn't respond to anything.
8      Q    Was this when she was saying "money, power,
9   respect"?
10     A    No, that's when I first got to the car.
11     Q    When you first got there you looked inside and
12  said, are you okay?
13     A    No, I tried to get into the car.  When I got
14  inside the vehicle I asked if she was okay.
15     Q    Did she make a verbal response to that?
16     A    No.
17     Q    Now, how many times did you ask her are you okay?
18     A    Once.
19     Q    Other than asking her at that time was she okay,
20  did you say anything else to her?
21     A    No, I just told her that we needed to get out of
22  the vehicle.
23     Q    And then you helped her get out?
24     A    Yes.
25     Q    And she was behind you?

CORRETJER-PEOPLE-CROSS

1      A     Yes.

2      Q     And then she ran towards the police car?

3      A     Yes.

4      Q     And you didn't see any injuries on Ms. Taylor?

5      A     She had minor scrapes and cuts but didn't look

6   like she had any broken bones.  She stood upright

7   completely once she was out of the vehicle.

8      Q     And you didn't see when she exited the police

9   car?

10      A     No, I didn't.  I was taken some where else at that

11   point.

12               MR. RENFROE: I have no further questions of

13          this witness.

14               THE COURT:  Counselor.

15               MR. MATTEI: No further questions.

16               THE COURT:  Thank you.  You are excused.

17               (Whereupon, the witness is excused.)

18               THE COURT:  Call your next witness please.

19               MR. MATTEI: Police officer Robert Albano.

20               THE COURT:  We will wait until after lunch.

21          We will break until 2:15.  Be back in the jury room

22          at 2:15 sharp.  Make sure you get there on time.

23          Hopefully we will start as soon as we can to that

24          time.

25               Same admonitions apply every time we have a

AP

CORRETJER-PEOPLE-CROSS

1    recess.   We heard some testimony, we haven't heard

2    it all.   Do not talk to any of the parties in this

3    case, do not discuss the case, do not go to any of

4    the locations that we discussed during the

5    trial.

6              Do not sell any information about this case

7    or do any research.   Do not do any internet research.

8    If anybody tries to talk to you about the case, let me

9    know immediately.   And if someone tries to influence

10   you in anyway, let me know immediately.

11             Thank you, have a good lunch.   See you at

12   2:15.

13             (Whereupon, the jury exits the courtroom. )

14             THE COURT:   Jury is out the room, the door is

15   closed.   Is there anything either party wants to bring

16   to my attention?

17             MR. MATTEI: No.

18             MR. RENFROE: No.

19             THE COURT:   2:15, thank you.

20             (Whereupon, a luncheon recess was taken.)

21

22

23

24

25

SULLIVAN-PEOPLE-DIRECT

1          A F T E R N O O N   S E S S I O N.

2          THE CLERK:  Case on trial.

3          THE COURT OFFICER:   Ready for the jury?

4          THE COURT:  Yes, please.

5          THE COURT OFFICER:   Jury entering.

6          (Whereupon, the jury enters the courtroom. )

7          THE CLERK:  Case on trial continues, People of

8    the State of New York against Taliyah Taylor under

9    indictment number 335 of 2006.

10          All jurors are now present.  Do both sides

11   stipulate to the presence and proper seating of the sworn

12   jury?

13          MR. MATTEI: So stipulated.

14          MR. RENFROE: So stipulated.

15          THE CLERK: Your Honor.

16          THE COURT:  Thank you.  You may be seated.

17          People call your next witness please.

18          MS. SILVERS: People call Crystal Ann Sullivan.

19          THE CLERK:  Raise your right hand, please.

20     C R Y S T A L   A N N   S U L L I V A N

21          Having been called as a witness by and on

22       behalf of the People, after having been first duly

23    sworn, testified as follows:

24

25

AP

Case 1:14-cv-01402-ERK-LB  Document 6-10  Filed 08/12/14  Page 65 of 129 PageID #: 1275

1          THE CLERK:  Please be seated.

2          For the record, please stated your name and

3      spell your last name.

4          THE WITNESS:  Okay, Crystal Ann Sullivan,

5      S-U-L-L-I-V-A-N.

6          THE COURT:  Thank you.

7          MS. SILVERS: May I inquire?

8          THE COURT:  Yes.

9   DIRECT EXAMINATION

10  BY MS. SILVERS:

11      Q    Crystal, are you employed?

12      A    Yes, I am.

13      Q    Where are you employed?

14      A    I work in a school in Jersey City called Golden Door

15  Charter School.

16      Q    What do you do there?

17      A    I am a teacher's assistant.

18      Q    I am going to direct your attention to

19  October 18, 2006, at about 10:45 p.m., where were you at that

20  time?

21      A    I was just a arriving at Chick N Bones Restaurant

22  and Bar on Forest Avenue.

23      Q    And what, if anything, happened when you approached

24  the chicken place?

25      A    As I got out of my vehicle I was walking up to the

SULLIVAN-PEOPLE-DIRECT

1   front door of Chick N Bones when I heard a bang.  I turned

2   around and I saw some objects flying in the air.  After I

3   saw that, I looked over to my left and saw a dark car hit a

4   red car and made it spin out of control.

5         As I started walking towards Forest Avenue I noticed

6   that what I saw flying in the air was a shoe.  It was a white

7   sneaker.  And then I looked around the scene and saw a body

8   part underneath a car.

9         Q     What type of body part was it?

10        A     It was a leg.

11        Q     Crystal, where did you park your vehicle?

12        A     I was parked on the same side of Chick N Bones maybe

13   two or three cars from the entrance.

14        Q     And can you just describe what's in front of Chick N

15   Bones?

16        A     A Lowes, I believe.  A Lowes parking lot.

17        Q     Across the street?

18        A     Across the street.

19        Q     In front of Chick N Bones itself?

20        A     There is a square parking lot where cars usually

21   park diagonally.  I was parked on the street, so I had to

22   walk up the parking lot to get to the front door.  And I was

23   about midway when I had heard the bang, like right before

24   entering.

25        Q     At that point is when you turned around and walked

SULLIVAN-PEOPLE-DIRECT

1   back towards Forest Avenue?

2       A    Yes.

3       Q    And you stated that you saw an object or objects in

4   the air, and what did you later learn that to be?

5       A    That was a white sneaker that I -- as I was

6   approaching Forest Avenue I noticed it was a sneaker.  At

7   first I didn't realize why there was a sneaker there

8   until I looked to the left and saw the leg underneath a

9   car.

10      Q    Crystal, you said you saw a vehicle strike a red --

11  another vehicle, a red vehicle?

12      A    Yes.

13      Q    Can you describe the vehicle that you saw strike the

14  red vehicle?

15      A    It was a dark colored car, it was going really fast

16  so I really couldn't tell you the exact details or model or

17  the make of the car.

18      Q    And where in -- location wise, where did the dark

19  vehicle strike the red vehicle?

20      A    The vehicle maybe the front end.  I am not really

21  sure.  It was going so fast, all I know is I saw the red car

22  spin around.

23      Q    Where was the red car at that point?  What point of

24  Forest Avenue?

25      A    It was on the side closest to the Chick N Bones.

AP

158

SULLIVAN-PEOPLE-DIRECT

1    So, it would be going towards Richmond Avenue.  It was on the

2    right side of the road, the opposite side of Lowes.

3        Q    Besides the sneaker that you saw flying in the air

4    and the leg that you saw under the car, did you notice

5    anything else that was flying in the air?

6        A    I think a T-shirt.  Like a white T-shirt.  I really

7    only remember the sneaker.  That was the thing that stuck out

8    most to me.

9              MS. SILVERS: I have no other questions of this

10        witness.

11             THE COURT:  Counselor.

12             MR. RENFROE: I have no questions.

13             THE COURT:  You are excused, thank you.

14             (Whereupon, the witness is excused.)

15             THE COURT:  Call your next witness please.

16             MR. MATTEI: People call Jeffrey Housman.

17             THE COURT OFFICER: Step up and remain standing

18        and face the clerk.

19             THE CLERK:  Raise your right hand.

20    J E F F R E Y   H O U S M A N

21             Having been called as a witness by and on

22        behalf of the People, after having been first duly sworn,

23        testified as follows:

24

25

AP

HOUSMAN-PEOPLE-DIRECT

1           THE CLERK:  Please be seated.

2           For the record please state your name and spell

3      your last name.

4           THE WITNESS:  Jeffrey Housman, H-O-U-S-M-A-N.

5           MR. MATTEI: May I inquire.

6           THE COURT:  Yes

7   DIRECT EXAMINATION

8   BY MR. MATTEI:

9      Q    Good afternoon, Mr. Housman, where do you work?

10     A    Lowes Home Improvement.

11     Q    What type of job do you have at Lowes Home

12  Improvement?

13     A    Lowes prevention.

14     Q    What is involved in that?

15     A    Protect the company's assets.

16     Q    What is your particular title in this store?

17     A    Lowes prevention manager.

18     Q    Where do you currently work, which Lowes?

19     A    I am in Old Bridge, New Jersey.

20     Q    And how long have you worked for Lowes in the

21  Lowes prevention?

22     A    A total of about three and a half to four

23  years.

24     Q    And before working for Lowes, where did you

25  work?

HOUSMAN-PEOPLE-DIRECT

1      A    Home Depot.

2      Q    And on October 18, 2006, were you work working for

3   Lowes as Lowes prevention manager there?

4      A    Yes.

5      Q    What store were you assigned to at that time?

6      A    2171 Staten Island, New York.

7      Q    I am sorry?

8      A    Staten Island, New York.  Staten Island store.

9      Q    Where is that store?

10     A    Forest Avenue.

11          THE COURT:  Keep your voice up so everybody can

12     hear you.  The mike is not on.

13          MR. MATTEI: The mike doesn't work.  You have to

14     project back to the.

15     Q    Were you working on the evening of October 18, 2006?

16     A    Yes.

17     Q    And was anybody else working with you that evening?

18     A    Yes.  I had one of my L.P.S.s working, his name was

19   Patrick and my boss Seth Harry.

20     Q    Sometime after 10:30, 10:45 or so, were you in your

21   office at Lowes?

22     A    Yes.

23     Q    And that's Lowes on Forest Avenue?

24     A    Correct.

25     Q    Can you tell us what's in your office?

AP

1      A      Inside my office that's where we keep all our

2   confidential paperwork, file cabinets from shoplifters, we

3   also have our video equipment.

4      Q      Do you have the monitors in that office?

5      A      Monitors, yes.

6      Q      What type of monitors did you have?

7      A      We have three, lutellix systems.

8      Q      And how many cameras did you have for the outside of

9   the building?

10     A      Outside of the building two mobile cameras.

11     Q      Where were they located?

12     A      One was scanning the parking lot and the other was

13  facing onto Forest Avenue.

14     Q      And the parking lot is the front of the store?

15     A      Yes.

16     Q      Was the other camera on the back of the store?

17     A      Back left hand corner.

18     Q      The Samuel Place side?

19     A      Yes.

20     Q      It's placed towards Forest Avenue?

21     A      Yes, correct.

22     Q      Can you tell us what happened about that time?

23     A      At approximately I would say little after 10:30 I

24  received a knock on my door.  It was one of my door guards

25  stating that there was an accident in the parking lot,

HOUSMAN-PEOPLE-DIRECT

1    that a car flipped over into the lot.

2           Immediately I went outside, my L.P.S. went outside

3    with me, my boss stayed behind and he started to scan the

4    parking lot.

5           As I got outside to the scene of the accident I

6    saw a car overturned in the parking lot inside the Lowes

7    parking area.  Once I ran up to the scene of the accident,

8    I saw somebody crawl out the passenger side, and then when

9    she finally got out of the car it was a female who was

10   naked.

11      Q    Do you see her in court today?

12      A    Yes.

13      Q    Can you describe what she is wearing today?

14      A    Green shirt.

15           THE COURT:  Indicating the defendant.

16           MR. MATTEI: Thank you.

17      Q    And did you see -- did somebody assist her out of

18   the vehicle?

19      A    Yes, I don't remember the gentleman's name.  I saw

20   somebody help her out of the car.

21      Q    Was he a security guard at that time?

22      A    Yes.

23      Q    How long did you stay outside approximately?

24      A    I will say maybe fifteen minutes we were outside.

25   Could be a little longer.

HOUSMAN-PEOPLE-DIRECT

1      Q      And after the defendant got out of the car, did

2   you stay in that area or did you go some place else?

3      A      I stayed in that area.  Once -- immediately once she

4   got out of the car I want to stay.  I don't want to give a

5   time frame.  I will say a couple of -- a few seconds later a

6   cop car arrived on the scene and went up to the dark car not

7   knowing that the subject was walking around.

8      Q      What did you see then?

9      A      They were trying to tell the police officers that

10  she was walking around and they bent down to look at the car

11  and at that time she went into the driver's side of the

12  police car and hit the doors.

13     Q      Did you have occasion to see a car out on Forest

14  Avenue?

15     A      Yes.  At one point in time I remember there was

16  another gentleman, ran over and said that she hit another car

17  in the parking lot -- I mean out on Forest Avenue and said

18  she also hit a pedestrian in the street.

19                   MR. RENFROE: Objection.

20                   THE COURT:  Sustained, just say what you saw.

21     Q      Well, did you go out on the street?

22     A      After the police had taken her into custody I

23  went to the front of the parking lot out through our

24  entrance.

25     Q      And tell us what you saw?

HOUSMAN-PEOPLE-DIRECT

1 A At that point in time, it's kind of hard to say.

2 There was a person there, just basically in pieces laying all

3 over the street.

4 Q Did you return to your office after that?

5 A Yes, I returned to my office after that and

6 just started to rollback the video to see if we had

7 anything.

8 Q Did you review the cameras from Samuel Place?

9 A Yes.

10 Q And from the parking lot?

11 A Yes.

12 Q And did you create a DVD that evening or CD that

13 evening --

14 A Yes.

15 Q -- from the area of the parking lot as well as a car

16 going through the intersection of Samuel Place?

17 A Yes.

18  MR. MATTEI: At this time I would like to play

19 People's 8.

20  THE COURT:  Okay.

21  (Whereupon, People's 8 was played to the jury.)

22 Q Do you recognize what's depicted on the scene right

23 now?

24 A Yes, that's our camera on the left side of the

25 building right near the hazmat cage.

HOUSMAN-PEOPLE-DIRECT

1    Q    This is part of the DVD that you captured that

2    night?

3    A    Yes.

4    Q    You signed that DVD sometime before today?

5    A    Yes.

6    Q    Mr. Housman, up to this point in the video was that

7    just an example of traffic travelling up and down Forest

8    Avenue?

9    A    Normal speed.

10   Q    Normal speed and regular fashion?

11   A    Yes.

12   Q    And did something significant happen at that point

13   in the video that you noticed?

14   A    Yes, within a few minutes you will see -- a few

15   seconds you will see a car go by.  I think it basically

16   takes three flicks for it to go by, the headlights weren't

17   on, wrong side of the road, towards the red light.

18                MR. MATTEI: Resume the video.

19   Q    That was it?

20   A    That was the car going through.

21   Q    Can we back it up.  Back it up.

22        Is this how you can tell it's on the wrong side of

23   the road, by the chevrons over there?

24   A    Yes, you can see that she is on the other side of

25   the road, on the other side the median.

AP

HOUSMAN-PEOPLE-DIRECT

1      Q    And every other car on this frame -- did you do

2   about five minutes or so on this?

3      A    I went from five minutes before to five minutes

4   after.

5      Q    And all the cars had the headlights on, you could

6   clearly see the headlights?

7      A    Yes.

8      Q    And you could see what side of the road the cars

9   were on on both sides of the road?

10      A    Yes.

11              MR. MATTEI: If we can have this marked as

12         People's 9, your Honor.

13              (Whereupon, a DVD was marked People's number 9

14         for identification.)

15      Q    Mr. Housman, you know what's on the second DVD?

16      A    Yes, that was the copy that was made.

17      Q    Is that a fair and accurate representation or

18   copy of some of the stills -- did that create stills from

19   the video we just saw?

20      A    Yes.

21      Q    And you were there when that was made with the

22   A.D.A. in the office?

23      A    Yes.

24      Q    Mr. Frey working the computer?

25      A    Yes.

HOUSMAN-PEOPLE-DIRECT

1          MR. MATTEI: At this time I move this into

2      evidence as People's 9 in evidence.

3               THE COURT:  Counsel?

4               MR. RENFROE: No objection.

5               THE COURT:  9 in evidence.

6               THE COURT OFFICER:   So marked

7               (Whereupon, People's number 9 was marked in

8      evidence.)

9      Q     We will call this still number one.  Is this

10     immediately before the car went through with no headlights as

11     it appears on the DVD?

12     A     Yes.

13     Q     Go to still number two now.

14           Is this the beginning of car up here behind the car

15     stopped at the light?

16     A     Yes.

17     Q     On number three, is this that same car going through

18     the intersection at -- right about where one of the crosswalk

19     lines are?

20     A     Yes.

21     Q     And number four, is this that same car on the

22     chevrons and on the other side of the road again with

23     no headlights having passed through the intersection?

24     A     Yes.

25     Q     And number five, is it cleared, the entire camera?

AP

HOUSMAN-PEOPLE-DIRECT

1        A    Correct.

2        Q    And with the lutellix system in place in your store,

3    is it capable of being edited or altered in any way?  Explain

4    how it works?

5        A    The lutellix system, each system is different.

6    There is no way I can edit any type of video.  Only thing

7    I can do is burn it on a CD.  Depending on how many cameras

8    we have on motion, every ninety, sixty days, it re-records

9    itself.  There is no way to erase.  You can't erase it,

10   tape over it.  What's there is there.  There is no way I can

11   alter a video anyway.   That's why I went five minutes before

12   and five minutes after to give you a whole scene of the car

13   going through.

14            There is no way I can erase anything on that video.

15       Q    Is there any way to erase anything that night?

16       A    No.

17       Q    You made this DVD that night?

18       A    Yes.

19       Q    And gave it to the police that night?

20       A    Yes.

21                      MR. MATTEI: Could I have this marked

22            People's 10.

23                      (Whereupon, a photograph was marked

24            People's 10 for identification.)

25       Q    Mr. Housman, do you recognize what's depicted in

HOUSMAN-PEOPLE-DIRECT

1    People's number 10 for identification?

2        A    Yes.

3        Q    What's that?

4        A    It's a photograph of Forest Avenue.

5        Q    And is that that same intersection that was involved

6    with the dark car with no lights on?

7        A    Yes.

8        Q    Is the camera depicted in that photograph?

9        A    Yes, it is the bottom right-hand corner.

10       Q    Maybe you can circle the camera.

11       A    (Witness complies.)

12       Q    Is that a fair and accurate representation of that

13   intersection and the side of the Lowes building?

14       A    Yes.

15       Q    And is that a fair and accurate representation of

16   how it appeared on October 18, 2006?

17       A    Yes.

18            MR. MATTEI:  Judge, at this time I would like to

19   move it into evidence as People's number 10 in evidence.

20            MR. RENFROE:  No objection.

21            THE COURT:  So moved 10 in evidence.

22            THE COURT OFFICER:  So marked.

23            (Whereupon, People's 10 was marked in

24   evidence.)

25       Q    Now, perhaps you can circle the position of the

1      camera that took that film?

2          A      (Witness complies).

3          Q      And show it to the jury?

4          A      Camera is right there (indicating).

5                  MR. MATTEI: Indicating the circled material,

6          your Honor.

7                  THE COURT:  So indicated.

8                  MR. MATTEI: I have no further questions.

9                  THE COURT:  Mr. Renfroe.

10                 MR. RENFROE: Thank you.

11     CROSS EXAMINATION

12     BY MR. RENFROE:

13         Q      Good afternoon, Mr. Housman, how are you?

14         A      How are you.

15         Q      You arrived on the scene very quickly; is that

16     correct?

17         A      Yes.

18         Q      Matter of fact, you actually are in the video?

19         A      Yes.

20         Q      You had a white shirt on?

21         A      Yeah, I believe so.

22         Q      Now, when you got there, you saw Ms. Taylor,

23     right?

24         A      Yes.

25         Q      And when you saw her, what was she wearing?

HOUSMAN-PEOPLE-DIRECT

1       A       Nothing.

2       Q       Was she screaming?

3       A       Yeah, she was screaming "money, power, respect".

4       Q       And can you tell me, was that in a loud voice?

5       A       Loud enough to hear, the people around.

6       Q       And was she dancing around?

7       A       I wouldn't say dancing, I would say jumping up and

8    down.

9       Q       And did she appear to be somewhat disoriented or

10   incoherent to you?

11      A       I would have to say, yes, you know.

12      Q       Tell us what did you see?

13      A       At the point when I saw everything it was just

14   kind of like a disbelief, what you just seen from the

15   accident outside to her getting out the car totally nude.

16   I guess you were totally taken back like what's going

17   on.

18      Q       What did you see about Ms. Taylor, was she happy,

19   sad, how did she look to you?

20      A       She had a regular face on.  Normal face, no smile,

21   no sad face.

22      Q       And you indicated she was saying something, what was

23   it?

24      A       "Money, power, respect."

25      Q       You say that the police arrived shortly after she

AP

HOUSMAN-PEOPLE-DIRECT

1    got out of the car; is that correct?

2        A    Yes, shortly after.

3        Q    And they came to investigate the vehicle to see if

4    there was anybody in there?

5        A    Yes.

6        Q    And she went to the police vehicle; is that correct?

7        A    Yes.

8        Q    How much time elapsed between the time they were at

9    her vehicle until the time they went back to where she was in

10   their vehicle?

11       A    I am not too sure.  I couldn't give you an honest

12   guess on that.

13       Q    Can you give us the distance how far the blue

14   vehicle was from the police vehicle?

15       A    Maybe less than fifteen yards.

16       Q    The distance in this courtroom?

17       A    I would say if I had to say, her car was here and

18   the police car was maybe on the right side two, three rows

19   back.

20                    THE COURT:  Indicating about twenty feet.

21                    THE WITNESS:  Maybe less than that.

22       Q    Was the police car on?

23       A    I believe so, yes.

24       Q    And when she got in the police car, where were the

25   police?

1    A    They went to her car.

2    Q    So, they then left from that vehicle and went back

3    over to where she was at, right?

4    A    Yes.

5    Q    And did she ever get that vehicle to get into drive?

6    A    No.

7    Q    Did you hear any of the conversations she was having

8    with the police?

9    A    No.   Only thing I heard was the police officer

10   say, get out of the car.   That was it. I didn't hear anything

11   else.

12   Q    What happened after the police said that?

13   A    They repeated it maybe a few times and I think the

14   one cop went through the driver's side and was able to open

15   the door at one point.

16   Q    And at some point they took her out of the police

17   car?

18   A    Yes.

19   Q    Where did they put her?

20   A    What's that.

21   Q    Do you know where she was placed?

22   A    I think she was placed in the back of the patrol

23   car.

24   Q    Were you looking at her at this time?

25   A    I think at that point in time that's when another

HOUSMAN-PEOPLE-DIRECT

1   gentleman came over and just said forget her, she hit

2   somebody in the street --

3                    MR. RENFROE: Your Honor, that wasn't

4       responsive.

5                    MR. MATTEI: That was responsive.  Objection.

6                    THE COURT:  Read the answer back please.

7                    MR. MATTEI: And the question.

8                    THE COURT:  Read the question first.

9                    (Whereupon, the requested portion was read

10      back.)

11                   THE COURT:  Sustained.  Strike that from the

12      record.  Go ahead.

13      Q    Were you looking at that at that time; yes or

14   no?

15      A    I would say, yes.

16      Q    Did she still look incoherent to you?

17                   MR. MATTEI: Objection.

18                   THE COURT:  Overruled.

19      A    I don't know if I could give a straight answer on

20   that.

21      Q    Tell us what you saw?

22      A    She didn't show any emotion.  She wasn't happy, she

23   wasn't sad.  I didn't see any of that.

24      Q    She showed no emotion at all?

25      A    No.

HOUSMAN-PEOPLE-DIRECT

1    Q    You had indicated she was jumping up and down.  At

2    some point she was in the car; is that correct?

3    A    Uh-huh.

4    Q    She got out of the car; is that correct?

5    A    Yeah, she crawled out the passenger side window,

6    went around.

7    Q    At some point she is literally jumping up in the

8    air?

9    A    Yes.  Not like -- I guess it was like jumping up and

10   down, hop, steps, and then started walking around.

11   Q    And when you say hop, steps, can you describe?

12   A    She was jumping like taking steps.  Jumping, hopping

13   up and down.

14   Q    Instead of walking she was jumping?

15   A    Yeah.

16             MR. RENFROE:  Just one second, your Honor.

17             THE COURT:  Take your time.

18   Q    You heard her saying "money power, respect"?

19   A    Correct.

20   Q    How many times did she repeat that?  Was it more

21   than once?

22   A    It was more than once.  I can't give you an absolute

23   number.

24   Q    You have too help us, we weren't  there.  More than

25   five?

HOUSMAN-PEOPLE-DIRECT

1     A    I really don't recall. I know she did say it.  She

2  did say it.

3     Q    Was it something she was chanting?

4     A    I guess you could say that.

5          MR. RENFROE: Your Honor, I have no further

6  questions.

7               THE COURT:  Counselor.

8               MR. MATTEI: No further questions.

9               THE COURT:  Thank you, you can step down.

10              (Whereupon, the witness is excused.)

11              THE COURT:  Call your next witness please.

12              MR. MATTEI: People call Emanuel Saldivias.

13              THE CLERK:  Raise your right hand, please.

14  E M A N U E L   S A L D I V I A S

15              Having been called as a witness by and on

16  behalf of the People, after having been first duly sworn,

17  testified as follows:

18

19

20

21

22

23

24

25

HOUSMAN-PEOPLE-DIRECT

1           THE CLERK:  Please be seated.

2           For the record, please state your name and

3       spell your last name.

4           THE WITNESS:  Name is Emanuel Saldivias.

5       Saldivias.

6           THE CLERK:  Thank you.

7           THE COURT:  Thank you.  Counselor.

8   DIRECT EXAMINATION

9   BY MR. MATTEI:

10      Q    Good afternoon.  Tell the members of the jury where

11  you where?

12      A    On the night I was standing in front of Chick N

13  Bones --

14      Q    Where do you work?

15      A    Where do I work?

16      Q    Yes.

17      A    I work in the city, Symphony House.

18      Q    And prior to that, in October of 2006, where did

19  you work?

20      A    I worked in Barnes and Noble.

21      Q    Did you work on October 18, 2006?

22      A    Yes, I did.

23      Q    Did you go out after work?

24      A    Yes, I did.

25      Q    Where did you go?

1     A      Chick N Bones.

2     Q      What time did you get there, approximately?

3     A      10:00, 10:15.

4     Q      And where is Chick N Bones located?

5     A      On Forest Avenue between Amity and South Avenues.

6     Q      And did you stay inside the Chick N Bones all night?

7     A      No.

8     Q      Tell us what happened when you came outside?

9     A      It was brief. .  I was getting ready to go home.  I

10    was smoking a cigarette.  I was about to walk away, go home,

11    when I heard a car laboring.  That's when I turned my head

12    to the right and I looked down the block and I seen a car

13    coming, no headlights on, proceeds to keep coming, runs

14    through a red light, hits a gentleman who I saw in the

15    middle of the street.

16    Q      What side of the street was that car on?

17    A      The opposite side of oncoming traffic.

18    Q      The wrong side of the road?

19    A      Yes.

20    Q      Your side of the road as you stood at Chick N Bones?

21    A      Yes.

22    Q      Where did the car go after it hit the man?

23    A      After it hit him it kept going.  It hit a red Toyota

24    that was sitting at a red light, careened off and flipped

25    into the parking lot across the street.

HOUSMAN-PEOPLE-DIRECT

1    Q    Can you tell us where the man went that was hit?

2    A    He went through the air.  He was hit, and he flew at

3    least thirty feet across the parking lot.

4    Q    Through the telephone wires?

5              MR. RENFROE: Objection.

6              THE COURT:  Overruled.

7    Q    By the telephone wires there?  Are there telephone

8    wires there?

9    A    Yes.

10   Q    Where how are they?

11   A    Twenty, twenty-five feet in the air.

12             MR. MATTEI: Judge, can I have this marked as

13        People's 11.

14             (Whereupon, photographs were deemed People's

15        11A and 11B in evidence.)

16   Q    Do you recognize what's depicted in the photograph

17   marked 11A, designated 11A?

18   A    Yes.

19   Q    Is that a fair and accurate view of Forest Avenue

20   from the Chick N Bones?

21   A    Yes, it is.

22   Q    Is that a fair and accurate view as it was that

23   night on October 18, 2006?

24   A    Yes, it is.

25             MR. MATTEI: Judge, at this time I ask that it

AP

1    be moved into evidence.

2                THE COURT:  Counsel.

3                MR. RENFROE: No objection.

4                THE COURT:  So moved 11A in evidence.

5                THE COURT OFFICER:  So marked.

6                (Whereupon, People's 11A was marked in

7        evidence.)

8        Q    And with regard to 11B, do you recognize what's

9    depicted in that photograph?

10       A    Yes, I do.

11       Q    Is that a fair and accurate view of Forest Avenue as

12   you looked from Chick N Bones -- in front of Chick N Bones to

13   the left?

14       A    Yes.

15       Q    And is that the same way it appeared on October 18,

16   2006?

17       A    Yes.

18                MR. MATTEI: Judge, I ask that that be moved

19        into evidence.

20                THE COURT:  Any objection?

21                MR. RENFROE: No.

22                THE COURT:  11A and B.

23                THE COURT OFFICER:  So marked

24                (Whereupon, People's 11B was marked in

25        evidence.)

HOUSMAN-PEOPLE-DIRECT

1      Q      With regard to 11A, can you hold that up.  Can you

2    describe for us the car that struck the man?

3      A      Describe the car?

4      Q      Yeah, describe the car?

5      A      It was dark out, so it was a dark color in general.

6    It looked like a, Nissan that's what it looked like.

7      Q      In that picture 11A, can you show the jurors

8    which direction it came from and passed by the Chick N

9    Bones?

10     A      This side -- on my side of the street the wrong way,

11   traffic going this way.

12     Q      So from the right to the left as you look at that

13   photograph?

14     A      Yes.

15     Q      Is that in the direction of South Avenue?

16     A      Yes.

17     Q      Does that fairly and accurately reflect the

18   telephone wires that were there?

19     A      Yes.

20     Q      Look at 11B also, does that fairly and accurately

21   represent the telephone wires that were there that

22   night?

23     A      Yes.

24     Q      Can you show us in 11A the path that the man took as

25   he passed before your eyes?

HOUSMAN-PEOPLE-DIRECT

1     A   He went from this region up and over this way.

2     Q   So, from the right to the left up and over and

3  through those telephone wires?

4     A   Striking them and landing in the street.

5     Q   And landing down the block?

6     A   Down the block in the street.

7     Q   Prior to the man being struck, did you hear the car

8  with no lights on sound?

9     A   Yes.

10    Q   You heard the car?

11    A   Yes.

12    Q   Tell us exactly what it sounded like?

13    A   It sounded like a speeding car coming very

14  fast.  The engine was laboring.  You could very distinctive.

15    Q   Do you drive?

16    A   Yes.

17    Q   Can you remember, have you had occasion to estimate

18  the speed of cars on the road in the past?

19    A   Yes.

20    Q   Can you approximate for the members of the jury how

21  fast that car was going when it struck the man?

22    A   High rate of speed.  Anywhere from eighty-five to

23  the triple digits it looked like.

24    Q   Prior to striking the man, did the car swerve at all

25  to avoid him?

ALBANO-PEOPLE-DIRECT

1    A    The car as it was coming went through a red light

2    where there was another car sitting, had to go around that

3    car.

4    Q    And when it struck the man, did it swerve to avoid

5    him?

6    A    Didn't seem to swerve at all, just kept going.

7    Q    Did it sound its horn?

8    A    No.

9    Q    Did it hit its brakes?

10   A    No.

11              MR. MATTEI: No further questions.

12              THE COURT:  Counsel.

13              MR. RENFROE: Your Honor, I have no questions

14   for this witness.

15              THE COURT:  Thank you.  You can step down.

16              (Whereupon, the witness is excused.)

17              THE COURT:  Call your next witness, please.

18              MR. MATTEI: People call Detective Robert

19   Albano.

20              THE CLERK:  Raise your right hand, please.

21   D E T E C T I V E   R O B E R T   A L B A N O,

22         bearing Shield Number 16236, called as a

23         witness on behalf of the People, having first

24         been duly sworn, was examined and testified as

25         follows:

AP

ALBANO-PEOPLE-DIRECT

1          THE CLERK:  Please be seated.

2                For the record please state your name, spell

3    your last name, give your shield number and command.

4                THE WITNESS:  Police Officer Albano, shield

5    number 16236 of Highway Five.

6                THE COURT:  Ladies and gentlemen we are going

7    to take a ten-minute recess.  We will call you back in a

8    few minutes.

9                (Whereupon, the jury exits the courtroom. )

10               THE COURT:  The jury is out of the room.  The

11   door is closed.  You can step outside.  Be back outside

12   the door in about five minutes.

13               THE WITNESS:  Yes, sir.

14               (Whereupon, the witness exits the courtroom. )

15               THE COURT:  Ten minutes.

16               (Whereupon there was a break in the

17   proceeding.)

18               THE CLERK:  Case on trial continues.  People of

19   the State of New York against Taliyah Taylor under

20   indictment 335 of 2006 in the absence of the sworn

21   jurors.

22               THE COURT:  Please bring the panel, please.

23               MR. RENFROE: I know we looked at photographs.

24   There were some that were excluded because of the graphic

25   nature of the photographs.  I understand there is a

1    balance that the Court has to strike between prejudice

2    and probative value.

3    One of things I want to note is I don't

4    think the defense is contesting that this accident

5    didn't happen, and Mr. Simon wasn't killed, and the

6    vehicle wasn't driven by Ms. Taylor under those

7    premises.

8    There is one where -- the shot of Mr. Simon in

9    the street, I really don't have an objection to that.

10   There are two photographs of that, they have his legs

11   severed from his body and I object to those photographs

12   in light of the fact that we are not contesting that we

13   are the cause of that.

14   I understand the district attorney has the

15   ability to prove his case, but just that I think the

16   prejudice outweighs any probative value since there

17   are many things that -- as you see, we are not

18   contesting.

19   THE COURT:  Counsel.

20   MR. MATTEI: I think those pictures go to a lot

21   of what's going on in the case.  The corroborative speed,

22   the corroborative of how far he went and they show

23   exactly what happened.

24   They are not that graphic at all. You seen some

25   graphic pictures.  There is no blood involved because of

ALBANO-PEOPLE-DIRECT

1    the nature of the injuries.  They are what they are.

2    They are pieces of his body.  There is nothing that is so

3    grotesque that those pictures should not go into the

4    jury.

5         THE COURT:  The Court viewed, I guess, half a

6    dozen photographs.  Of those photographs one was of the

7    torso.  I believe that's the one you are not objecting to

8    Mr. Renfroe.

9         MR. RENFROE: That's correct.

10        THE COURT:  And the other two are of the

11   individual legs of Mr. Simon that were found at different

12   spots from the torso.  The three that were excluded were

13   very gory and gruesome photographs showing blood and

14   interior body parts and organs on the roadway.  These

15   three simply show the areas where the individual sections

16   of Mr. Simon were found.

17        Just to reiterate, the torso and two legs.

18   None of the three photographs is particularly bloody.

19   They obviously speak for themselves.

20        The Court's reasoning for allowing these

21   photographs in, are threefold.  First, it's important

22   that the People be allowed to introduce evidence as to

23   the speed and manner in which the car was driven.

24        Obviously, the person was struck by the vehicle

25   and what occurred to that person goes in some way to the

AP

1    speed, obviously, the car that was driven and the manner

2    of the car was driven.

3         And also the element of depravity, the speed of

4    the vehicle and manner it was driven has some relevance

5    to depravity.

6         And also finally the manner of death, and the

7    injury to the body may have some relevance.  Obviously,

8    these are factors for the jury to determine.  They may

9    have some relevance or do have relevance with respect

10   to the injury and the manner of death.  The People

11   can't stipulate to those particular -- I don't think the

12   defense would stipulate either to those particular

13   items.

14        In any event, the People couldn't be forced to

15   stipulate those being elements of the crime.  I don't see

16   anyway that I could preclude them.

17        The Court must note that it is, of course,

18   moved as anyone would be with respect to these particular

19   photographs and I do understand your concern,

20   counselor.

21        We also intend to give an admonition with

22   respect to the photographs when they enter dealing with

23   the reason for their entry.

24             Is there anything else?

25             MR. RENFROE: No, your Honor.  Thank you.

AP

ALBANO-PEOPLE-DIRECT

 1          THE COURT:  Send in the witness and then bring

 2      in the panel, please.

 3              (Whereupon the witness enters the courtroom.)

 4              THE CLERK:  Be seated officer.

 5              THE COURT OFFICER:   Ready for the jury,

 6      Judge?

 7              THE COURT:  Yes, please.

 8              THE COURT OFFICER:   Jury entering.

 9              (Whereupon, the jury enters the courtroom.)

10              THE CLERK:  Do both sides stipulate to the

11      presence and proper seating of the official sworn jury

12      and reading of the roll?

13              MR. MATTEI: So stipulated.

14              MR. RENFROE: So stipulated.

15              THE COURT:  Thank you.  Counsel

16  DIRECT EXAMINATION

17  BY MR. MATTEI:

18      Q    Officer Albano, where are you assigned?

19      A    Currently assigned to Highway Patrol Unit number

20  Five.

21      Q    Is that here on Staten Island?

22      A    Yes, it is.

23      Q    How long have you been a police officer?

24      A    About eighteen years.

25      Q    Where have you worked on the police department?

ALBANO-PEOPLE-DIRECT

1    A    I started my assignment in the 9th precinct,

2    lower Manhattan, then Highway Two in Brooklyn and

3    currently assigned to Highway Five.

4    Q    And what type of duty do you have at Highway Five?

5    A    My responsibility is usually generally at nighttime,

6    patrol.  Random patrol on the highway. I also do speed

7    enforcement on the highway. I am D.W.I. Technician, I enforce

8    D.W.I. as well and I am an accident investigation technician.

9    Q    Tell the members of the jury what you mean by

10    accident investigation technician?

11    A    I respond to accidents where people have been

12    killed or likely to die at that accident scene.

13    Q    And have you received any training with regard to

14    being an accident technician?

15    A    Yes, I did.

16    Q    What type of training did you receive?

17    A    I received a two week course in accident

18    investigation.

19    Q    And after that, did you receive hands-on training in

20    the field and things like that from other members of highway

21    units and detective?

22    A    Yes, we work closely with the detective unit.

23    Q    How are they detectives assigned to the accident

24    investigation squad?

25    A    Yes, they are.

190

ALBANO-PEOPLE-DIRECT

1    Q    How many accident investigations have you been a

2    part of?

3    A    Been a part of about thirty-five.

4    Q    Of those, how many have you been the lead

5    technician?

6    A    Approximately eight to ten.

7    Q    Tell us what you do as an accident technician

8    when you go to a scene where somebody is dead or likely to

9    die?

10   A    Well, we are notified through the radio to respond

11   to a scene which we did.

12        At that scene first thing we are doing is looking

13   for key pieces of evidence that involves that incident.  We

14   try to locate the evidence, we try to locate the people

15   involved.  We locate anything that can be involved in the

16   accident, the road conditions, the lighting conditions.  We

17   do a technical drawing of the scene.  We photograph the scene

18   and also interview witnesses.

19   Q    Now, on October 18, 2006, were you working?

20   A    Yes, I was.

21   Q    And what tour of duty did you have?

22   A    I was working 10:15 at night to 6:50 in the

23   morning.

24   Q    And at some point after roll call were you assigned

25   to go some place?

AP

ALBANO-PEOPLE-DIRECT

1        A    Yes, I was directed to Forest Avenue and Samuel

2    Place.

3        Q    Describe that area of Forest Avenue?

4        A    That area of Forest Avenue is a four-lane roadway

5    east and west bound, two lanes for eastbound, two lanes for

6    westbound.

7             The east and westbound traffic is separated by

8    a safety zone, two sets of yellow pavement marking

9    double yellow lines with white hash marks in the

10   middle.

11       Q    Where were you specifically assigned to go?

12       A    We were we were to go to Samuel and Forest.

13       Q    Where is Samuel Place?

14       A    It's next to the Lowes on Forest Avenue.

15       Q    Would that be behind the Lowes, so to speak?

16       A    Yes.

17       Q    Are you familiar with Amity Place?

18       A    Yes, I am.

19       Q    Can you describe for the members of the jury

20   where Amity Place is with regard to Forest and Samuel

21   Place?

22       A    It's a little offset street from Samuel Place.

23   Samuel Place and Amity Place are side streets that run into

24   Forest Avenue..  There is a "T" intersection, you can't go

25   straight on those.  Once you get to Forest Avenue you either

ALBANO-PEOPLE-DIRECT

1    have to make a left or right turn.

2       Q    Is Amity Place on the other side of Forest Avenue

3    from Samuel Place?

4       A    Yes.

5       Q    Is there a traffic control device at Amity Place?

6       A    Yes.

7       Q    What type of traffic control device?

8       A    Three phase lights.  It goes from a green to yellow

9    to red.

10      Q    Now, what's the speed limit at that part of

11   Forest?

12      A    Posted thirty-five miles per hour.

13      Q    When you say posted, what does that mean?

14      A    There is a sign located at a pole stating the exact

15   speed limit you can go.

16      Q    Where was that sign posted on Forest Avenue?

17      A    On Forest Avenue just below Samuel Place.

18      Q    Now, do you bring equipment with you to a scene when

19   you go there?

20      A    Yes.

21      Q    What type of equipment do you bring?

22      A    We have an accident investigation case.  Inside that

23   case it consists of a camera, film, various paperwork that we

24   need to do at the scene.  It has a measuring stick, which

25   is a walking stick that we take our measurements.  There is

ALBANO-PEOPLE-DIRECT

1    a moving tape which is a hand held measuring device, yellow

2    crayons, and various paperwork that we do at the scene.

3        Q    Do you do anything with the equipment prior to going

4    to the scene?

5        A    Yes, we check our case before we leave the station

6    house.

7        Q    Did you check your equipment that night?

8        A    Yes.

9        Q    Prior to going to Forest and Samuel Place?

10       A    Yes.

11       Q    Tell the members of the jury what, if anything, you

12   saw when you first got to Forest and Samuel Place?

13       A    When we first got to Forest and Samuel Place, by the

14   time I got there there was numerous officers on the scene,

15   E.M.S., supervisors.

16       Q    Did you know what type of situation you were going

17   to investigate?

18       A    Yes, I did.

19       Q    What was that?

20       A    It was a vehicle incident that had a pedestrian

21   killed.

22       Q    After you got there and saw other police presence,

23   what did you do?

24       A    The first thing was speak with my supervisor, at

25   that portion I was told what kind of incident, again, that it

AP

ALBANO-PEOPLE-DIRECT

1    was.

2           At that time I started to walk through the scene and

3    take notice of everything that was going on.

4    Q    Where did you walk through the scene from?

5    A    I was actually closer to South Avenue, I started

6    walking the scene up to Samuel place.

7    Q    And as an accident investigator, how do you measure

8    the scene?  How do you do that?

9    A    What we do is try to develop a reference point.

10   Q    Tell the members of the jury what you mean by a

11   reference point?

12   A    A reference point is an object in the scene that is

13   something that's always going to be there.  What I used, I

14   used several of them, light poles.  Even if you knock down a

15   light pole at a later date there is a city diagram that can

16   tell you where that light pole was on that particular day.

17          I know where ever I do my diagram from I can always

18   go back to that exact spot, whether the light pole is there

19   or not and take my measurement from there.

20   Q    How many reference points did you use in this case?

21   A    I used three reference points in this case.

22   Q    Why did you use three?

23   A    Due to the size of the scene, it was over 700 feet

24   long.  Just to make reading the diagram at a later date

25   easier for myself or any other person that was going to read

AP

ALBANO-PEOPLE-DIRECT

1    that diagram.  It was easier to use three reference points so

2    it's not so far.  It's easier for people to read.

3         Q    As part of an accident investigation technician, do

4    you take note of the weather when you go to a scene?

5         A    Yes.

6         Q    What was the weather like?

7         A    Clear night, normal weather conditions, the road was

8    dry.

9         Q    Did you take note of the street it self?

10        A    Yes.

11        Q    What was the pavement condition?

12        A    Asphalt street, pavement markings through the

13   incident from Samuel Place to South Avenue.

14        Q    Did you take note of the streetlights and other

15   marks like that on the street?

16        A    Yes.

17        Q    Tell the members of the jury what you observed for

18   that crime scene?

19        A    Samuel Place -- on Forest Avenue from Samuel place

20   to South Avenue there was numerous light poles that had

21   working lights on it to give us the road conditions to make

22   sure it was properly lit and it was.

23             There was traffic lights at Samuael Place and at the

24   entrance way to the Lowes parking lot, and there were three

25   phase lights that were overhanging.

ALBANO-PEOPLE-DIRECT

1        I did check to make sure they were in proper working

2   order.  There were crosswalks in the area, made sure all the

3   pavement markings were clear.

4        As you came up to the entrance way to the Lowes

5   parking lot, on the eastbound end and westbound side of

6   the intersection there were pavement markings in each lane

7   that were arrows that tell the traffic which direction to

8   go.

9        Q    Now.  Where did you establish your first reference

10  point?

11       A    My first reference point was just off the corner of

12  Samuel Place.

13       Q    What was that?

14       A    A light pole.

15       Q    Now, you walked the scene?

16       A    Yes.

17       Q    Tell us what you saw when you walked the scene?  Did

18  you see some vehicles?

19       A    The first thing I do is I walk the scene from the

20  start to the end and at that point I am just taking note of

21  what's in the street.

22       There was debris from the accident, which were parts

23  of the car, glass, there was parts of the victim's clothing

24  spread throughout the scene.  There was the victim himself.

25  There was other various body parts that were throughout the

ALBANO-PEOPLE-DIRECT

1    scene.   There was the first vehicle, the maroon vehicle that

2    was still at the intersection of Forest Avenue and Lowes.

3    And the second vehicle that was overturned in the Lowes

4    parking lot.

5         Q     Now, with regard to the vehicle that was overturned

6    in the Lowes parking lot, did you determine what type of

7    vehicle that was?

8         A     Yes.

9         Q     Could you tell us what type of vehicle that was?

10        A     I am just going to go to one of the sheets that I

11   have.   That has all the information on it.

12                   MR. MATTEI: May he refresh his recollection.

13                   THE COURT:   If you need it to refresh your

14         recollection.

15        A     The car that was overturned in the parking lot, 1995

16   Nissan, four-door, blue in color.

17        Q     What was the license plate?

18        A     D, as in David, U, as in union, S, as in Sam, 5034.

19        Q     And did you come to determine who the registered

20   owner was?

21        A     Yes.

22        Q     Who was that?

23        A     Trisha Matthews.

24        Q     Did you have an address for her?

25        A     Yes, 17 -- 173 Pine Place, Staten Island, New York.

ALBANO-PEOPLE-DIRECT

1    Q    And how about the second car that was involved?

2    A    Second car was a 2005 Toyota four-door sedan, maroon

3    in color.

4    Q    Who was the owner of that car?

5    A    Vincent Cavalieri.

6    Q    Did you take note of the license plate?

7    A    Yes.  V, as in Victor, V, as in Victor, A, as in

8    Adam, 554.

9    Q    Did you come to learn some pedigree information

10   about the pedestrian or the person that was killed?

11   A    Yes, I did.

12   Q    What was his?

13   A    Larry Simon.

14   Q    Did you get his age?

15   A    Forty-one years old.

16   Q    After you indicated that you draw a diagram and you

17   use your reference point to do that, did you draw a diagram

18   in this case?

19   A    Yes.

20   Q    How many pages did your diagram encompass?

21   A    Four pages.

22            MR. MATTEI: Judge, if I can have these marked as

23       12A, B and C.

24            MR. MATTEI: Mr. Renfroe, did you see them?

25            MR. RENFROE: Yes

AP

ALBANO-PEOPLE-DIRECT

1          (Whereupon, drawings were marked People's

2      People's 12A, B and C for identification.)

3          MR. MATTEI: If I may have them shown to the

4      witness.

5      Q    Do you recognize what's depicted in People's 12A for

6  identification?

7      A    Yes, I do.

8      Q    And what is that?

9      A    It's a top portion of my diagram.

10     Q    Would that be what we refer to as the first page?

11     A    Yes.

12     Q    I am going to ask you to look at B, and do you

13  recognize that?

14     A    Yes.

15     Q    What is that?

16     A    That's actually the second and third page of my

17  diagram.

18     Q    And C do you recognize that?

19     A    Yes.

20     Q    What's that?

21     A    A fourth page of my diagram.

22     Q    Are these fair and accurate reproductions of your

23  original diagram?

24     A    Yes.

25     Q    Just blown up to a better size for people to see?

ALBANO-PEOPLE-DIRECT

1    A    Yes.

2              MR. MATTEI: If I may I have these admitted as

3    12A, B, and C.

4              THE COURT:  Counsel.

5              MR. RENFROE: No objection.

6              THE COURT:  So moved 12A, B and C in evidence

7              THE COURT OFFICER:   So marked.

8              (Whereupon, People's 12A, B and C was marked in

9    evidence.)

10             THE COURT:  Thank you, counsel.

11   Q    You indicated that you take measurements at the

12   scene, from your reference point how do you do that?

13   A    What I do is actually, each piece of evidence comes

14   with two measurements.  What I do for my reference point, I

15   first walk in the westbound direction to where a point of

16   reference would be, so everything west of my first point of

17   reference, then I go southbound.  So everything is in a right

18   angle.

19   Q    Why don't you hold up A so we can start at 12A.

20   Maybe if you can put it on the easel and lean over.

21             Can you show us what's -- or tell the members of the

22   jury what's in this portion of your diagram?

23   A    In this portion of my diagram this is Forest Avenue

24   and everything east of my reference point if you are coming

25   from Richmond Avenue, which is the next major intersection,

ALBANO-PEOPLE-DIRECT

1  going down towards South Avenue.  This diagram is depicting

2  Forest Avenue as a four-lane roadway, two lanes in each

3  direction, the safety zone that I drew.  These would be solid

4  yellow linings and these would be the white hash marks going

5  across.

6       This is the intersection where Amity Place is

7  running into Forest Avenue.  And this is the traffic control

8  lights that are overhanging that control of the east and

9  westbound traffic.

10      Q    This would be on the rear of the Lowes Home

11  Improvement Store?

12      A    Yes.  This would be the Lowes Home Improvement Store

13  and Richmond Avenue.

14      Q    Can you show us now B.  Can you show us on there

15  where your first reference point was?

16      A    My first reference point is the light pole that's

17  right up here.

18      Q    Right on the top of the diagram?

19      A    Just where the diagram starts.

20      Q    Does it have a number?

21      A    Yes.

22      Q    What's the number?

23      A    I am going to read it from the diagram because it's

24  a little cut, 18614.

25      Q    And just without getting into the details of what

ALBANO-PEOPLE-DIRECT

1    you found, show us how you walked the scene and marked where

2    the evidence is.

3        A    As I said, this would be my first reference point up

4    here.  As I am walking the scene this is going down towards

5    South Avenue.  This would be the first A.

6            A would be the first piece of evidence I had

7    located.  The way I measured it, I am walking down and

8    measuring how far down from this light pole.  I am walking

9    west now going towards South Avenue up to where the first

10   piece of evidence is.

11           So, I am walking down, I measure where it comes and

12   I measure across from this point.  Everything works on a

13   right angle aspect.

14       Q    Now are you familiar with what skid marks are?

15       A    Yes.

16       Q    Tell the members of the jury what skid marks are?

17       A    Skid marks are when a person applies their brakes

18   and locks their brakes.  Your tire heat up and it leaves a

19   marking on the road as the tire goes across that surface.

20   In the skid mark you can see the thread of the tire and the

21   grooves of the tire.

22       Q    And are skid marks important in an accident

23   investigation?

24       A    Yes, they are.

25       Q    Can you tell us why?

ALBANO-PEOPLE-DIRECT

1     A     They help us determine the speed of the vehicle.

2     Q     Can they also help you determine --

3     A     The direction.

4     Q     -- the direction of the vehicle?

5     A     The direction of travel, yes.

6     Q     Are you familiar with a term called coefficient of

7     friction?

8     A     Yes.

9     Q     What is that?

10     A     Coefficient of friction is a measurement of

11     the resistance needed of an object to go across a surface.

12     Q     Is that just applicable to cars and roadways?

13     A     No, it's applicable to anything.  Any object going

14     across a surface.

15     Q     Any object going across a surface?

16     A     Right.

17     Q     How do you measure coefficient of friction?

18     A     We use a -- it's a weighted tire.  It's a known

19     weight that we have, it's actually 25.3 pounds.  It's the

20     bottom portion of a tire and it has a weight in it.  What we

21     do is we use another scale and we place it next to the skid

22     mark and we use a constant force pulling on that weight and

23     we get a number and it goes into a known equation and that

24     gives us the coefficient of friction and gives us a known

25     speed.

1          MR. MATTEI: Can we have this marked as People's

2      number 13.

3          (Whereupon, a photograph is marked People's 13

4      for identification.)

5      Q    Do you recognize what's depicted in People's Exhibit

6   13?

7      A    Yes.

8      Q    What is that?

9      A    A drag sled.

10     Q    And is that the drag slick used on the evening of

11  October 18, 2006?

12     A    Yes.

13          MR. MATTEI: I ask that that be moved into

14      evidence as People's Exhibit 13.

15          MR. RENFROE: No objection.

16          THE COURT:  So moved.

17          (Whereupon, People's 13 was marked in

18      evidence.)

19     Q    If you can hold that up for the jurors now show them

20  again how it works?

21     A    What you are seeing is the top view. The bottom part

22  is what you would normally look at, your tire.  Inside it's

23  weighted and the weight of the sled is 25.3 pounds.  This

24  object here is the scale.  Before I pull it along the scene

25  I make sure I weigh the tire to make sure it's still

ALBANO-PEOPLE-DIRECT

1    accurate to the 25.3 pounds.

2           What I do is place it this next to the skid mark and

3    I pull it on the handle using a constant force and it will

4    give us a reading on the scale of which I was doing with the

5    detective and the detective took the reading.

6       Q    Do you do that more than once?

7       A    Yes.

8       Q    Did you do it more than once that night?

9       A    Yes, we did.

10      Q    Can you show us now on your diagram the evidence

11   that you obtained and where you obtained it?

12      A    As I walk through the scene things that I noticed I

13   actually have listed on the side.  Point A, I found some skin

14   tissue from the victim.

15          Point B there is a piece of the victim's underwear.

16      Q    How far away from the reference point was point A?

17      A    Point A was a 119 feet 9 inches west of my first

18   reference point and 39 feet 6 inches south of my reference

19   point.

20      Q    In which lane of traffic on Forest Avenue was that

21   piece of skin found?

22      A    Going from lane one, two, it was found in the third

23   lane where the A is marked.

24      Q    Is that a lane that would be for traffic proceeding

25   towards Richmond away from South?

ALBANO-PEOPLE-DIRECT

1    A    Yes, it is.

2    Q    All right, show us where B was?

3    A    B was also -- it was in the fourth lane, that was a

4    piece of the victim's underwear.

5         C, which is actually in the safety zone, that was

6    one of victim's sneakers.

7         D, which is also a little further down in the safety

8    zone, was some more skin tissue from the victim.

9         E, which is now in front of the parked car, that

10   lane, was a turn single from one of the cars.

11        F, which is I little further down, that's some more

12   clothing from the victim.

13        G, which is over here now, which is more underwear

14   from the victim.

15        H, again was more clothing from the victim.

16        I, was the victim's -- pieces of the victim's

17   jeans.

18        J, was also some more of the victim's jeans.

19        K, which would be down here, was also parts of the

20   victim's clothing.

21        L, which is now over here, which would be another

22   one of victim's sneakers.

23   Q    How far away from the reference point was that

24   sneaker?

25   A    The L.

ALBANO-PEOPLE-DIRECT

1      Q      The L?

2      A      The L was 242 feet 3 inches from my first reference

3   point and then it was 64 feet over.

4      Q      Just so it's clear, the reference point is not -- if

5   I jump ahead -- is not where you think Mr. Simon was struck,

6   correct?

7      A      Correct.

8      Q      That's a fixed reference point that you use to take

9   your measurements?

10     A      Correct.

11     Q      What's M, continue?

12     A      M, was which is located right here, was one of the

13  victim's legs.

14     Q      How far away from the reference point was that leg?

15     A      That leg was 340 feet 8 inches from my reference

16  point and 54.7 inches over from the reference point.

17     Q      Continue.

18     A      N, was some more skin tissue that I had found.  That

19  was in the area over here.

20            O, again was more skin tissue down here by this

21  parked car.

22            That's everything I used for my first reference

23  point.

24     Q      Now, where was your second reference point?

25     A      My second reference point was here at the light pole

ALBANO-PEOPLE-DIRECT

1    just before the Lowes parking lot.

2        Q    How far from reference point number one was

3    reference point number two?

4        A    389 feet 10 inches.

5        Q    Tell us what you found after you used your second

6    reference point?

7        A    A, which was all the way across in the Bank of

8    America parking lot, which is behind a parked car, was the

9    second leg of the victim.

10       Q    Could you tell us how far away that was from the

11   second reference point?

12       A    From the second reference point it was two feet east

13   and then it was a 125.3 feet south of that reference point.

14       Q    And that was in the parking lot?

15       A    Yes, it was a Bank of America.

16       Q    Go ahead.

17       A    B, which would be right here, was the remaining

18   torso of the body.

19       Q    How far was the torso from the second reference

20   point?

21       A    From the second reference mark it was 49 feet 6

22   inches this direction and then 26 feet 6 inches going across.

23       Q    And again how far was that reference point from the

24   first one?

25       A    Reference point one to reference point two 389 feet

AP

ALBANO-PEOPLE-DIRECT

1     10 inches.

2          Q     Continue.

3          A     If you were using one reference point, you would

4     use -- you would take these numbers and add it down so it

5     would make it longer.  It seems shorter here.  Did I explain

6     that correctly?

7          Q     Well, did you use more than one reference point so

8     you can get as accurate as possible?

9          A     Yes, correct.

10              C, was one of point of the second car that was

11    involved in the accident.

12              D, was another point of the car that was in this

13    lane that helps us measure the car.

14         Q     Which car was that?

15         A     The maroon Toyota.

16              E, was the start of the driver's side skid.

17              And F, was the start of the passenger side skid.

18         Q     Do you know which car those skid marks belong to?

19         A     Yes, they belong to the 1995 Nissan.

20         Q     That's the one that was overturned in the parking

21    lot?

22         A     Yes.

23         Q     How do you know?

24         A     We can follow them right from where we first

25    observed them to the car.

ALBANO-PEOPLE-DIRECT

1    Q    And then with regard to 12C, could you tell us

2    what's on 12C?

3    A    This would be my third reference point.  That

4    reference point was 432 feet 2 inches from my original

5    reference point number one.  In this diagram, things that I

6    marked were the fire hydrant for when I followed the skid

7    marks it hit the pole that protects the fire hydrant.

8         B, was another light pole.

9         Just passed it, C was a tire from the car that was

10   overturned.

11        D and E is where I started to plot the overturned

12   vehicle in the Lowes parking lot.

13        F, was a passenger side skid mark.

14        And G, was a driver's side skid mark.

15            MR. MATTEI: Now, can I have this marked as 14,

16        your Honor.

17            THE COURT:  Can I see it, please

18            (Whereupon, a board was marked People's number

19        14A-G for identification.)

20   Q    Officer I am going to ask if you recognize what's in

21   People's exhibits 14 for identification.

22   A    Yes, I do.

23   Q    What is that?

24   A    In the center of it is a small portion of my

25   diagram, and around it are photographs of the skid marks of

ALBANO-PEOPLE-DIRECT

1    the scene.

2        Q    Is that the portion of the diagram which indicated

3    where the skid marks were?

4        A    Yes, that were in the diagram, two.

5        Q    Are those pictures that's surrounded a fair and

6    accurate representations of the skid marks or some of

7    the skid marks that you found at the scene that evening?

8        A    Yes, they are.

9                MR. MATTEI: Judge, if I may have it admitted.

10               MR. RENFROE: No objection.

11               THE COURT:  Just come up for a minute.

12               Bring that bring that over here, officer.

13               (Whereupon, there was a side-bar.)

14               THE COURT OFFICER:  So marked.

15               THE COURT:  In evidence as 14A through G.

16               (Whereupon, People's 14A-G was marked in

17           evidence.)

18       Q    Officer, when you measured the skid marks, can you

19   tell us how long the skid marks were?

20       A    Yes.

21               THE COURT:  Are you refreshing your

22           recollection?

23               THE WITNESS:  Yes, I am.

24       Q    From your diagram?

25       A    From my diagram.

ALBANO-PEOPLE-DIRECT

1   Q    Which diagram are you using?

2   A    This is going to be the fourth piece of diagram.

3        THE COURT:   That would be 12C in evidence.

4   A    The overall driver's side skid mark was 236 feet 7

5   inches.   The overall passenger side skid mark 176 feet 6

6   inches.

7   Q    Can you tell us where did the skid marks start?

8   A    The skid marks started after the vehicle struck the

9   maroon vehicle and started to change direction just after the

10  impact in this lane and then go all the way across until the

11  vehicle stopped and overturned in the Lowes parking lot.

12  Q    I am going to ask you, with the exhibit there which

13  is 14, if you can show the jurors starting with A on the

14  bottom, if you can show the jurors the actual skid marks

15  that you observed and how they progressed?

16  A    This would be the lane of the vehicles that are

17  travelling away from Lowes going towards Richmond Avenue.   It

18  would be going this direction.   In the turning lane you will

19  see it, in the right turning arrow you will see how the skid

20  marks start.

21       As you go to picture B, you can see how the skid

22  marks now are across the double yellow lines through the

23  safety zone through the double set of yellow lines which is

24  a closer view, it crosses now the opposite lanes of

25  traffic.   That would be D as it goes down photograph

ALBANO-PEOPLE-DIRECT

1    number E --

2                    THE COURT:  It's actually letter E.

3        A    -- letter E, as they hit the front of the skid

4    marks, go up on the curb.  Then letter number F you can

5    see how the skid marks go across the sidewalk and then as

6    the tires finish going across the sidewalk into the grass

7    it's the curb of the Lowes parking lot through the fence

8    and that's where the car overturned.

9        Q    As part of the investigation, did you determine

10   whether Mr. Simon had a vehicle there that evening?

11       A    Yes, I did.

12       Q    I am going to show you what's been marked 5B, do you

13   recognize what's depicted in this picture?

14       A    Yes, Larry Simon's personal vehicle.

15       Q    Does that depict where it was parked at the time you

16   established the crime scene?

17       A    Yes.

18       Q    And could you show the jurors where it was parked?

19       A    From the photograph or the diagram.

20       Q    What's parked right behind it? What's right behind

21   it?

22       A    Samuel Place is right behind it.

23       Q    Is that a telephone pole  there?

24       A    Yes, it is.

25       Q    Is that the first telephone pole off of Samuel

214

ALBANO-PEOPLE-DIRECT

1    Place?

2        A    Yes, it is.

3        Q    This is People's 10, that's already in evidence.

4    Could you show the members of the jury the telephone pole

5    that Mr. Simon's vehicle was parked next to?

6        A    This is Forest Avenue going from Richmond Avenue to

7    South Avenue, are the major intersection.  This is Amity

8    Place and this side street is Samuel Place.  His vehicle was

9    parked right at this corner.

10       Q    Could I have the witness shown 6.

11            Is that the vehicle that was overturned in the

12   Kohl's/Lowes parking lot?

13       A    Yes, it is.

14       Q    Can you show us where it actually entered the

15   parking lot in that picture or from which direction it came

16   in?

17       A    It came in through the fence.  It's hard to see from

18   here.  Forest Avenue would be on the other side of this

19   fence, these are some of the stores opposite from the Lowes

20   and Kohl's parking lot.  This is Forest Avenue, through the

21   fence, overturned and came to a rest.

22       Q    Now was that vehicle -- the way that vehicle is

23   facing now, that's toward Richmond, correct?

24       A    The front of the vehicle is towards Richmond Avenue.

25       Q    Now, when it was travelling, which direction was it

AP

ALBANO-PEOPLE-DIRECT

1    travelling?

2         A    Towards South Avenue.

3         Q    So, that vehicle was facing upside down in the total

4    opposite direction that it started out in?

5         A    Yes, it is.

6              MR. MATTEI: Judge, if I may have these marked.

7              THE COURT:  Could I see them, please.

8              MR. MATTEI: Yes, your Honor.

9              THE COURT:  All right you can mark them.

10             THE COURT:  15A, B and C.

11             THE COURT OFFICER:   So marked.

12             (Whereupon, photographs were marked People's

13        number 15A, B and C for identification.)

14        Q    I ask if you recognize what's depicted in People's

15   15A?

16        A    Yes, I do.

17        Q    What is that?

18        A    It's a picture of Mr. Simon's torso.

19        Q    Is that how he appeared in the intersection of

20   Forest Avenue that evening?

21        A    Yes, it is.

22        Q    Can you look at B, do you recognize what's in

23   that?

24        A    Yes, I do.

25        Q    What is that?

ALBANO-PEOPLE-DIRECT

1      A    A portion of Mr. Simon's leg.

2      Q    Is that the one in the parking lot or the street?

3      A    This was the one on the street on Forest Avenue.

4      Q    Is that a fair and accurate representation of how it

5  appeared that evening?

6      A    Yes, it is.

7      Q    C, do you recognize that?

8      A    Yes.

9      Q    What is that?

10     A    It is the lower half of -- lower leg of Mr. Simon.

11     Q    That's the one that was up in the parking lot of the

12  bank?

13     A    Yes, it is.

14     Q    Is it a fair and accurate representation of how it

15  appeared that evening?

16     A    Yes, it is.

17           MR. MATTEI: Judge, I ask that they be marked in

18      evidence.

19           THE COURT:  Counselor.

20           MR. RENFROE: Your Honor --

21           THE COURT: Subject to your previous objection?

22           MR. RENFROE: Yes.

23           THE COURT:  So moved 15A, B, and C in evidence

24           (Whereupon, People's 15A, B and C was marked in

25      evidence.).

ALBANO-PEOPLE-DIRECT

1    THE COURT:  I ask that they be shown to the

2    jury.

3    (Whereupon the photographs were published to

4    the jury).

5    THE COURT:  Ladies and gentlemen, I am going to

6    briefly call your attention to those photographs.

7    Obviously, referring to 15A, B, and C, these are

8    photographs of Mr. Simon, I am sure we all find them to

9    be somewhat grim and unpleasant.  They are being admitted

10   into evidence because they are relevant to certain

11   issues such as the speed of a vehicle, manner of death

12   and other issues that you may feel are appropriate to

13   this case.

14   I now charge and I emphasize that you are not

15   to dwell upon these photographs.  That when you view

16   them, please do so quickly and do so calmly and do so

17   unemotionally, if possible.

18   I charge you, that it is your determination of

19   the weight, if any, that you see fit to give these

20   photographs.  But if you do, it must be done objectively

21   without emotion, sympathy, or prejudice to either the

22   People or the defendant.

23   Counsel.

24   MR. MATTEI: I have no further questions.

25   THE COURT:  Mr. Renfroe.

ALBANO-PEOPLE-DIRECT

1    MR. RENFROE: Just one second, your Honor.

2    I have no questions of this witness.

3    THE COURT:  Excuse me?

4    MR. RENFROE: No questions.

5    THE COURT:  You are excused.

6    (Whereupon, the witness is excused.)

7    THE COURT:  Do you have any other witnesses

8    today?

9    MR. MATTEI: No, your Honor.

10   THE COURT:  Ladies and gentlemen, we are going

11   to adjourn for today.  I ask that you come back tomorrow

12   morning to the jury room at 9:45 and we will make our

13   best effort to be here at 9:45 tomorrow so we can start

14   as close to 9:45 as possible.

15   So, you should be able to start as close to

16   that as possible provided, of course, we are all

17   here.

18   Obviously, the same admonitions apply every

19   time we have a recess.  Please do not talk among

20   yourselves about this case.  Do not talk to any of the

21   parties involved.  Don't go to any of the locations that

22   we talked about during the course of the trial.

23   Do not do any internet research.  Don't read

24   any media accounts of the case.

25   Don't try to make any attempt to sell or plans

ALBANO-PEOPLE-DIRECT

1    to sell any information about the case.  If anybody comes

2    up to you and they want to talk to you about the case, or

3    they try to influence you in any way, please report that

4    to me as soon as possible and do so without mentioning it

5    to anybody else in the jury.

6              Get some rest, tonight looks like a nice

7    evening.  Enjoy it.  I will see you in the morning.

8    Thank you.

9              (Whereupon, the jury exits the courtroom.)

10             THE COURT: The jury is out of the room, the

11   door is closed, is there anything either party wants to

12   bring to my attention before tomorrow morning.

13             MR. MATTEI: No.

14             MR. RENFROE: No.

15             THE COURT:  9:45 tomorrow morning.

16             (Whereupon, the case is adjourned to October

17   16, 2008, at 9:45 a.m.)

18                 *   *   *   *

19        It is hereby certified that the foregoing is a true

20   and accurate transcript of the proceedings.

21

       _____          _____

22     ELIZABETH CRUZ                    ANGELA PUNTORNO

23     PRINCIPAL COURT REPORTER          OFFICIAL COURT REPORTER

24

25

                                                            AP