# SUPREME COURT OF THE STATE OF NEW YORK

---

RICHMOND COUNTY

---

PEOPLE OF THE STATE OF NEW YORK,

Plaintiff-Respondent,

-against-

TALIYAH TAYLOR,

Defendant-Appellant

Indictment No. 355/06

---

440.10

## BRIEF FOR DEFENDANT-APPELLANT

---

Taliyah Taylor, Pro Se
Bedford Hills Correctional Facility
P.O. Box 1000- 247 Harris Road
Bedford Hills, NY 10507-2499

1

## TABLE OF CONTENTS

**PAGE**

**TABLE OF AUTHORITIES**............................................................ 4

**TABLE OF CASES**.................................................................. 5

**TABLE OF ABBREVIATIONS**..................................................... 7

**STATEMENT PURSUANT TO RULE 5331**.................................... 8

**PRELIMINARY STATEMENT**.................................................... 8

**QUESTION PRESENTED**........................................................ 9

**STATEMENT OF FACTS**......................................................... 9

**ARGUMENTS**................................................................... 12

**POINT I**

      **DEFENDANT-APPELLANT WAS DEPRIVED OF HER CONSTITUTIONAL
      RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH
      AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION AND
      ARTICLE 1, SECTION 6 OF THE NEW YORK STATE CONSTITUTION**

**A. DEFENDANT-APPELLANT WAS DEPRIVED OF HER CONSTITUTIONAL
    RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL
    FAILED TO PREPARE AND PRESENT A MENTAL ILLNESS DEFENSE.....** 13

    1. Historical Context of Depraved Indifference............................................. 14

    2. Depraved Indifference in the Context of D.W.I...........................................18

    3. Defendant-appellant's Mental State

        a. Prior to Offense.............................................................................28

        b. Immediately After Accident.............................................................. 30

        c. At St. Vincent's Hospital.................................................................. 30

        d. At Elmhurst Hospital.......................................................................31

        e. Post-Elmhurst Hospital.................................................................... 34

B.  DEFENDANT-APPELLANT WAS DEPRIVED HER CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO MOVE TO SUPPRESS AUDIOTAPES AND/OR ASK FOR A LENGTHIER CONTINUANCE...............................................................   47

C.  DEFENDANT-APPELLANT WAS DEPRIVED OF HER CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO PRESENT DEFENSE WITNESSES.......................................   52

D.  DEFENDANT-APPELLANT WAS DEPRIVED OF HER CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL COERCED DEFENDANT-APPELLANT NOT TO TESTIFY.......................   56

E.  DEFENDANT-APPELLANT WAS DEPRIVED OF HER CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL DID NOT RENEW HIS MOTION FOR A CHANGE OF VENUE AND CONDUCT A MORE EXTENSIVE VOIR DIRE...........................................................   57

F.  DEFENDANT-APPELLANT WAS DEPRIVED OF HER CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL DID NOT INTRODUCE EVIDENCE OF VOLUNTARY INTOXICATION TO NEGATE THE MENTAL STATE OF DEPRAVED INDIFFERENCE...............   57

G.  DEFENDANT-APPELLANT WAS DEPRIVED OF HER CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL DID NOT OBJECT TO THE PROSECUTOR'S PREJUDICIAL SUMMATION, WHICH INCLUDED MISSTATED EVIDENCE, AND INSTRUCTIONS TO THE JURY USING THE INCORRECT STANDARD OF LAW.............................   59

H.  DEFENDANT-APPELLANT WAS DEPRIVED OF  HER CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL DID NOT ARGUE THAT THE MENS REA REQUIRED TO SUPPORT A DEPRAVED INDIFFERENCE MURDER CHARGE MUST BE CONTEMPORANEOUS WITH THE ACTUS REUS...................................   65

CONCLUSION...................................................................   68

TABLE OF AUTHORITIES

CONSTITUTIONAL PROVISIONS

New York Constitution, Article I, Section 6
New York Constitution, Article VI, §3 [a].
United States Constitutional Amendment V
United States Constitutional Amendment VI
United States Constitutional Amendment XIV

FEDERAL CASES

Berger v. United States, 295 US 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1985)
Claudio v. Scully, 982 F. 2d 798 (2nd Cir. 1992)
Cuyler v. Sullivan, 446 US 335
Deluca v. Lord, 77 F3d 578, 584 (2d Cir.) cert. den. 519 US824, 117 S. Ct. 83 (1996)
Fahy v. Connecticut, 375 US 65, 86, 84 S. Ct. 229, 230, 11 L. Ed. 2d 171
Garden v. Florida, 430 US 349 (1977)
Lopez v. Scully, 58 F3d 38 (1995)
Mathis v. Hood, 937 F2d 790 (2d Cir. 1991)
Mauldin v. Wainwright, 723 F2d 799, 800
Mayo v. Henderson, 13 F. 3d 528 (2nd Cir. 1994)
Mendez v. Artuz, 303 F. 3d 411 (2nd Cir. 2002)
Strickland v. Washington, 466 U.S. 668, 686 (1984)
The Related Companies, et. al., v. Bishops Services Incorporated, 171 AD2d 241
United States v. Bagley, 473 U.S. 667 (1985)
United States v. Couto, 311 F. 3d 179. 187 (2d Cir. 2002)
United States v. Ellison, 798 F2d 1102 (7th Cir. 1986)
United States v. Hansel, 70 F3d 6, 8 (2d Cir. 1995)
United States v. Jones, 900 F2d 512 (2nd Cir. 1990)
United States v. Levy, 25 F3d 146, 152 (2d Cir. 1994)
United States v. Matos, 905 F. 2d 30 (2d Cir. 1990)
United States v. Segna, 555 F. 2d 226 (1977)
United States v. Tarricone, 996 F. 2d 1414 (2d Cir. 1993)
Winkler v. Keane, 7 F3d 307

LEGAL AUTHORITIES

Black's Law Dictionary, 977 8th ed. 2004
DONNINO, 2008 Supplemental Practice Commentaries, McKinney's Constitutional Laws of
New York, Penal Law Article 125
Mahoney, Ryan. "Depraved Indifference Murder Context of DWI Homicides in New York." 82
St. John's Law Review 1537. Fall 2008.
National Institute on Drug Abuse, "NIDA InfoFacts," National Institutes of Health, September
2009, available at: www.drugabuse.gov/tib/comorbid.html
National Institute on Drug Abuse, "NIDA's Latest Research Report Focuses on MDMA
(Ecstasy) Abuse," National Institutes of Health, Vol. 19, No. 5 (January 2005), available at
http://www.nida.nih.gov/NIDA_notes/NNVol19N5/tearoff.html (last visited on April 6,
2010).

National Institute on Drug Abuse, "What is MDMA?," <u>National Institutes of Health</u>, July 22,
2008, available at: <u>http://www.drugabuse.gov/ResreachReports/MDMA/MDMA2.html</u>
(last visited on October 16, 2008).

STATE LAWS

CPL § 250.10 (1)
CPL §290.10 (1)
CPL §330.30 (1)
CPL §470. 05 (2)
CPL §470.15 (2)(c), (6)(b)( McKinney 2000)
CPL§470.35
<u>New York Penal Law</u>, Article 15
<u>New York Penal Law</u> § 15.05 [3] (McKinney 2004)
<u>New York Penal Law</u> §15.25
<u>New York Penal Law</u> § 25.00
<u>New York Penal Law</u> § 40.15
<u>New York Penal Law</u> § 125.25 (2) (McKinney 2008)
<u>New York Revised Statutes of 1829</u>, 2 N.Y. Rev. Statutes, pt. 4, Ch. 1, tit. 1 §5(2)(1829)
<u>People v. Akinson</u>, 21 AD3d 145 (2nd Dept. 2005)
<u>People v. Almonar</u>, 93 NY2d 571 (1999)
<u>People v. Angellilo</u>, 91 AD2d 666, 66-67 (2d dept. 1982)
<u>People v. Baba-Ali</u>, 179 AD2d 725
<u>People v. Baldi</u>, 54 NY2d 137, 146 (1981)
<u>People v. Bennett</u>, 29 NY2d 462, 466 (1972)
<u>People v. Benvento</u>, 91 N.Y.2d 708 (1998)
<u>People v. Cahill</u>, 2 NY3d 14, 58 (20030
<u>People v. Colavecchio</u>, 1960, 11AD2d 161, 165
<u>People v. Coon</u>, 34 AD3d 869
<u>People v. Crimmins</u>, 36 NY2d 230, 242
<u>People v. Darry</u>, 10 NY 120 (1854)
<u>People v. De La Hoz</u>, 131 AD2d 154 (1st Dept. 1987), (156 1v dismissed 70 NY2d 1005)
<u>People v. DeJesus</u>, 399 NY2d 196
<u>People v. Donovan</u>, 13 N.Y.2d 148 (1963)
<u>People v. Droz</u>, 39 NY2d 457
<u>People v. Dudley</u>, 31 AD3d 264, 265 (1st Dept. 2006) <u>1v denied</u> 7 NY3d 866
<u>People v. Ellis</u>, 94 AD2d 652, 653
<u>People v. Feingold</u>, 7 NY3d 288 (2006)
<u>People v. Fenner</u>, 61 NY2d 971
<u>People v. Figueroa (need cite)</u>
<u>People v. Finger</u>, 95 Ny2d 894
<u>People v. Flack</u>, 125 NY 324, 334 [1891]
<u>People v. Florestal</u>, 53 A.D. 3d 164 (2008)
<u>People v. Gomez</u>, 65 NY2d 9 (1985)
<u>People v. Gonzalez</u>, 1NY3d 464 (2004)
<u>People v. Gracius</u>, 774 NYS2d 534 (A.D. 1 Dept. 2004)
<u>People v. Green</u>, 56 NY2d 432
<u>People v. Gruttola</u>, 43 NY2d 116

People v. Gugino, 132 AD2d 989, 990 (4th Dept. 1987)

People v. Hafeez, 100 NY2d 253 (2003)

People v. Harris, 491 NYS 2d 678

People v. Hawkins, No. 175 11/25/2008

People v. Heigden (Taylor), 22 NY3d 259 (2013).

People v. Hines, 97 NY2d 56, 62 [2001]

People v. Hobot, 84 NY2d 1021, 1022 (1995)

People v. Jenkins, 68 NY2d 896 (1986)

People v. Johnson, 10 NY3d 875 (2008)

People v. Johnson, 783 NYS2d 5

People v. Lazartes, 23 AD 3d 400 (2d Dept. 2005)

People v. Mancini, 7 NY3d 767 (2006)

People v. Morgan, 246 NYS2d 100, 103, 158 NE 35

People v. Parmes, 1982, 114 Misc2d 503, 451 NYS2d 1015

People v. Payne, 3NY3d 266 (2004)

People v. Peryea, 68 AD 3d 21 (2009)

People v. Petrovich, 641 NYS2d 592

People v. Prindle, 16 NY 3d 768 (2011)

People v. Poplis, 30 NY2d 85 (1972)

People v. Pryor, 417 NYS2d 491

People v. Register, 60 NY2d 270 (1983)

People v. Roe, 74 NY2d 20 (1989)

People v. Rosa, 108 AD2d 531 (1st Dept. 1985)

People v. Sanchez, 98 NY2d 373 (2002), overruled by People v. Feingold, 7 NY3d 288 (2006)

People v. Saunders, 54 AD2d 938, 939 (2d Dept. 1976)

People v. Shawn Brown, 8/21/98 NYLJ at 21 (Sup. Ct. Queens Co.) (Eng,J.)

People v. Smith, 655 NYS2d 416

People v. Smith, 79 NY2d 309, 315 [1992]

People v. Suarez, 6 NY 2d 202 (2005)

People v. Sullivan, 209 AD 2d 558

People v. Taylor, 75 NY2d 277 (1990)

People v. Valencia, 14 NY3d 927, (2010)

People v. Valles, 1984, 62 NY2d 36

People v. Zimmer, 51 NY2d 390, 393 (1980)

Policano v. Herbert, 825 NY2d 678 (Ct. App. 2006)

## TABLE OF ABBREVIATIONS
## DOCUMENTS INCLUDED WITH BRIEF

BER- (Dr. Berill's 12/23/07 Report)
BER2- (Dr. Berill's 4/8/08 letter to Attorney Renfroe)
CAL- (Dr. Calicdan's Psychiatric Assessment"- 10/21/06)
CAN- (Dr. Cancino's 10/22/06 report)
ELM- (Elmhurst Psychiatric Discharge Transfer Summary)
HEA- (New York City Health Progress Note- Mr. Egbuna 10/21/06)
IN- (Mental Health Intake Form- 10/21/06
MDMA2- (what is MDMA?")
MR- (Maliyah Rowe's sworn affidavit- 9/19/11)
NIDA1- (National Institute on Drug Abuse "Info Facts"- September 2009)
NIDA2- (NIDA's "Latest Research Report Focuses on MDMA Ecstacy_Abuse"- January 2005)
PAB- (CPL Article Evaluation by Dr. Pabon 12/6/06
PAR- (730 Competency Evaluation by Dr. Cheryl Paradis 4/26/07)
PER- (730 Competency Evaluation by Dr. Alan Perry 4/26/07)
PROG- (New York State Progress Note-Dr. Leveille)
PROG2- (Elmhurst Records "Progress Record")
PSY- (Psychosocial Evaluation-Riker's Island by Leigh Barnett)
REF- (Mental Health Reference C.O. Cuffey 10/21/06)
RM- (Regina McClain's sworn affidavit- 9/12/11)
SCH- (Dr. Schneider's 9/30/09 report)
STAT- (Mental Health Status Notification and Mental Observation Transfer form- 10/21/06)
SUI- (Mental Health Suicide Observation Rounds Note)
TM- (Tricia Matthew's sworn affidavit- 9/19/11)
TOR- (Pamela Audi-Torazzo's 1/30/08 Report)
WAN- (12/7/06 CPL Article 730 Competency Evaluation by Dr. Wang)
WIT- (Consultation Request- Witowski- 10/20/06)
ZUN- (Dr. Zuniga's 10/23/06 Report)
2REF- (Correction Department Mental Health Referral LCSW Morgan- 10/21/06)
2SUI- (Mental Health Suicide Observation Rounds Note- 10/21/06)

## DOCUMENTS SUBMITTED FROM LOWER COURT

AR- (Arrest Report)
HU- (Huntley Hearing Transcripts)
SM- (Sentencing Minutes)
ST- (Sentencing Transcripts)
TR- (Trial Transcripts)
TTR- (Technician's Test Report-Officer Bartel)

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF RICHMOND

---

PEOPLE OF THE STATE OF NEW YORK,

                Plaintiff-Respondent,

    -against-                                    Ind. No. 355/06

TALIYAH TAYLOR,

                Defendant-Appellant.

---

## STATEMENT PURSUANT TO RULE 5331

1. The indictment number in the Supreme Court of Richmond County was 355/06.

2. The full names of the original parties were People of the State of New York against Taliyah Taylor.

3. This action was commenced in Supreme Court, Richmond County.

4. The filing of an instant indictment on November 8th, 2006 commenced this action.

5. This appeal is from a judgment convicting Defendant-Appellant, after a jury trial, of one count of Murder in the Second Degree (Penal Law §125.25(2)), two counts of Reckless Endangerment in the First Degree (Penal Law §120.25), and one count of Operating a Motor Vehicle While Under the Influence (V.T.L. 1192(H)).

6. This is an appeal of a judgment of conviction rendered on October 24, 2008, before Honorable Judge Collini.

    Defendant-appellant has been granted permission to appeal as a poor person on the original record to file a Pro Se brief. The appendix method is being used.

## PRELIMINARY STATEMENT

    Defendant-appellant appeals from a judgment of the Supreme Court, Richmond County, rendered on October 24, 2008, convicting her, after jury trial of one count of Murder in the Second Degree (Penal Law §125.25(2)); two counts of Reckless Endangerment in the First Degree (Penal Law §120.25); and one count of Operating a Motor Vehicle While Under the Influence (V.T.L. 1192(H)). Appellant was sentenced to an aggregate term of 22 1/3 years imprisonment (Judge Collini, trial and sentence).

Timely Notice of Appeal was filed on October 24, 2008. Defendant-appellant's then-Attorney Erica Horwitz filed a Direct Appeal on March 27, 2009. Her direct appeal was denied by the Appellate Division, Second Department on August 8, 2012. Defendant-appellant requested Leave to Appeal to the New York Court of Appeals on February 25, 2013. The Court of Appeals granted Defendant-appellant Leave to Appeal on March 21, 2013. By and through counsel Erica Horwitz, Defendant-appellant filed an appeal in the New York Court of Appeals on May 17, 2013. The Court of Appeals denied her appeal on November 21, 2013. Defendant-appellant has no co-defendants in the trial court. Defendant-appellant is incarcerated pursuant to the judgment. No Stay has been sought.

## QUESTION PRESENTED

1. Whether Defendant-appellant was deprived of her constitutional right to Effective assistance of counsel under U.S. Constitution Amendment 6, U.S. Constitution Amendment 14, and N.Y.S. Constitution Article 1§6.

## STATEMENT OF FACTS

Introduction

On October 18, 2006, 24-year-old defendant-appellant Taliyah Taylor intended to finish recording a rap music album and return home with her family. Because she had a previous conviction for DWI and had her driver's license suspended, she chose to be driven to and from the studio by a licensed driver, Tricia Matthews. When defendant-appellant's license was suspended, in approximately September 2006, she hired Ms. Matthews to drive her wherever she needed to go.

In the weeks prior to October 18, 2006, defendant-appellant began experiencing the symptoms of a psychotic break. Both witnesses and self-reported documentation evidence that defendant-appellant was hearing voices, increasingly more paranoid, under the impression that she was receiving messages from the radio and TV, and engaged in a spiritual battle between good and evil (Dr. Wang's report, hereinafter "WAN"). According to witnesses, she suffered from sleep deprivation, delusions of grandeur, and a preoccupation with religiosity that manifested itself in increasingly erratic and seemingly nonsensical behavior. She reported "she had spent the days before her arrest, paranoid, having to be driven to churches to feel calm" (Id.).

9

On the night of October 18, 2006, in this weakened and progressively worsening mental state, defendant-appellant drank one Heineken beer, smoked half of a "Purple haze" marijuana cigarette and ingested an ecstasy tablet while in the recording studio trying to finish her album. She was driven to the studio by Ms. Matthews and also accompanied by her 7-year-old nephew, Kaysean, cousin Mailyah and her daughter Saniyah, and her friend Monika. While in the studio, defendant-appellant became increasingly frustrated because she could not remember part of the lyrics to her own song. Her frustration exacerbated her deteriorating mental state. She and a friend argued about whether to leave or stay. Defendant-appellant left, with her nephew, and began walking. Ms. Matthews came to pick her up but she refused to get in the car with Ms. Matthews, who she believed was a "demon." By the time she arrived at her grandmother's house, defendant-appellant was in the throes of a complete psychotic break. She ordered her cousin Mailyah to remove all of her clothes and the children's clothes because she felt that the devil was trying to attack them all and God wanted her to tell them to remove all of their clothes. She told Dr. Berrill later that she was sure "some spirit was going to crawl into her clothing" (hereinafter "BER" 9) because she "thought she was dead and that everyone around her 'seemed like a demon'" (Id.). Trial Transcripts (hereinafter "TR") state that the defendant-appellant recalled that she took her nephew's clothes off because "she wanted to get the evil off of [him]" (at 464). When Maliyah refused to take off her own clothes, defendant-appellant uncharacteristically began a physical altercation with her cousin. This impulsive and aggressive behavior alarmed neighbors who called the police, and Maliyah, who called defendant-appellant's mother, who then called the police also. The last thing defendant-appellant recalls about that moment is being placed, while naked, in the back seat of the car with her nephew Kaysean and Mailyah's daughter, Saniyah. Before Ms. Matthews could drive off, Mailyah said she became afraid and took her daughter Saniyah and got out of the car. Kaysean said he jumped out of the car next. Ms. Matthews said defendant-appellant then pushed her out of the car.

Although she has no recollection of it, what is sure is that defendant-appellant got in the driver's seat and drove off alone. She later learned that while driving naked, at a speed of over 80 mph, and without headlights on, she struck and killed a pedestrian, Larry Simon, who at the time, was a Staten Island District Attorney. The vehicle the defendant-appellant was operating then side-swiped another car, ended up on the wrong side of the road, hit a fence, and landed

overturned in a Lowe's parking lot. A witness immediately on the scene found defendant-appellant in the wreckage nonsensically chanting "money, power, respect" over and over. When the police arrived, defendant-appellant was running around the parking lot "jumping, hopping up and down" (Id. at 175) naked and still chanting. The first Police Officer to arrive on the scene, Bartel, stated that defendant-appellant was "incoherent" and "lethargic" and said that "God told [her] to drive naked" (Id. at 47). Despite having described her as "incoherent," Officer Bartel read her the Miranda rights nonetheless (Id.).

Defendant-appellant was then transported by ambulance to St. Vincent's Hospital. While in the ambulance, defendant-appellant was "asked over and over again to spell Tricia's name," but she "couldn't" (Id. at 30, 154). In the Technician's Test Report (hereinafter "TTR"), she was described as having "glassy eyes," being "combative," "acting irrationally" and "talking unintelligible at times."

Upon her arrival at the hospital, a nurse noted that she was "acting bizarre" (TR at 279). While at the hospital, she was interviewed again, this time by Detective Signorelli. He stated that she told him that she thought he was "an angel" (Id. at 468). He described her as engaging in "nonsensical talk" (Id. at 461). She recalls having "begged the officers at the hospital to tell her whether she had 'gone to heaven or hell'" (BER 9). Defendant-appellant remembers Detective Signorelli "'yelling' at her," (Id.) and that he told her "that there was a car accident and that she had killed his friend" (Id.).

Later that night she was transferred to Riker's Island. The defendant-appellant was housed in the Mental Health Observation Unit at Riker's Island where she continued to exhibit behavior evidencing a psychosis. Three days later, she was admitted to the Elmhurst Hospital Psychiatric Ward. Defendant-appellant remained psychotic and underwent two CPL §730 competency exams, where she was deemed unfit to proceed to trial on December 7, 2006. It wasn't until April 26, 2007, a full six months after the accident, that defendant-appellant was deemed fit to proceed with trial.

At trial, her lawyer, Christopher Renfroe rested her case without presenting a case-in-chief to the jury. Defendant-appellant was convicted of P.L. §125.25 Murder in the Second Degree, Depraved Indifference; P.L. §120.25 Reckless Endangerment; and Vehicle and Traffic Law §1192 (Driving While Under the Influence). Defendant-appellant was sentenced to: 20 years to life for Second Degree Murder, 2 1/3 to 7 years for Reckless Endangerment, to be

11

served concurrently, and 1 to 3 years for Driving While Under the Influence, to be served consecutively.

On March 27, 2009 defendant-appellant filed her direct appeal. On August 8, 2012, her appeal was denied <u>People v. Taylor</u> (N.Y.A.D. 2 Dept. 2012). Defendant-appellant petitioned the Court of Appeals for leave to file an appeal on February 25, 2013. She filed her brief on May 17, 2013. The appeal was denied on November 21, 2013 <u>People v. Heigden</u> (Taylor) 22 NY3d 259 (2013) 949 NYS2d 209. Defendant-appellant remains incarcerated at Bedford Hills Correctional Facility in Bedford Hills, New York.

<u>ARGUMENTS</u>

**POINT I. DEFENDANT-APPELLANT WAS DEPRIVED OF HER CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION AND ARTICLE 1, SECTION 6 OF THE NEW YORK STATE CONSTITUTION**

Trial counsel failed to adequately prepare a mental disease/defect defense, despite having actual knowledge of defendant-appellant's lengthy and documented history of mental illness. Both the United States Constitution and the New York State Constitution guarantee each defendant the right to effective assistance of counsel (U.S.C.A. 6; N.Y. Const., Art. I, Sect. 6); <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984) set the standard for ineffective assistance of counsel at a showing when (1) trial counsel's deficient errors were so egregious that they failed to function as the "counsel guaranteed the defendant by the Sixth Amendment," and (2) "the deficient performance prejudiced the defendant enough to deprive him of due process of law" (at 687).

When "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result," for a defendant's Sixth Amendment right to effective counsel claim, a defendant must demonstrate that her attorney's performance fell "below an objective standard of reasonableness," and there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome" <u>United States v. Couto</u>, 311 F. 3d 179, 187 (2d Cir. 202); <u>U.S. v. Bagley</u>, 47 3 U.S. 667 (1985); <u>Mendez v. Artuz</u>, 303 F. 3d 411 (2d Cir. 2002); <u>Strickland</u> at

12

668, 688, 694; <u>Mayo v. Henderson</u>, 13 F. 3d 528, 533 (2nd Cir. 1994); <u>Claudio v. Scully</u>, 982 F. 2d 798, 803 (2nd Cir. 1992).

When deciding whether counsel was ineffective, it "cannot be fixed with yardstick precision, but varies according to the unique circumstances of each representation" (<u>People v. Baldi</u>, 54 NY2d 137, 146 (1981)); (<u>see also People v. Droz</u>, 39 NY2d 457). Under the New York Constitution, "'prejudice' is examined more generally in the context of whether the defendant received representation" <u>People v. Benevento</u>, 91 N.Y. 2d 708 (1998); <u>Baldi</u>, at 137.54 N.Y. 2d 137. Thus, under the state standard:

> While the inquiry focuses on the quality of the representation provided to the accused, the claim of ineffectiveness is ultimately concerned with the fairness of the process as a whole rather than its particular impact on the outcome of the case. In that regard, we have refused to apply the harmless error doctrine in cases involving substantiated claims of ineffective assistance (citations omitted). Thus, whether defendant would have been acquitted of the charges but for counsel's errors is relevant, but not dispositive under the state Constitutional guarantee of effective assistance of counsel. The safeguards provided under the Constitution must be applied in all cases to be effective and, for that reason, 'our system is concerned as much with the integrity of the judicial process as with the issue of guilt or innocence' (<u>People v. Donovan</u>, 13 N.Y. 2d 148 (1963).

Defense Attorney Renfroe's errors changed the outcome of the case (<u>People v. Jenkins</u>, 68 NY2d 896 (1986); <u>People v. De La Hoz</u>, 131 AD2d 154 (1st Dept. 1987), (156 1v dismissed 70 NY2d 1005). Absent trial counsel's errors, defendant-appellant would not have been convicted of depraved indifference murder. Further, counsel's errors caused a "fundamental miscarriage of justice, which excuses any potential procedural default even without a showing of cause and prejudice" (<u>Murray</u> at 495).

In <u>People v. Pryor</u>, 417 NYS2d 491, the Appellate Division reversed and remanded the case because the defendant was deprived of a fair trial and believed that there was a significant probability that the defendant may have been acquitted had cumulative errors not taken place, thus, as a matter of discretion in the interest of justice the Court found that the error deprived defendant of a fair trial pursuant to CPL §470.15 [6][a]; <u>People v. Johnson</u>, 783 NYS2d 5 (2008).

## A. **Defendant-Appellant was Denied Her Constitutional Right to Effective Assistance of Counsel When Trial Counsel Failed to Prepare and Present a Mental Illness Defense**

In order to assess the magnitude of trial counsel's failure to prepare a mental illness defense, it is critical to understand the legislative intent behind, and the historical course of depraved indifference murder cases.

Depraved indifference murder is governed by Penal Law §125.25 (2), which provides: A person is guilty of murder in the second degree when…

> 2. Under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person…

A person acts "recklessly" with respect to the death of another "when he is aware of and consciously disregards a substantial and unjustifiable risk that [death] will occur (N.Y. Penal Law §1505 (3) (McKinney 2004).

With the Court of Appeals ruling in <u>People v. Feingold</u>, 7 NY3d 288, the "jury would have to find the requisite mental state and could not rely solely on the objective factual circumstances surrounding the crime" (at 294-95). The statutory definition of a depraved mind murder includes both a mental element ('recklessly') and a voluntary act ('engaging in conduct which creates a grave risk of death to another person').

1. <u>Historical Context of Depraved Indifference Murder</u>

Malice aforethought is the provenance of depraved indifference murder. According to Black's Law Dictionary, the term encompasses: "(1) the intent to kill; (2) the intent to inflict grievous bodily harm; (3) extremely reckless indifference to the value of human life; and (4) the intent to commit a dangerous felony" (977 8th ed. 2004). The Revised Statutes of 1829 incorporated depraved indifference into New York Law (55 Syracuse L. Rev. 455 at 462 (2005)). These statutes defined murder as a killing, "perpetrated by any act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual" ( NY Rev. Stat. pt 4 Ch. 1, tit. 1 §(2) 1829).

Since its inception, New York's depraved indifference law traveled a meandering route where case law reflected the Courts' continuing confusion in attempting to define the particulars of depravity and recklessness in the context of <u>mens rea</u> and <u>actus reus</u>. Although the concept of a "depraved mind murder" was first established in <u>Darry v. People</u>, 10 NY 120 (1854), as recently as 2008, it has been admitted that "few terms have…engaged more differences of

opinion among judges as to its meaning than the term 'depraved indifference to human life'"
(Donnino, 2008 Supp. Practice Commentaries, McKinney's Const. Law of NY, Penal Law Art.
125, at 182). It was in <u>Darry</u> (at 148) that the court first explicated that "depraved mind" was a
mental state, which could not be applied in one-on-one situations like <u>Darry's</u> (at 147-8).
Instead, the Court interpreted that the statute was designed to apply to cases "where the acts
resulting in death are collated to put the lives of many persons in jeopardy without being aimed
at any one in particular, and are perpetrated with a full consciousness of the probable
consequences" (<u>Id.</u>). The Court defined the recklessness as an "utter wantonness" (Id. at 138),
stemming from a "malicious intent" (Id. at 137), and evincing an "indifference to human life"
(Id. at 148).

   In 1964, the Revision Commission modified the definition from "any act imminently
dangerous to others" to "conduct which creates a grave risk of death to another person" (N.Y.
Penal Law §125.25 (2) (McKinney 2008)). Next came <u>People v. Poplis</u>, 30 NY2d 85 (1972).
<u>Poplis</u> reiterated that the mental state required to support a charge of depraved indifference
murder was above and beyond traditional recklessness. The Court stated that murder "requires
more than recklessly causing death…the murder definition requires conduct with 'depraved
indifference' to 'human life' plus recklessness. This is conduct of graver culpability, and it is
"…something more serious than mere recklessness alone…'" (at 88).

   The classic definition of depraved indifference, which treated the defendant's wanton
disregard for human life as a quasi-<u>mens</u> <u>rea</u> was replaced in <u>People v. Register</u>, 60 NY2d 270
(1983). The opinion held that only simple "recklessness" was the required <u>mens</u> <u>rea</u> for
depraved indifference murder (<u>Id</u>, at 278). The focus shifted from the subjective intent of the
defendant, to an objective assessment of the degree of risk. In the dissent, Judge Jasen cautioned
that the majority "effectively eviscerated the distinction between manslaughter 2 and murder 2,
with respect to the accused's state of mind" (<u>Id.</u> at 284).

   Six years later, in <u>People v. Roe</u>, 74 NY2d 20 (1989), a fatal game of "Russian Roulette"
left the defendant charged with depraved indifference murder. When the Court examined the
circumstances to determine the objective risk inherent in that case, they came to a markedly
different opinion than in <u>Register</u>. In <u>Roe</u>, the Judges concluded that the circumstances "render
the risk uncertain and counterindicate depravity, callousness and indifference of the level
fictionally equaling premeditated, intentional murder" (at 20, 33). In regards to the <u>mens</u> <u>rea,</u> the

15

Roe court stated, "in a trial for murder under Penal Law §125.25 (2), proof of the defendant's subjective mental state is, of course, relevant to the element of recklessness, the basic element required for both second-degree manslaughter and depraved indifference murder" (see Penal Law §15.05 [3]).

In 2002, the Court again revisited the concept of depraved indifference in People v. Sanchez, 98 NY2d 373. While the Sanchez Court did not explicitly overrule the Register formula, the dissenting opinion clearly evidenced a finding of difficulty with it. Dissenters expressed their opinion that depraved murder, intentional murder, and manslaughter were becoming conflicted. They argued that if depraved indifference is a "disregard of so plain a risk of death to another that it is treated as the equivalent of an intent to kill," then the mens rea would, accordingly, require "not only extreme risk but also an unusually evil mental state" (at 315).

Historically, depraved indifference entailed a mens rea of universal or general malice that was not directed to one particular individual. However, beginning in 2003 with People v. Hafeez, 100 NY2d 253 (2003), continuing through People v. Gonzalez, 1 NY3d 464 (2004), and People v. Payne, 3 NY3d 266 (2004), the Court seemed to take a new direction. Issues arose concerning subjective verses objective intent in relation to twin count indictments where defendants had all been acquitted of intentional murder but found guilty of depraved indifference.

Subsequently to Hafeez, the Court of Appeals' decisions unveiled a markedly different, yet still evolving assessment of depraved indifference murder. In particular, the Suarez court noted that the Register formula had led to abusive results. The Court departed from Register to require "proof of a danger to the public, uncommon brutality, abandonment of a helpless victim, or similar facts in addition to an enhanced risk of death" (Suarez. at 212). They also noted that depraved indifference "must now be construed as having meaning independent of the degree of risk caused by the defendant's conduct" (Id. at 277). Suarez also restricted the applicability of the depraved indifference murder statute in cases where the defendant's conduct endangered the general public. The Court reasoned that such conduct could only rise to the level of murder if the defendant showed an "utter disregard for the value of human life," as defined as a "willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not" (Id. at 296). This was the first time that the Courts of Appeals

made it clear that the additional requirement of depraved indifference has meaning independent of the gravity of the risk (Id. at 215). The Suarez Court departed from Register in "requiring not only extreme risk but an unusually evil mental state" (Id. at 315). The Suarez Court outlined two recurring patterns-"abandon[ing] a helpless and vulnerable victim in circumstances where the victim is highly likely to die" and "engage[ing] in torture or a brutal, prolonged and ultimately fatal course of conduct against a particularly vulnerable victim" (People v. Barboni, 971 NYs3d 729 (N.Y. 2010) quoting Suarez at 212) that set out the "few rare circumstances" in which a defendant can be convicted of depraved indifference murder. Defendant-appellant's case, however, does not fit either circumstance. The Barboni Court elaborated that "a brutal course of conduct against a vulnerable victim occurring over a prolonged or extended period of time is more likely to be associated with the mental state of depraved indifference to human life than brutality that is short in duration and is not repeated" (at 736).

The definition of depravity began to emerge as "a disregard of so plain a risk of death to another that it is treated as the equivalent of intent to kill" (Id. at 202). The Court elaborated on the very limited instances, which rise to the level of depraved indifference:

> the defendant's utter depravity in causing the victim's death warrants punishment in excess of that available for manslaughter. Such cases will arise only when the acts of the defendant are marked by uncommon brutality – coupled not with an intent to kill but with depraved indifference to the victim's plight (citation omitted). To constitute depraved indifference, the defendant's conduct must be so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others and so blameworthy so as to warrant the same criminality as that which the law imposes upon a person who intentionally causes the death of another (Id. at 202).

As the Court moved down a divergent path for depraved indifference law, the Suarez decision did not explicitly overrule Register (People v. Atkinson, 21 AD3d 145, (2d Dept. 2005)). However, it began a surgical process of cutting to the core of how the depraved indifference murder statute should be both interpreted and applied.

Register distinguished depraved indifference murder from manslaughter by requiring a significantly heightened recklessness. First, "in a depraved mind murder the actor's conduct must present a grave risk of death whereas in manslaughter it presents the lesser substantial risk" (at 276). Then, it mandates proof that the circumstances evince a depraved indifference to human life by focusing "upon an objective assessment of the degree of risk" which converts the substantial risk present in manslaughter into a very substantial risk" (Id. at 277). The "inhuman

frame of mind is what equates the crime's blameworthiness with intentional murder" (Rosenblatt, J., dissenting, Id. at 326).

The 2006 decision in Feingold definitively overruled both Register and Sanchez by declaring that "depraved indifference to human life is a culpable mental state" at (294). Prior to this decision, the culpable mental state of depraved indifference, which is not contained within Article 15 of the NYPL, had not been acknowledged. The Feingold Court developed a two prong test of the mens rea in depraved indifference, whereby proof must be offered that a defendant was first "indifferent" and then also "depraved." The Court reasoned that even an act with an extremely high objective level of risk cannot amount to murder unless the offender recognizes this "grave risk of death" and "simply doesn't care if someone dies" (Id. at 697). More than reckless conduct is now required, where the defendant's state of mind must be one of extreme wickedness and abject moral deficiency.

So, it is with this precise definition in mind that defendant-appellant here requests a review as to whether defense counsel was ineffective when he failed to prepare and present a mental illness defense.

2. Depraved Indifference in the Context of DWI

Historically, examples of depraved indifference murder include "shooting a gun into a crowd" (People v. Fenner, 61 NY2d 971), "opening the door of a lion's cage in a zoo," "placing a bomb in a public place" (Feingold at 293, 288) or "poisoning a well" (Suarez at 214). These examples involve "purposeful, conscious conduct from which abject moral depravity and extreme indifference required for a charge of murder can be inferred" (Mahoney, p.6). DWI does not encompass the same requisite level of depravity inherent in the classic examples. The only culpable act in DWI offenses is the decision to get in the car and drive in the first place. When one chooses to shoot a gun, open a lion's cage or poison a well, however, these decisions manifest a decidedly marked level of moral wickedness because of the higher degree of danger involved. Therefore, the objective risk of driving while intoxicated cannot be considered alone. Statistics indicate that only "0.1% of all incidents of impaired driving resulted in a fatality" (Id.), thereby rendering the objective risk of death to be comparatively low. This, along with "objective state of mind evidence" and the circumstances surrounding an incident, "render the risk uncertain and counterindicate depravity, callousness, and indifference of the level fictionally equaling premeditated, intentional murder" (Roe at 20, 33). This rationale appears as

18

a perfect example of Judge Jasen's dissent in Register, where he remarked that charging depraved indifference is "an overextension and misapplication of New York homicide law" (at 296). The standard for review mandates more than simply recklessly causing death. A depraved mens rea must be inferred by wanton, purposeful, immoral conduct. The subjective mental state of the actor is the crux of every depraved indifference murder. Even when the behavior is reckless and highly dangerous, it must be proved that the mens rea of depraved indifference is actually present in the offender. There must be conscious conduct, independent of the drunk driving, that evinces the depraved state of mind required to support a charge of murder. Thus, it is within this context, that the defendant-appellant's defense against depraved indifference murder should have been presented to the jury.

On June 8, 2005, the New York Legislature passed "Vasean's Law" that "established that [when] the person operating such motor vehicle…caused such death while unlawfully intoxicated or impaired by the use of alcohol or a drug, then there shall be rebuttable presumption that, as a result of such intoxication or impairment…such person operated the motor vehicle:…in a manner that caused such death…" (N.Y. Penal Law§125.13(5)). Vasean's Law removed the element of criminal negligence from first and second degree vehicular manslaughter (see Penal Law §125.13(5) and §125.12(30) and "created a rebuttable presumption of causation between intoxication and death" Id.; §125.13(5).The rebuttable presumption that the intoxication was the cause of the death eliminated any form of mens rea from the vehicular manslaughter statute. Since the prosecutor's theory of the case was that defendant-appellant's impairment caused the accident here, vehicular manslaughter in the Second Degree was the only appropriate charge to submit to the jury in relation to Larry Simon's death. Had the jury found the defendant-appellant guilty of vehicular manslaughter in the Second, the authorized sentence, anything from 3 years to 7 years, would have presented less severe potential sentencing options.

In 2006, the legislature enacted a comprehensive reform of DWI laws, including adding four new aggravating factors to the crime of first degree vehicular manslaughter (N.Y. Bill Jacket, 2006 S.B. 8232, ch. 732 (2006)). In 2007, in keeping with a zero tolerance trend toward DWI's the grade B felony of aggravated vehicular homicide was created (N.Y. Penal Law §125.14). This encompasses a first degree vehicular manslaughter plus reckless driving (N.Y.

Vehicle Traffic Law §1212 (McKinney 2008)). Notably, the legislature recognized recklessness as a separate element.

It is worth noting, as well, that defendant-appellant's initial charge, according to Police Officer Bartel's New York Police Department Form dated Oct. 18, 2006, was "Manslaughter 1 –Reckless Conduct" (Arrest Report, hereinafter "AR"). The Preliminary Report (hereinafter "PRE") completed by Detective Racioppo, also on Oct. 18, 2006, lists the offense as "Manslaughter –DWI." The TTR completed by Officer Bartel states "Manslaughter 2." The following date, October 19, 2006, Sgt. Michael Tricardo's report (hereinafter "TRIC"), lists the crime as "Vehicular Manslaughter" (p.3). A separate Omniform System Compliant (hereinafter "CR") completed by Officer Bartel on October 19, 2006, states "Manslaughter 2 (by intoxicated driver)." The next day, October 20, 2006, Sergeant Marc Mednick's Complaint Follow-Up Report (hereinafter "FU") lists the offense as "Negligent Homicide." It wasn't until much later that her charge was elevated to second degree murder, while the circumstances of the accident remained the same as they had on October 18, 2006 when first assessed by police officers on the scene.

When considering both 2005's Vasean's Law and 2006's legislative changes, it is clear that the Legislature recognized that DWI homicides were to be separately considered from murder offenses. With this proclamation, the legislature clearly opined that reckless driving, while intoxicated or impaired by the use of drugs, and an aggravating factor, warrants a grade B felony. The construction of a statutory scheme, particularly for DWI offenses, is proof of the Legislature's sentiments that all DWI offenses are to be charged somewhere within the confines of the DWI statutes. If it were intended that DWI offenses warrant penalties beyond a grade B felony of aggravated vehicular homicide, they surely would not have gone through the pains of constructing a separate sentencing scheme for vehicular offenses that involve intoxication or impairment.

In Suarez, the Court ruled that:

Reckless homicide cannot be elevated into depraved indifference murder merely because the actions of the defendant created a risk of death, however grave or substantial that risk may have been. Otherwise, manslaughter in the second degree would routinely and automatically become depraved indifference murder inasmuch as the victim (who was, after all, killed) was necessarily exposed to a grave or substantial risk of death. The

critical statutory language that separated second-degree manslaughter from depraved indifference murder is the defendant's underlying depraved indifference. 'Circumstances evincing a depraved indifference to human life' are not established by reckless conduct only with the action that carries even an inevitable risk of death (at p.34).

The legislature clearly enacted a scheme by which statutes would address DWI fatalities. To charge defendant-appellant with second-degree murder was excessive and violative of the legislative intent behind the murder statute. This "should not be judicially sanctioned if it is incomparable with the enforcement mechanism chosen by the Legislature or with some other aspect of the over-all statutory scheme" (Sheehy v. Big Flats Community Day, 73 Ny2d 629, [1989]).

The Court of Appeals June 2010 opinion in People v.Valencia, 14 NY 3d 927 (2010) held that "the legislature, which is entrusted with determining social policy and degrees of culpability, should resolve this perplexing question of whether intoxication, to whatever extent, functions as a defense to depraved indifference crimes" (at 927). Thus, New York's highest appellate-level court definitively deferred responsibility for crafting the standard for depraved indifference in the context of DWI cases to the Legislature. The Court did tellingly reduce defendant Valencia's conviction and subsequent punishment markedly because, even as late as 2010, they found that the intoxication rendered the evidence insufficient to support a conviction for depraved indifference. Also, in People v. Lazartes, 23 AD 3d 400 (2d Dept. 2005) the Court exercised its interest of justice jurisdiction to dismiss his murder and first-degree assault charges in the interest of justice due to failure of proof to support the depraved indifference charge.

If that evidence was deemed insufficient to support a depraved mens rea, then the conviction in the case at bar surely cannot be said to be based on sufficient evidence either. As recently as 2006, the Feingold Court explained that "there is no dispute that the term 'depraved indifference' has the same meaning in both the depraved indifference murder statute and the reckless endangerment statute" (at p.4). Thus, in the case at bar, since defendant-appellant clearly did not possess a depraved mens rea at the time she hit Larry Simon, then she did not possess the depraved indifference element of reckless endangerment either. The Feingold Court clearly addressed this very issue when it stated: "We overrule, by implication, only those depraved indifference reckless endangerment cases that rest on the premise that depraved indifference is measured not by a culpable mental state but by an objective assessment of the

risk involved" (Id. at p. 6). Hence, the case at bar clearly falls under this line of reasoning because the prosecution relied on the risk and circumstances, not defendant-appellant's mental state, to prove depraved indifference.

As early as 1989, the dissent in Roe issued a cautionary caveat that the majority mischaracterized depraved indifference murder's core element as mere recklessness rather than depraved indifference, and that as long as depraved indifference murder and reckless manslaughter were identified as having the same core element-mere recklessness-depraved indifference murder could be improperly used as a proxy for reckless manslaughter" (at 29-38), and that is precisely what happened in the instant case. Despite a long line of precedents issued as courts grappled with fine tuning depraved indifference law, the prophetic warning issued by the Roe Court unfortunately occurred in the case at bar.

When the Court of Appeals considered defendant-appellant's case, it did so with two other depraved indifference cases People v. Heigden and People v. McPherson (22 NY 3d 259 (2013)). Court of Appeals' Justice J. Read noted that the Court of Appeals:

> majority has resurrected the Register standard for cases in which intoxicated drivers kill innocent people, or at least has done so here in order to salvage [Taylor's] conviction. But any departure from Feingold for drunk driving cases is contrary not only to our precedent, but also to Legislative intent. The Legislature in 2007—just a year after we decided Feingold—amended the Penal Law to create the new crime of aggravated vehicular homicide, a class B felony with the penalty of up to 25 years in prison (see Penal Law §125.14; see also L 2007, ch 345). This crime occurs when an individual kills someone while driving with ability impaired by alcohol or drugs, along with the presence of at least one of the following factors: a blood alcohol content of .18 or higher; a DWI conviction within the previous 10 years; the crash caused the death of more than a single person; the crash killed one person and severely injured another; or the offender was driving with a suspended or revoked license from any state... In sum, the legislature has addressed the proper standards for assessing the culpability of drunk drivers who cause fatalities, and the proper measure of their punishment. And it did not chose to do so by amending the second degree murder statute, which the majority now reinterprets so as to uphold [Taylor's conviction] for depraved indifference murder (Read, dissent, pp.2-3).

The case at bar is distinguishable from Heigden on several fronts, including that defendant-appellant was completely "oblivious" to what was occurring on the night of the accident and unable to "comprehend the gravity of [her] actions, due to both intoxication" and her psychosis. While Heidgen "deliberately chose to drive," defendant-appellant deliberately chose not to and hired a licensed driver. In fact, defendant-appellant had no idea she was even driving. Heidgen had been drinking for an extended period and chose to drive. Defendant-appellant's circumstances more closely resemble Valencia's, and were "too temporally remote" from her "act of driving" hours later (Valencia at 933-34). In People v. Coon, 34 AD 3d 869 the Court held that the defendant was "intoxicated to a degree of total oblivion or mania" (at 870), which more closely describes defendant-appellant's inability to possess the requisite intent to establish depraved indifference. People v. Peryea, 68 AD 3d 21 (2009) (explained that depraved indifference murder has to include a depraved mens rea (purposeful, deliberate, intentional, not an accident); Karim-Harris (depraved indifference charge dismissed due to insufficiency of the evidence to support depraved indifference); Casper ( modified from depraved indifference murder to manslaughter 2 due to legal insufficiency); People v. Corliss, 51 AD3d 79 (1st Dept. 2008) (grand jury neglected requisite mental state); Valencia (depraved indifference assault reduced to second degree assault). This trend, coupled with recent legislative action in relation to DWI offenses, evidences efforts to categorize DWI offenses and their punishments as more proportionate to the culpability involved; Lazartes, at 403, (driving 100 mph is reckless but not depravedly indifferent); People v. Prindle, 16 NY 3d 768 (2011) (no depraved indifference even though defendant was speeding into oncoming lanes, ran five red lights, was being chased by the police, and kept driving after he hit a truck before the fatal accident).

The subsequent legislative changes applicable to DWI fatalities should be considered retroactively.  In the light of the changes, defendant-appellant's trial, had it occurred a mere year later, would be considered fundamentally unfair. While N.Y. Criminal Procedure Laws §440.10 (3)(b) and 440.10 (2)(a)(McKinney 1994) provide for retroactive application when laws have changed after a defendant's appeal, the instant appeal gives this Court the opportunity to correct the injustice now. The subsequent retroactively effective changes would be applicable, and in light of those changes, defendant-appellant's case-from indictment to sentencing-had it occurred today, would be considered fundamentally unfair. In the interest of justice, defendant-appellant's conviction for depraved indifference murder should be reversed.

Further supporting defendant-appellant's position is the Court's ruling in Peryea, which also involved a DWI fatality. In its dismissal of the depraved indifference murder count the court noted: "the fact that an individual is driving a vehicle while in an intoxicated condition and, as a result, causes the death of another, cannot, standing alone, sustain an indictment for depraved indifference murder since the crime of Vehicular Manslaughter addresses this circumstance. Something more, some aggravating circumstance or circumstances is needed to raise the level of seriousness, first to the crime of manslaughter in the second degree and then to the crime of murder in the second degree" (at p.2). Again, the Court emphasized that depraved indifference murder must include a depraved mens rea. It has to be purposeful and intentional, not an accident, as in defendant-appellant's case. While any aggravating factors might justify elevating the crime to one of the higher vehicular homicide offenses or reckless manslaughter, the Feingold Court clearly held that these factors are no longer enough to evince depraved indifference to human life. In fact, the Peryea opinion concurred stating, "this Court agrees with the Court of Appeals' pronouncements in this spate of cases for the simple reason that it is difficult to conceive of many actions resulting in an unintentional murder which should be classified at the same level as intentional murder" (at p.2). Yet this is precisely what occurred when  defendant-appellant was convicted under the second subdivision of murder in the second degree (depraved indifference murder) since its level of seriousness is the same as the first subdivision of murder in the second degree (intentional murder).

Defendant-appellant respectfully asks this Court to follow the guidance in the Peryea opinion where Judge Ryan ruled: "relative to the depraved indifference murder charge, the Court finds that the defendant's alleged actions, tragic and condemnable as they may be, were not such that would elevate his actions to a level of criminal liability equal to that of intentional murder, particularly in the light of the Court of Appeals' recent instructions on this topic as to the degree and type of proof needed to support a finding relative to actions that create a grave risk of death, and also after a comparison of the factual elements that have been present in driving while intoxicated fatalities in which a murder in the second degree charge or conviction has been sustained" (at p.4). One such case where the conviction was sustained is People v.Gomez, 65 NY 2d 9 (1985). In affirming Gomez's conviction, the Court of Appeals cited particularly aggravating circumstances that supported the depraved indifference conviction. Gomez is distinguishable from the case at bar because Gomez was not a DWI case, and the

defendant "failed to brake when requested by an occupant of the car" after he killed two children, and before the second victim was struck said he "could not stop because he had already killed someone" (at 9). Thus, the <u>Gomez</u> Court relied upon specific evidence of the defendant's depraved mindset in order to sustain his conviction. In the case at bar, no such evidence existed.

The only appropriate charge in this case, in relation to the death of Larry Simon is vehicular manslaughter in the second degree. Under the same theory the defendant-appellant advances in relation to depraved indifference, she submits that, under the law, she is not guilty of manslaughter in the second degree either.

The law states that a person is guilty of manslaughter in the second degree when that person recklessly causes the death of another person. A careful parsing of the term "recklessly" elucidates the critical importance of understanding exactly the <u>mens rea</u> of a particular defendant in order to assess whether he or he is guilty of manslaughter in the second degree. Judge Collini gave the following charge at trial:

> A person acts recklessly with respect to a death when that person engages in conduct which creates or contributes to a sustainable and unjustifiable risk that another person's death will occur, and when he or she is aware of and consciously disregards that risk, and when that risk is of such a nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in this situation. Once again, a person also acts recklessly when he or she creates a risk but is unaware of that risk, solely by reason of his or her voluntary intoxication (TR at 656).

The first prong of the definition is that the person must engage "in conduct which creates or contributes to a substantial and unjustifiable risk that another person's death will occur." Thus, the trier of fact must judge the particular conduct to determine whether it presents a sustainable and unjustifiable risk that someone else will die. In defendant-appellant's case, the only conduct in question is the act of driving under the influence. As statistics demonstrates, "less than .1% of DWIs result in fatalities," (Mahoney, p.6) so the conduct in question unequivocally cannot be said to create or contribute to a substantial and unjustifiable risk that someone will die. A substantial risk is a large or great risk, and the statistics just don't support that premise. Also, the definition says the risk is that someone "<u>will</u> die" (emphasis added), not

that someone "might" die. And again, the DWI statistics do not sustain the word "will." When examining the myriad actions a person could take to kill someone including, but not limited to, stabbing, shooting, beating, poisoning, hanging, electrocuting, drowning, suffocating-it is clear that driving while intoxicated presents a considerably lower risk that someone will die, rather than a substantial risk. Perhaps, that is why the Legislature constructed a wholly different category of offenses that apply when an intoxicated driver kills someone. In defendant-appellant's case, the more suitable Vehicular Manslaughter in the second degree was submitted as a lesser included offense. However, because her ineffective trial counsel never put forth a defense, she was convicted of the top charge-murder-and the jury never got the more fitting Vehicular Manslaughter.

The definition of recklessly continues that the actor is "aware of and consciously disregards" the risk. Clearly, in defendant-appellant's case, she was not aware of any risk because her psychotic break rendered her unable to process what she was doing. She has absolutely no memory of anything from the time she was put in the backseat naked, up until the accident and its immediate aftermath. According to the first police officer on the scene, defendant-appellant was 'incoherent' (Huntley Hearing, hereinafter "HU" at 20), 'lethargic...and acting irrationally" (Police Report, hereinafter "PR"). After defendant-appellant's arrival at Rikers Island she was "shouting, crying, and screaming" while "expressing a belief that there are plots or plans against [her], believing someone or everyone is watching , talking, spying or acting suspiciously" (Reference Report, hereinafter "REF").

On October 21, 2006, defendant-appellant was placed on suicide watch (2REF) and described as being "confused and paranoid" (Intake Form, hereinafter "IN" at 1). The list of professionals who documented defendant-appellant's psychotic state cannot be refuted. The first psychiatrist who evaluated defendant-appellant reported that "her affect was constricted, her thought process was impoverished...she was suffering from both preoccupations and delusions" (DR.Calicdan's assessment, hereinafter "CAL" at 4) and diagnosed her as "Axis 1 – psychosis" (Id.). And this evaluation occurred two days after the accident. It is most telling that defendant-appellant was still in the throes of a serious psychotic break days after the incident. She was clearly not "aware of" any risk at the time of the accident due to her psychosis.

Furthermore, the definition of recklessness continues not only that the actor be aware of the risk, but that he or she "consciously disregards that risk." Obviously, because the defendant-

26

appellant was unaware of any risk, she most certainly could not choose to consciously regard or disregard it. Since the decision to drive the car is the conduct in question, she asks this Court to consider that she never had any intention to drive anywhere that night. That is why she had a licensed driver. In fact, when defendant-appellant left the studio that night, she actually walked to her grandmother's because she was afraid to get in the car with her driver because, in her psychotic state, she thought Ms. Matthews was a "demon" (herein at 9 ).

Judge Collini charged the jury that the risk required to support a murder 2 or a manslaughter 2 conviction must be "of such a nature and degree that disregard of it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in that situation" (TR at 652). The key here is that "the gross deviation from the standard of conduct" is supposed to be determined by what a "reasonable person would observe." In defendant-appellant's case, she was certainly not "reasonable" on the night of October 18, 2006. Thus, inherent in the standard for the assessment itself is that the decisions made in relation to the risk are comparable to what a "reasonable" person would do. Defendant-appellant's case can be distinguished because her mental state disqualified her from meeting the definition of recklessness.

Judge Collini further instructed the jury that "a person recklessly engages in conduct which creates a grave risk of death to another when he or she creates the risk, but is unaware of the risk solely by reason of his or her voluntary intoxication" (Id. at 654). While voluntary intoxication is not a defense to recklessness, the definition positively delineates that it cannot be a defense to recklessness when the intoxication is "solely" the reason for the risky conduct. Defendant-appellant's case was not a typical DWI case where an intoxicated driver kills someone. Her case is complicated by the fact that her psychosis crippled her mental state. Defendant-appellant was mentally incapacitated, which renders certain the determination that she does not fit the definition of recklessness and cannot therefore be guilty of depraved indifference murder or manslaughter 2 either. The only suitable charge in defendant-appellant's case is vehicular manslaughter 2, which carries a considerably shorter sentence of 3 to 7 years, rather than the lengthier 20 to life range for murder 2.

As previously stated, the crime was an accident. While the death of Larry Simon was undoubtedly tragic, defendant-appellant possessed no intent to cause any crime. She had no intention of driving on the night of the accident, which was evidenced by the fact that she had a

licensed driver driving her around that very night, as well as previously to that night. However, the Judge relied on defendant-appellant's prior DWI to infer her <u>mens rea</u> on the night of Larry Simon's death (<u>Id</u>. at 569-571). Since defendant-appellant's psychosis rendered her unable to have any conscious regard for a risk, she was irrefutably incapable of having the decision-making skills to consider her prior DWI. If anything, her responsible decision to be driven by a licensed driver should have been considered by Judge Collini as a mitigating factor for sentencing. Yet, to the contrary, he told defendant-appellant, "you still decided…to drive a car" (ST at 36), "you decided…to kill Larry Simon" (<u>Id</u>. at 35).

Like the judge, Prosecutor Mattei related the misguided argument that defendant-appellant's prior DWI purportedly enhanced her depraved <u>mens rea</u> in this crime. He believed, "after having already been convicted of such a crime…that separates this type of crime from other [DWI's]" (<u>Id</u>. at 570), but there is absolutely nothing in the statutory language that states that a prior DWI goes to an assessment of a present-day <u>mens rea</u>. Just because a defendant has a prior knowledge of a risk (DWI) that doesn't enhance her ability to possess a conscious regard or disregard of a risk at a later point in time. Since the defendant-appellant was unable to possess any regard or disregard for anything while in her compromised mental state, she certainly wouldn't have been able to factor in her prior knowledge of a risk because she was unable to factor anything. In her past DWI, she possessed the mental state to disregard a potential risk; in the instant case, she did not. Her mental state during the first DWI was completely different than during her second one.

3. <u>Defendant-Appellant's Mental State</u>

a. <u>Prior to the Offense</u>

Defendant-appellant's conviction for depraved indifference murder should not stand because defense counsel was ineffective when he failed to prepare and present a mental illness defense to negate the element of her having a depraved mind when she committed the offense. The fact that she was operating under the influence was eclipsed by a mental breakdown that included an uncontrollable psychosis.

The events which occurred in the weeks and days prior to October 18, 2006, are indicative of defendant-appellant's deteriorating mental state. About two weeks prior to the accident, defendant-appellant began feeling like she was losing control of her temper and very emotional. She recalls feeling like she was sinking into her bed and that something was holding

her so she couldn't get up. She suffered from insomnia and felt that the TV was sending her messages. She became increasingly paranoid and obsessed with completing the CD she was recording.

During the days leading up to the accident, defendant-appellant exhibited many uncharacteristic behaviors that evidenced her deteriorating mental state. She called numerous people on her cell phone and would ramble on about God, demons and strange occurrences. She repeatedly told her mother that her deceased father was trying to speak to her. She became argumentative and combative with her mother. Some days she was walking around the house reading the Bible to feel calm. In some instances, she became paranoid and refused to answer her door or phone.

A few days before the accident, she decided she needed a new car radio because she felt the static was hurting her. Tricia Matthews drove her to downtown Brooklyn where, while on the way there, the defendant began rocking back and forth in the car. While at the car shop, she saw a lady she thought was an angel. They left the car while the new radio was being installed.

On the way back to pick up the car, Tricia and defendant-appellant got into a cab. Defendant-appellant told the cab driver her destination, but he didn't move. She gave him the card to the shop where her car was, and he never responded so she thought he was a demon and jumped out of the cab and began to walk. As she was walking, Tricia pulled up next to her in another cab, so she got in and went back to the shop.

On a different occasion, she asked Tricia to drive her to the beauty shop where Tricia's mother was getting her hair done. On the way to the shop, Tricia stopped at a red light, and something caused defendant-appellant to jump out of the car. She refused to get back inside the car because she felt Tricia was a demon. Defendant-appellant's friend Joyce pulled up next to her and asked her if everything was okay and if she needed a ride. Defendant-appellant got in Joyce's car and asked to play her (defendant-appellant's) CD so she allowed her to put the CD in, drove her to the beauty shop, and dropped her off.

The elder Ms. Matthews took her straight to a church, got her a Bible and read her the Lord's Prayer. Ms. Matthews drove defendant-appellant back to her house, but when defendant-appellant arrived, she saw a car outside and became afraid so she told her to drive her to her grandmother Mary Ann Rowe's house.

On the night of the accident, she decided to go to the studio where she could record her album. She started to buy religious jewelry and crosses for her car because she felt they would protect her from the demons. She called the studio and told them she'd be an hour late, but in her discombobulated mental state, she was really an hour early. While there, she began to feel her deceased father was coming and that he made her talent increase and sprout.

    b.  <u>Immediately after Accident</u>

     The first officer to arrive at the scene of the crime was Police Officer Bartel. He described observing defendant-appellant running around the parking lot naked chanting "money, power, respect" (TR at 269). He handcuffed her and put her in the back of his police car. He said she was acting "combative then she would be calm" (<u>Id</u>. at 288). He said she was "kicking the doors" of the car (<u>Id</u>. at 227).

     When he asked her where she was driving to at the time of the accident, she told him she was "going to the light" to see "her father" (<u>Id</u>. at 265). This was clear evidence of the defendant-appellant's impaired mental state, considering her father had been dead since she was seven years old. Despite the fact that she didn't have any visible injuries, she was taken out of the police car and put into the ambulance. According to the <u>Huntley</u> hearing transcripts, she was "incoherent, gazing off" (HU at 20), "lethargic" (<u>Id</u>. at 47), and said "God told me to drive naked" (<u>Id</u>.). Although she was not under arrest, she was read her <u>Miranda</u> rights (<u>Id</u>. at 42). When the ambulance Emergency Medical Technician asked her "over and over to spell Tricia's name, she couldn't" (TR at 154). He later testified that he felt she was "lying" (TR at 427, 430, 432). His testimony was given extra weight because he was an "expert" technician and had professional training, yet he could not even accurately assess that the defendant-appellant was under the influence at the time of the accident (HU at 149). Later, in his Arrest Report Officer Bartel described the defendant-appellant as "naked incoherent and was also combative" (AR). The police documents state that defendant-appellant was "lethargic, combative, and acting irrationally" (PR.) She was observed as having "watery eyes" (<u>Id</u>.). The Technician's Test Report describes her as having "glassy eyes" and being "combative, acting irrationally" and "talking unintelligible at times" (TTR). Defendant-appellant was transported in an ambulance to St. Vincent's Hospital.

    c.  <u>At St. Vincent's Hospital</u>

Upon her arrival at St. Vincent's, the attending Nurse described defendant-appellant as "acting bizarre" (TR 279). She later testified that if she had she known that defendant-appellant's father was dead when she heard her say she was "going to the light to see her father", "she would have gotten her a psychiatric consult" (TR at 291). In fact, had defendant-appellant been seen and treated through a psychiatric consult, she would have had a proper mental health diagnosis and subsequent treatment that night, which would have changed the entire landscape of the case.

Defendant-appellant was examined by a medical doctor and treated for scratches and given stitches on her leg for a minor leg injury. Later, she was interviewed by Detective Signorelli at approximately 2:00am, who said she was "just about medically cleared" (HU 19) when he interviewed her. He described their interview as akin to "casual conversation" (Id. at 25), where she talked to him about "what movies she likes to watch" (TR 461). Defendant-appellant's nonsensical talk about movies was not about what movies she enjoyed, but instead about how she felt like she was in a movie due to all the weird occurrences she had been experiencing lately. This was clear proof of her confused and delusional mindset. Her comments were completely out of the range of the normal, expected responses of a person who just almost died in a car accident and who just found out that she had killed someone. Defendant-appellant's impaired mental state was likely worsened by the Ecstasy pill she ingested, The National Institute on Drug Abuse (hereinafter "NIDA1") noted in their "Research Report" (hereinafter "NIDA3") that Ecstasy "acts as both a stimulant and psychedelic, producing...distortions in time and perceptions" (NIDA3). Thus, to validly assess her particular mens rea at the time of the accident, one must consider both her psychosis and the effects of this powerful drug.

d.   At Riker's Island

Defendant-appellant was released from St. Vincent's Hospital to Riker's Island on October 19, 2006 in the late evening. On October 21st, Correctional Officer Cuffey filled out a Mental Health Referral (REF) on Ms. Taylor. The behaviors that C.O. Cuffey noted as being exhibited by defendant-appellant were:

"hiding from the C.O."
"frequent displays of shouting, crying, and/or screaming"
"expressing a belief that there are plots or plans against personal safety; believing someone or everyone is watching, talking, spying or acting suspiciously"

"showing poor personal hygiene" (REF).

A mental health consultation form (hereinafter "WIT") was filled out by Dr. Witkowski stating, "Pt was involved in a MVA with somebody death?/Pt denies suicidal, depressed thoughts please f/u." Defendant-appellant was scheduled to be seen by Mental Health staff.

At approximately 9:30 am on October 21st, Licensed Clinical Social Worker Ms. Morgan wrote a "Correction Department Mental Health Referral" for Ms. Taylor. Notes include that defendant-appellant was "expressing a belief someone is after her" and that she was "placed on suicide watch" (2REF).

Defendant-appellant's compromised mental state was further recorded by Ms. Morgan on a "Mental Health Intake Form" (IN). Notes include that she "appears confused and paranoid" (IN at 1). She said, "I'm confused" and evidenced her compromised mental state when she said, "I think my father killed himself by driving his car into a crash" (Id.) That statement is indicative of her conflation of reality because, in truth, her father did not kill himself; he was shot. It appears that defendant-appellant was confusing her own reality of hearing she had been involved in a car crash, with learning someone had died, and feeling she had been on her way to the light to see her father. Indeed, Ms. Morgan described Ms. Taylor as exhibiting "psychosis/anxiety" (Id. at 2). Defendant-appellant's interrupted thought process was evident in her responses to what should have been simple background questions. She was "confused about which year she was born, whether or not her father committed suicide, and whether her siblings included all sisters or a brother" (Id.) On the page before that, Ms. Morgan had recorded that defendant-appellant told her that her "brother Batar (sic) and his friends did things-they hurt me," yet minutes later, the record reflects that defendant-appellant couldn't even remember she had a brother.

At 10:05 am, a "Mental Health Status Notification and Mental Observation Transfer" (hereinafter "STAT") form was completed by Ms. Morgan. The notation made reads, "Please transfer patient to Bldg. 9- MO" (STAT). At this point, defendant-appellant was transferred to a mental health observation unit, where she was placed on suicide watch.

At 11:00am, on October 21st, defendant-appellant was finally seen by a psychiatrist, Dr. Calicdan, who wrote a "Psychiatric Assessment". He noted that her affect was constricted, her thought process was impoverished, her memory was impaired, and she was suffering from both preoccupations and delusions (CAL at 4). He reported that she claimed "she was trying to save her

family from disaster," and that she was "staring" and acting suspicious (Id.). Thus, a full 61 hours after the accident, defendant-appellant was still experiencing a psychotic breakdown. Dr. Calicdan noted that her then present state was "irritable," "unpredictable," "confused," and "guarded" (Id. at 3). He diagnosed her as "Axis I –Psychosis" (Id. at 4) and prescribed both "Haldol" and "Risperdal" (Id. at 5).

Since Dr. Calicdan was the first psychiatrist who examined defendant-appellant, his diagnosis was critical as the most immediate clinical assessment of her mens rea. If defendant-appellant was in a full-blown psychotic state a day and a half after the car accident, this is most indicative of an evaluation of her incapacity to have been functioning at a normal mental health level at the time of the accident. This is reminiscent of People v. Gracius, 774 NYS2d 534 (A.D. 1 Dept. 2004) where the determination that the defendant was "'illogical, inconsistent and psychotic' at the time of the offense, and thus, was unable to form an intent to" commit the crime, was grounds for reversal." Dr. Calicdan's observations, coupled with those of other mental health staff such as Ms. Morgan, and that of Correctional Officers is evidence in tandem of the fact that defendant-appellant's compromised mental state was not due to her taking one ecstasy pill, and smoking one marijuana cigarette while drinking one beer some 61 hours before. According to NIDA's, "What is MDMA?" Information Sheet (hereinafter "MDMA2"), the effects of one ecstasy tablet only last between 3 to 6 hours (MDMA2, p.1).

Later, on October 21st, at approximately 2:40 pm, a "New York City Health Progress Note" (hereinafter "HEA") written by Mr. Egbuna stated that defendant-appellant was "refusing to go in cell," "acting out" and saying, "I'm seeing things that are strange in here" (HEA). A "Mental Health Suicide Observation Rounds Note" (Hereinafter "SUI") also documented that defendant-appellant was "anxious" and "irritable" (SUI). A second "Mental Health Suicide Observation Rounds Note" (Hereinafter "2SUI") explained, "patient has been peering out window all day," reflecting her on-going paranoia and delusions. It continued that she was "depressed," "agitated," and "hyper vigilant," evidencing "inappropriate behavior," "poor insight," and "impaired perceptions" (2SUI). The suicide watch was again recommended to continue.

On October 22nd, Dr. Leveille filled out a "New York State Progress Note" (hereinafter "PROG"), which documented that the defendant-appellant was "uncooperative," exhibiting "mutism," and "knocking her head against the wall" (PROG). On October 22, 2006 it was noted

that defendant-appellant was "talking incoherently…very anxious" (hereinafter "PROG2"). One interviewer noted that defendant-appellant "believes she is being controlled by voodoo…says staff can control her with their eyes. In the middle of the interview, [defendant-appellant] refused to answer [a] question because of the nurse's face" (Id.). Thus, she was sent to be seen by Dr. Cancino, who noted, "the patient also discussed hearing voices but 'it is not people'…patient labile, illogical, afraid of her safety'" (hereinafter "CAN," p.1). He went on to diagnose her as "psychotic as evident by paranoid delusions, religiously preoccupied, auditory hallucination, thought process w/LOD, tangential" (Id. at p.2).

   e.   At Elmhurst Hospital

   On October 22nd, defendant-appellant was transferred to the psychiatric unit at Elmhurst Hospital Center. It was determined by the Elmhurst Treatment Team (hereinafter "ELM") that she demonstrated an "illogical thought process," which was "initially disorganized" (ELM p.3). Defendant-appellant was observed as "hyperactive (dancing and singing in the hallway), delusional (reporting that 'voodoo' was making her feel strange and afraid), religiously preoccupied, (stating that she had being (sic) given 3 copies of the Bible to protect her from the spells), and internally preoccupied" (Id.). The Elmhurst treatment team also took note of the fact that "corrobative information obtained from the family on October 25th, described erratic behavior 2-3 weeks prior to the accident. This included impulsive behavior, delusions, paranoia, erratic behavior" (Id). It ended by stating that she had "improved on meds," but remained convinced that she was "under the influence of voodoo" and that "someone was against" her (Id. at 4).

   Defendant-appellant's psychosis was documented continually in the days that followed: on October 23rd, she was described as "displaying signs of paranoia…very suspicious and stating 'I know that my peers are talking about me'" (PROG); On October 23rd, later in the day, she "was observed dancing energetically" (Id.), then "guarded and suspicious" (Id.), then "agitated, shaking uncontrollably and stated that she doesn't feel safe on the unit" (Id.).

   On October 25, 2006, defendant-appellant was seen by yet another Doctor (Wang), who noted that she "remain[ed] disorganized with circumstantial speech, tangential speech; pt continues to report experiencing delusions prior to her arrest and afterwards…she felt forces pulling her clothing, keeping her from sleeping" (WAN). The following morning, Dr. Wang recorded that defendant-appellant was "confused about whether she took meds" and stated that

"people have been 'changing' on the unit and at court, acting as if they know her then as if she was a stranger" (Id.), He noted she said, "somebody's playing a trick in my head to see which way I'm gonna fall, evil or good" (Id.). This statement caused Dr. Wang to ask her who that "'someone' could be, [and] she suggested the Devil or God" (Id.) His diagnosis was "bipolar D/O, manic with psychotic…R/O Schizophrenia D/O" (Id.).

On October 27, 2006, defendant-appellant was seen by Dr. Zuniga who diagnosed her as "bipolar D/O manic phase with psychotic features…R/O Schizophrenia disorder" (hereinafter "ZUN"). He recorded that defendant-appellant told him she felt "someone was playing tricks on her 'to make [her] fall to the other side'" (Id.). When he asked her what she meant, she said, "to the evil-the devil side'" (Id.). Dr. Zuniga concluded that defendant-appellant remained "psychotic and delusional, circumstantial, and tangential…thinking about 'voodoo' for explain (sic) what happened to her" (Id.). Thus, in a mere 5-day period, the "Problem/Issues Section" of the Records Document (Id.) noted "paranoia," "anxiety," "insomnia," "delusional thoughts," "psychosis," "agitation," and "disorganization." And in that same 5-day period, no less than five different Doctors (Calicdan, Leveille, Zuniga, Cancino and Wang), and a number of Nurses and staff members all documented defendant-appellant's obviously psychotic mental state. That defense counsel did not present all of this critically important evidence to the Jury is ineffective assistance of counsel, cannot be deemed harmless, and requires reversal.

The next available note is from November 16, 2006, and states that, prior to the accident, defendant-appellant "felt her soul was being taken from her" (Id.).

On November 22, 2006, Dr. Wang conducted a 730 Competency Evaluation on Ms. Taylor. He noted that she felt she was a "'victim of voodoo'…her soul was in jeopardy, that dark spirits 'like in the movie 'ghost' were following her'" (WAN). He noted in detail defendant-appellant's religious preoccupation:

> She stated that she came to the discovery that she was under a voodoo curse when 'an angel' sent her Bible, while in court…She later reported that the curse was removed by God, as evidenced by seeing the hospital clock move backwards by an hour…She continues to believe her incident to be the result of a complicated matter of voodoo, and distorted supernatural influences. She continues to report evidence of such phenomena within the hospital, signifying her spiritual healing, etc. Though she takes psychotropic medications in the hospital, she believes she will be supernaturally healed and that God shall decide her fate (Id.).

Defendant-appellant's delusional state was evidenced by her statement to Dr. Wang that "the TV talks to me or prepares me for stuff in life" (Id.) While Dr. Wang noted some progress

due to medications, he wrote, "with treatment, the patient's mood symptoms began to clear. However, days and weeks later she continues to report delusional beliefs...beliefs of being spiritually victimized, being visited by voodoo and spirits" (Id.).Dr. Wang's thoughts about the examination, led to the following diagnosis:

> Her current diagnosis is bipolar disorder, though her level of distorted reality may eventually prove more consistent with a primary psychotic disorder such as schizophrenia or schizoaffective disorder. There has been no <u>evidence of malingered mental illness</u> while on the hospital unit. In fact, Ms. Taylor does not believe she has a mental illness...insight into her mental illness is poor, and distorted by delusional beliefs...she continues to endorse ideas of reference...symptoms of <u>major mental illness</u> including paranoid and persecutory delusional beliefs (Id.) (emphasis added).

Thus, even a month after the accident, she was deemed "not fit to proceed with trial" (Id.).

Per Honorable Judge Rienzi's November 8, 2006 order, Dr. Pabon conducted a "CPL Article 730, Competency Evaluation" (hereinafter "PAB") on defendant-appellant. The evaluation was ordered due to the "defendant's menacing, disorganized and bizarre behavior, ostensible poor comprehension of charges and court processes, uncooperative with defense counsel, and the extreme or bizarre nature of the alleged offense" (Id.). Dr. Pabon recorded that the "defendant was unable to discuss her case in a logical and rational manner" and that "her statements clearly indicate that she does not have a rational understanding of how a defense attorney can help her" (Id.). Dr. Pabon's report, written on December 6, 2006, was nearly two months after the accident. Yet, even after the passage of that considerable amount of time, Dr, Pabon wrote, "this evaluation strongly contends that Ms. Taylor's marked psychiatric impairment precludes rational and reasonable cooperation with counsel and basic rational and factual understanding of the judicial process" (Id)

Dr. Pabon's extensive examination of defendant-appellant is clearly proof of the fact that she was still experiencing a psychosis that began germinating prior to the accident. He recorded that "during the past two months that preceded the alleged crimes, the defendant experienced a worsening of the (previously described) manic and psychotic symptoms" (730). He noted she had:

- "more severe insomnia"
- "ideas of reference"
- "more bizarre psychotic symptoms"
- "grandiose delusions"
- "visual hallucinations"
- "paranoid delusions re: 'evil eyes, lurking, trying to take [her] soul'"

36

- "paranoid delusions about a 'voodoo hex' placed on her " (Id. at 4)

When Dr. Pabon interviewed defendant-appellant, she told him she felt "that the TV and radio were referring to her" and that she was receiving "special messages from the TV and radio" telling her she was a "superhero, with special magical powers" endowed to "save people" (Id.).

All of the available mental health documentation was proof that defendant-appellant could not possibly have possessed the requisite mental state to satisfy a depraved indifference charge and defense counsel was clearly ineffective when he failed to put forth a mental health defense. Suarez made it clear that "reckless homicide cannot be elevated into depraved indifference murder merely because the actions of the defendant created a risk of death, however grave or sustainable that risk might have been" (at 276). To prove depraved indifference murder, there is "an additional requirement of the crime- beyond mere recklessness and risk- which in turn comprises both depravity and indifference, and that a jury considering a charge of depraved indifference murder should be so instructed" (Id. at 277; See also Register at 270, 276). As the Barboni Court held "Put simple, the People must prove that the defendant did not care whether his victim lived or died" (at 734). In defendant-appellant's case, the Prosecution had absolutely no evidence that defendant-appellant "did not care whether [Mr. Simon] lived or died." While the accident that resulted in Mr. Simon's death was indeed tragic, as a matter of law, defendant-appellant's mental state was not "marked by uncommon brutality...with depraved indifference to the victim's plight," as required by Payne (at 271), or as "morally reprehensible as intentional murder," per Suarez (at 271).

N.Y. Penal Law §125.25(2) defines depraved indifference murder as entailing "depraved indifference, not mere loss of memory or actions performed without conscious focus." The terminology used, "a conscious focus," cannot be said to apply in any way to the accident caused by defendant-appellant on the night of October 18, 2006. Mere minutes after the accident, she couldn't even remember how to spell her name (HU 154). In Coon at 869, the Court opined:

> It is now settled that, where a defendant's conduct endangers only a single person, to sustain a charge of depraved indifference there must be proof of wanton cruelty, brutality, or callousness directed against a particularly vulnerable victim, combined with utter indifference to the life or safety of the helpless target of the perpetrator's inexcusable acts (Suarez at 202, 213). Although County Court found that defendant acted with heightened recklessness, depraved indifference is a culpable mental state (Feingold at 288, 294) and

this element is not established merely by proof of reckless conduct (Suarez at 214). While defendant's conduct was reprehensible, the evidence demonstrated defendant was too intoxicated to form a specific criminal intent; thus, he also would be incapable of possessing the culpable mental state necessary to prove depraved indifference.

Dr. Pabon also evaluated defendant-appellant in regards to her behavioral symptoms and diagnoses while she was still staying in Elmhurst. She exhibited "acute psychiatric symptoms, florid psychosis and mania, delusions (grandiose and paranoid)" (PAB). He continued that she was "euphoric, overly talkative and expressed her thoughts in a disorganized and illogical manner" (Id.). Defendant-appellant's mental state, even a month after the accident, was critically impaired to a degree where she, at the time, still did not possess the mental capacity to form the requisite depraved mindset to satisfy the mens rea element of depraved indifference murder.

Dr. Pabon noted that defendant-appellant believed "she can save the world as a 'superhero,' and that she was hexed by voodoo, saved by a Bible that was sent in the mail, and that her deceased father appeared at Riker's Island as a prison guard" (Id.). Even after the accident and her incarceration for a month, defendant-appellant was still out of touch with reality and had "also expressed delusions about experiencing a 'time warp' on the unit that cast her into another dimension" (Id.). Dr. Pabon continued defendant-appellant's anti-psychotic medication (Risperdal) and her mood stabilizing medication (Depakote). While he noted that she was "calmer, less manic, sleeps better, is less hyperactive, and is less garrulous," he made it completely clear that "notwithstanding these recent improvements, she remains psychotic," and he deemed her "not fit to proceed with trial" (Id.).

   f.   Post-Elmhurst Hospital

Defendant-appellant was discharged from Elmhurst Hospital and returned to Riker's Island on December 18, 2006. Her "Adult Discharge After-Care Support Service Plan" (hereinafter "DIS"), contains her diagnoses as "Bipolar Disorder, R/O Schizophrenia, paranoid type" (DIS at 3).

On December 24, 2006 at 7:30pm her Psychosocial Evaluation (hereinafter "PSY") contained the following notes: "displays evidence of delusional thinking-believes experiences of herself and her ex-girlfriend are a result of voodoo" (PSY). She was recorded as experiencing delusions of "grandeur, paranoia, delusional thoughts, ideas of reference/influence/grandiosity/paranoia" (Id. at 3).

On April 26, 2007, per Judge Rienzi's April 19, 2007 order, Dr. Cheryl Paradis and Dr. Alan Perry conducted another CPL Article 730 examination on defendant-appellant (hereinafter "PAR"). Regarding her mindset at the time of the offense, Dr. Paradis wrote, "her recollections appeared incomplete. It is likely that her memory is faulty **due to her mental state at the time of the offense** and it is possible she will never regain memory of the events. Her description of her feelings and thoughts suggest that **she was psychotic and delusional at the time**" (Id.). Dr. Paradis concluded that "a review of previous evaluations indicates that she was experiencing acute symptoms of mental illness after her arrest" (Id.) as well. Dr. Paradis diagnosed a "likely Schizoaffective Disorder" (Id.).

On the same date, April 26, 2007, Dr. Perry wrote in his 730 Evaluation (hereinafter "PER") that "the defendant **seems to be recovering from a psychotic process**, and is doing much better, so much so that I believe at the present time she is fit to proceed…and sufficiently psychiatrically stable to consider her legal options in a rational fashion" (PER). Diagnostically, Dr. Perry noted: "Axis I: Likely Schizoaffective Disorder Improving" (Id.)

Defendant-appellant was evaluated by Dr. Berill on September 26, 2007, who wrote a report dated December 23, 2007, in which he noted that, in the days prior to her accident, defendant-appellant "was decompensating; drugs made her increasingly paranoid/irrational" (BER, p.9). He continued that she "suffered from serious psychiatric symptoms for quite some time and was clearly decomposing-that is, **experiencing an increase in the severity of her symptoms, prior to the instant offense**" (Id.) His diagnoses were "schizoaffective disorder; R/O Schizophrenic paranoid type; R/O paranoid (delusional) disorder; personality disorder NOS with narcissistic, obsessive-compulsive, paranoid and histrionic personality features" (Id.) and that defendant-appellant was an "**extremely disturbed individual**" who "will require psychiatric treatment, either on an inpatient or outpatient basis, for the remainder of her life" (Id. at p. 13).

In a letter dated April 8, 2008, (hereinafter BER 2), Dr. Berrill, a Consulting Forensic Psychologist from the New York Center for Neuropsychology and Forensic Behavioral Science, wrote defendant-appellant's Attorney regarding her diagnoses. He determined she "likely suffers from a schizoaffective disorder. This disorder is but one type of Schizophrenia and reflects an admixture of thought/perceptual, as well as affective disturbance" (BER2). He was

also cautious to offer that "there are two other possible or competing diagnoses" (Id.), which he identified in his report as "rule outs" (Id.).

Per the District Attorney's request, Dr. Myles Schneider also evaluated defendant-appellant. In an attempt to ascertain whether she suffered from any mental illness, he conducted clinical interviews with defendant-appellant on January 19, 2007, February 4, 2007, February 11, 2008, and August 13, 2008. He completed his report (hereinafter "SCH") on September 30, 2008. By then, Dr. Schneider determined that the defendant-appellant "did not, as a result of mental illness disease or defect, lack substantial capacity to know or appreciate the nature and consequences of her conduct or that such conduct was wrong" (SCH, p.75). While he concluded that she was competent to stand trial at that point in time, he noted that she suffered from "antisocial personality disorder" (Id.) at p.3) and "conduct disorder" (Id. at 29).

Lastly, Licensed Clinical Social Worker Pamela Audi-Torazzo completed a comprehensive evaluation of defendant-appellant's mental health issues. In her report dated November 30, 2008 (hereinafter "TOR") , she related the background information she compiled about defendant-appellant's life-long mental health issues, beginning in childhood and continuing up until weeks before the accident. Ms. Audi-Torazzo reported that defendant-appellant's mother, Regina McClain, stated, "My daughter always talked to spirits from the age of two. She was in her own world. I feel that she always had trouble with reality" (TOR, p.8). Defendant-appellant's Aunt Rhonda Rivera confirmed that even as a child, she "always seemed to have severe mood swings... as a child Taliyah would talk to ...dead people in the family" (Id. at p. 10).

Both Ms. McClain and Ms. Rivera recalled events in close proximity to the date of the accident that were particularly relevant to an accurate assessment of defendant-appellant's then mental state. Ms. McClain remembered that "two weeks prior to this tragic event, [defendant-appellant] was acting stranger than usual...she'd call me and begin talking 50 miles a minute on and on about God; talking to her dead father; how she has to save the world and save her family" (Id. at p.8). Ms. Rivera spoke of the same events: "two weeks prior to this incident, she [defendant-appellant] spent about three hours rambling on...she was saying that her father was telling her things" (Id. at 10). Ms. McClain corroborated the defendant-appellant's mania, stating "she was crying and not sleeping for days" (Id. at p.8). Ms. McClain was so concerned that she related, "I went to her house to try to get her in a psych ward, but she wasn't there...I

told her girlfriend to call 911 when she came home, but she never did" (Id.). Ms. McClain attested that "it sounded like she [defendant-appellant] was losing her mind" so she then spoke to defendant-appellant's girlfriend, Tricia Matthews, and told her [Ms. Matthews] to bring her daughter to the hospital, but she told me Ms. McClain that Taliyah was running from her saying she was the devil (Id.). These observations were critical to disprove the allegation, subsequent to the accident, that defendant-appellant was somehow "malingering" mental illness, and defense counsel's failure to include them at trial as part of a psychiatric defense was ineffective assistance of counsel. To even entertain such an allegation as potentially accurate, one would have to believe the preposterous notion that the defendant-appellant somehow knew she'd have an accident two weeks later, so she'd have to start establishing a psychiatric defense. The requisite willing suspension of disbelief to substantiate such a finding belies its exactitude.

The proof that defendant-appellant was experiencing a psychotic break at the time of the accident was well documented by numerous Psychiatrists, Psychologists, Therapists and lay people, yet trial counsel did not mount a psychiatric defense on behalf of defendant-appellant. In the face of the overwhelming amount of available evidence proving defendant-appellant had a psychotic break at the time of her crime, the silent record of defendant-appellant's case warrants reversal of her conviction. Deluca v. Lord, 77 F3d 578 (2d Cir.)

Defendant-appellant's Sixth Amendment right to effective counsel was violated when he failed to secure and offer independent medical and psychiatric testimony that was available People v. Baba-Ali, 179 AD2d 725; People v.Bennett, 29 NY2d 462 (1972); at 462. The importance of pursuing this line of defense was addressed in Deluca. The Court held that the defense counsel's "representation was deficient because he failed to consider adequately, to explain properly to his client, or even to understand, the EED defense and its potential importance to her case" (at 585). The Deluca Court acknowledged that defense counsel's premature rejection, for inadequate reasons, of a possible psychiatric defense was reversible error (Id. at 587). The Court ruled that the "disregard of the EED defense fell below what was required by prevailing standards of conduct" and could not "be considered either a reasonable professional judgment or a reasoned strategic choice" (Id. at 588).

Defendant-appellant's lawyer was duty-bound to defend his client to the best of his ability, and his failure to do so compromised her due process rights. It was incumbent upon defense counsel to enter evidence of defendant-appellant's mental state to demonstrate that she

41

did not have a depraved <u>mens rea</u> so that material element of the crime was not proven. <u>Peopl v.</u>
<u>Taylor</u>, 75 NY 2d 277, 293 (1990) (fact that rape trauma syndrome was a "therapeutic and not a
legal concept" did not "preclude its admissibility into evidence at trial when relevance to a
particular disputed issue has been demonstrated'). In defendant-appellant's case, there was
evidence of temporary insanity, extreme emotional disturbance, and at the very least, a
diminished capacity. Every defendant has the "right to assistance by an attorney who has taken
the time to review and prepare both the law and the facts relevant to the defense" <u>Droz</u>, at 462;
<u>see also Bennett</u> at 466 (competent counsel must "conduct appropriate investigations, both
factual and legal, to determine [what] matters of defense can be developed"). Defendant-
appellant contends that evidence of her mental illness was a sound and colorable defense to the
accusation that she had a <u>mens rea</u> of depraved indifference; yet counsel's failure to investigate
and present any mitigating evidence of her compromised mental state so undermined and
prejudiced her fundamental right to a fair and just trial. Had counsel adequately prepared, he
would have argued that a diminished capacity defense should have been presented, especially to
highlight the defendant-appellant's inability to form the requisite intent to support depraved
indifference murder.

Defendant-appellant asserts that trial counsel's strategy was negligent and prejudiced her,
in that, counsel did not call any witnesses, expert or lay, to testify on behalf of defendant-
appellant's psychological and historical background. Because these facts were not investigated,
introduced or addressed at her trial, defendant-appellant contends that she was highly prejudiced
by this neglect because her mental capacity was the defining factor in her defense against
depraved indifference murder.

If Attorney Renfroe had adequately prepared and presented evidence of the defendant-
appellant's psychotic breakdown and mental illness, by investigating and calling witnesses to
testify to and evaluate her mental health before, during, and after the accident, the outcome of
the proceeding would have been different (<u>Deluca</u> at 1330).

The evidence shows that defendant-appellant operated the motor vehicle in a manner that
caused the death of Larry Simon. Yet, it was the mental breakdown, not depravity, that caused
her to operate the car in a manner that caused his death. To satisfy the element of depraved
indifference, "the defendant must evince a wicked and mischievous disregard (i.e., utter
indifference) for the nearly certain consequences of his or her irresponsible act. It is this

42

extreme wickedness- this abject moral deficiency- that, in the final analysis, places the defendant's culpability on an even plane with the intentional murderer" <u>Sanchez</u> at 373. When psychosis, rather than a depraved <u>mens rea</u>, causes the action, in this case driving, the element of depravity is notably absent, and the crime of depraved indifference murder is not supported by the evidence. Thus, trial counsel's failure to present a psychiatric defense amounts to ineffective assistance of counsel.

Furthermore, defendant-appellant's intoxication was used to assess liability, yet the conflation of the ecstasy and marijuana and the psychotic breakdown was not properly factored into the determinations regarding her <u>mens rea</u>. In fact, National Institute of Drug Abuse (NIDA) clearly recognizes that "drug abuse may bring about symptoms of another mental illness. Increased risk of psychosis in some marijuana users suggests this possibility" (NIDA1, p.1). The mental defect was clearly exacerbated by the intoxication, and the jury should have considered this, according to <u>People v. Florestal</u>, 53 AD3d 164 (1st Dept. 2008), and especially in light of the fact that ecstasy "impairs the ability to carry out complicated motor skills tasks" (TR at 330), such as driving a car.

In <u>Gomez</u> at 9, the Court held that the fact finder has to make an inquiry into the subjective mental state of the actor, thus allowing for such mitigating factors as Extreme Emotional Disturbance (at 10). In <u>People v. Flack</u>, 125, NY 324, 334 (1891), the Court also held that they consider "the question of the defendant's state of mind to be a classic matter of the jury." In <u>People v. Morgan</u>, 246 NY2d 100, Judge Cardozo wrote that, "whenever intent becomes material, its quality or persistence the deranging influence of fear or sudden impulse or feebleness of mind or will-is a matter for the jury if such emotions or disabilities can conceivably have affected the thought or purpose of the actor." And in instances where the fact finders are determining if a defendant acted, "not because [she] meant to cause grievous harm but because [she] simply did not care whether harm would result" (<u>Feingold</u> at 298), the importance of assessing the <u>mens rea</u> cannot be understated.

In his opening statement, defense counsel Renfroe told jurors that his "client had a schizophrenic attack, and that is a burden that I am going to have to prove to you, by a preponderance of the evidence" (TR at 41). He went even further and told jurors, "You must hold me to that proof" (<u>Id</u>. at 43). Yet, he presented no psychiatric defense to the charges. This cannot be characterized as harmless error because defendant-appellant's entire case was

compromised by his failure to do so. And although, as a matter of law, a defendant does not have to "prove" anything, Attorney Renfroe told jurors, "I have that burden. I have to prove that to you" and promised the jury "I'm going to bring that evidence in" (Id. at 48). This, most assuredly, after hearing no defense case at all, left jurors feeling that Attorney Renfroe had not "proven" his case, and thus, albeit erroneously, defendant-appellant was guilty. Yet, had defense counsel brought forth a §40.15 defense, the jury most likely would have concluded that because of a mental disease or defect, there was no criminal liability, and thus, defendant-appellant was not guilty. This evidence, especially when mens rea is a critical element, was not emphasized. There can be no real argument that the evidence of defendant-appellant's impairment did not exist. In the dissenting opinion of the Court of Appeals' decision denying her direct her appeal Justice Smith noted that, "On [the] record a reasonable juror could infer beyond a reasonable doubt that Taylor chose to drive at a very high speed, that she knew that she might hit someone, and that she was unmoved by the risk. If she were not so obviously mentally impaired, it might be reasonable to conclude from these facts that she was depravedly indifferent to human life. But in my view, those words simply cannot be applied to someone so unhinged" (Heigden, J. Smith, dissent, p.7) (emphasis added).

Furthermore, in the majority opinion in the same decision, the Court stated that it was up to the jury to decide whether the defendant-appellant knew she "was driving on the wrong side of the [road] and proceeded regardless" (Id., majority, at p.22), but there was no evidence that the jury considered this specific prong of intent during their deliberations. Thus, Justice Smith acknowledged: "It is clear, and the majority implicitly recognizes, that unless [defendants] knew they were driving the wrong way, they were not guilty of depraved indifference murder. In the absence of such knowledge, their conduct does not show 'depraved indifference to human life' (Penal Law §125.12 [2])" (Id.at 3). Since there was no evidence even proffered at trial as to this intentional conduct, the required intent was not satisfied. In Gracius, 774 NY2d 534 (AD 1 Dept. 2004), the Court ruled that the:

> sanity of the defendant, who had been subject to two competency hearings and who, at the time of the offense had been fixed with irrational ideas, leading him to strip his clothing and leave his apartment, and the defendant's ability to form the requisite intent to commit rape would be significant factors at trial, and psychiatric evidence was necessary and relaxant to the defense, in that the psychiatric evaluation demonstrated a clear connection between the defendant's

44

psychosis and his inability to form the intent to rape. McKinney's CPL §250.10, 730.10 et. seq.

Even at sentencing, the prosecutor highlighted how the defense failed to prove mental illness (ST at 9). Attorney Renfroe appeared to have acknowledged his error at sentencing when he said, "I choose [sic] not to proceed with the psychiatric defense. I want to state this now. That was not what my client wanted me to do. In 20/20 hindsight, maybe I was wrong" (Id. at 19).

Defendant-appellant asserts that her trial counsel's failure to raise the affirmative defense of mental disease or defect to explain her mental state and lack of mens rea necessary to commit the crime, was also grossly negligent of her 6th and 14th Amendment due process rights, under the U.S. Constitution, and Article 1§6 of the New York State Constitution. U.S. v. Segna, 555 F.2d 226 (1977); Fed Crim Law 38, 305 (2), 311, 323, 324, 330, 33, 675 and 717. These omissions by counsel affected the outcome of the trial and amounted to unreasonable professional judgment and were outside the wide range of professionally competent assistance.

Specifically, N.Y. Penal Law §40.15 explains that the affirmative defense of mental disease or defect acknowledges that the defendant "'lacked criminal responsibility by reason of mental disease or defect." Such lack of responsibly means that at the time of such conduct, as a result of mental disease or defect, he lacked substantial capacity to know or appreciate either: "(1) the nature and consequences of such conduct; or (2) that such conduct was wrong." This defense has been found to be admissible to negate intent (see People v. Colavecchio, 1960, 11 A.D.2d 161), so it follows that it would have been available to disprove that defendant-appellant did not intentionally consciously disregard a risk or intentionally evince a depraved mind or engage in conduct which created a grave risk of harm. It is clear from the psychological assessments of defendant-appellant that she could not have formed a conscious regard or disregard for human life because of her compromised mental state. If, at the time of a crime, one is acting in a state of diminished capacity by reason of mental disease or defect, extreme emotional disturbance, or voluntary intoxication, the result is either lessened responsibility or no responsibility (see People v. Parmes, 114 Misc2d at 503).

Defendant-appellant was completely deprived of an adequate defense and her fundamental right to a fair trial. She contends that if counsel had produced supporting evidence to prove her mental illness, along with character and expert witnesses, in conjunction with lay witnesses, the jury would have very likely reached a different conclusion.

Counsel failed to subpoena prison psychiatric records of the defendant-appellant or call any doctors who examined her. Any possible strategy here was not reasonable due to a lack of investigation, preparation, or presentation, thus, the defendant-appellant asserts that her request for post-conviction review and relief could be a decision of innocence or a holding of ineffectiveness of counsel violative of the United States Constitution Amendments 6 and 14, and the New York State Constitution, Art 1§6.

Furthermore, had the evidence of mental disease or defect been offered, it would have been the people's burden to prove each element of the offense, including mens rea, beyond a reasonable doubt. Court of Appeals' Justice Smith even acknowledged that there was "considerable evidence of what Taylor was thinking," (Heigden, Smith, dissent at p.6), so the fact that the mens rea necessary to refute a depraved indifference finding existed, was evident. Plus, "if the jury unanimously finds the defendant not guilty of the elements of the crime charged, the defendant must be found not guilty irrespective of whether the defendant has proven the affirmative defense. If the jury unanimously finds the defendant guilty of the elements of the crime charged but also unanimously finds the defendant has proven an affirmative defense, then the defendant is entitled to an acquittal or conviction of a lesser offense" (N.Y. Penal Law §25.00). Further, such an exculpatory defense must be charged to the grand jury (see People v. Valles, 1984, 62 NY2d 36); thus, the grand jury, having been properly charged, would have more than likely not even indicted on the depraved indifference murder charge.

Trial counsel's failure to adequately investigate and offer a mental disease/defect defense, left jurors without any explanation for defendant-appellant's actions on the night of October 18, 2006. This error was ineffective assistance of counsel as found in Deluca (counsel failed to conduct adequate investigation of possible defense of extreme emotional disturbance which could have reduced murder charge to first-degree manslaughter). Her entire defense was crippled by this error; thus, it cannot be deemed harmless. Had the jurors heard the well-documented evidence concerning defendant-appellant's mental disease/defect, they would have concluded that she did not possess the culpable mens rea of depraved indifference murder, and without proof of that element, she would have been found not guilty. Even at the preliminary hearing, Renfroe's ineffectiveness was evidenced by his failure to elicit testimony from Dr. Wang as to his professional assessment of defendant-appellant's behavior and statements

46

immediately following the accident. While Dr. Wang was on the stand, defense counsel had the perfect opportunity to have him interpret how her bizarre statements and actions were symptomatic of mental illness. Renfroe's error was especially damning in light of the fact that he allowed Detective Signorelli to testify to his interpretation of defendant-appellant's statements and behavior while he was not a psychiatric expert, nor was he ever qualified to testify as one (HU 88-90, 95, 110). Renfroe let Signorelli testify, without objection, at trial about his interpretation concerning what defendant-appellant thought or meant when she made certain statements (TR at 471). He repeatedly testified to his interpretations and assumptions, despite the fact that he had no clinical qualifications to explicate any of the defendant-appellant's behaviors or statements during her psychotic break. While ineffective assistance of counsel is often viewed in terms of the "totality" of the evidence (Baldi, at 147), a single substantial error by counsel can be an exception to the totality requirement (see People v. Hobot, 84 NY2d 1021, 1022 (1995) (a single substantial error by counsel which seriously compromises a defendant's right to a fair trial can constitute ineffective representation).

**B.  Defendant-Appellant was Deprived of Her Constitutional Right to Effective Assistance of Counsel When Trial Counsel Failed to Move to Suppress Audiotapes and/or Ask For a Lengthier Continuance**

After the close of the People's case, prosecutors attempted to introduce audiotape recordings of defendant-appellant's telephone conversations while at Riker's Island. They told the Judge their interpretation of the substance of the relevant portions of the audiotapes and their intent to enter them into evidence if defendant-appellant put forth a case-in-chief. The importance of this issue cannot be understated because the prosecution's production of these tapes caused defense counsel to entirely abandon his defense. Upon receiving knowledge of these tapes, it was incumbent on defense counsel to immediately request an adequate continuance until he was at least able to listen to the tapes and read those recordings that had been transcribed. His failure to do so amounts to ineffective assistance of counsel and was reversible error.

According to the prosecution, defendant-appellant was alleged to have engaged in witness tampering during the taped phone calls. In reference to the witnesses, the prosecutor alleged defendant-appellant was "trying to tell them and suggest what to say" (TR at 549). He characterized defendant-appellant's conversations as "more than simple preparation," which,

"could be viewed as more than but almost suborning perjury" (Id.). These highly serious allegations were leveled against her, yet went unanswered by her defense attorney. In fact, defense counsel basically agreed with the prosecutor's allegations when he said, on the record, that defendant-appellant "talked to these witnesses or told them what to say" (ST at 19). This was an admission of guilt to a consciousness of witness tampering, which was not true and never entered into evidence. Defendant-appellant later had to correct her own attorney, on the record, and said, "I never tampered with a witness" (Id. at 29). That the allegations were adopted by the defense at face value is startling.

After the prosecutor disclosed that he had the audiotape evidence, defendant-appellant was moved to the holding pen during a break in the proceedings. Attorney Renfroe told her he intended to rest the case without calling any witnesses or experts to testify. Defendant-appellant told Renfroe that she wanted her witnesses and doctors called to the stand, and that if he didn't want to do that, then she no longer wanted him as her attorney. She told him that, although she did not have the money to hire a new attorney, she knew that the court was supposed to appoint her another one. Attorney Renfroe told her the Judge would not give her a new attorney. In fact, he even called his co-counsel over to verify that the Judge would not give her a new attorney. Renfroe told her she could either represent herself or let him close the case the way he wanted to. Because Attorney Renfroe told her she would not get a second lawyer, defendant-appellant was coerced into continuing with Attorney Renfroe's representation. She did, however, tell him to tell the Judge she wanted to speak to him because she wanted the Judge to know she did not agree with Attorney Renfroe's decision not to call any witnesses. Defendant-appellant told Judge Collini at sentencing: "I tried to even fire Mr. Renfroe so I could get a new attorney to represent me, he told me that you wouldn't give me an attorney, that I would be forced to represent myself" (ST at 32). The silent record after that statement shows Renfroe knew defendant-appellant was telling the truth. Had Renfroe "argued in favor of his client's motion" this "would require admitting serious ethical violations and possibly subject him to liability for malpractice; on the other hand [a]ny contention by counsel that defendant's allegations were not true would...contradict his client" Lopez v. Scully, 58 F3d 38, 42 (1995), quoting United States v. Ellison, 798 F2d 1102, 1107 (7th Cir. 1986). The same logic applies to the case at bar.

Judge Collini's failure to investigate this conflict of interest, prior to sentencing was reversible error. Because "sentencing is a critical stage of the criminal proceeding at which [a

defendant] is entitled to the effective assistance of counsel, Garden v. Florida, 430 US 349, 358 (1977), a constitutional violation may occur if a conflict of interest arises after a defendant is convicted but before he is sentenced" Lopez at 38. Furthermore, United States v. Levy, 25 F3d 146, 152 (2d Cir. 1994) established that "a defendant has suffered ineffective assistance of counsel in violation of the Sixth Amendment if his attorney has a potential conflict of interest that resulted in prejudice to the defendant." The Court in Winkler v. Keane, 7 F3d at 307, elaborated that "an attorney has an actual…conflict of interest, when during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." In the case at bar, Renfroe's decision to decline to present any defense case at all definitely qualifies as the "course of action" the Winkler Court identified.

Attorney Renfroe indicated, on the record, that neither he, nor the doctors he intended to call as defense witnesses had heard the tapes (TR at 533), yet he failed to request an adequate adjournment to review this new evidence. See People v. Gugino, 132 AD2d 989, 990 (4th Dept. 1987). Attorney Renfroe took a devastating leap to assuming that the doctors were ruinous to the defense. Attorney Renfroe drew conclusions about the doctors' potential testimony based on evidence that they had not even heard. His failure to speak to the doctors regarding this potential evidence was ineffective assistance of counsel under Bennett, at 466. As in Bennett (at 462) and People v. Angellio, 91 AD 2d 666 (2d Dept. 1982), defense "counsel's failure to prepare the defense was so egregious as to render a verdict of guilt inevitable and thereby deny the appellant a fair trial" (Id.). What is more egregious is the fact that defense counsel, himself, had not even reviewed all of the tapes. The tapes have absolutely nothing to do with the state of mind defendant-appellant had on the night of the accident. These tapes would have had no bearing on the doctors' testimony regarding defendant-appellant's psychological examinations and hospital evaluations before she was stabilized. The lack, or the existence, of depraved indifference is supposed to be assessed by the mens rea during the accident, not months or years afterwards. Thus, his decision not to call the doctors as witnesses, because of the audiotapes proffered by the prosecution cannot be written off as a mere harmless, tactical error. It was flagrant ineffectiveness of counsel. At the very least, he should have requested a lengthier continuance to investigate the new evidence and/or moved to suppress it. Defendant-appellant is entitled "to have counsel conduct appropriate investigations, both factual and legal, to determine

if matters of defense can be developed, and to allow himself time for reflection and preparation for trial" Bennett at 466, quoting from Coles v. Peyton, 389 F2d 224, 226, cert. denied 393 US 849. Because Attorney Renfroe failed to investigate the alleged new, last minute, evidence, it is apparent that he "failed to conduct a legally sufficient investigation which would [have] allow[ed] him to make such a strategy decision" Mauldin v. Wainwright, 723 F2d 799, 800, which requires reversal. Defense counsel's deficient performance prejudiced defendant-appellant enough to deprive her of due process. According to Fahy v.Connecticut, 375 US 85, the error is not harmless under the Federal test if "there is a reasonable possibility that the [ERROR] might have contributed to the conviction." In the instant case, there is more than a reasonable possibility that the failure to present a case-in-chief after a thorough review of the tapes caused, let alone merely "contributed to the conviction". Renfroe's decision to abdicate his planned defense is particularly distressing when considering that Renfroe himself told the jury that the "Prosecutor might try and show the faking of a mental illness" (TR at 222-223). Renfroe's awareness of this possibility proves that he should not have been later taken aback by the prosecutor's intention to do so to the point where he aborted the entire defense theory. Defendant-appellant contends that Attorney Renfroe had a personal reason for not wanting the tapes to come into evidence, and that improperly influenced his decision not to call witnesses. The tapes contain numerous conversations where the defendant-appellant is complaining of Renfroe's representation of her. She discussed how he would not come to see her or respond to her concerns about her case. Renfroe did not want his poor representation of defendant-appellant exposed. Defendant-appellant's complete dissatisfaction with his representation was clearly conveyed in the taped conversations. Renfroe put his own self-interest in keeping the tapes out of evidence ahead of defendant-appellant's interests which amounts to ineffective assistance.

The fact that Renfroe intended throughout the entire trial to present a defense, yet abruptly abandoned that intention, is evidenced by a review of the trial transcripts, which substantiate the causal connection between the prosecution's mention of the audiotapes and the defense's decision to abandon the presentation of a defense. His decision to discard the entire defense theory was based solely upon the prosecution's unveiling of audiotape recordings made of defendant-appellant's phone conversations while on Riker's Island. This tactical decision was fatal to the defense, amounts to ineffective assistance of counsel, and as such, requires reversal.

What makes this decision by Renfroe even more nefarious is that neither he nor defendant-appellant ever saw all the transcripts of the recordings or heard all of the tapes. The tapes were never authenticated by anyone or even reviewed by any potential expert witnesses. Neither the prosecution nor the defense actually reviewed all the tapes (Id. at 533). Prosecutors admitted there were over "80 conversations on the disks" (Id. at 534) (some fifteen minutes long), but conceded, "We haven't listened to in any way, shape or form all the conversations ourselves, but we believe as of now there are eight that we've listened to" (Id.). This means they only listened to 10% of the tapes, which makes the decision to cripple the defense with them all the more startling. Attorney Renfroe told the Judge that the tapes purport to contain evidence of defendant-appellant "coaching witnesses and feigning mental illness" (Id. at 534), which are serious allegations that he seemed to have just taken at face value from prosecutors. While he made a record that he didn't have a chance to let any doctors set to testify on behalf of defendant-appellant hear the tapes (Id. at 533), one day later, he rested the case without ever allowing any experts to review the tapes, but instead, just assumed what they would conclude. This decision eviscerated defendant-appellant's chance of an acquittal especially because the testimony regarding her mental incapacity to form the requisite mens rea to support the depraved indifference charge disproved the allegation that she was somehow "feigning mental illness."

 This allegation flies in the face of the facts in this case. Early on in this case, way before Renfroe was even assigned or Judge Collini was appointed as the trial Judge, Riker's Island sent a letter to the Court telling them to "send Ms. Taylor to a psychiatric consult because she's not acting right" (Sentencing Minutes, hereinafter "SM" at 18). To allege that the defendant-appellant was "feigning a mental illness" is absurd. Since defendant-appellant was exhibiting signs of mental illness long before the accident, she would have had to have been psychic and foreseen the accident at least two weeks before it happened so she could began establishing her defense prior to the accident. She also would have had to have known that she would be left alone naked in a car and that Larry Simon would have been crossing the street at the exact moment her car passed. The utter insanity of this allegation renders that argument ludicrous.

 At the very least, Attorney Renfroe should have requested an immediate adjournment to review this new "evidence" himself, have the relevant mental health witnesses review it as well, and then conduct a thoughtful assessment as to how to proceed with the new information. Even

the Judge remarked, "obviously you want to speak to doctors" (Id. at 520), yet despite how "obvious" this should have been to Renfroe, he never called any doctors. Surely, trained mental health experts are in a better position to offer their professional opinions as to whether or not defendant-appellant was faking a mental illness, and the jury should have been presented with their opinions. Furthermore, "since direct evidence of the inner workings of a person's mind is often unavailable, the determination of the actual mens rea of a killer has traditionally remained in most situations a question of fact for the jury based on all the evidence and the entire circumstances" Suarez at 202; see also People v. Smith, 79 NY2d 309 [1992]. It is worth noting that Renfroe had promised the jury that "it's on the records she suffers from schizophrenia" (Id. at 57, 62) and "was having a schizophrenic attack" (Id. at 45, 46), and assured the jury they would hear testimony from "some doctors who [were] treating physicians" that the defendant-appellant was "having delusions" and "not in her right mind" (Id. at 48).

This testimony by doctors who first saw defendant-appellant was critical to proving she lacked the requisite mens rea to establish depraved indifference. He went on to tell the jurors they would "hear medical testimony...some doctors who will interpret this" (Id. at 47). See People v. Shawn Brown, 8/21/98 NYLJ at 21 (Sup. Ct. Queens Co.)(Eng, J). Further, Renfroe promised the jury he would call Corrections Officers from Riker's Island who would say defendant-appellant was observed "hitting her head against the wall" and expressing "delusional ideology" (Id. at 54), which caused them to notify psychiatrists. In the instant case, Attorney Renfroe's choice not to present a case-in-chief prevented jurors from basing their verdict on all the evidence available and the entire circumstances.

### C. Defendant-Appellant was Deprived of Her Constitutional Right to Effective Assistance of Counsel When Trial Counsel Failed to Present Any Defense Witnesses

Trial counsel was ineffective when he decided not to present a case-in-chief. While a criminal defense attorney does have the leeway to determine whether to put forth a defense to the charges, he cannot act against the best interest of his client when making tactical decisions. Counsel's failure to investigate, locate, or call significant witnesses compromised her right to effective representation (People v. Sullivan, 209, AD2d 558).

It was clear from the onset of the trial, that defense attorney Renfroe intended to present a case-in-chief for defendant-appellant. In fact, in his opening argument, he promised jurors he

was going to "prove" defendant-appellant had a schizophrenic attack (TR at 41), and specifically instructed jurors: "you must hold me to that proof" (Id. at 48). He went on further to state, "I have that burden. I have to prove that to you. I am going to bring that evidence in" (Id.). Renfroe made repeated references to the jury that he would present evidence of defendant-appellant's mental illness (including but not limited to: TR at 41, 43-48, 54, 57, 62, 145, 151, 212-223, 318). That he later failed to proffer one witness in the furtherance of his promises to the jury, obliterated defendant-appellant's chance of being found not guilty. This cannot be characterized as harmless error. He told jurors that they "must hold [him] to that proof" (Id. at 43), and they did just that and found defendant-appellant guilty.

In addition to failing to call mental health experts to testify, Attorney Renfroe should have called witnesses who would have testified as to defendant-appellant's mental breakdown. This failure to call any witnesses is grounds for reversal as in Angellilo at 666-67. The witnesses Renfroe failed to call all could have given accounts about the defendant-appellant's psychotic break. Although they are not mental health experts, they would have provided evidence of the defendant-appellant's behavior from weeks before the incident, right up to moments before the incidentOn the night of the incident, and moments before defendant-appellant got into the car and drove, she was at her grandmother's house exhibiting symptoms of an increasingly worsening psychotic break. She began ranting to her cousin Mailyah about the evil around her, and how she had to "get it off" her nephew (TR  464). The normally modest defendant-appellant then stripped both herself and her nephew naked and attempted to strip her cousin Maliyah's clothes off to "get the evil off them" ( Id.). Had Maliyah Rowe been able to testify she would have confirmed all of this. Defendant-appellant was experiencing the delusion that she was being tormented by demonic forces and started overturning furniture and other household items, while hearing voices and screaming. Tricia, Maliyah and the children exited the apartment, out of fear, and began to drive away. When defendant-appellant stepped outside naked, Tricia stopped the car and put defendant-appellant inside in the back seat. Because of defendant-appellant's bizarre behavior, Maliyah exited the car with the children, then Tricia left as well. A completely delusional defendant-appellant then jumped from the back seat to the front of the car and drove onto the road.

There were also witnesses to defendant-appellant's diminished mental capacity after the accident. The police officers on the scene described her as "incoherent". When asked several

address. At the hospital, the intake nurse said defendant-appellant was "acting bizarre" (Id. at 279). Detective Signorelli, who interviewed her first, reported she said she was "going to the light to be with her father" (Id. at 265). Her mental breakdown was evidenced by what she supposedly told him at the hospital. He erroneously had attributed a statement to her that actually came from family interviews and other sources (Regina McClain's affidavit, hereinafter "RM"). In particular, in reference to Ms. Matthew's testimony, Attorney Renfroe assured jurors, "Tricia is going to testify" (TR at 46). Had he called her, she would have been able to testify that defendant-appellant had taken the precaution of getting a licensed driver so that she specifically would not be driving (Tricia Matthew's affidavit, hereinafter "TM"). This false contention that defendant-appellant was intentionally driving despite her suspended license and prior DWI, was continually used as an example of how she was purportedly depravedly indifferent based on her decision (which she truthfully did not consciously make) to drive. Ms. Matthews and Ms. Rowe (TM; and Maliyah Rowe's affidavit, hereinafter "MR") would have countered Detective Signorelli's false testimony that defendant-appellant "jumped into the car and took off" (Id. at 467). These witnesses were critical to prove that defendant-appellant never made a conscious choice to get into the car of her own volition. Renfroe's failure to call these witnesses resulted in defendant-appellant telling the judge "no one knows what happened because Renfroe decided not to call witnesses" (SM at 31).

Further, in U.S. v. Tarricone, 996 F.2d 1414 (2nd Cir. 1993), the Court held that "the defendant established a reasonable probability that the outcome of the trial would have been different if defense counsel had presented testimony of an expert to contradict the government witnesses' testimony." The defendant-appellant's trial counsel was obligated, at a minimum, to present the expert psychological testimony available to him in her case. She clearly has a "plausible" claim of ineffective assistance of counsel. See United States v. Matos, 905 F.2d 30, 33-34 (2d Cir. 1990). Thus, she asks for an evidentiary hearing, at minimum, for the purpose of developing a full factual record.

Attorney Renfroe's errors were compounded by his failure to present any expert witnesses to the ramifications of ingesting ecstasy on an individual's ability to both make rational decisions, which goes to the heart of the mens rea of depraved indifference and on an individual's ability to operate a motor vehicle, the actus reus of the particular crimes with which she was charged. This failure to call expert witnesses was ineffective assistance under People v.

Saunders, 54, AD2d 938, 939 (2d Dept. 1976). The prosecutor even remarked at the <u>Huntley</u>

hearing, "the defendant has not brought in any records of intoxication or any evidence of drug

inducement" (at 178). Thus, he even acknowledged that it was incumbent on Renfroe to bring

this evidence in, especially because the whole point of the <u>Huntley</u> hearing was that defendant-

appellant was not in the proper mental state to consent to a valid wavier of her <u>Miranda</u> rights.

 Defendant-appellant's mental state at the time of the crime was an element the

prosecution was legally required to prove beyond a reasonable doubt. The Court of Appeals has

held that expert testimony may be admissible to negate a mental state, even when the defendant

does not raise an extreme emotional disturbance or insanity defense. In <u>People v. Almonor</u>, 93,

NY2d 571, 580 (1999), the Court held that:

> An insanity affirmative defense is not the same as a <u>mens rea</u>-type defense. The
> two appear in different paragraphs of CPL §250.10 (1). They rest on different
> psychiatric foundations and different mental states. They call for different
> psychiatric testimony and involve different legal theories. An insanity affirmative
> defense is defined by the precise wording of Penal Law §40.15, which
> contemplates that as a result of a mental disease or defect, the defendant lacks
> sustainable capacity to know or appreciate either the nature and consequences of
> such conduct or that such conduct was wrong. A <u>mens rea</u>-type defense, by
> contrast, serves to negate a specific intent necessary to establish guilt.

Whether defendant-appellant acted with depraved indifference was a disputed issue at trial. The

prosecution argued that defendant-appellant was acting with depraved indifference. Defense

Counsel should have introduced evidence to explain the counterintuitive reason that defendant-

appellant ended up driving the car on the night of the accident. Had the jurors heard the lengthy,

documented history of defendant-appellant's mental health history from the psychiatric experts,

they would have determined that despite how tragic the accident was, defendant-appellant's

actions were not depraved or indifferent. Defense counsel's failure to proffer this evidence was

ineffective assistance of counsel. A reviewing court must weigh "the relative probative force of

conflicting testimony and the relative strength of conflicting inferences that may be drawn from

the testimony" (<u>People v. Cahill</u>, 2 NY3d 14, 58 (2003) (citation omitted).Moreover, in Justice

Smith's dissenting opinion in defendant-appellant's Court of Appeals decision, he noted an

error of the majority who distinguished "<u>Valencia</u> on the ground that there was, in that case, a

finding of fact that defendant was oblivious to the risks he was running (majority op at p. 15).

But our memorandum in <u>Valencia</u> does not rely on, or even mention that finding; it says the

evidence was 'insufficient' to support a finding of depraved indifference; if it was insufficient there, it is insufficient here" (Heigden, Smith dissent, p. 6).

    For the foregoing reasons, defendant-appellant's trial counsel was ineffective when he failed to present any defense witnesses. Therefore, defendant-appellant's conviction should be reversed or, at least, modified by reducing the murder conviction to a lesser-included offense. See People v.Dudley, 31 AD 3d 264, 265 (1st Dept. 2006) ("[s]ince the evidence supports a conviction of a lesser charge defendant requested at trial, we reduce defendant's conviction accordingly").

### D.  Defendant-Appellant was Deprived of Her Right to Effective Assistance of Counsel and Her Due Process Rights When Trial Counsel Coerced Her Not To Testify

    The Fifth Amendment to the United States Constitution secures a criminal defendant's right to testify on his or her own behalf. When real or tacit pressure not to testify is applied, a defendant's right to testify is abridged. Very much like defendant Deluca in Deluca, defendant-appellant felt "throughout the trial…that [her attorney] would mount a defense and that she would take the stand. She felt that the jury would want to hear her story, and that she had nothing to hide…[and although she disagreed with her attorney's decision] she acquiesced, believing that the decision whether to testify was for her attorney to make" (TR at 584).

    In the instant case, Attorney Renfroe coerced defendant-appellant not to testify by telling her that, if she did, she would lose her case because of the audiotapes. When she expressed her disagreement with his decision, he told her that the prosecutor was contending that she had tampered with witnesses and faked a mental illness. He kept telling defendant-appellant to "trust him" because he "knew what [he] was doing." Defendant-appellant contends that due to this grossly persuasive misrepresentation by counsel, she was denied effective assistance of counsel which so undermined her defense and arbitrarily negated her fundamental right to equal protection afforded under the Due Process Clause of the 14th Amendment of the U.S. Constitution and the New York State Constitution, Article 1 §6 (People v. Smith, 655 NY2d 416.  U.S. v. Hansel, 70 F.3d 6, 8 (2d Cir 1995).

    Attorney Renfroe also pressured defendant-appellant not to testify by telling her that the prosecutor would use her past against her to discredit all of her testimony. She repeatedly emphasized to Attorney Renfroe that her past troubled behaviors occurred when she was much

emphasized to Attorney Renfroe that her past troubled behaviors occurred when she was much younger, and that she had changed as an adult. She emphasized her work experience and child-rearing responsibilities as evidence of her character, morality, and focus. He continually dismissed her protests. He kept telling her not to testify, despite her desire to do so. Ultimately, she did not testify because he refused to call her witnesses and he told her he was not presenting a defense (TR at 557-559). Had he agreed to call them, she would have continued to pursue her Fifth Amendment right to testify, despite his wishes that she should not.

Judge Collini neglected to even address defendant-appellant's conflict of interest on the record. He permitted sentencing to continue despite the fact that Renfroe labored under an actual conflict of interest during the sentencing proceeding. The Lopez Court found that sentencing defendant-appellant there "without relieving the attorney or inquiring into his willingness or ability to represent his client further" (at 41) was reversible error. Once a petitioner has shown that an actual conflict of interest adversely affected defense counsel's performance, prejudice to the petitioner is presumed and no further showing is necessary for reversal. See Lopez at 43; Cuyler v. Sullian, 446 US 335, 356 n. 3, 349-50; United States v. Jones, 900 F2d 512, 519 (2d Cir. 1990). Because prejudice is presumed, the violation of defendant-appellant's Sixth Amendment rights cannot be harmless. (See Mathis v. Hood, 937 F2d 790, 795 (2d Cir. 1991)).

### E.   Defendant-Appellant Was Deprived of Her Right to Effective Assistance of Counsel When Trial Counsel Did Not Renew His Motion For a Change of Venue and Conduct a More Extensive Voir Dire

The pre-trial and trial publicity permeated the Staten Island area and compromised defendant-appellant's right to a fair trial. Because there was no change of venue, the jury was selected from this same community wherein the negative, prejudicial publicity brewed. Because Staten Island has only one major newspaper, The Staten Island Advance, only their biased interpretation of the circumstances of this case existed.

During all of the pre-trial and trial proceedings, jurors were living and moving through the community, tending to errands, shopping, etc. This case received an inordinate amount of publicity, none of which was favorable for defendant-appellant. The case was a topic ripe for discussion in workplaces, restaurants, homes, stores, etc., and it is preposterous to conclude that jurors were not exposed to the strong negative opinions of defendant-appellant and her case.

the matter were too late; one cannot unring a bell or put toothpaste back in its tube. Once it's out, it's impossible to put back. The damage had already been done to the defendant. Thus, defendant-appellant's right to a fair trial by an impartial jury was violated.

Because the victim in this case was a former Richmond County Assistant District Attorney, the case generated an avalanche of negative, inflammatory, prejudicial pre-trial publicity. Furthermore, the fact that Mr. Simon was an esteemed colleague of the Richmond County District Attorney's Office and well-known in legal circles, influenced the charges that were brought before the grand jury. Even the detectives who questioned defendant-appellant and investigated the accident knew the victim personally. In fact, when Detective Signorelli interviewed defendant-appellant on the night of the accident, while at St. Vincent's Hospital, he told her, "You killed my friend" (BER 9). This statement was indicative of the prejudicial emotions that permeated this case and infected the proceedings from the trial judge all the way to the jurors.

While defense counsel initially moved for a change of venue pre-trial, he never returned to the issue. He should have conducted a more extensive voir dire of the potential jurors to determine their exposure to prejudicial pre-trial publicity. In addition, he should have renewed his motion for a change of venue after jury selection. His failure to do so left the defendant-appellant with her trial in Richmond County, which was polluted by negative publicity, and court personnel and officers who were friends and colleagues of the decedent. In addition to Renfroe's error having her tried by a jury and judge who were prejudiced against her, his failure to renew the motion for change of venue violated her right to due process under the Fifth and Fourteenth Amendments of the United States Constitution.

A change of venue should have been granted sua sponte because the Judge was well aware of the fact that highly-charged emotions based on personal relationships with the victim in the case were compromising defendant-appellant's right to a fair trial. As tragic as the accident that killed Mr. Simon was, it was exactly that, an accident, just as the thousands of other traffic fatalities that occur every year are. Yet, even of all the fatalities, a cursory review of those deemed DWI fatalities-like the defendant-appellant's was- shows that the percentage of defendants that even get charged with depraved indifference is less than 1% (cite).

A particularly relevant example of the disparity involved occurred in Peryea at 21. In that case, the defendant was driving under the influence with a blood alcohol content of .12%,

A particularly relevant example of the disparity involved occurred in <u>Peryea</u> at 21. In that case, the defendant was driving under the influence with a blood alcohol content of .12%, crossed lanes into oncoming traffic, and hit and killed a passenger in another car (at 21). The defendant also had a previous conviction for DWI. Pre-trial, the defendant moved to dismiss several charges in the indictment, most notably, murder in the second degree (depraved indifference). Judge Ryan agreed with the defendant's argument that the circumstances of the case did not elevate his DWI fatality to a depraved indifference murder, and thus, dismissed that count of the indictment. The parallels between defendant <u>Peryea's</u> case and defendant-appellant Taylor's case are striking, and therefore, so is the disproportionality between the consequences each defendant faced. What is perhaps even more telling is that <u>Peryea's</u> case occurred on April 4, 2006, and the decision dismissing the depraved indifference charge was rendered on August 1, 2006, a mere <u>two</u> <u>months</u> <u>before</u> defendant-appellant's case. Hence, the major distinguishing factor is the victim's status in the instant case.

While the bearing of a particular victim's status has never been before this Court, the ruling in <u>People v. Figueroa</u> (need cite) is instructive. In <u>Figueroa</u>, the issue before the Court was whether the status of the <u>defendant</u> (emphasis added) was influencing the proceedings. The Court held that the defendant's status is never relevant as to whether a defendant's case goes to the prosecution. Since the defendant's status was deemed irrelevant in <u>Figueroa</u>, it only follows that the victim's status in the case at bar was influential from the night of the murder on, and the least the trial Judge should have done was granted a change of venue to protect defendant-appellant's right to a fair trial.

F.   <u>**Defendant-Appellant Was Deprived of Her Constitutional Right to Effective Assistance of Counsel When Trial Counsel Did Not Introduce Evidence of Voluntary Intoxication to Negate the Mental State of Depraved Indifference**</u>

N.Y. Penal Law §15.25 states that while intoxication is not a defense to a criminal charge, "evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negative an element of the crime charged." The element at the heart of the matter here is the culpable mental state. N.Y. Penal Law §15.05 (3) allows evidence of intoxication to negate the presence of culpable mental states, with the exception of recklessness. The <u>mens</u> <u>rea</u> required for depraved indifference murder, under the <u>Register</u> law was recklessness, so the Court prohibited evidence of intoxication as to the <u>mens</u> <u>rea</u> (at 280). But because <u>Feingold</u> held

specifically addressed this very issue in his dissent in <u>Register</u>. He noted that "the Legislature could constitutionally exclude intoxication as a factor which negates the element of 'depraved indifference' just as it has with respect to the element of 'recklessness' (see Penal Law §15.05, subd. 3), the simple fact is that the Legislature has not done so; indeed section 15.25 of the Penal Law has done just the opposite" (<u>Id</u>.).

Trial counsel, in the instant case, knew the jury was instructed regarding voluntary intoxication. Thus, he was aware that the jury knew that they could consider whether defendant-appellant's mind was impaired due to drugs to the extreme that the substances had an impact on her ability to possess the requisite <u>mens rea</u> of depraved indifference. Yet, he offered no evidence to support this. In order for the jury to consider the effects of the drug on this particular defendant-appellant's mindset, it was incumbent upon defense counsel to present that evidence to the jury. Researchers for NIDA concluded that "in the hours after taking the drug, MDMA significantly impairs memory and information processing. These deficits can interfere with performing skilled activities, such as driving a car" (NIDA2, p.1). Attorney Renfroe's failure to proffer the very proof he asked the jury to consider when deciding the defendant-appellant's <u>mens rea</u> was fatal to the defense and constituted ineffective assistance of counsel.

In a dissenting opinion in the Court of Appeals' decision in the case at bar, Justice Smith noted:

> As to both <u>Heigden</u> and <u>McPherson</u>, the majority suggest that the very fact that they did drive the wrong way for miles ignoring many signs and other events that should have alerted them, supports an inference that they knew what they were doing. To me, it supports more strongly the inference that – as blood test proved—they were very drunk. Ignoring warnings that would alert a sober person is what drunk people do. I do not doubt that, as the majority says, a drunk person is not biologically incapable of perceiving and reacting to his surroundings, but anyone who has ever met one knows that they often fail to do so (Dissent, p.5).

This is particularly troubling when one considers the plethora of evidence defense counsel had at his disposal. Not only did he have witnesses who could testify about defendant-appellant's behavior immediately prior to the accident, but he could have called the police officers on the scene after the accident. Furthermore, the numerous corrections officers who observed defendant-appellant post-accident were available as well. The toxicologist and various psychiatrists could also have testified to the effects of these drugs, especially in the context of a psychotic break in a person suffering from a mental illness. Even the majority opinion issued by the Court of Appeals in the case at bar, included the characterization of defendant-appellant's

psychotic break in a person suffering from a mental illness. Even the majority opinion issued by the Court of Appeals in the case at bar, included the characterization of defendant-appellant's behavior as "obviously frenzied" ("Heigden, p.19).As recently as March 2009, the dissent in Valencia, at 879, held that "the question of whether intoxication negates a depraved mental state should be a fact-intensive inquiry employed on a case-by-case basis" (at p.5). Because the prosecutor told jurors that the defendant-appellant's drug use showed "her conscious disregard for the lives of others" (TR at 598), it was incumbent upon defense counsel to show that mere drug use alone does not prove the required depravity.

In the case at bar, the "fundamental questions" are whether defendant-appellant was afforded meaningful representation throughout the entire judicial process, and whether her constitutional rights to due process and equal protection were compromised by inadequate legal assistance. Fundamental questions "are those which are reviewable even though no objection was registered to the purported error...it refers to a purported error that goes to the integrity of the process" People v. DeJesus, 399 NY2d 196; People v. Petrovich, 641 NYS2d 592; ABA Standards for Criminal Justice, Defense Function, Standard 4-5.2 (a) [2d ed. 1980 & 1986 Supp.]; People v. Harris, 491 NYS2d 678. Defense counsel's failure to introduce evidence of defendant-appellant's mental illness and intoxication surely left the jurors to reasonably conclude that he didn't have it. Thus, in essence, he had told the jury to look for that specific evidence to prove that defendant-appellant was not guilty, yet he neglected to present it.

The effect of this on jurors' opinions as to guilt or innocence cannot be minimized. In fact, Judge Jasen emphasized the critical import of such evidence in Register when he commented that if the defendant could show that "as a result of his intoxication he was not aware of what he was doing and the risks involved and was not, therefore, competent to consciously disregard those risks" he could not be convicted of depraved indifference murder (at 282-83). Under Feingold, the same standard applies to the depraved mens rea. As such, defense counsel's error cannot be dismissed as a tactical error, but instead, it must be viewed as the substantially monumental error it was.

G. **Defendant-Appellant was Deprived of Her Constitutional Right to Effective Assistance of Counsel when Trial Counsel Did Not Object to the Prosecutors' Prejudicial Summation Which Included Misstated Evidence and Instructions to the Jury Using the Incorrect Standard of Law**

appellant, misstated the law and evidence, and engaged in conjecture during his closing arguments. His comments, taken as a whole, deprived defendant-appellant of a fair trial. Thorough the trial and into the summation, Prosecutor Mattei continually used the gruesome and brutal photos of the victim's severed body parts to inflame the jurors' passions. The purported probative value of the photos, according to Mattei, was to show the jury "how brutal her actions are" (TR at 624), yet, post-Feingold, the circumstances surrounding the crime are not what dictates whether the crime constitutes depraved indifference murder. Mattei spoke of the objective circumstances repeatedly, yet, the act itself (driving) was not brutal. He continually used a conscious decision to drive (Id. at 617) as a premise for all his arguments, yet defendant-appellant never made a conscious decision to drive. During summation, Mattei told the jury again, "We put those pictures of Larry Simon into evidence…there is no doubt how brutal her actions were…" (Id. at 623). He clearly sought to use the photos to attempt to prove a causal connection in the jurors' minds between the accident and the purported depravity. Since the circumstances no longer are supposed to be the basis for the jury establishing a defendant's depraved mens rea, or lack thereof, the prejudicial value of the photos cleary outweighed the probative value and seriously compromised defendant-appellant's right to a fair trial.

This error was compounded by Mattei's comments during summation, which denigrated defendant-appellant. While referencing her behavior after the accident, he told jurors: "she was acting as if it was just any old day in the neighborhood" (Id. at 622), and continued by admonishing jurors that they should "consider that when you consider how blameworthy she is for this" (Id.). In guessing why defendant-appellant had taken her clothes off before she got in the car, he told jurors she was "stupid maybe" (Id. at 599), and then later reinforced that belief by opining that "she is just not as smart as some other people" (Id. at 613). He took defendant-appellant's words that she had "took ecstasy" and "smoked purple haze" and from there leapt to the conclusion that "for this defendant, [it was] just like any day in the old neighborhood" (Id. at 595). However, driving naked, chanting, and speaking about God, Jesus, angels, and demons is not even within the realm of actions exhibited by the average intoxicated person. He told jurors "she's a rapper" (Id. at 598), as if to conjure in their minds all the negative stereotypes they may have of "rappers" and their lifestyles. Defendant-appellant's particular preference in music had absolutely no relevance to the case, yet he introduced this information to denigrate defendant-appellant. He continually emphasized his personal feeling: "again, like it's another day in the

neighborhood" (Id. at 628), as if defendant-appellant spends her days getting in car accidents that result in fatalities. Then he went on to state that this being, in his perception, "just another day in the neighborhood," that jurors should see this as "evidence of her utter disregard for the lives of others," and they should conclude that "after all this carnage, after all this destruction, after all that she did, it's just another day in the neighborhood" (Id. at 629). Defense counsel allowed all of this without even objecting.

 Attorney Mattei's errors in summation were exacerbated by the fact that he told the jury to focus specifically on the objective circumstances to gauge whether or not defendant-appellant was depravedly indifferent. Since Feingold established that depraved indifference is a "culpable mental state," (at 294), the prosecutor should have been limited to that standard in summation. Instead, Mr. Mattei told the jurors to look at "how many people she put at risk, how many people's lives she disregarded" (TR 629) as if that were what would constitute depraved indifference. Earlier he told the jury that because defendant-appellant said, "I wish I could take the man off the street" (Id. at 583), that was, according to Prosecutor Mattei, evidence of her "wicked, evil intent" (Id.) He went on, unchallenged by defense counsel to say defendant-appellant's "depravity is even more evidenced by things she did after the accident," (Id. at 609-612, 615, 622) which is completely contrary to the ruling in People v. Mancini, 7 NY3d 767 (226), which states that a defendant's conduct after the crime has absolutely no bearing on whether or not he or she was depravedly indifferent (emphasis added).

 Despite that ruling, Mr. Mattei asked the jury again to consider, "how despicable is it on the part of any person to cause this damage to this man and keep on driving" (TR at 628). It is clear that he was attempting to connect, in the jurors' minds, a depravedly indifferent mental state to an objective assessment of the circumstances. He even went as far as to state: "When you consider whether or not she was so intoxicated that she can't be guilty of depraved indifference...consider how many people she endangered...consider how she expressed her attitude after all this devastation she caused" (Id. at 622). He erroneously told jurors, "her actions show disregard, and "her conduct/actions bore the results" (Id. at 599). Again, he used the objective circumstances of her "running through a red light," "driving on the wrong side of the road," and driving "with no headlights" to preface his question to the jury "how depraved is that?" (Id. at 602). He kept emphasizing what a "reasonable person" (Id. at 608, 626) would have done, but defendant-appellant was not a "reasonable person" while in the midst of a

psychotic break. Perhaps his most telling proof of his misconstruction of the law was when he told jurors: "She's just on drugs. That's what this case is about" (Id. at 623). The truth is that the case was supposed to be about whether or not defendant-appellant had a depraved mens rea. Mr. Mattei's statements during summation compromised defendant-appellant's right to a fair trial, and defense counsel's failure to strenuously object amounted to ineffective assistance of counsel.

The prosecutor also misstated the evidence in the case during summation. He characterized defendant-appellant's use of ecstasy, marijuana, and her then getting in a fatal car accident as "just like any day" (Id. at 595), however, there was absolutely no evidence brought forth during trial that the defendant-appellant did any of these things every day. His prejudicial comment was designed to have the jurors believing that the defendant-appellant led a reckless lifestyle, where she used drugs and drove under the influence on a daily basis.

In addition, he also misstated facts that were not in evidence. He said defendant-appellant had "an argument with her mother" (Id. at 598), at the house but there was no evidence of this proffered at trial because it simply did not happen. The defendant-appellant didn't even see her mother on the day of the accident. Furthermore, regarding defendant-appellant taking her clothes off, he said, "She wanted to show her mother a point" (Id. at 599), but once again, her mother wasn't even anywhere around during any of the events of that night.

Lastly, the prosecutor compromised the defendant-appellant's right to a fair trial by engaging in conjecture throughout his summation. As to "why she [the defendant-appellant] took her clothes off," he decided, "she thought that she was proving a point. She wanted to show her mother a point" (Id. at 599). How the prosecutor supposedly knew what the defendant-appellant "thought" or "wanted" was not explained. Furthermore, her mother was nowhere around during the defendant-appellant's removal of her own clothing, so she obviously could not have been trying to "prove" anything to her mother.

When discussing how she had told Detective Signorelli he was an "angel," Mr. Mattei instructed the jury: "What is meant is, 'What is going to happen to me now'" The logic behind that interpretation is unclear, and there was no foundation for this comment. He continued with his conjecture when he surmised, "She's a rapper. Maybe that [the drugs] just helped her create...that's why she took those drugs" (Id. at 598). In fact, he went as far as to say that her drug use started to "show her conscious disregard for others" (Id. at 598). Truthfully, the

create...that's why she took those drugs" (Id. at 598). In fact, he went as far as to say that her drug use started to "show her conscious disregard for others" (Id. at 598). Truthfully, the prosecutor had no idea what drugs did for her or why she took them, yet he told the jury his conclusion as if it were fact, and trial counsel let this continue without objection.

The Court of Appeals addressed the latitude afforded to attorneys during summation in People v. Rosa, 108 AD2d 531 (1st Dept. 1985). There the Court held: "...Certainly we are not required, at this late date, to set forth the duties of...[a prosecutor] during trial...Nevertheless, we point out that a prosecutor may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one..." (Berger v. United States, 295 US 79 (1985); and see also People v. Zimmer, 51 NY2d 390 (1980)). As a whole, the effects of the prosecutor's remarks, which were not objected to by defense counsel in summation, deprived defendant-appellant of a fair trial. Each of these errors, standing alone, might not warrant a reversal, but the cumulative prejudice of her ineffective assistance to counsel denied defendant-appellant a fair trial (The Related Companies, et. al., v. Bishops Services Incorporated, 171 AD2d 421; see also, People v. Crimmins, 36 NY2d 230; Ellis, at 652 ).

**H.  Defendant-Appellant Was Deprived of Her Constitutional Right to Effective Assistance of Counsel When Trial Counsel Did Not Argue that the Mens Rea Required to Support a Depraved Indifference Murder Charge Must be Contemporaneous with the Actus Reus.**

Depraved indifference can best be understood as an utter disregard for human life. The mindset of the offender reflects "wickedness, evil or inhumanity, as manifested by brutal, heinous and despicable acts" (Mahoney, p.4). Article 15 of the New York Penal Law identifies the various degrees of culpability recognized by the law. But because it is difficult to examine the mind of a particular offender when he commits a crime, culpability must be "inferred from the facts and circumstances proved" (People v. Green, 56 NY2d 432). Furthermore, the legislature instructed that, in Driving While Intoxicated (hereinafter "DWI") fatalities, a defendant's "overall conduct and culpability should be appraised not alone as of the time of the accident but as of an entire period commencing when he deliberately began to destroy his power of perception and of judgment by becoming intoxicated, and continuing through his drunken

The prosecution's theory throughout defendant-appellant's trial was that she drank one beer, ingested one ecstasy tablet, and smoked some of a marijuana cigarette and became intoxicated, thus acting with depraved indifference to human life, some four hours and 15 minutes later, she got behind the wheel of a vehicle while in that intoxicated state and drove. While there are numerous problems with this theory, it was imperative that defense counsel should have argued that the mens rea to support a depraved indifference charge must be contemporaneous with the actus reus, which was clearly not proven by the prosecution. Defense counsel's failure to advance this argument left the jury to erroneously conclude that a perceived depraved indifference mens rea could be formed hours before the actus reus of driving while intoxicated and amounted to ineffective assistance of counsel.

In Valencia at 927, the defendant was drinking all night at a friend's house. He later got into the car and drove the wrong way on the Long Island Parkway at a high speed for approximately four miles. He crashed into two oncoming vehicles and caused serious physical injuries to the drivers. When tested, Valencia's Blood Alcohol Content was .21%. The trial judge determined the defendant had been 'oblivious' to the risks caused by drunk driving at the time of the offense, but nevertheless convicted him of depraved indifference assault based simply on his earlier acts of drinking to the point of extreme intoxication despite the defendant's awareness that he would be driving in that condition later that evening ( at 928 [Graffeo, J., conclusion]).

The Appellate Division overturned Valencia's convictions because "the trial evidence established only the defendant was extremely intoxicated and did not establish that he acted with the culpable mental state of depraved indifference" ( at 927-928). The Court of Appeals, in defendant-appellant's case erroneously distinguished Valencia from her case because, in Valencia, the trial judge determined the defendant's obliviousness to any risk, but in defendant-Appellant's case, the jury "rejected the argument that defendant's impairment" rendered her "incapable of forming the requisite mental state by reason of her intoxication" (Heigden, Read, dissent, pp.2-3). This line of reasoning is faulty for a number of reasons, and defendant-appellant's trial counsel's failure to advance the argument that the mens rea required to support a depraved indifference murder charge must be contemporaneous as a matter of law, thereby opened the door for the Appellate Division's erroneous holding.

66

a depraved indifference murder charge must be contemporaneous as a matter of law, thereby opened the door for the Appellate Division's erroneous holding.

However, whether this Court concludes that the mens rea required to prove depraved indifference must be contemporaneous with the actus reus, or in the alternative, that it does not have to be, neither opinion was supported at the trial by sufficient evidence, and it was incumbent upon defense counsel to present a challenge to the lack of evidence on defendant-appellant's behalf.

Assuming arguendo that the mens rea and actus reus in depraved indifference murder do not have to be contemporaneous, the argument would be that defendant-appellant became intoxicated, despite the knowledge that she would be driving later on that evening. Competent trial counsel should have emphasized the failure of this argument, due to the fact that defendant-appellant had employed a licensed driver, for the express purpose of driving her that night. The evidence is that defendant-appellant had absolutely no intention of ever getting behind the wheel on the night of the incident, so there could be no depraved indifference mens rea.

In the alternative, had the prosecution furthered the argument that the mens rea and actus reus for depraved indifference murder must be contemporaneous, and competent defense counsel agreed, defendant-appellant's counsel should then have shown the jury that the evidence was not there to support this theory either. There was no question that, in the moments prior to her driving the vehicle defendant-appellant was either, according to the defendant, in the midst of a psychotic break; or according to the prosecution, extremely intoxicated. Thus, under either scenario, the mens rea necessary to support depraved indifference murder charge simply does not exist.

Nonetheless, defendant-appellant's counsel should have known that he had to advance the argument that the mens rea and actus reus must be contemporaneous because, in defendant-appellant's case, her decision to ingest intoxicants was at approximately 5:30 pm, and over five hours passed before she drove the car. Entirely too much time passed to make a causal connection between the mens rea and actus reus in this case. In a concurring opinion in Valencia, Judge Jones emphasized "the necessity of a temporal connection" between the mens rea and actus reus (at 931), which rests upon the "basic premise of Anglo-American criminal law that the physical conduct and the state of mind must concur" (Id. at 933-34). The failure of

counsel to forcefully argue this distinction resulted in her wrongful conviction and was reversible error.

CONCLUSION

Defendant-appellant was deprived of her Constitutional right to Effective Assistance of Counsel under the Sixth and Fourteenth Amendments of the U.S. Constitution and Article I, Section 6 of the New York State Constitution. Each of the instances of ineffective assistance of counsel referred to in this brief is enough, by and of itself, to require reversal. However, the cumulative effect of all these errors resulted in an unjust verdict. Absent these errors, the likely outcome of this trial would have been not guilty verdicts.

Wherefore, defendant-appellant asks that her convictions be vacated on the grounds raised herein, and any other relief the Court deems just and proper.

Taliayah Taylor Pro Se
Bedford Hills Correctional Facility
247 Harris Road
Bedford Hills New York, NY 10507-2499

Dated: 30 September 2014
Westchester, County

Sworn to before me
This 30 day of September, 2014.

Notary Public

Susanne E. Hermans
Notary Public State of New York
Commission No. 01HE6269084
Qualified in Westchester County
Commission Expires 09/17/2016

68