```
 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF RICHMOND - CRIMINAL TERM - PART 14

 3   THE PEOPLE OF THE STATE OF NEW YORK
     ------------------------------------------X
 4
     TALIYAH TAYLOR
 5                -against-

 6                                          DEFENDANT.
     ------------------------------------------X
 7   Hearing                    26 Central Avenue
     Indict. No 335/2006        Staten Island, New York
 8                              February 26, 2016

 9

10   B E F O R E:

11       HONORABLE WILLIAM E. GARNETT
         Justice of the Supreme Court
12

13   A P P E A R A N C E S:

14
         OFFICE OF MICHAEL E. MCMAHON,
15       DISTRICT ATTORNEY-RICHMOND COUNTY
         Attorney for the People
16   BY:  ANNE GRADY, ESQ.,
         Assistant District Attorney
17

18       PHILIP SMALLMAN, ESQ.,
         Attorney for the Defendant
19       32 Court Street
         Brooklyn, New York
20

21

22

23

24

25
                          ANGELA PUNTORNO
                          SENIOR COURT REPORTER
```

Proceeding                                                    2

1    THE CLERK: Calendar number one, Taliyah Taylor,

2    indictment 335 of 2006 on for various motions and hearing.

3        Appearances.

4        MR. SMALLMAN: Good morning, your Honor, on

5    behalf of Ms. Taylor, Philip Smallman, S-M-A-L-L-M-A-N,

6    32 Court Street, Brooklyn, New York.

7        Ms. Taylor is appearing before the Court.

8        MS. GRADY: Anne Grady for the People.

9        THE COURT: Good morning. Ms. Taylor is now

10   here. If you will be seated I want to go over some of the

11   motions that Ms. Taylor has made and give you my

12   decisions.

13       First, there was a motion before the Court for

14   me to recuse myself. I read that. That motion is denied.

15       There was a motion before the Court to change the

16   venue of this 440. That motion is denied.

17       Ms. Taylor made a motion to enlarge the

18   parameters of the testimony aspect by this Court. First

19   of all, I received this motion de novo. That means that

20   it is my case, that any prior rulings by a judge of

21   coordinate jurisdiction are not binding upon me. However,

22   I will enlarge some of the areas of Ms. Taylor's

23   testimony. Specifically she will be allowed to testify

24   regarding what she meant by the calls and her

25   interpretation and intent of the calls that she made with

AP

Proceeding                                                        3

1    the two lay witnesses who were presumably going to be

2    called by the defense in this case.

3         We are not going to relitigate the issue of

4    mental illness except to the extent that is relevant to

5    an understanding of what Ms. Taylor was trying to convey

6    in her conversations with these witnesses.

7         All right, I think that's, in essence, it.

8         Mr. Smallman, correct me if I am wrong, all of

9    the tapes had been provided to you by the district

10   attorney; is that correct?

11        MR. SMALLMAN:  That is correct, Judge.

12        THE COURT:  All the tapes were sent for

13   Ms. Taylor to hear but there was some problem with her

14   hearing all of them?

15        MR. SMALLMAN:  Judge, Ms. Taylor was incarcerated

16   in Bedford Hills and immediately after our last appearance

17   here I FedExed a copy of the tapes to the facility with

18   the assistance of a counselor who worked in the jail and

19   was working with Ms. Taylor.

20        Unfortunately it had been my expectation that

21   her efforts to play the tapes for Ms. Taylor would take

22   place quickly upon their receipt.  Apparently they did

23   not.

24        I have had a couple of visits with Ms. Taylor up

25   at Bedford Hills and at that point was assured she would

AP

Proceeding

4

1    still be given the opportunity to hear the tapes.  It was

2    either late last week that I got a phone call from

3    Ms. Stanley, that's the woman at Bedford Hills, indicating

4    that the facility did not have the capacity or capability

5    technology-wise to play the tapes for Ms. Taylor.

6              Ms. Grady in turn then sent another set of

7    tapes overnight to the facility to expedite that process.

8    Efforts were made again earlier this week again to play

9    those new set of the tapes, CDs.  They were still -- the

10   tapes could not be heard.

11             I have discussed the matter with my client.  She

12   is aware of it obviously and she is comfortable with the

13   situation as it exists now.  She doesn't remember each

14   tape individually but assuming if they were played, she

15   could certainly be oriented to them.

16             THE COURT:  Based upon our discussion which we

17   had earlier regarding the organization of this hearings,

18   the People were going to offer collectively all of those

19   tapes in evidence.  You want it marked as a People's

20   exhibit or Court exhibit so that I'm going to listen to

21   all of them.  I think I've listened to all of them.  I

22   want to make sure that I have.

23             MR. SMALLMAN:  If I may, Ms. Grady and I have

24   discussed that prior to appearing here today.  It matters

25   not to me whose exhibit it is but I would be comfortable

AP

Proceeding                                    5

1    with it being a Court exhibit.

2         THE COURT:   It will be deemed Court exhibit

3    number 1.

4         Ms. Grady, are you prepared to hand it up to the

5    Court and I will take it and put it in the file?

6         MS. GRADY:   At this time?

7         THE COURT:   Well, if I could get it today or by

8    Monday.

9         MS. GRADY:   We will be playing them in court

10   today, I believe.

11        THE COURT:   You will need them today?

12        MS. GRADY:   Yes.

13        May I address what we have been discussing?

14        THE COURT:   Yes.

15        MS. GRADY:   There is -- these CDs, there are two

16   CDs, they are reproductions of two CDs from the People's

17   file.   The thing that distinguishes them is one was

18   originally marked 10-16 and, therefore, it bears 10-16.

19   That's the CD with 88 calls on it.

20        The other CD, the original, was marked 10-23.

21   The CD in my hand is marked 10-23, which I think means

22   October 16 and October 23 to be clear.   That second CD,

23   October 23 has 16 calls on it.   Just so we know what we

24   are referring to.

25        THE COURT:   All right, there are differences in

AP

Proceeding                                                                6

1    the number of calls and differences in the dates.  Is

2    there any significance to that or is that just a --

3              MS. GRADY:  My anticipation Mr. Renfroe will say

4    he was provided with a copy of the CD that is marked

5    October 16.  He was given that on October 21.  He did not

6    receive the CD from October 23, which obviously was

7    produced later.

8              THE COURT:  For what purpose was the October 21

9    prepared?

10             MS. GRADY:  Because I found it in the file.  It's

11   pretty much no more complicated than that.  It contains

12   her calls.

13             I want to be clear what we are offering these

14   for.  We are offering them for her to be her phone calls,

15   her statements.

16             THE COURT:  You may have answered this at

17   least partially.  Are the 16 part of the 88 or you don't

18   know?

19             MS. GRADY:  The 16 phone calls on this -- the

20   second CD, there are a few overlaps but there are some

21   that are unique to that disk.

22             THE COURT:  There are some differences?

23             MS. GRADY:  Yes.

24             THE COURT:  Was an index created, by any chance?

25             MS. GRADY:  I did not create an index.  I could

Proceeding                                                      7

1    that if it's of assistance to you.

2              THE COURT:  What I prefer to do is then make the

3    one that is dated October 16 with the 88 calls would be

4    Court Exhibit Number 1.

5              And the one dated October 23 with the 16 calls

6    will be Court Exhibit Number 2.

7              And I just ask that the court reporter mark them.

8    And for the purposes of today, I will return them to

9    Ms. Grady to presumably be played later.

10             MS. GRADY:  The other point I wanted to make, I

11   supplied these exhibit as exhibits to my original motion

12   response at the beginning of 2015.  Ms. Taylor filed a

13   motion for an evidentiary hearing February 2015.  In that

14   motion she said that she had listened to the CD, the

15   one -- at least the one that had at least more than 80

16   calls on it.  That was part of the basis for her moving

17   for an evidentiary hearing and because she wanted a chance

18   to explain the contents of the calls.

19             I am calling the Court's attention that it seems

20   that she heard at least Court Exhibit 1.

21             THE COURT:  We can develop that at the hearing as

22   a matter of the fact.

23             Okay, anything else?

24             MS. GRADY:  No, Judge.  Can I do a technical

25   check before we start?

AP

Proceeding                                                    8

1          THE COURT: Mr. Smallman, are you going to need

2   to play any of these tapes for Ms. Taylor's testimony?

3          MR. SMALLMAN: I will not.

4          THE COURT: Why don't we wait until later. All

5   right, court officer.

6          (Whereupon, a CD was marked as Court Exhibit 1 in

7   evidence.)

8          (Whereupon, a CD was marked as Court Exhibit 2 in

9   evidence.)

10          THE COURT: They have been marked and being

11   returned. Subsequently they will have to be -- after they

12   are used as part of the hearing they will be returned to

13   the Court for my review.

14          MS. GRADY: Thank you.

15          THE COURT: So, let me just -- for me the

16   critical fact finding in this hearing will be from the

17   time that Mr. Mattei, the Assistant District Attorney at

18   the time, revealed to defense counsel, Mr. Renfroe,

19   that phone calls from Rikers Island in which Ms. Taylor

20   was a participant and which were recorded had been

21   obtained by the district attorney. From that point

22   forward until Mr. Renfroe noting his client's disagreement

23   with his position told Judge Collini that he was resting

24   without calling any witnesses. Also, up to the point

25   where there is a colloquy between Justice Collini

AP

Proceeding                                                                    9

1    and Ms. Taylor about her decision whether she would

2    testify.

3          In my mind that's the timeframe, things that

4    occurred during that period of time on the ultimate issue

5    of whether in this case Mr. Renfroe's defense of

6    Ms. Taylor was effective under the law.  That is it,

7    Mr. Renfroe gives Ms. Taylor meaningful representation.

8          So with that, we will begin the hearing.

9          Mr. Smallman.

10         MR. SMALLMAN:  If I might, Judge, I certainly do

11   not disagree with your Honor's focus on that point of the

12   prior proceedings but I would ask you to allow some basic

13   background about the time that Ms. Taylor met Mr. Renfroe

14   under the circumstances.

15         THE COURT:  The nature of their relationship?

16         MR. SMALLMAN:  And how it lead up to the point

17   that the Court is considering --

18         THE COURT:  In terms of how they got along but

19   not as to specific issues?

20         MR. SMALLMAN:  Correct.

21         THE COURT:  Their relationship?

22         MR. SMALLMAN:  Yes.

23         THE COURT:  I will allow that.

24         MR. SMALLMAN:  Thank you.

25         With that understanding I call Ms. Taylor.

Taylor-Defense-Direct

10

1

2          THE COURT: Ms. Taylor, would you step up,

3   please.

4          Before we begin Ms. Taylor's testimony, there

5   are two motions that I indicated I decided.  I have also

6   written on the buck sheet on each motion.

7          First there had been a motion by Ms. Taylor to

8   compel production of the audio tapes.  That was denied as

9   moot as the People had turned over that material.

10          Next, there was a motion for reassignment of

11   counsel.  I have reviewed that and that application is

12   also denied.  I have indicated that on the buck sheet.

13          THE CLERK: Ms. Taylor, raise your right hand

14   please.

15          T A L I Y A H   T A Y L O R, the defendant,

16   having been duly sworn by the clerk of the court, was

17   examined and testified as follows:

18          THE CLERK: Thank you.

19          Please state your name for the record.

20          THE WITNESS: Taliyah Taylor.

21          THE COURT: Ms. Taylor, please keep up your

22   voice during your testimony and you don't have to speak

23   directly into that but towards that so I can hear you.

24          THE WITNESS: Okay.

25          THE COURT: Mr. Smallman, you may proceed.

MR. SMALLMAN: Thank you.

Taylor-Defense-Direct

1    DIRECT-EXAMINATION

2    BY MR. SMALLMAN:

3    Q.   Good morning, Ms. Taylor.

4    A.   Good morning.

5    Q.   How are you feeling today?

6    A.   I'm okay.

7    Q.   You understand where you are?

8    A.   Yes.

9    Q.   You understand what we are doing here today?

10   A.   Yes.

11   Q.   Have you and I had an opportunity to meet previously

12   and discuss today's proceedings?

13   A.   Yes.

14   Q.   Do you know a gentleman by the name of Christopher

15   Renfroe?

16   A.   Yes.

17   Q.   How do you know Mr. Renfroe?

18   A.   He was my trial attorney.

19   Q.   Can you tell, very briefly, the Court the

20   circumstances under which you came to meet Mr. Renfroe?

21   A.   When I met him I was at Elmhurst Psychiatric Hospital.

22   Q.   Was Mr. Renfroe hired by your family?

23   A.   Yes.

24   Q.   You had no involvement in the hiring of Mr. Renfroe,

25   did you?

Taylor-Defense-Direct                                                    12

1    A.    No.

2    Q.    You didn't have any ability to pay him at that point

3    I'm sure, did you?

4    A.    No.

5    Q.    To kind of narrow the focus of things, you were under

6    arrest for a crime at that point, correct?

7    A.    Yes.

8    Q.    You were being treated at that point at least in a

9    psychiatric facility?

10   A.    Yes.

11   Q.    Do you know how long it took between the event that

12   lead to your arrest for the trial in your matter to begin?

13   A.    Approximately two years.

14   Q.    And would it be fair to say you were incarcerated for

15   that entire period of time?

16   A.    Yes.

17   Q.    You were charged, in effect, with a homicide, right, a

18   murder?

19   A.    Yes.

20   Q.    How many times do you recall meeting personally with

21   Mr. Renfroe in that two year period?

22   A.    I believe one time I recall at the hospital.  No more

23   than two to three times at Rikers.  Probably two times.

24         THE COURT:  Two times at Rikers and once at the

25   hospital?

AP

Taylor-Defense-Direct

1          THE WITNESS:  Yes, that I recall.

2     Q.   Would it be fair to say at the first meeting at the

3   psychiatric facility you weren't able to discuss any

4   substantive matters about your case; would that be fair to

5   say?

6          MS. GRADY:  I am going to object.  Aside from

7   some of the introductory questions, I am objecting to the

8   leading nature.

9          MR. SMALLMAN:  Withdrawn.

10         THE COURT:  Well, the question has been

11  withdrawn.

12    Q.   Put a timeframe on the visits that you recall getting

13  from Mr. Renfroe at Rikers Island.  For instance, how many

14  hours?

15    A.   I don't believe I ever met with him for more than an

16  hour.

17    Q.   Three visits for a total of say three hours?

18    A.   I can't say three hours total.  I know I haven't met

19  with him over an hour.

20    Q.   How many hours all told do you recall meeting Mr.

21  Renfroe during the pendency of your case?

22    A.   I can't give an estimate because I wasn't really

23  calculating the time.  I just don't recall seeing him over an

24  hour the times I did see him.

25         THE COURT:  At the times you would meet with him

13

1    at Rikers it was no more than an hour, correct?

2              THE WITNESS: Correct.

3    Q.   Each visit lasted an hour?

4    A.   I don't think it lasted a full hour. I don't

5    remember seeing him over an hour.

6    Q.   They were, to the best of your recollection, three

7    visits, is that right?

8    A.   Yes.

9              THE COURT: Three visits at Rikers?

10             THE WITNESS: No, I believe two at Rikers and I

11   remember one at Elmhurst.

12   Q.   Did Mr. Renfroe ever send any investigators or other

13   professional personnel from his office to meet with you?

14   A.   I remember Dr. Berrill, I believe, and then he sent

15   another lady towards the trial.

16   Q.   Did the lady identify herself?

17   A.   I believe if I am not mistaken Pamela. She did some

18   kind of report, like an overall report of everything. All the

19   doctors' reports and experience at the hospital and family

20   history.

21   Q.   Now, did you ever discuss offering testimony, your

22   testimony, at your trial?

23   A.   Yes.

24   Q.   And did Mr. Renfroe ever prepare you for testimony at

25   your trial?

Taylor-Defense-Direct                                                      15

1    A.    No.

2    Q.    Did anyone ever prepare you for testimony at your

3    trial?

4    A.    No.

5    Q.    Did you discuss at any time with Mr. Renfroe any

6    witnesses that might be available for your defense?

7    A.    Yes.

8    Q.    When did you have those discussions.

9    A.    Well, I had a discussion with him, I believe, in one

10   of the Rikers Island visits.  Besides that I think he had knew

11   of two -- the first two witnesses that I wanted him to call

12   from the very start of the case because they were with me

13   that night and the rest of the witnesses came later after

14   my -- after the psychiatric intervention.

15        THE COURT:   Let me ask you this:   Did you have

16   in addition to face to face meetings with Mr. Renfroe, did

17   you have phone conversations with him during that two

18   years between your arrest and the trial?

19        THE WITNESS:   I definitely remember talking to

20   him one time.  I am not sure if I talked to him more than

21   that.  I don't think it was more than twice on the

22   telephone.

23        THE COURT:   Who were the two witnesses that you

24   had identified who had been with you that night that you

25   discussed?

AP

Taylor-Defense-Direct                                                    16

1                  THE WITNESS:  Tricia Matthews and Maliyah Rowe.

2                  THE COURT:  Roth?

3                  THE WITNESS:  Maliyah Rowe.

4        Q.   You had a series of court appearances between the time

5   you were arrested and the time you went to trial, right?

6        A.   Yes.

7        Q.   You were produced to the courthouse for those court

8   appearances?

9        A.   Yes.

10       Q.   And was Mr. Renfroe your attorney?

11       A.   Yes.

12       Q.   Did he meet with you during those court appearances?

13       A.   Sometimes, yes.

14       Q.   About how many times, if you can recall?

15       A.   I don't have an estimate.  I have been to court a lot

16   of times.  Some of the times he was there, some of the times he

17   wasn't.

18                  THE COURT:  I just have to clarify that.  Was he

19   always with you in the courtroom when your case was

20   called?

21                  THE WITNESS:  No.  Sometimes a representative

22   came for him.

23                  THE COURT:  Someone came from his office or some

24   attorney standing for him?

25                  THE WITNESS:  I believe it was some attorney he

AP

Taylor-Defense-Direct

1

2          THE COURT:   Go ahead, Mr. Smallman.

3    Q.   Did you have a conference with Mr. Renfroe from the

4    pen area or downstairs in the bullpen when you had those court

5    appearances?

6    A.   Sometimes.

7    Q.   How many times altogether, if you can recall?

8    A.   I can't recall.

9    Q.   Can you give us an estimate?

10   A.   I can't estimate.

11   Q.   More than ten, less than ten?

12   A.   I don't really remember how many times he showed

13   opposed to the people that he sent.

14   Q.   Can you guess -- withdrawn.

15        Can you tell the Judge how many hours all told you may

16   have had an opportunity to conference with Mr. Renfroe about

17   your case?

18        THE COURT:   In the courthouse in those two years

19   if you can estimate?

20        THE WITNESS:   I wouldn't say over an hour.  The

21   longest time that I talked to him was in trial when we

22   were having difficulty.  Other than that they were very

23   brief.

24   Q.   Okay, now, did you get or were you provided with

25   paperwork in your case?

17

Taylor-Defense-Direct

1    A.    After a long time, yes.

2    Q.    How did you come to get the paperwork?

3    A.    I think they were turned over one day in court, if I

4    am not mistaken.

5    Q.    Were they given to you promptly after Mr. Renfroe got

6    them?

7    A.    I don't know exactly when he received them.  I was

8    requesting them for a long time though.

9    Q.    Did you write letters to Mr. Renfroe?

10   A.    Yes.

11   Q.    Did you get correspondence back from him?

12   A.    No.

13   Q.    Did there come a time when Mr. Renfroe indicated to

14   you that the case was getting ready to go to trial?

15   A.    Yes.

16   Q.    What were your requests of Mr. Renfroe at that point?

17   A.    Well, for a long time I was requesting him to -- he

18   was supposed to subpoena a lot of the witnesses that I

19   requested him to contact.

20   Q.    Anything else?

21   A.    Repeat the question.

22   Q.    Were there items you requested from Mr. Renfroe or

23   things that you wanted to get done prior to your trial?

24   A.    Other than him contacting the witnesses, no.

25   Q.    How did you get this information to Mr. Renfroe?

18

Taylor-Defense-Direct

```
 1        A.    Well, I told him personally and I also wrote him
 2   letters in regards to my request.
 3        Q.    Did you and Mr. Renfroe have a good relationship?
 4        A.    I can't say that we did.
 5        Q.    Why not?
 6        A.    Because I didn't see him long enough to establish one
 7   and a lot of the times I was trying to reach out to him and
 8   didn't get a response.
 9        Q.    When I was going to court a lot of the times if I sent
10   him messages I never got a response and letters never got a
11   response and I didn't see him often.
12        Q.    Did you voice your concerns about this to your family
13   members?
14        A.    Yes.
15        Q.    What did you ask them to do?
16        A.    I didn't particularly ask them to do anything.  Any
17   time I expressed my concerns they so happen to be convinced
18   that he would do a good job and they kept wanting me not to
19   worry.
20        Q.    Did you ask your family members to do anything
21   directly with Mr. Renfroe?
22        A.    Other than ask him questions on my behalf or try to
23   find out information for me.
24        Q.    When your pretrial hearings began, were you adequately
25   prepared to go forward?
```

Taylor-Defense-Direct

1   A.   I don't really know what that means.  There was no

2   preparation.  I would just get brought to court.  It's not like

3   he sat and prepared me.

4             THE COURT:  Did you testify at any of the

5   pretrial hearings?

6             THE WITNESS:  No.

7             THE COURT:  Okay, let's go.

8   Q.   How much time after the hearings did the trial begin?

9   A.   I believe soon after.

10  Q.   About a week or thereabouts?

11  A.   I don't remember that.

12  Q.   Did you spend any time with Mr. Renfroe between the

13  hearings and the trial in preparation for the trial?

14  A.   No.

15  Q.   Did you ask to spend any time preparing?

16  A.   I didn't really know that I needed to.

17  Q.   Okay.

18       You were present for the entire duration of your

19  trial, right?

20  A.   Yes.

21  Q.   You listened to the witnesses as they testified?

22  A.   Yes.

23  Q.   And did you discuss things with Mr. Renfroe during the

24  trial itself?

25  A.   I don't recall during the trial.  During pretrials I

Taylor-Defense-Direct

1   did discuss things.

2   Q.    What did you expect your defense was going to be at

3   your trial?

4   A.    That it was 4015 mental disease defect.

5   Q.    How did you expect to go about presenting your

6   defense?

7   A.    Well, I would hope that the witnesses would be called

8   on my defense basically to get the story of what happened to

9   the jury.

10  Q.    Who were those witnesses going to be?

11  A.    I was -- well, it was supposed to be Maliyah Rowe,

12  Tricia Matthews.   I was hoping for Officer Clark and Officer

13  Winfield along with a series of different doctors I was seen

14  by.

15        THE COURT:   Clark and Winfield were two of the

16  officers that were first on the scene, do you remember?

17        THE WITNESS:   They weren't first on the scene

18  but they were in the mental observation unit that I was

19  placed in before they sent me to the hospital.

20        THE COURT:   Had they taken you to the hospital?

21        THE WITNESS:   They dragged me to intake to take

22  me to the hospital -- to get me sent to the hospital.

23        THE COURT:   Where did you last see Clark and

24  Winfield?

25        THE WITNESS:   Building nine.   Mental observation

AP

21

Taylor-Defense-Direct                                                22

1      unit.

2              THE COURT:   At East Elmhurst?

3              THE WITNESS:   No, Rikers Island.

4              THE COURT:   These correction officers or police

5      officers?

6              THE WITNESS:   Correction officers.

7      Q.   Were there any other doctors that you expected to

8      testify other than Dr. Berrill?

9      A.   Dr. Wang and some of the doctors at Rikers Island.

10     Q.   Did you make known to Mr. Renfroe that these were, in

11     fact, witnesses that you wanted to use?

12     A.   Yes.

13     Q.   And were you adamant about that?

14     A.   Yes.

15     Q.   Tell the Court why you were adamant about that?

16     A.   Because I believe that the only way for the jury to

17     know the truth of what happened was for them to be present to

18     explain my mental state when they seen me because that went

19     hand in hand with my mental state the night of the accident.

20             THE COURT:   When did you come in contact with

21     Dr. Wang?

22             THE WITNESS:   Dr. Wang, Elmhurst Hospital.  I

23     think it was October.

24             THE COURT:   He treated you in Elmhurst Hospital?

25             THE WITNESS:   Yes.

AP

Taylor-Defense-Direct                                   23

1          THE COURT: Thank you. Go ahead -- let me ask

2    you this: When did you first see Dr? Berrill.

3          THE WITNESS: I don't remember when I saw him

4    first.

5          THE COURT: Were you at Rikers or still

6    hospitalized?

7          THE WITNESS: No, I was at Rikers Island.

8          THE COURT: Go ahead.

9    Q.   Do you recall how many times you were visited by

10   Dr. Berrill?

11   A.   I believe twice.

12   Q.   Do you recall how long you may have spent speaking

13   with Dr. Berrill?

14   A.   I'm not sure. Maybe approximately like two hours

15   because he had like assessment, different tests that I had to

16   take.

17   Q.   After you met with the doctors, did you discuss this

18   with Mr. Renfroe?

19   A.   No.

20   Q.   Did Mr. Renfroe ask you about the sessions with the

21   doctors?

22   A.   No?

23          THE COURT: Well, had Mr. Renfroe gotten

24   Dr. Berrill to speak with you?

25          THE WITNESS: Yes.

Taylor-Defense-Direct                                                    24

                    THE COURT:  He had arranged that?

 1                  THE WITNESS:  I believe so.

 2   Q.   As you listened to all the witness's testimony

 3   throughout the trial against you, witnesses for the government,

 4   was it still your intention to advance your case in your

 5   defense?

 6   A.   Yes.

 7   Q.   Do you recall a time when the government or the

 8   prosecution finished their case?

 9   A.   Yes.

10   Q.   Do you recall having discussions with Mr. Renfroe

11   about the existence of certain tapes at that point?

12   A.   Yes.

13   Q.   Tell the Judge what your position was with Mr. Renroe

14   regarding going forward with your defense?

15                  THE COURT:  After she had listened to the tapes

16   or been told about them?

17   A.   After I was told of the existence I let him know

18   Q.   After you were told about the existence of the tapes?

19   that I would want him to play them to the jury for the jury

20   to make the decision because I didn't believe the allegations

21   that were being brought against me or what they were trying to

22   allege, I didn't believe it to be true.  So I felt they should

23   play it to the jury and let them decide.

24                  THE COURT:  You felt it was your position that

25

AP

Taylor-Defense-Direct                                                    25

1    what the prosecutor was alleging that these tapes showed

2    was not right and that if the jury heard all of the them

3    they would come to that conclusion?

4         THE WITNESS: Correct.

5    Q.   Were you given an opportunity to listen to the tapes?

6    A.   No.

7    Q.   Did you ask to hear the tapes?

8    A.   Yes.

9    Q.   Who did you ask?

10   A.   Mr. Renfroe.

11   Q.   Did you tell Mr. Renfroe that you had any --

12   withdrawn.

13        Did you make any request to Mr. Renfroe with the Court

14   at that point in time?

15   A.   The only request I made with him was once he decided

16   that he was going to make his position to do a summation, he

17   called it.  I told him I didn't want him to represent me if

18   he wasn't gonna call my witnesses or the doctors and he told

19   me that the Court wouldn't give me another attorney at that

20   time.

21        THE COURT:  So, when that occurred you hadn't

22   heard any of these tapes?

23        THE WITNESS:  No, they just submitted

24   transcripts.

25        THE COURT:  Did you read the transcripts?

AP

Taylor-Defense-Direct                                                    26

1       THE WITNESS:  I did and I didn't see any

2   connection to what they were alleging.

3       THE COURT:  So you read the transcripts and then

4   what did Mr. Renfroe tell you?

5       THE WITNESS:  Well, he told me that he had

6   intended to do a summation.

7       THE COURT:  He was going to rest without putting

8   any of your witnesses on including Ms. Rowe and

9   Ms. Matthews and the doctors?

10      THE WITNESS:  Correct.

11      THE COURT:  So there would be no defense evidence

12  and he would just sum up?

13      THE WITNESS:  Yeah, that was his idea.

14      THE COURT:  Go ahead, Mr. Smallman.

15  Q.   Did you discuss offering testimony yourself without

16  your civilian witnesses or the doctors?

17  A.   Not without them, no.

18  Q.   Did you have that discussion with Mr. Renfroe?

19  A.   Well, he know that I wanted to testify but we didn't

20  have a discussion that I would without the witnesses being

21  called.

22  Q.   What did you want to do at that point?

23  A.   Well, I wanted to testify but it didn't make any sense

24  to testify without my witnesses so I couldn't.  It's not like I

25  didn't want to.

AP

Taylor-Defense-Direct                                                      27

1    THE COURT:  Would it be fair to say that when

2  Mr. Renfroe made the decision not to call any witnesses it

3  was then your decision not to testify alone; is that

4  correct?

5    THE WITNESS:  I didn't feel I had any other

6  choice.

7    THE COURT:  Just tell me yes or no.

8    When he told you that he had decided as a matter

9  of his strategy --

10    THE WITNESS:  Uh-huh.

11    THE COURT:  -- that he wasn't going to call any

12  witnesses in light of the tapes, your decision then was,

13  Mr. Renfroe you made that decision and, therefore, it's my

14  decision that I'm not going to testify?

15    THE WITNESS:  No, that's not how it went.

16    THE COURT:  Okay, tell me how it went.

17    THE WITNESS:  The Judge asked me if I wanted to

18  testify and I told him not at this time.  He told me

19  there is not going to be another time.  Then he asked me

20  if I wanted to testify again.  I told him it didn't make

21  sense.

22    Then he asked me to say yes or no but I couldn't

23  say yes or no.  It's not like I didn't want to, I wanted

24  to but to me it didn't make sense without my witnesses

25  so I couldn't answer yes or no.  It didn't make sense

AP

Taylor-Defense-Direct

1   without the witnesses.

2        THE COURT:  But you didn't take the witness

3   stand.  You didn't say, Judge, despite all that, I want

4   the jury to hear from me?

5        THE WITNESS:  For me it didn't make sense.

6        THE COURT:  We are doing the same thing you did

7   with Judge Collini.

8        I understand what you were thinking but

9   ultimately based upon what you were thinking it was your

10  decision not to step up and testify, right?

11       THE WITNESS:  It was the decision that he didn't

12  leave me any other choice.

13       THE COURT:  That's how you feel.  I am just

14  trying to get to the bottom line.

15       You decided for whatever reason, right or wrong,

16  that you, under the circumstances, were not going to

17  testify?

18       THE WITNESS:  Correct.

19       THE COURT:  Okay, go ahead.

20  Q.   Was your decision not to testify made because of the

21  decisions that Mr. Renfroe made?

22  A.   Because of that and the fact that he didn't step down.

23  He said they wouldn't allow me another attorney.  I didn't have

24  any other choice but to stay with him.  And it didn't make

25  sense to testify if he wasn't going to call my witnesses.  I

28

Taylor-Defense-Direct

1   didn't understand why he wasn't calling the witnesses.

2        THE COURT: Let me frame the question a little

3   differently.

4        If Mr. Renfroe said, okay, Ms. Taylor, I changed

5   my mind and I will call your witnesses and I will put

6   Doctors Berrill and Wang on the stand, you would have been

7   fine with Mr. Renfroe?

8        THE WITNESS: What do you mean, I would have been

9   fine with him?

10        THE COURT: You said you wanted a new lawyer?

11        THE WITNESS: Yes.

12        THE COURT: That was based upon his refusal to

13   submit your defense to the jury?

14        THE WITNESS: Correct.

15        THE COURT: My question is, if he had decided to

16   do so --

17        THE WITNESS: Uh-huh.

18        THE COURT: -- you would have been okay with him?

19        THE WITNESS: With his defending me?

20        THE COURT: His continuing to defend you?

21        THE WITNESS: Yes.

22   Q.   You wanted Mr. Renfroe to present the case the way you

23   thought it was important to be presented?

24   A.   Yes.

25   Q.   And you wanted Mr. Renfroe to put the issues before

29

Taylor-Defense-Direct

1    the jury that were important to you?

2    A.    Yes.

3    Q.    And you wanted Mr. Renfroe to do that in spite of

4    what you heard were the contents of these phone calls,

5    correct?

6    A.    Yes.

7    Q.    Is that because it was your belief that you didn't do

8    anything improper in those phone calls?

9    A.    Correct.

10            THE COURT:    And your knowledge of the substance

11    of those phone calls was simply your conversations with

12    Mr. Renfroe, what he told you was on those tapes?

13            THE WITNESS:    No, they gave me a transcript in

14    court.

15            THE COURT:    But you didn't -- you read the

16    transcripts but you didn't hear the tapes?

17            THE WITNESS:    Correct.

18    Q.    Were you told that the transcripts were only portions

19    of the phone calls or the entire phone calls?

20    A.    I don't remember them telling me any of that.  I just

21    looked at what they submitted and didn't understand the

22    allegations.

23    Q.    When you read the transcripts, did you recall the

24    individual phone conversations that were being referred to?

25    A.    Yes.

30

AP

Taylor-Defense-Direct

31

```
1    Q.    Some of those phone conversations were fifteen minutes

2  in length, right?

3    A.    Yes.

4    Q.    Many of them in fact, right?

5    A.    Yes.

6    Q.    How long was the transcript that you were handed?  How

7  many pages?

8    A.    I don't recall how many pages or how many calls but

9  they're different than what they -- the transcripts that I

10 received and the things that were being alleged are different

11 than what was later alleged because then they were talking

12 about like static on the phone.  Any time I mentioned static,

13 which to me didn't have any relevance, but they were

14 speculating over those conversations.

15         THE COURT:  The question was how much material

16 did you get?

17         THE WITNESS:  I don't remember how many pages.

18         THE COURT:  Was it thick, was it thin?

19         THE WITNESS:  It was thin.  It wasn't really

20 thick.

21    Q.    Did you imagine you were reading a transcript of those

22 conversations word for word or were you reading a synopsis of

23 each of those or some of those?

24         THE COURT:  A summary.

25    A.    What I read appeared to be word for word but I don't
```

AP

Taylor-Defense-Direct                                    32

1    know if it was like a full call, part of a call.  I am not sure

2    about that.  But it appeared to be word for word.

3         Q.    And you didn't get a transcript of each and every

4    call, right?

5         A.    No, it was a few.

6         Q.    Without saying what it was, did Mr. Renfroe offer you

7    his opinion about how to proceed in your trial?

8              THE COURT:  There again, in this setting the

9    attorney-client privilege is waived.  I think she can

10   discuss the discussion she had with her attorney about

11   strategy.

12             MR. SMALLMAN:  Sure.

13        A.    Repeat the question.

14        Q.    Did you have a discussion with Mr. Renfroe about --

15   withdrawn.

16        Q.    Did Mr. Renfroe offer his opinion to you as to how to

17   proceed after reading these transcripts?

18        A.    Yes.

19        Q.    Did you agree with him?

20        A.    No.

21        Q.    Did you tell him that?

22        A.    Yes.

23        Q.    How strongly did you make your position felt?

24        A.    So strongly that I wanted to speak to the Judge.

25        Q.    Did you explain to him why you felt the way you did?

Taylor-Defense-Direct

1   A.   Yes.

2   Q.   What did you tell him?

3   A.   I told him that I didn't agree with what he was

4   saying.  That I understood what he was saying if what he was

5   presented was accurate.  To me I thought it was a scare tactic

6   and I didn't think he should go with that decision.  I thought

7   it was wrong for him to go forward with the defense because

8   this was what actually happened and how could you not present

9   the truth regardless of what they are trying to allege on the

10  phone calls.

11           THE COURT:  That's what you told to Judge

12  Collini?

13           THE WITNESS:  That's what I told to Mr. Renfroe.

14           THE COURT:  Did you ever say anything to Judge

15  Collini?

16           THE WITNESS:  No.  When I attempted to he said I

17  should speak through the attorney and then they would

18  revisit it later and never got back to it.

19  Q.   You had never been on trial before, had you?

20  A.   No.

21  Q.   In fact, have you ever testified in any kind of a

22  proceeding before that?

23  A.   When I got raped.

24  Q.   Other than that?

25  A.   No.

33

Taylor-Defense-Direct

1    Q.    And that was as a victim, right?  You didn't sit for

2    the entire trial?

3    A.    Right.

4    Q.    You just came and offered your testimony for that one

5    portion of the trial?

6    A.    Right.

7    Q.    You didn't have to have an attorney?

8    A.    I am not sure if it was a trial or what it was.  I

9    know I had to go in, explain what happened to some people and

10   then that was that.

11   Q.    Might have been a grand jury?

12   A.    I guess.  I don't know.

13   Q.    Okay.  Other than offering your testimony at that

14   point, you didn't have to discuss strategy or the impact of

15   your testimony with anyone else, did you?

16   A.    No.

17         THE COURT:   Before you testified did the DA tell

18   you what his or her questions were going to be?

19         THE WITNESS:   No.

20         THE COURT:   Did he go over -- he or she go over

21   what your responses would be?

22         THE WITNESS:   No.

23         THE COURT:   So, you were just told to take the

24   witness stand and tell what happened?

25         THE WITNESS:   Yeah.

AP

34

Taylor-Defense-Direct

1                THE COURT:  Go ahead.

2      Q.    Were you told to testify truthfully?

3      A.    Yes.

4      Q.    Is that what you did?

5      A.    Yes.

6      Q.    And you were told to testify truthfully by the

7  prosecutor in that case?

8      A.    I don't remember.  I don't know who was who.  I know I

9  had to explain what happened.

10     Q.    And that's in the matter of when you were the victim,

11 right?

12     A.    Yeah.

13     Q.    How would you -- describe for Judge Garnett your

14 feeling towards Mr. Renfroe at this particular point in the

15 trial?

16                THE COURT:  At the point where he told her he was

17 going to rest?

18                MR. SMALLMAN:  I will rephrase it, Judge.

19     Q.    Prior to Mr. Renfroe telling the Judge that you were

20 not going to present a defense, you had discussions with him,

21 right?

22     A.    Yeah.

23     Q.    Do you know where those discussions took place?

24     A.    In the bottom of the courthouse.  It was a different

25 one.

AP

35

Taylor-Defense-Direct

1    Q.    And was Mr. Renfroe upset, nervous?  How would you

2    describe him?

3    A.    I don't know if he was upset.  He was assertive with

4    the decision that he wanted to make and he explained to me what

5    he felt about the tapes but I didn't understand it.  I didn't

6    hear the tapes and I didn't believe what was being alleged on

7    the tapes.

8          He also talked about my history being brought up and I

9    didn't feel that it had any relevance to the case and it was

10   things that happened when I was a child and I explained to him,

11   that, you know, I was misguided then.  How could it be used

12   against me now.  I didn't understand any of that.

13   Q.    Did Mr. Renfroe express any anger about you making

14   those phone calls?

15   A.    He didn't really express anger, no.

16   Q.    What did he express?

17   A.    He seemed to be under the belief of what with the

18   People were alleging.  That's what I --

19   Q.    When you say "the People", you mean the government?

20   A.    Yes.

21              THE COURT:  What did he believe they were

22   alleging?

23              THE WITNESS:  No, they were alleging I was

24   tampering with witnesses, coaching, leading and faking a

25   mental illness.

AP

36

Taylor-Defense-Direct

1    Q.    You did state on the tapes something to the effect

2  about giving people questions; is that right?

3    A.    Yes.

4    Q.    Why did you do that?

5    A.    Because I felt that he needed to ask certain questions

6  for the truth to be presented and he didn't know what they

7  witnessed.  He wasn't there.  But like with Tricia and Maliyah

8  they were with me that night.  I know what they witnessed.

9         The doctors, I know what time I seen them.  So, if you

10  are going to ask -- he would have had to know the experience to

11  be able to ask the proper questions.

12    Q.    Did you ask Mr. Renfroe to talk to your civilian

13  witnesses?

14    A.    Yes.

15    Q.    At the time that you gave them or asked that they be

16  given your written questions, did you believe Mr. Renfroe had

17  spoken to them at that point?

18    A.    No.

19    Q.    He hadn't spoken to them at that point, correct?

20    A.    No.  It's not that -- I asked him if he could present

21  those questions.  It wasn't necessarily that he had to.  I just

22  felt that he should for the truth to be presented.

23    Q.    Well, let me ask you another way.

24         Did you give those questions to those people because

25  Mr. Renfroe wouldn't do it or didn't do it?

AP

37

Taylor-Defense-Direct

1   A.   No.  I just read a list of questions that I created

2   that I felt that he should ask them.

3   Q.   Did you suggest answers to those questions?

4   A.   No.

5   Q.   Did you want to know what their answers were?

6   A.   No.

7   Q.   Did you want to know what they were going to testify

8   at trial about?

9   A.   Well, I would assume that they was testifying to what

10  they witnessed.

11  Q.   And that's what you were trying to find out?

12  A.   What do you mean?

13  Q.   Were you trying to find out whether or not their

14  testimony was going to be exactly what they saw?

15  A.   No.  The questions that I asked were in relation to

16  the experience that -- like for Maliyah and Trish, they were

17  with me so I know partial of what they witnessed.  I already

18  know the answers.  Like if I ask you what's my name, I know

19  my name.  It was just questions that I felt he should ask them

20  for the truth to be presented to the people.

21  Q.   Well, let me ask you this, Ms. Taylor:  The night of

22  the incident it's your position that you were not in your right

23  mind; is that correct?

24  A.   Correct.

25  Q.   And isn't it so that you -- even as you sit here

AP

38

Taylor-Defense-Direct

1  today, you don't recall each and every event that night, do

2  you?

3     A.   I don't recall everything but I recall a lot of things

4  because it was a frightening experience.

5     Q.   Was it your belief that your friends may have known

6  more or remembered more than you did?

7     A.   I'm not sure.   Like I don't know -- from my position I

8  don't know a hundred percent what they witnessed because I was

9  witnessing something else.   So, I don't really know what they

10 seen a hundred percent.

11    Q.   Would it be fair to say that the questions you asked

12 them or asked that they be given were an effort to find out

13 what they knew?

14    A.   Actually, no.   He would have had to ask those

15 questions.   I only asked basic general questions that I

16 personally knew the answer to.   I didn't ask like any -- you

17 know what I mean.   I don't know.

18    Q.   You weren't trying to ask them any trick questions, in

19 other words?

20    A.   No.

21    Q.   So, tell Judge Garnett very purely and simply why you

22 wanted those questions to be given to those people?

23    A.   Because I felt that the jury and also Mr. Simon's

24 family should know what happened.

25    Q.   You weren't trying to suggest any answers?

39

Taylor-Defense-Direct

```
 1   A.   No.

 2   Q.   You weren't trying to get them to lie?

 3   A.   No.

 4   Q.   Did you feel as though the truth was going to help

 5   you?

 6   A.   Yes.

 7   Q.   And that's what you wanted the jury to hear?

 8   A.   Yes.

 9   Q.   Was it ever your intention to suborn perjury?

10   A.   No.

11   Q.   Was it ever explained to you by Mr. Renfroe that the

12   case was your case?

13   A.   I don't know if I remember that.

14   Q.   Did Mr. Renfroe ever explain to you that it was your

15   decision ultimately that would control?

16   A.   It was --

17        THE COURT:   Decision as to what?

18   Q.   Your decision as to how the case should be presented

19   and what evidence should be brought out at your trial?

20   A.   No.

21   Q.   What did Mr. Renfroe ever say to you about that?

22   A.   I don't think he -- I'm not sure if he mentioned any

23   of that.

24   Q.   Did there come a time when you had a disagreement with

25   Mr. Renfroe about this?
```

AP

40

Taylor-Defense-Direct

1   A.   About what?

2   Q.   Strategy?

3   A.   I don't know about strategy.   The only time we

4   had -- we had many disagreements from the few times that I seen

5   him.   Well, one in particular.   But the big one was when these

6   calls were presented in and his position, what I felt should

7   be done and me not wanting him to represent me if he wasn't

8   going to do what I requested.

9         THE COURT:   Ms. Taylor, up until the time that

10   the tapes were revealed, you were expecting that

11   Mr. Renfroe would call Tricia and Maliyah, Dr. Wang,

12   Dr. Berrill, and perhaps Correction Officers Clark and

13   Winfield; is that correct?

14         THE WITNESS:   At that time I didn't think that he

15   was gonna call the correction officers --

16         THE COURT:   Okay, okay.   Put the correction

17   officers out of that.

18         Who did you expect -- before the tapes were

19   revealed, who did you expect Mr. Renfroe was going to call

20   as part of your case?

21         THE WITNESS:   Tricia Matthews, Maliyah Rowe, I

22   know he intended to call Dr. Berrill, Dr. Wang and I'm not

23   sure after that.

24         THE COURT:   Was part of that -- was that going to

25   end with your testimony?   Had you made a decision at that

41

Taylor-Defense-Direct                                          42

1    point whether you were going to testify or not?

2         THE WITNESS:   I don't think me and him discussed

3    that.  He told me it was my decision to testify.  He kept

4    trying to say I didn't need to testify but I didn't

5    believe that that was true.

6         THE COURT:   So everything was basically okay

7    strategy wise until you had a disagreement with him over

8    what these tapes -- what effect these tapes would have in

9    your case; is that right?

10        THE WITNESS:   I can't say strategy wise.  He

11   didn't discuss strategy.

12        THE COURT:   By strategy he was going to call

13   those witnesses.

14        THE WITNESS:   That's what he said.

15        THE COURT:   Then the tapes were revealed?

16        THE WITNESS:   Uh-huh.

17        THE COURT:   Then he comes back and says, listen,

18   these are damaging and I don't think you should call

19   anybody.

20        THE WITNESS:   No, he didn't think I should -- he

21   told me what he was going to go do.

22        THE COURT:   That's what I mean by strategy.

23   That's when you had the fundamental disagreement with him,

24   right?

25        THE WITNESS:   Yes.

AP

Taylor-Defense-Direct

1          THE COURT:  Up to that you were kind of on board

2    with what he was going to do.  You might have had a

3    dispute as to whether the correction officers were going

4    to be called but as to Berrill, Wang, Maliyah and Tricia,

5    they were going to be called as witnesses?

6          THE WITNESS:  Yes.

7    Q.    Did Mr. Renfroe ever tell you that it was ultimately

8    your decision to decide whether or not to call those

9    witnesses?

10   A.    No.

11   Q.    Did he simply tell you it was his decision not to go

12   in that direction?

13   A.    Yeah.  He told me what he was gonna do.

14   Q.    And did he tell you he based that decision on his

15   review of the transcripts or the tapes?

16   A.    I can't say that I received that.  I know that it

17   came.  His decision was based on the tapes but I don't know if

18   it was because of him reviewing them or not.

19   Q.    What did he tell you about that, if anything?

20   A.    About the tapes?

21   Q.    What did Mr. Renfroe tell you about his review of the

22   tapes or the transcripts?

23   A.    I'm not sure if he used Judge Garnett's word,

24   damaging.  I don't remember a hundred percent what he said.

25        THE COURT:  Well, did he say this is not good?

Taylor-Defense-Direct

1        It was his opinion that these tapes were damaging?

2            THE WITNESS:  Yes.

3            THE COURT:  And that they could at least

4    partially at least undermine your case?

5            THE WITNESS:  That's what he was pointing to.  I

6    guess so.

7            THE COURT:  You may have disagreed but that was

8    his position?

9            THE WITNESS:  Yes.

10           THE COURT:  And did he tell you that?

11           THE WITNESS:  He told me that.  But I didn't --

12   from -- all right, at that point I didn't hear the tapes.

13           THE COURT:  Right.

14           THE WITNESS:  I just read the transcripts.

15           THE COURT:  We are trying to find out what

16   Mr. Renfroe told you his impression of the tapes was?

17           THE WITNESS:  Well, he pretty much told me

18   that -- he didn't think they were good.  I didn't get that

19   from the transcripts so it didn't make any sense to me.

20   But more so he talked about bringing in stuff from the

21   past, which I didn't understand.

22           THE COURT:  I read that in the transcript.  We

23   are not going to worry about that.

24   Q.   Let's try to focus --

25           THE COURT:  Let me ask one more question.

44

Taylor-Defense-Direct

```
 1        MR. SMALLMAN:  Sure.

 2        THE COURT:  After he talked to you about the

 3   tapes, did he immediately tell you I've now decided that

 4   I'm not going to call Tricia; I am not going to call

 5   Maliyah; and I am not going to call the doctors?

 6        THE WITNESS:  Pretty much.

 7        THE COURT:  Go ahead.

 8   Q.   Did he tell you why he was making that decision?

 9   A.   To me it was just in regards to the tapes and the

10   testimony that will be presented but it didn't make sense to

11   me.

12   Q.   What did he tell you?  I am not asking you what your

13   opinion was.

14   A.   Right.

15   Q.   I am asking you what he told you, if you recall

16   that?

17   A.   I can't remember a hundred percent what he said.  I

18   just know it was because -- it was supposed to be the contents

19   of the tapes.  But from the transcripts I didn't see the

20   connection, the relevance.  I didn't understand.

21   Q.   Did you try to explain to him what your position in

22   those telephone conversations was?

23   A.   Yes.

24   Q.   Even after listening or even after hearing the

25   transcripts, did you tell Mr. Renfroe that you still wanted to
```

45

AP

Taylor-Defense-Direct

1   go forward with your defense?

2       A.   I never heard them.   I just read the transcripts and

3   yes.

4       Q.   Mr. Renfroe disagreed with you?

5       A.   Yeah, he had his own.

6       Q.   Was it at that point you told him you were going to

7   try and get another lawyer?

8       A.   Yes.

9       Q.   Was that how strongly you felt about it?

10      A.   Well, I told him that I don't have the money to afford

11  another attorney and the Court has to -- the Court has to

12  afford me one.   And he told me they weren't at that time.

13  And that was based off the fact that he was not going to

14  present the witnesses.

15      Q.   So, did you feel at that point you were stuck with

16  Mr. Renfroe?

17      A.   It was either he did his summation or I represent

18  myself and I didn't know how to do that.

19      Q.   Did you discuss representing yourself with

20  Mr. Renfroe?

21      A.   Well, those were the only options that I had.

22           THE COURT:   The question was, did you talk to him

23  about it?

24           THE WITNESS:   They gave me the options.

25           THE COURT:   Who gave you the options?

AP

Taylor-Defense-Direct

1    THE WITNESS:  Mr. Renfroe and he had some guy

2    that was with him.  Second opinion that the Judge --

3    THE COURT:  Mr. Araujo?

4    THE WITNESS:  I don't remember his name.

5    Q.   What did they tell you about representing yourself?

6    A.   That was just the option.  Either I do the summation

7    or represent myself.  That was the only options available.

8    Q.   Did you think it was at all feasible to represent

9    yourself at that point?

10   A.   No.

11   Q.   What is the extent of your education?

12   A.   Today?

13   THE COURT:  No, then.

14   A.   Then I had a GED.

15   Q.   Did Mr. Renfroe offer to discuss these issues --

16   withdrawn.

17   Did you ask Mr. Renfroe for any more time to try and

18   resolve this issue?

19   A.   He didn't discuss any time with me.

20   Q.   Did you ask him to ask the Judge to give you more

21   time?

22   A.   No.  I didn't feel I had any decisions to make.  He

23   was making all the decisions regardless of what I wanted.

24   MR. SMALLMAN:  Thank you very much, Ms. Taylor.

25   I have nothing further.

AP

47

Taylor-Defense-Direct

THE COURT:  Ms. Taylor, before I give Ms. Grady a

chance to talk to you, question you, I have listened to

some of the tapes and at one point I recall you were

talking to -- I don't know if it was Tricia or Maliyah

and you said words to the effect, remember to tell them

about what happened like a month ago or two weeks ago.

Do you remember that?

THE WITNESS:  I would have to hear the call.

THE COURT:  You have no recollection of asking

them to recall events that had occurred prior to the car

accident?

THE WITNESS:  Well, I was suffering before the

car accident, yes.

THE COURT:  Getting them to testify to

some -- whether it was psychotic or emotional breakdown

that you had suffered prior to the automobile accident in

the past?

THE WITNESS:  Uh-huh.

THE COURT:  Do you recall talking to them about

that?

THE WITNESS:  Yes.

THE COURT:  And what was your purpose in telling

them to -- there again, my recollection is that you

would either say to somebody, tell Maliyah or do you

remember -- remember to say about my anxiety attack or my

48

Taylor-Defense-Direct

1    breakdown two months ago?

2         THE WITNESS:   One, I would have to hear the call

3    to know exactly what you are speaking about.   But if I

4    ever asked them to speak about prior events before the

5    accident is because I was suffering before that night.

6         THE COURT:   Okay.

7         THE WITNESS:   So it would have been relevant to

8    my state of mind or to the breakdown.

9         THE COURT:   To your psychiatric defense?

10        THE WITNESS:   Right.

11        THE COURT:   Okay, Ms. Grady, go ahead.

12        MR. SMALLMAN:   Judge, may I step up for a quick

13   second, please.

14        THE COURT:   Sure, step up.

15        (Whereupon, there was a discussion held off the

16   record.)

17        THE COURT:   Ms. Taylor, we are going to break.

18   Mr. Smallman has to take a phone call.

19        We are going to sit in place.

20        (Whereupon, there is a pause in the proceeding.)

21        THE COURT:   Okay, Ms. Taylor, listen to the

22   questions asked by Ms. Grady.   If they can be answered

23   yes or no, please answer them yes or no okay.

24        THE WITNESS:   Okay.

25        THE COURT:   Go ahead, Ms. Grady.

AP

49

Taylor-Defense-Cross

1

2  CROSS EXAMINATION

BY MS. GRADY:

3    Q.   Good afternoon, Ms. Taylor.

4         What do you hope to obtain from this hearing?

5    A.   What do I hope to obtain?

6    Q.   Uh-huh.

7    A.   Well, that the truth be presented.

8    Q.   Don't you hope to obtain a vacatur of your conviction?

9    A.   Prayerfully so.

10   Q.   You said before you had obtained your GED by the time

11   of 2006?

12   A.   Yes.

13   Q.   Isn't it true you worked at Banana Republic?

14   A.   Yes.

15   Q.   In what capacity?

16   A.   I was a lost prevention agent.

17   Q.   Did you also work as a security guard for SJS

Security?

18   A.   Yes.

19

20   Q.   From 2000 to 2003?

21   A.   I believe so.

22   Q.   And you got a license to do that, isn't that correct?

23   A.   Yes.

24   Q.   Briefly describe your family?

25        MR. SMALLMAN:   Relevance.   Objection.

AP

50

Taylor-Defense-Cross

1

2          THE COURT:  Just briefly.  I will allow it.

3          Overruled.

4   Q.   Let me be more clear.  Your father is deceased; is

that correct?

5   A.   Yes.

6   Q.   You have a mother?

7   A.   Yes.

8   Q.   What is your mother's name?

9   A.   Regina McClean.

10  Q.   You have a brother?

11  A.   Yes.

12  Q.   What's his name?

13  A.   Baydr Taylor.

14  Q.   Spelled B-A-Y-D-R?

15  A.   Yes.

16  Q.   Same last name?

17  A.   Yes.

18  Q.   Does Baydr have a son?

19  A.   Yes.

20  Q.   His son is Kaysean?

21  A.   Yes.

22  Q.   Spell that?

23  A.   K-A-Y-S-E-A-N.

24  Q.   In 2002 you obtained custody of Kaysean; is that

25  correct?

AP

51

Taylor-Defense-Cross

```
 1        THE COURT:  What's the purpose of that?

 2        MS. GRADY:  Her competence, her abilities.

 3        THE COURT:  We are discussing the effectiveness

 4   of her lawyer.

 5        MS. GRADY:  I will move on.

 6        THE COURT:  Sustained.

 7   Q.   You had never prior to the crime been hospitalized for

 8   mental illness; isn't that correct?

 9   A.   Correct.

10   Q.   You had never received any treatment for psychiatric

11   disorders; isn't that correct?

12   A.   Correct.

13   Q.   You had gone to some counseling but not for

14   psychiatric disorders?

15   A.   Correct.

16   Q.   You had never been diagnosed with any psychiatric

17   disorders, is that right, prior to the arrest?

18   A.   No.  I think I might have had some diagnosis as a

19   child.  I can't remember what it was.

20   Q.   It wasn't for psychiatric disorders, isn't that

21   correct?

22   A.   I don't think so.  I was like starting being seen

23   after my father died.

24   Q.   Were you traumatized after your father died?

25        MR. SMALLMAN:  Objection.
```

AP

52

Taylor-Defense-Cross                                                53

1

2          THE COURT:  Was it for trauma as a result of your

3    father's death?

4          THE WITNESS:  I believe so.

5     Q.   Now, during direct examination you said that the

6    defense you intended to present was 4015.  Are you referring to

7    the Criminal Procedure Law when you say 4015?

8     A.   Yes.

9     Q.   Section 40 point 15 of the CPL; is that right?

10    A.   Yes.

11         THE COURT:  Well -- go ahead.

12    Q.   What was the course in your defense?

13    A.   What do you mean by that?

14    Q.   When you say 40.15, your defense, was it not that you

15   were mentally ill at the time of the crime?

16    A.   Yes.

17    Q.   What was that mental illness at the time of the crime?

18    A.   What was the mental illness?

19    Q.   Yes.  What was your diagnosis?

20    A.   I was diagnosed with three different things at that

21   time; bipolar mania, schizoaffective disorder and

22   schizophrenia.  I am not sure which one was the actual diagnose

23   or if they were seeing symptoms of all.

24    Q.   When did the symptoms of those mental illnesses first

25   begin?

     A.   The accident happened in October.  So it was like a

AP

Taylor-Defense-Cross

54

1   couple of weeks before the incident that psychiatric symptoms

2   started to manifest.

3   Q.   When you say psychiatric symptoms, can you be more

4   specific?

5   A.   Yeah.  Seeing things, hearing things.  I guess

6   distorted delusional beliefs they call it.

7   Q.   Distorted you mean distorted thinking?

8   A.   That's what they considered it.

9   Q.   Those began two weeks before the incident?

10  A.   It was weeks.  I can't tell you exactly.  I know I was

11  suffering weeks before that day.

12  Q.   Isn't it true that during this same period of time you

13  were also taking Ectasy?

14  A.   Yes.

15  Q.   You were at least taking Ectasy from at least the

16  previous summer; is that right?

17  A.   Yes.

18  Q.   Did you use any other controlled substances?

19  A.   Marijuana, I don't think alcohol as a controlled

20  substance and cocaine.

21  Q.   But you were consuming alcohol; is that what you

22  mean?

23  A.   Yeah.  Yeah, I was drinking.  I am saying I don't

24  think it's a controlled substance.

25         THE COURT:   Were you drinking a lot or just a

AP

Taylor-Defense-Cross                                                55

1           little?

2                    THE WITNESS:  I guess it depends on the time.

3           Q.   Let's focus on those two weeks, were you consuming a

4      lot of alcohol during that time?

5                    MR. SMALLMAN:  Objection to two weeks.  She said

6           a period of two weeks.

7                    THE COURT:  She said I believe a couple of weeks

8           from the onset of her symptoms.  Overruled.

9                    In the two weeks before the accident were you

10     using or drinking a lot of alcohol?

11                   THE WITNESS:  I can't say heavily.  I don't

12     think.

13                   THE COURT:  Go a head.

14           Q.   All right, your symptoms began weeks -- a number of

15     weeks before the accident.  How long did your symptoms last?

16           A.   Months after the accident.  When I left the hospital

17     they still said I was delusional.  So, I don't know exactly

18     when I became more sound or stable.

19           Q.   After you were arrested you were treated at Elmhurst

20     and other places?

21           A.   Rikers Island first and then Elmhurst and then back to

22     Rikers Island.

23                   THE COURT:  You were given medication?

24                   THE WITNESS:  Yes.

25                   THE COURT:  That medication helped you?

AP

Taylor-Defense-Cross

1

2        THE WITNESS:  Yes.

3        THE COURT:  When thereafter did you feel good

4     again?

5        THE WITNESS:  When I left the hospital I felt

6     better but like I was still under treatment then.

7        THE COURT:  The medicine helped you?

8        THE WITNESS:  Yes.

9   Q.    When you left the hospital and you went back to Rikers

10  Island, correct --

11  A.    Uh-huh.

12  Q.    -- were you put in general population?

13  A.    No.

14  Q.    Were you in the mental observation unit?

15  A.    Yes.

16  Q.    Did you stay there until the end of the trial --

17  A.    Yes.

18  Q.    -- until you were sentenced.

19        While I am thinking of it, you said GP, does that

20  stand for general population?

21  A.    Yes.

22  Q.    So this defense -- if the jury had accepted the

23  defense, what would have been the result?

24  A.    There was possibilities that it could have been

25  acquittal or I could have got convicted of all of the charges,

     some of the charges.

56

AP

Taylor-Defense-Cross

1    Q.   What if they had accepted the defense of mental

2 disease or defect?

3    A.   Then I would have went to the mental hospital.

4    Q.   Were you worried about that?

5    A.   Was I worried about it?

6    Q.   Being committed to the mental institution?

7    A.   No.

8    Q.   Why not?

9    A.   Why would I be worried about that?

10         THE COURT:   Were you worried or not?

11         THE WITNESS:   No.

12         THE COURT:   Okay.

13   Q.   How long did you expect to have to stay in a mental

14 hospital?

15   A.   I didn't know how long I would have to say there but

16 according to the law library research that I found you have to

17 get evaluated a lot of times and then if they deem you not a

18 threat to society or yourself then you go home.

19   Q.   Did you hope to pass such an examination?

20   A.   Yes.

21   Q.   I had asked you about gaining custody of your nephew.

22 You had no signs of mental disease or defect at that time; is

23 that correct?

24   A.   No.

25   Q.   That was in 2002?

Taylor-Defense-Cross

58

1    A.    Right.

2    Q.    You had no signs of mental disorder at the time you

3    got a license to be a security guard?

4    A.    Correct.

5          THE COURT:   When was that?

6          MS. GRADY:   2002, is that right?

7          THE COURT:   Is that when you got your license?

8          THE WITNESS:   I think so.

9    Q.    As part of the preparing for this defense you spoke to

10   Dr. Wang and also to Dr. Berrill, correct?

11   A.    Yes.

12   Q.    These interviews were conducted after you committed

13   this crime; isn't that correct?

14   A.    Yes.

15   Q.    As you say, they came to the conclusion you suffer

16   from schizoaffective disorder.   Wasn't that based exclusively

17   on what you told them?

18   A.    No -- well, some of it was the experience and some of

19   of it was what I was suffering at the time.

20   Q.    At what time?

21   A.    At the time of the hospital.   At the time of the

22   Rikers Island.   Well, it was the same thing the night of the

23   accident but when Dr. Wang saw me it was in the hospital and

24   when the doctors at Rikers Island seen me it was at Rikers

25   Island.

AP

Taylor-Defense-Cross

```
 1              THE COURT:  You saw Dr. Wang at the hospital.

 2    Once you were discharged from Elmhurst did you see him

 3    again?

 4              THE WITNESS:  I seen him at the hearing.

 5              THE COURT:  At a hearing.  In a professional

 6    capacity did you see him again after?

 7              THE WITNESS:  No.  I saw the doctors at Rikers

 8    Island.

 9              THE COURT:  As far as you know, did Dr. Wang

10    speak to Maliyah or anybody else in your family?

11              THE WITNESS:  I don't know if he spoke to

12    Maliyah.  I believe he might have spoke to my mom.  I am

13    not sure if he spoke to anybody else.

14              THE COURT:  Go ahead.

15       Q.   You also had spoken to an expert by the People; isn't

16    that right, Dr. Schnieder?

17       A.   Yes.

18       Q.   Lionel Schnieder.  Did Dr. Schnieder come to a

19    different diagnosis?

20       A.   Yes.

21       Q.   What was that?  Wasn't it antisocial personality

22    disorder?

23       A.   Yes.

24       Q.   And that disorder does not involve any delusions or

25    hallucinations; isn't that right?
```

Taylor-Defense-Cross

60

1    A.    I have no knowledge of what that disorder is.

2    Q.    Did he also come to the conclusion that you were

3    malingering?

4    A.    Yes.

5    Q.    Do you know what that word means, malingering?

6    A.    Yes, I looked that up.

7    Q.    What does that mean, as you understand it?

8    A.    As I understand it, lying or like faking.

9    Q.    He believed you were doing that, faking a mental

10   illness because you thought it would help your case; isn't that

11   right?

12   A.    No.    I don't know why he believed that.

13   Q.    Isn't that why one would malinger?

14        MR. SMALLMAN:    Objection.

15        THE COURT:    Overruled.

16   A.    I have no clue.

17        THE COURT:    Let me ask you a question.

18        You and Mr. Renfroe had a copy of Dr. Schneider's

19   report before the trial began; is that correct?

20        THE WITNESS:    You talking to me?

21        THE COURT:    Yeah.

22        THE WITNESS:    I'm --

23        THE COURT:    Did you know about Dr. Schneider's

24   conclusion before the trial began that there would be a

25   dispute between him and Dr. Berrill?

Taylor-Defense-Cross

THE WITNESS:  Yes.

THE COURT:  Okay.

1    Q.    So, drawing your attention to October 6, 2008, you

2

3

4    proceeded to trial; is that right?

5    A.    I don't remember the date.

6    Q.    That was in front of Judge Collini in a jury; is that

7    right?

8    A.    I remember going to trial.  I don't recall the day.

9          THE COURT:  But it was Judge Collini?

10         THE WITNESS:  Yes.

11   Q.    And on that date, on October 6, prior to jury

12   selection, you were offered a plea offer by the People; isn't

13   that right?

14   A.    Yes.

15   Q.    Fifteen years; is that correct?

16   A.    Yes.

17   Q.    You rejected that offer in favor of going to trial; is

18   that right?

19   A.    Yes.

20   Q.    Why did you reject that offer?

21   A.    Because I felt it was unfair considering the

22   circumstances.  If it was an accident I didn't understand why I

23   should take fifteen years.

24   Q.    Did you think about the possible strength of the

25   People's case?

61

Taylor-Defense-Cross                                                                62

1    A.    I didn't think about the strength of the People's

2    case.   I just knew what happened.

3    Q.    Didn't you think that if you were going to have

4    fifteen years you would want to put the People to their burden

5    of proof first?

6              MR. SMALIMAN:  Objection.

7              THE COURT:  Sustained.

8    A.    I didn't know any of that.

9              THE COURT:  Objection.   The answer is stricken.

10   Q.    Was that your decision to reject the fifteen years?

11   A.    Yes.

12             THE COURT:  Did Mr. Renfroe recommend it to you?

13             THE WITNESS:  Yes.

14   Q.    How strongly did Mr. Renfroe recommend the fifteen

15   years?

16   A.    I can't say strongly.   He told me that he thought it

17   was best.   But his decision didn't make sense because it was

18   solely --

19             THE COURT:   He recommended it to you and you

20   rejected it?

21             THE WITNESS:  Yes.

22             THE COURT:   Let's go on.

23   Q.    So then you proceeded?

24   A.    Yes.

25   Q.    The next order of business was a Sandoval hearing;

AP

Taylor-Defense-Cross

```
 1   isn't that right?
 2      A.   I know we had one.   I don't know if that was the next
 3   order of business.
 4      Q.   Judge Collini determined if you testified you could
 5   be cross examined about certain prior crimes; is that
 6   correct?
 7      A.   Yes.
 8      Q.   It was limited that the People would be allowed to ask
 9   you if you were convicted of a felony in 2000 and a misdemeanor
10   in 2000?
11      A.   Yes.
12      Q.   The People had offered and wanted to bring out in
13   their case the facts underlying one of your previous
14   convictions; isn't that right?
15      A.   I believe so.
16      Q.   The Judge told them no?
17      A.   Correct.
18      Q.   The facts of that underlying conviction was that you
19   had previously been involved in an offense of intoxicated
20   driving?
21      A.   Yes.
22      Q.   However, wasn't the Judge's ruling if the doctors
23   testified the People would have been allowed to ask them about
24   that prior case?
25      A.   I believe so.
```

63

AP

Taylor-Defense-Cross

64

```
 1   Q.   And the facts underlying that prior case?

 2   A.   I believe so.

 3   Q.   Isn't it true that prior case of drunk driving was

 4   very similar to this case?

 5   A.   Incorrect.

 6   Q.   No, you don't feel that it was?

 7   A.   No.

 8   Q.   That prior case was in 2000; is that correct?

 9   A.   Right.

10   Q.   That case involved you being intoxicated on what you

11   call moonshine; is that right?

12   A.   It was Devil Springs.  I don't know if it was

13   moonshine.

14   Q.   It was alcohol?

15   A.   Yes.

16   Q.   In that prior case while you were driving intoxicated

17   there was no issue of you being mentally ill at that time; is

18   that right?

19   A.   No.

20   Q.   You heard the Rikers Island -- at least some of the

21   Rikers Island calls this morning?

22   A.   Yes, some of them.

23   Q.   You recognize your voice in those calls?

24   A.   Yes.

25   Q.   You recognize the voices of people on those calls as
```

AP

Taylor-Defense-Cross                                              65

1   family members and friends?

2        A.   Yes.

3             THE COURT:   Including Maliyah and Tricia?

4             THE WITNESS:   Yes.

5        Q.   And a few of the calls you are speaking to someone

6   you call her Boo, that's your nickname for Tricia Matthews; is

7   that right?

8        A.   I'm not sure.   I was talking to a lot of different

9   women at that time.

10            THE COURT:   Did you call Tricia Boo?

11            THE WITNESS:   I don't believe that was ever a

12  name I called her.

13       Q.   Who did you call Boo?

14       A.   I would have to hear the call to know who I was

15  referring to.

16            THE COURT:   You refer to more than one person as

17  Boo?

18            MR. SMALLMAN:   Judge, can we step up.

19            THE COURT:   Sure okay.

20            (Whereupon, there was a discussion held off the

21  record.)

22            THE COURT:   Ms. Taylor, you refer to a number of

23  people as Boo; is that correct?

24            THE WITNESS:   I can't say.   I'm saying that I was

25  talking to different women at that time so I am not sure

AP

Taylor-Defense-Cross

1    who I was speaking to when I said that word.

2         THE COURT:  Let's go.  Let's move on.

3    Q.    You also referred to Care Bear and spoke to someone

4    named Care Bear.  That was your nickname for your nephew?

5    A.    No.

6    Q.    Who is Care Bear?

7    A.    My ex-girlfriend.

8    Q.    Care Bear is your ex-girlfriend?

9    A.    Yes.

10        THE COURT:  Is it Tricia or Maliyah?

11        THE WITNESS:  That's my ex-girlfriend.

12        THE COURT:  It's not Tricia or Maliyah?

13        THE WITNESS:  No.

14   Q.    And Lee Lee, is that your Aunt Lisa?

15   A.    Yes.  Yes.

16   Q.    And in the calls when you say -- there is more than

17   one call where you say, quote, If I'm gonna blow, I'm gonna

18   blow my way, closed quote.

19        Did you mean if you were going to lose at trial you

20   wanted to do it with your defense?

21   A.    Yes.  If I was going to blow then let it be -- once

22   the truth is out there whatever the jury decides they decide.

23   So, if I blow with that, then I'm fine with that if that was

24   the case.

25   Q.    By the word "blow" you meant be convicted?

AP

66

Taylor-Defense-Cross                                            67

1    A.    Lose.

2    Q.    By "my way" you meant with the defense you crafted?

3          MR. SMALLMAN:  Objection to the word.

4    A.    The way it happened --

5          MS. GRADY:  Withdrawn.

6    Q.    The defense that you desire to have presented?

7    A.    This is lawyer language when you say the defense to

8    me.

9          THE COURT:  It's not lawyer language.

10         By meaning you were going to go down your way,

11   you wanted the correction officers to be called, you

12   wanted Tricia to be called, you wanted Maliyah to be

13   called, and you want Doctors Wang and Berrill to be

14   called; is that right?

15         THE WITNESS:  Right.

16   Q.    As the trial got underway you were generally happy

17   with Mr. Renfroe's performance; is that right?

18   A.    Maybe at some stages.

19   Q.    For example, were you pleased that he was doing a good

20   job cross-examining the People's witnesses?

21   A.    I believe so.

22         THE COURT:  At any time from the time he began

23   representing you up until the time of the trial had you

24   asked for another lawyer?

25         THE WITNESS:  No.

AP

Taylor-Defense-Cross

1    THE COURT:  From the time that the trial began to

2    the time that the tapes were revealed, had you asked for

3    another lawyer?

4         THE WITNESS:  No.  At that point I didn't know I

5    could.

6         THE COURT:  Everything was going fine at that

7    point; is that correct?

8         THE WITNESS:  Incorrect.  I didn't know I could

9    ask for another lawyer.

10        THE COURT:  What would it cost you if you asked?

11        If Mr. Renfroe was to call all the witnesses that you

12   wanted, why would you want another lawyer?

13        THE WITNESS:  Before that stage we had a lot of

14   complications.  If I knew I could get another lawyer then

15   I would have.

16        THE COURT:  Go ahead.

17        But did you tell this to Judge Collini?

18        THE WITNESS:  I attempted to.

19        THE COURT:  I am saying did you?

20        THE WITNESS:  No.

21        THE COURT:  Go ahead.

22   Q.   You are now speaking about your feelings about

23   Mr. Renfroe prior to the beginning of the trial; isn't that

24   right?

25   A.   Right.

68

AP

Taylor-Defense-Cross

1    Q.    But after October 6, after he started cross-examining

2  witnesses and actually doing his job where you could see him

3  doing his job, isn't it true you became more satisfied with his

4  performance?

5    A.    I think that he did good in that area.  I can't say if

6  I was satisfied with the performance.  I don't really

7  understand that.

8              THE COURT:   Let's move on please.

9    Q.    I have one more question.

10   Q.    Were you satisfied with the cross examination of the

11  People's witnesses that you were beginning to think that you

12  might not need to testify?

13   A.    I'm not sure about that.  My family was trying to

14  convince me that I didn't need to if the doctors and the

15  witnesses were called.

16   Q.    What reasons was your family giving you not to

17  testify?

18   A.    They was talking about them being able to ask me

19  things about the past and stuff like that.

20   Q.    And that would not have been good for your case if

21  they asked about your past; isn't that right?

22   A.    That's what they said.

23              THE COURT:   Do you think it would be good if the

24  jury heard you had a felony conviction and misdemeanor

25  conviction?

69

Taylor-Defense-Cross                                    70

1          THE WITNESS:    If it didn't have any relevance to

2    the accident.

3          THE COURT:    If they told the jury you may

4    consider Ms. Taylor's credibility and in doing that you

5    may take into consideration that she has a prior felony

6    and misdemeanor conviction, you think that would be

7    good?

8          THE WITNESS:    I think they would have to rule on

9    this particular case, the circumstances in this particular

10   case.

11         THE COURT:    In terms of believing what you would

12   have said, do you understand the jury would be able to

13   consider the fact that you had prior criminal

14   convictions?

15         THE WITNESS:    Yeah, I would think that made a

16   difference to me.

17         THE COURT:    You think that would be good if they

18   would hear that you had prior convictions?

19         THE WITNESS:    I don't think having prior

20   convictions is good period.    But I don't think -- I don't

21   believe that that would be their position.

22         THE COURT:    Okay.

23         THE WITNESS:    From the past they would have to --

24         THE COURT:    Mr. Renfroe had discussed with you

25   that that would come up if you chose to testify in this

AP

Taylor-Defense-Cross

1   case?

2       THE WITNESS:  Yes.

3       THE COURT:  Okay.

4       MS. GRADY:  I'm going to play a call for you.

5       THE COURT:  Is there a way to reference this by

6   time and date or by exhibit?

7       MS. GRADY:  Yes, definitely.

8       The call I am going to play is on Court

9   Exhibit 1.

10      THE COURT:  That's the one with the 88 phonecalls

11  on it?

12      MS. GRADY:  Yes, marked October 16.  The call is

13  dated 9-22.

14      THE COURT:  9-22-06?

15      MS. GRADY:  I believe '08.

16      THE COURT:  Zero eight, okay.

17      MS. GRADY:  The code is 2008092210316.

18      THE COURT:  Does that give us -- I see 9-22-08 as

19  part of it.  Is the second part a time?

20      MS. GRADY:  The call ended at 10:13.  So, the

21  date modified on the file is 10:13 a.m.

22      THE COURT:  How long is this call approximately,

23  do you recall?

24      MS. GRADY:  I am going to start playing from the

25  end of the call at minute five and thirty-five seconds.

AP

71

Taylor-Defense-Cross

72

1    THE COURT:  Go ahead.

2    (Whereupon, the tape is played.)

3    MS. GRADY:  I will let it start and let her hear

4    her voice.  I am pausing it.

5    Q.  Ms. Taylor, do you recognize your voice on that call?

6    A.  Yes.

7    (Whereupon, the tape is played.)

8    Q.  I am stopping it.  That's the end of the call.  It got

9    cut off.

10   Ms. Taylor, did you hear the content of that call?

11   A.  Uh-huh.

12   Q.  You said you would love to put bread in your account,

13   does that mean put money in your prison account?

14   A.  Correct.

15   Q.  If you had been in GP or general population you would

16   have been able to get a normal job; isn't that correct?

17   A.  Correct.

18   Q.  And receive money?

19   A.  Yes.

20   Q.  But you didn't want to be in GP because being in the

21   mental unit was good for your case; isn't that right?

22   A.  Correct.  But they wouldn't allow me to anyhow.

23   Q.  Well, my question is --

24   THE COURT:  Please answer the question.  If

25   Mr. Smallman thinks there is an explanation he will ask

AP

Taylor-Defense-Cross                    73

1        you.

2    Q.    Whether they allowed you there or not, you desired to

3    stay in the mental unit because it was good for your case;

4    isn't that right?

5    A.    Yes.

6    Q.    Could you see how that could appear to look like you

7    were faking?

8    A.    No.    I think if you want to speculate then you could.

9    But no I wouldn't receive that from that.

10   Q.    And there are other calls where -- actually I would

11   like to play another call on the same CD?

12         THE COURT:    Please reference it.

13         MS. GRADY:    The call is from October 4.    The

14   number is.

15         THE COURT:    Zero eight?

16         MS. GRADY:    Yes.    Yes.    I believe they are all

17   from September to October of 2008.    October 4.    The

18   number -- the file number is 20081004162l252.

19         (Whereupon the tape is played.)

20   Q.    Just to interrupt, do you recognize your voice on this

21   call as well?

22   A.    Yes.

23         MS. GRADY:    Judge, I am going to forward it to a

24   minute twelve of the call and play to minute 1440 of the

25   call.

AP

Taylor-Defense-Cross

1

2      Q.    So, Ms. Taylor, you heard that?  I have a couple of

3  questions with regard to that call.

4          (Whereupon, the taped is played.)

5      A.    My brother.

6      Q.    Baydr?

7      A.    Yes.

8      Q.    You were telling him about what Mr. Renfroe had

9  explained to you about the charges, right?

10     A.    Correct.

11     Q.    So Mr. Renfroe did explain the charges to you, right?

12     A.    Well, he explained that part but I looked up the

13  charges in the law library so I already knew what they were.

14     Q.    He explained what you could face after trial; is that

15  right?

16     A.    Yes.

17     Q.    He explained about the fifteen years; isn't that

18  right?

19     A.    Yes.

20     Q.    He said you were the boss?

21     A.    That's what he said.

22     Q.    He said, you're the boss with regard to taking the

23  fifteen years or not?

24     A.    I don't know if it was in regards to that.  That was

25  just what he said.

First, who were you speaking to there?

Taylor-Defense-Cross

75

1   Q.   Okay.  Second, you said towards the beginning of the

2   call there, from the portion of the call, I know how to get out

3   of the hospital?

4   A.   Correct.

5   Q.   So, you were confident that even if you had been found

6   not guilty by reason of insanity and committed to a hospital,

7   you were confident that you knew how to get out of the

8   hospital?

9   A.   It wasn't the confidence, it's what I learned at the

10  law library.  It's procedures they have to follow.

11       Their idea was that I would never get out because the

12  judge would not release me.  That's the belief that they had.

13  They wanted me to take the fifteen.  They didn't want me to go

14  forward with the defense because they thought if I went to the

15  hospital the judge would never release me.  That's incorrect

16  information.

17       It's procedures that have to be done.  They have to do

18  examinations and if the doctor -- if the judge didn't sign off

19  then I could appeal it.  So, they just can't keep me in there

20  for the rest of my life if I am no longer a danger to myself

21  and society.

22  Q.   So you knew what the test was to get out of the

23  hospital; is that right?

24  A.   I don't know what the test was.  I just read they have

25  to do examinations.

AP

Taylor-Defense-Cross

1    Q.    And the third thing I want to ask you, in the call you

2    were telling your brother that you were fine when you took the

3    drug; isn't that right?

4    A.    I said that I was aware.   I don't know about fine.

5    Q.    Isn't that --

6            THE COURT:   Are you talking about the drugs that

7    she took the evening of the accident or that she had been

8    prescribed at the hospital?

9            THE WITNESS:   No, they are talking about the

10   drugs the night of the accident.

11   Q.    You were talking about the time that you consumed

12   Ectasy that night.   You knew you had a licensed driver to drive

13   you around that night?

14   A.    We were talking about awareness at that part of the

15   call, whether I was consciously aware or not.

16   Q.    And that you were -- in your words on the call, that

17   you were fine when you took the drug?

18   A.    I just heard the call but I don't remember saying

19   fine.   I know it was that I was aware when I took the drug.

20   Q.    Aware of your surroundings, aware that you had a

21   licensed driver?

22   A.    I don't know, aware of the fact that I was taking the

23   drug.   Meaning in that reality I knew what was transpiring.

24   Q.    Okay.   Did your witnesses ever have any conflicts with

25   your version of events?

AP

76

Taylor-Defense-Cross                                                    77

1       A.      Conflicts?

2       Q.      Did your witnesses ever have a different account of

3  what happened than what you wanted them to present?

4               MR. SMALLMAN:  Objection to what she wanted.

5               THE COURT:  Sustained.  Sustained to what she wanted.

6  the question.

7       Q.      You said on direct that you knew what you wanted each

8  witness to testify to; isn't that right?

9       A.      I know from my experience and the part they were with

10 me I know what they experienced from the studio to my

11 grandmother's house.  I don't really know their account of what

12 transpired in the car.  Well, I learned that later.

13              THE COURT:  At any point during your

14 conversations with your witnesses, did there come a time

15 when their recollection of what happened that night was

16 different from yours?

17              THE WITNESS:  Our recollection is only different

18 of what transpired inside the car.

19              THE COURT:  How about recollections about what

20 had happened in the past before the day of the accident?

21              THE WITNESS:  No, we don't have conflicts but

22 differences.  They have what they witnessed.  I know what

23 I experienced.

24              THE COURT:  Did you ever during these

25 conversations correct them?

Taylor-Defense-Cross

1     THE WITNESS:  No.

2     THE COURT:  As to what you remembered as opposed

3  to what they remembered on the day of the accident?

4     THE WITNESS:  No.

5     THE COURT:  Did you ever correct them on what

6  you remembered had happened in the past as opposed to

7  what they remembered happened in the past before the

8  accident?

9     THE WITNESS:  No.

10    MS. GRADY:  Judge, I would like to play a call

11 from CD number two.  Court Exhibit Number 2.

12    THE COURT:  All right.

13    MS. GRADY:  This call is from October 19, 2008,

14 with a date modified time of 11:26 a.m.  The file name is

15 200810191111147.

16    THE COURT:  All right.

17    (Whereupon, the tape was played.)

18    MS. GRADY:  I am sorry, that may have been a

19 different call than I was hoping it would be.  I may not

20 be able to.

21 Q.   Let me ask you, on any of these calls -- withdrawn.

22         On any of the conversations that you had during that

23 time as you reflect back, did you have a conflict with the

24 idea that Tricia had told Mr. Renfroe that you pushed her

25 out of the car that night and that was not how you remembered

AP

78

Taylor-Defense-Cross

1    it?

2    A.       It wasn't really a conflict.  I was just getting

3    everybody's recollection.  Like Maliyah had one, Tricia that

4    had one, Kaysean and baby had one, and I didn't clearly

5    really have one because I didn't know -- then I didn't know

6    what transpired.  So, I have Tricia's version of what

7    transpired.  Maliyah has a different one because she existed

8    the car before Tricia and then the baby had a different one.

9            THE COURT:  Who is the baby?

10           THE WITNESS:  Kaysean, I am sorry.

11           THE COURT:  How old was Kaysean?

12           THE WITNESS:  Seven.

13   Q.       How old was he when you got custody of him?

14   A.       Two.

15   Q.       How old were you when you got custody of him?

16   A.       I believe 18.

17   Q.       You were 18 when you got custody of Kaysean?

18   A.       I believe so.

19   Q.       During your discussions after trial do you remember

20   feeling mad that Tricia was telling your lawyer that you beat

21   her up and that's why she got out of the car?

22           THE COURT:  That she was feeling bad?

23           MS. GRADY:  Mad.

24   A.       No, I wasn't mad about anything.  That wasn't Tricia.

25   Q.       That Tricia was telling your lawyer --

AP

79

Taylor-Defense-Cross

1   A.   No.

2        THE COURT:   Let Ms. Grady finish.

3        THE WITNESS:   Okay.

4   Q.   Do you recall feeling mad that Tricia was telling your

5   lawyer that you had beaten her up and that's why she got out of

6   the car?

7   A.   No.

8   Q.   Do you remember hearing that's what she was telling

9   your lawyer?

10  A.   That I beat her up, Tricia, no.

11  Q.   What about that Tricia said, I pushed her out the

12  car?

13  A.   That's what they -- that's what she said transpired.

14  I didn't remember that so I didn't have a position on that.

15       THE COURT:   You couldn't tell if that was right

16  or wrong because you had no memory?

17       THE WITNESS:   Correct.

18  Q.   Fast forward to your decision not to testify.

19  You were not happy about not testifying, right?

20  A.   Right.

21  Q.   However, wasn't it your decision?

22  A.   What do you mean not to testify?

23  Q.   Well, going back to the rejection of the plea offer.

24  You weren't happy about going to trial and facing potential

25  murder charges, right?

80

AP

Taylor-Defense-Cross

1   A.   Was I happy about it?

2   Q.   Correct.

3   A.   No.

4   Q.   That wouldn't have been what you wanted to do, right?

5   You wouldn't want to be on trial for murder, right?

6   A.   Correct.

7   Q.   And you wouldn't want to accept fifteen years, would

8   you?

9   A.   No.  For an accident, no.

10  Q.   So, you made your decision between two bad choices;

11  isn't that right?

12  A.   No -- rephrase because you are losing me.

13  Q.   Okay.  If you had a choice between not going to trial

14  at all and just walking out the door --

15       MR. SMALLMAN:  Objection to the hypothetical

16  question.

17       THE COURT:  Sustained.

18  Q.   Let me ask this way:  Was it an easy decision to

19  reject the fifteen years and go to trial instead?

20  A.   Firmly standing on my belief, yes.

21  Q.   You wanted to go to trial and stand trial for

22  murder?

23  A.   It's not to stand trial for murder.  That's what I

24  am being accused of.  But if I know the truth and I know was

25  an accident then I would fight to defend and present that.

AP

81

Taylor-Defense-Cross                                          82

1          THE COURT:  You knew the risk and you still

2     wanted to go forward?

3          THE WITNESS:  Yes.

4          THE COURT:  You knew the risk that you could be

5     convicted and you could face up to twenty-five to life?

6          THE WITNESS:  Yes.

7          THE COURT:  And knowing that, you still wanted to

8     proceed.  That was your decision?

9          THE WITNESS:  Yes.

10         THE COURT:  And part of that decision was your

11    desire to testify; is that correct?

12         THE WITNESS:  That and the testimony of my

13    witnesses, yes.

14         THE COURT:  If your witnesses testified the way

15    you wanted them to you would have testified, right?

16         THE WITNESS:  It's not the way I wanted them to.

17    If they had been called to testify, yes, because that's

18    the only way the truth could get out.

19         THE COURT:  There again, if, for example, the

20    case wasn't in exactly the way you wanted it to go in,

21    the correction officers, Maliyah, Tricia and the doctors,

22    you would have testified?

23         THE WITNESS:  Yeah.

24    Q.   Then that's not what transpired.  You're witnesses

25    were not going to be called, which was not your choice.

AP

Taylor-Defense-Cross

1  Once that was the case, that your witnesses were not going

2  to be called, isn't it true that you then decided not

3  testify?

4      A.   It wasn't a decision that I made.  To me it didn't

5  make any sense to testify without them.

6           THE COURT:  That's your reason but your decision

7  was no.  We make decision every day and we have reasons

8  for our decisions.  But your decision was, no, you were

9  not going to testify.  And the reason you were not going

10 to testify was because these witnesses were not going to

11 be called.

12          THE WITNESS:  A decision is something you have

13 to sit down and decide to make.  That's not a decision

14 that I decided to make.

15          Everything transpired and then when I got before

16 the Judge he asked me if I wanted to testify and I'm

17 telling him it didn't make sense without the witnesses.

18 With the witnesses I would have testified.  If I testify

19 by myself who is supporting that?  Who is just going to

20 believe that?

21          THE COURT:  As a matter of record, for the

22 purpose of the hearing, move things along.  I read the

23 colloquy between the defendant and Judge Collini and the

24 decision, as we commonly know it.  It's my finding of

25 fact that she decided not to testify.  The reason for that

83

Taylor-Defense-Redirect

1    she explained.

2        MS. GRADY:  I have no further questions.

3        THE COURT:  Okay, Ms. Taylor, you may step down.

4        MR. SMALLMAN:  I have one or two follow-ups.

5        THE COURT:  I am sorry.  Would the Court staff

6    mind -- how long do you expect to be?

7        MR. SMALLMAN:  Two, three minutes.

8        THE COURT:  I would ask the staff, if you don't,

9    mind we will extend the lunch hour a little bit.  Thank

10   you.

11       Go ahead, Mr. Smallman.  I'm sorry.

12       MR. SMALLMAN:  It's quite all right.

13   REDIRECT EXAMINATION

14   BY MR. SMALLMAN:

15   Q.   Couple of quick questions.

16        Ms. Taylor, how old were you when your father died?

17   A.   Seven.

18   Q.   Do you know how he died?

19   A.   He got shot in the back and went through his heart.

20   Q.   Was that a traumatic event for you?

21   A.   Yes.

22   Q.   Caused you troubles down the road emotionally?

23   A.   Yes.

24   Q.   Did you spend a significant amount of time in the law

25   library?

AP

84

Taylor-Defense-Redirect

1    A.    Yes.

2    Q.    About how many hours would you guess?

3    A.    A whole lot.  I can't give an estimate.  I think when

4    we go we can go up to two to three hours at a time.  I was

5    there a lot of time the two years that we was waiting to go to

6    trial.

7    Q.    That's because you wanted to get familiar with the

8    facts and circumstances of your case?

9    A.    Yes.

10   Q.    Know as much as you could?

11   A.    Yes.

12   Q.    Now, did you ever refuse a request by the department

13   of corrections to put you in general population?

14   A.    No.  No one ever offered that to me.

15   Q.    That's not something that you could control, right?

16   A.    No.

17   Q.    Were you medicated while you were in corrections?

18   A.    Yes.

19   Q.    Right through to trial?

20   A.    Yes.

21   Q.    And that was by a doctor's order?

22   A.    Correct.

23   Q.    Now, you were asked if you were the boss of your case,

24   right?  You recall that?

25   A.    Uh-huh.

85

AP

Taylor-Defense-Redirect                                                    86

1   Q.   Did you ever actually feel you were in charge of your

2   case?

3   A.   Absolutely not.

4        MR. SMALLMAN:  Nothing further.  Thank you.

5        THE COURT:  Any recross based upon the redirect,

6   Ms. Grady?

7        MS. GRADY:  No, your Honor.

8        THE COURT:  Now you may step down, Ms. Taylor.

9        (Whereupon, the witness steps off the witness

10  stand.)

11       THE COURT:  We will be in luncheon recess.  We

12  will reconvene at 2:20.  2:20, please.  Thanks to the

13  Court staff.

14       MR. SMALLMAN:  Thank you.

15       (Whereupon, a luncheon recess was taken.)

16

17

18

19

20

21

22

23

24

25

                              AP

Renfroe-People-Direct                                                87

          A F T E R N O O N   S E S S I O N

1          THE CLERK:   Calendar number one, indictment 335

2    of 2006, Taliyah Taylor.

3          THE COURT:   Let's bring Ms. Taylor out.

4          (Pause in the proceeding.)

5          THE COURT:   Ms. Taylor is present.

6          Ms. Grady, are you ready yet?   Do you need a

7    couple of minutes?

8          MS. GRADY:   No, your Honor.   I am ready.

9          Your Honor, the People would like to call

10   Mr. Christopher Renfroe.

11         THE COURT:   Mr. Renfroe, please step up.

12         THE CLERK:   Please remain standing, face the

13   clerk.

14         C H R I S T O P H E R   R E N F R O E, called as

15   a witness on behalf of the People, having been first duly

16   sworn by the clerk of the part, was examined and testified

17   as follows:

18         THE CLERK:   State your name and spell your last

19   name.

20         THE WITNESS:   Christopher Renfroe, R-E-N-F-R-O-E.

21         THE COURT:   The microphone is on.   Direct your

22   comments in that direction.   Appreciate it.

23         Ms. Grady, whenever you are ready?

24         MS. GRADY:   Thank you.

25

                          AP

88

```
 1      DIRECT-EXAMINATION
 2   BY MS. GRADY:
 3        Q.    Good afternoon, Ms. Renfroe.
 4        A.    Good afternoon.
 5        Q.    What do you for a living, sir?
 6        A.    I am an attorney.  I do criminal law.
 7        Q.    How long have you been doing that?
 8        A.    I started in the legal Aid Society in 1984 and until
 9   present.
10        Q.    As of 2006 had you ever represented anyone in a
11   homicide?
12        A.    Yes.
13        Q.    Can you give an example of a challenging homicide?
14        A.    In 1998 I tried the third death penalty case in New
15   York State.  I tried numerous homicides throughout the years.
16   I have been capital certified to try homicides for death
17   eligible defendants.
18        Q.    And you know why you are being called to testify here
19   today, correct?
20        A.    Yes.
21        Q.    And did you represent Taliyah Taylor in this
22   prosecution?
23        A.    I did.
24        Q.    Did it go to trial?
25        A.    Yes, it did.
```

Renfroe-People-Direct

1    Q.    Do you remember generally what the facts of the case

2    were?

3    A.    There was a motor vehicle accident where a prominent

4    lawyer in Staten Island was hit and killed and there was

5    another vehicle that was hit and caused injury to two other

6    people.

7    Q.    Do you remember when approximately that happened?

8    A.    I think -- I believe it was 2006, 2007.

9    Q.    When did you first appear in the case?

10   A.    About a month after the case.

11         THE COURT:    A month after the incident?

12         THE WITNESS:    A month after the incident.  Sorry,

13   your Honor.

14   Q.    Were you retained or assigned?

15   A.    I was retained.

16   Q.    Did you meet with your client?

17   A.    I did.

18   Q.    Do you remember when the first time was?

19   A.    It would have been shortly thereafter.  I make a

20   point -- I am very leery of telephones so I usually go see my

21   clients in Rikers Island or whatever facility they are in.

22   Q.    Do you remember how long the case lasted?

23   A.    Approximately two years.

24   Q.    During those two years, did you meet with your client

25   again?

Renfroe-People-Direct                                                90

1    A.    I met with the client, met with the family.  Yes.

2    Q.    Did you also speak to your client over the phone?

3    A.    I believe we would have brief conversations over the

4    phone.  But I really don't have in depth conversations with

5    any of the clients over the phone.  Lawyer paranoia.

6    Q.    Did you also appear when the case appeared in court?

7    A.    Yes, I did.

8    Q.    On those occasions did you also have an opportunity to

9    speak to your client on those days as well?

10   A.    Yes, I did.

11   Q.    Close to the beginning of the case was there any

12   occasion for your client to have a mental health examination?

13   A.    Yes.

14   Q.    Did you receive the results of that examination?

15   A.    Yes, I did.

16   Q.    What was the purpose of that conversation?

17   A.    The first report was a 730 report to see whether she

18   was competent to proceed forward with the case.

19         THE COURT:    That was ordered by the Court?

20         THE WITNESS:    Yes.

21         THE COURT:    At your request?

22         THE WITNESS:    Yes.

23   Q.    Do you remember the name of doctor that wrote that

24   report, one of them?

25   A.    Dr. Wang.

Renfroe-People-Direct

1   Q.   Did you receive a written report?

2   A.   Yes, we get a written report.

3        MS. GRADY:   Your honor, I ask this item be marked

4   People's 1 and shown to the witness.

5        THE COURT:   People's 1 for identification.

6        (Whereupon, a report was marked as People's

7   Exhibit 1 for identification.)

8   Q.   You have been shown what has been marked People's 1.

9   Do you recognize it?

10  A.   Yes.

11  Q.   What do you recognize it to be?

12  A.   This is the report that was -- 730 report that was

13  prepared by Dr. Wang and for the Courts.

14       MS. GRADY:   Your Honor, I offer that into

15  evidence as People's 1.

16       MR. SMALLMAN:   Without objection.

17       THE COURT:   Without objection People's 1 in

18  evidence.

19       (Whereupon, People's Exhibit 1 was marked in

20  evidence.)

21       THE COURT:   I have looked at it.

22       Do you want me to give it back to him?

23       MS. GRADY:   Please.

24       THE WITNESS:   Thank you.

25  Q.   What was Dr. Wang's opinion?

Renfroe-People-Direct    92

```
 1    A.    Well, I know she was fit to proceed.  I think he
 2  found her fit.  Let me double check.  Dr. Pabon found her not
 3  fit to proceed.  The initial finding was she was not fit to
 4  proceed.  I see one from Dr. Pabon.  Let me just check.  And
 5  Dr. Wang also found her not fit to proceed initially.
 6    Q.    Did Dr. Wang form any clinical diagnosis of her?
 7    A.    Bipolar disorder.
 8    Q.    Now, at some point was she found competent to proceed?
 9    A.    Yes.
10    Q.    Was that after an actual hearing?
11    A.    Yes.  We did do a hearing, yes.
12    Q.    Who was your witness for that hearing?
13    A.    Dr. Wang.
14    Q.    And how -- in your opinion, how did he do as a
15  witness?
16    A.    I guess politely he took some lumps.  He was
17  challenged extensive by the prosecution of his findings.
18          THE COURT:    Did the People challenge his finding
19  that she was fit to proceed or that she was not fit to
20  proceed?
21          THE WITNESS:    Challenged the conclusion that she
22  was not fit to proceed.
23    Q.    So you -- the polite way was he took some lumps?
24    A.    Yes.
25    Q.    I won't ask for the impolite version.
```

AP

Renfroe-People-Direct

1        How did he stand up under cross examination?

2    A.    I thought that he didn't handle it well.  I think

3    that there was something -- from my memory he hadn't brought

4    all the material so the Judge was yelling at him about that.

5    A little -- well, it was a tough day.

6    Q.    And what was the outcome of that hearing?

7    A.    The trial.  We were getting ready to proceed to trial.

8    She was found fit.

9    Q.    So you lost the hearing?

10   A.    Yes.

11        THE COURT:  Was that Judge Collini?

12        THE WITNESS:  Yes.

13   Q.    Drawing your attention to October 6, 2008, did the

14   case proceed to trial?

15   A.    Yes, it did.

16   Q.    What was the top count of the indictment?

17   A.    Depraved inference murder.

18   Q.    Did you research the law of depraved indifference

19   murder at that time?

20   A.    Yes.

21   Q.    Do you remember what the elements were that you were

22   facing?

23   A.    That I engage in conduct which has a high chance of

24   causing death or serious physical injury.

25   Q.    Do you remember what the mens rea of that was?

AP

93

Renfroe-People-Direct

1    A.    Reckless.  But when you describe the reckless what

2    separates it from manslaughter is like -- the only way I can

3    describe it is opening the door on the lion's cage when there

4    is a crowd of people there.  Throwing a grenade at a group of

5    people.  That's what raises it from normal recklessness.

6    Q.    And what was your -- what was the plan for defense for

7    that charge?

8    A.    When we initially started the trial I planned to use

9    an insanity defense.

10        THE COURT:  In the hopes of getting a verdict of

11   not responsible?

12        THE WITNESS:  By reason of mental disease or

13   defect, yes.

14   Q.    How does such a defense compare to, for example, an

15   alibi defense?

16   A.    I have the burden of proving it by a preponderance of

17   the evidence.

18   Q.    Are there any other difficulties with a GRI defense?

19   A.    There are several.  You open the door to prior crimes

20   that might not -- might otherwise be Sandoval doubt.

21        But particularly in this case there was a motor

22   vehicle accident where my client had run some lights and hit

23   a house while driving intoxicated.  There was also an alleged

24   incident where she pulled a gun on a bouncer, something like

25   that.  Some of these things which were Sandavaled out would

AP

94

Renfroe-People-Direct

1    now come in at the cross examination of her and of the

2    experts.

3        Q.    How did you plan to meet your burden of the defense?

4        A.    There were witnesses who had indicated that prior to

5    the incident, like three or four days before, she was hearing

6    voices and acting strange.

7              And I remember one witness, Trish, who was a good

8    friend of Ms. Taylor.  So we were going to call witnesses to

9    put forward the defense, call the defendant, call Dr. Wang and

10   call Dr. Berrill.

11       Q.    Who is Dr. Berrill?

12       A.    Dr. Berrill was the psychologist that I had hired to

13   interview Ms. Taylor and come to a conclusion concerning what

14   he thought her mental capacity was at the time of the

15   incident.

16             THE COURT:  Mr. Renfroe, in regard to these

17   incidents that allegedly occurred three or four days

18   before the accident or crime, Tricia Matthews ring any

19   bells to you?

20             THE WITNESS:  Yes, it does.

21             THE COURT:  And Maliyah Rowe?

22             THE WITNESS:  Yes.  I think I spoke to Taliyah

23   Taylor's mom.  I'm not sure if she related that to me or

24   said if she had known this was going on she would have

25   taken her to the hospital.  I am not sure if she also had

Renfroe-People-Direct

1    known about those symptoms.

2        THE COURT:   And you had decided to call Dr. Wang

3    despite the difficulty you had on cross examination of the

4    730 exam?

5        THE WITNESS:   Because he was the treating

6    doctor.   If we were going to put forward the defense,

7    the observations that he made would be important.   He

8    was actually I think here in the courtroom.   I think was

9    in the courthouse on the date that I received the tapes.

10   Q.   Let's take it a step at a time.

11        Prior to trial you said you hired Dr. Berrill?

12   A.   Yes.

13   Q.   You arranged for Dr. Berrill?

14   A.   Yes.

15   Q.   Did he prepare a report?

16   A.   Yes, he did.

17        MS. GRADY:   I ask that this item be marked

18   People's 2 for identification and shown to the witness.

19        THE COURT:   2 for identification.

20        (Whereupon, a report was marked as People's

21   Exhibit 2 for identification.)

22        MR. SMALLMAN:   No objection, your Honor for

23   purposes of the hearing.

24        THE COURT:   It will be marked People's 2 in

25   evidence.

96

Renfroe-People-Direct

1

2            (Whereupon, People's Exhibit 2 was marked in

3     evidence.)

4            THE COURT:   2 in evidence being shown to

5     Mr. Renfroe.

6            Q.   Is that document Dr. Berrill's report as you recall

7     it?

8            A.   Yes.

9            Q.   What's the date on that report?

10           A.   One second.   December 23, 2007.

11           Q.   And what was Dr. Berrill's opinion?

12           A.   Schizophrenia paranoid type.   Schizoaffective

13    disorder.

14           Q.   So, his opinion was because she suffered from those

15    mental diseases or defects that she was not responsible for her

16    actions the night of the crime?

17           A.   That's correct.

18           THE COURT:   Is that what he wrote in the report

19    exactly?   Did he opine that she was insane or the

20    definition of 40.15?

21           THE WITNESS:   Yes.   There is -- Ms. Taylor was

22    suffering from serious psychiatric symptoms for sometime,

23    was clearly decompensating and experiencing an

24    increasing severity of the symptoms prior to the instant

25    offense.

         THE COURT:   His bottom line.

AP

Renfroe-People-Direct

1           THE WITNESS: Given the results -- clinically

2   speaking, given the results of this examination it's

3   apparent that Ms. Taylor is an extremely disturbed

4   individual. She seems to be receiving benefit from her

5   current psychiatric medicines which is a plus. Given

6   the nature of her mental illness and seriousness of her

7   condition, it's suspectable she would require psychiatric

8   treatment for inpatient or outpatient treatment for the

9   remainder of her life.

10          THE COURT: May I see that for a second.

11          THE WITNESS: Yes. (Handing)

12          THE COURT: Thank you.

13          There are three numbers on this. His page 11 sub

14  three. It reads, given her description of her mental

15  state at the time of the instant offense it is

16  unimaginable that she possessed the ability and/or

17  capacity to form the intent to commit this crime.

18          And then he goes on to say, she doesn't recall

19  any of the circumstances.

20          Did you ask Dr. Berrill to opine on a complete

21  affirmative defense of insanity or did you also ask him

22  to opine on whether based upon a psychiatric problem

23  combined with alcohol and medication that she could not

24  have the state of mind to act with a depraved indifference

25  to human life?

98

AP

Renfroe-People-Direct

1       Basically a fall back position from full

2  insanity. Try to eliminate it, the murder two, and bring

3  it down to a man. two or was it your intention to go for

4  the entire --

5       THE WITNESS:  To be honest, I didn't -- I don't

6  believe I had a fall back position.  I don't believe

7  I -- you know, things progressed pretty rapidly as I got

8  ready to call Dr. Wang, who was in the hallway to set the

9  parameters of the defense before calling the lay

10 witnesses.

11      I was given the tape and we broke and I went back

12 to the office and myself and Jose Araujo basically started

13 listening to the tapes.

14      THE COURT:  Go ahead.

15 Q.  Had the People hired a doctor to examine her?

16 A.  Yes.

17 Q.  Did they give you a copy of his report?

18 A.  Yes.

19 Q.  So you knew what his testimony was going to be?

20 A.  Yes.

21      MS. GRADY:  I ask that this be marked People's 3

22 for identification.

23      (Whereupon, a report was marked as People's

24 Exhibit 3 for identification.)

25      THE COURT:  3 for identification.

AP

99

Renfroe-People-Direct

1              This is Dr. Schneider's report?  Are you offering

2    it into evidence?

3              MS. GRADY:  Yes.

4              THE COURT:  Any objection?

5              MR. SMALLMAN:  No.

6              THE COURT:  Without objection People's 3 in

7    evidence.

8              (Whereupon, People's Exhibit 3 was marked in

9    evidence.)

10   Q.   What is the name of the doctor that the People hired?

11   A.   Dr. Myles Schneider.

12   Q.   And what was the date of his report?

13   A.   I see a date of February 4th, 2007.

14   Q.   What was his opinion -- first, do you remember what

15   his diagnosis was?

16   A.   Let me see.  He found her -- he stated Taliyah Taylor

17   is currently fit to proceed.  Ms. Taylor does not lack

18   substantial capacity to understand the charges against her, the

19   nature of the legal proceedings, and to cooperate in her

20   defense.

21   Q.   Had he formed any psychiatric diagnosis of her?

22        Are you trying to refresh your recollection?

23   A.   Yes.

24   Q.   Look towards the back, the last few pages.

25   A.   Thank you.

Renfroe-People-Direct

1    Q.    Do you recall whether it was antisocial personality

2  disorder?

3    A.    I think that and I think he indicated that he thought

4  she was malingering.

5    Q.    What does that mean?

6    A.    Sort of pretending to have a psychiatric defense.

7    Q.    Is antisocial personality disorder a defense you can

8  proceed with at trial as a disease -- as a mental disease or

9  defect that will negate intent?

10   A.    No.

11   Q.    Did that report give you any concern about the

12  defense?

13   A.    Well, at that point it was more a battle of the

14  experts.  That's --

15          THE COURT:  Do I have the dates right?  The

16  People had your client examined first and then Dr.

17  Berrill came in after this?

18          THE WITNESS:  Yes, I believe that.  If I can

19  look?  Dr. Wang was the first doctor.

20          THE COURT:  I am more interested in the retained

21  people.  Dr. Berrill you said was December 23, 2007?

22          THE WITNESS:  He saw her on September 26, 2007.

23          THE COURT:  And his report was?

24          THE WITNESS:  His report was December 23, 2007.

25          THE COURT:  And Dr. Schnieder was?

Renfroe-People-Direct

1

2

3

4                    THE COURT: Thank you.

5          Q.    You arranged for Dr. Berrill to come into the case

6    after it was a battle of the experts as you say?

7          A.    Also I had used him in other cases.

8          Q.    As you proceeded to trial what did you think of the

9    chances of the defense as you were preparing for trial?

10         A.    Well, based on the nature of the injuries and what

11   had happened, it was always a tough defense but it was a

12   defense that was presented.

13         Defenses, they don't come from the lawyer. They

14   actually come from the client. If the client says I was in

15   California, I couldn't have done this murder then you go check

16   out to see if the person was in California and you get ready to

17   proceed with the defense.

18         Q.    How did the issue of intoxication figure into your

19   plan?

20         A.    This case had two potential defenses. The insanity

21   defense and intoxication defense. Those defenses always

22   existed. There was a danger in both defenses.

23         Part of the danger in this defense, of the insanity

24   defense, is because you have a burden in opening up the door to

25   prior incidents with your client. Even in the report by

THE WITNESS: February 4.

THE COURT: 2007?

THE WITNESS: Yes.

102

AP

Renfroe-People-Direct

1    Dr. Berrill he's discussing long-term drug usage which can

2    cause, you know, schizophrenia.  It's been known to happen.

3    You know, they both raise concerns when you have a defense.

4        Q.   Concerns for what?

5        A.   As we do this business, you know, hopefully what we

6    are trying to do is we are trying to get our client off or as

7    little time as possible.  So they're inherent risks if you come

8    in second place.  People do a lot of time in jail.

9        Q.   And then even if you had called one with the GRI

10   defense, was there a down side to that?

11       A.   I spoke to and I don't remember the woman's name

12   but she was in Queens and I discussed it with her because

13   she -- she was the person in Legal Aid who did all the cases

14   when someone had like an insanity defense.  And she said,

15   well, like, the person will do -- her belief was that even if

16   the person was compliant with medicine and all this, she might

17   be in for like ten, eleven, years.

18            I also did a case in Brooklyn, was a capital murder

19   case, and we actually got a plea of not guilty by reasonable

20   disease or defect.  I had another lawyer with Russ Morray

21   (phonetic spelling.)  I was the lead counsel in the death

22   penalty case.  I explained the results.  The results that not

23   guilty by mental disease or defect you might never get out of

24   jail and he said I needed help.  I don't want to go to trial

25   and I want to take that result.

Renfroe-People-Direct

104

1   Q.   When you say "never get out of jail", you mean never

2   get out of jail?

3   A.   Never get out of the mental hospital.  That was a

4   person by the name of Troy Batson.

5   Q.   There is no time when you are committed to a hospital,

6   it's not for a length or a term?

7   A.   Yes.

8   Q.   It's indefinite?

9   A.   It's when the doctors feel that you are no longer a

10  danger to yourself and others.  That's my understanding.  And

11  a Judge has to sign off on that as to when you get released.

12  Q.   Did you have an opinion as to when she could hope to

13  be released from that hospital?

14  A.   I hadn't done that part of it.  That's why I contacted

15  the person from Legal Aid who had done a lot of these and she

16  said, you know, based on her experience it might be like ten

17  years.

18  Q.   What was the People's offer before trial?

19  A.   It was fifteen years and I think my client had

20  served two years by the time we were getting ready to go to

21  trial.

22  Q.   As you proceeded for trial did you speak to your

23  client about preparing for the case?

24  A.   Yes.

25  Q.   Was she assisting you in preparing for trial?

AP

Renfroe-People-Direct

1   A.   I believe so.  I think -- I went out to see her.

2   You know I talked to her witnesses.  I met with her family

3   members.

4   Q.   Was she engaged at what was happening in the trial?

5   A.   I believe so.  Yes.

6   Q.   Did she give you input on how to cross examine the

7   People's witnesses?

8   A.   Yes.

9   Q.   And then the trial began.  Did there come a day in the

10  trial when were you ready to start presenting your defense

11  case?

12  A.   Yes.

13  Q.   And what happened?

14  A.   Mr. Mattei gave me a CD and we approached and said I

15  had to listen to the CD before I proceeded, which I thought was

16  a good idea.  So we adjourned and I went back to my office and

17  I listened to the CD.

18       THE COURT:   Did Mr. Mattei indicate to you what

19  was on the CD?

20       THE WITNESS:   Yes, that was jail house calls by

21  my client.

22       THE COURT:   At any time prior, during the trial,

23  was there any intimidation or discussion with the

24  prosecutor that they were attempting to -- either they had

25  these taped recordings or they were attempting to get

105

Renfroe-People-Direct

1    these taped recordings from Rikers Island?

2         THE WITNESS:  No.

3         THE COURT:  The first time you heard about this

4    was just after the People --

5         THE WITNESS:  As I was getting ready to call

6    Dr. Wang, who was in the hallway.

7         THE COURT:  Okay, thank you. Go ahead,

8    Ms. Grady.

9    Q.   Did they give you any sense of what might be on the

10   tapes?

11   A.   I can't really say if they told me.  Having done this

12   for 30 years I had a feeling what was on the tape wasn't good

13   for me.

14   Q.   Even if you don't recall now what they said, do you

15   remember whether or not they communicated with you at all what

16   they were finding to be on the tapes?

17   A.   I don't recall.

18        THE COURT:  Do you recall receiving transcripts,

19   at least some transcripts along with the CD?

20        THE WITNESS:  I am not sure if I got transcripts.

21   I know I went back to the office and I started listening

22   to the tapes.

23   Q.   On that date, on that particular day, they are just

24   giving you the CD?

25   A.   I believe so.  I'm not sure.  But I know that -- I

AP

106

Renfroe-People-Direct

1    know I reached out to Jose Araujo and said, Jose, listen to

2    these tapes with me.  Jose was someone I have known.  He is

3    actually still with me.  When I did the death penalty case he

4    interned with me and has been with me ever since.  He has been

5    with me and goes through the cases with me.  He volunteered to

6    go through the tapes with me.

7    Q.    Did you listen to all the calls?

8    A.    I think we did.  I think we just sat.

9    Q.    How many calls?

10   A.    88 calls.

11   Q.    How long did that take?

12   A.    Well, it wasn't like you just listen to it.  You

13   listen to it, you go back.  So we were there, burning -- I

14   don't even -- I don't know if we even slept that night.  I

15   can't even tell you but we listened to those tapes.

16   Q.    As part of your preparation for today's hearing did I

17   provide you with a CD?

18   A.    Yes.

19   Q.    Did you listen to the contents?

20   A.    Yes.

21   Q.    What was on those CDs?

22   A.    Calls from Rikers Island.

23   Q.    Did you recognize the calls?

24   A.    Yes.

25              THE COURT:  Are you referring to Court Exhibit 1

Renfroe-People-Direct                                                    108

1                    or 1?

2                         MS. GRADY:  Court Exhibit 1.

3       Q.   Over the lunch break did we listen to the CD -- not

4  all the CD.  I am referring to Court Exhibit 1.  In fact, the

5  CD that I provided you is part of the preparation.  Do you have

6  that with you?

7       A.   Yes.

8       Q.   Can you look at it?

9       A.   I can grab it.  It's in --

10                        THE COURT:  Is there any question.

11      Q.   Is the CD with more than 80 calls on it?

12      A.   Yes.

13                        THE COURT:  Do you have the one that's marked?

14                        MS. GRADY:  Yes.  I just want to make sure we are

15  talking about the same CD.

16      Q.   Before I get to that, in these calls did you recognize

17  the voices?

18      A.   Yes, some of them.

19      Q.   Who did you recognize the voices to be?

20      A.   I believe I recognized Tricia's voice and Taliyah

21  Taylor's voice.

22      Q.   And what did recognize Tricia's voice from?  Had you

23  spoken to her?

24      A.   Yes.

25      Q.   That's Tricia Matthews you are speaking of?

AP

Renfroe-People-Direct

1    A.    Yes.  Yes.

2    Q.    Did the contents of the CD, these Rikers calls, did

3    that have any effect of your opinion of the defense you had

4    planned?

5    A.    Yes.

6    Q.    What was that?

7    A.    I came to the conclusion that if I went with the

8    defense I probably would be killing my client so I decided I

9    didn't think that was a good idea.

10   Q.    When you say killing your client, you didn't think --

11   A.    I didn't think it was a successful defense.

12   Q.    Were there certain calls in particular that you found

13   significant?

14   A.    There was one call where she commented how she

15   was -- she had gotten saliva on a guard because she had spit

16   out her medicine and she was joking with the guard.  You

17   know it was like this whole colloquy about that to who she was

18   talking on the phone with.  That was one.

19   Q.    Did that call make it sound as though that was an

20   isolated event or this was something she was doing, spitting

21   out her medicine?

22   A.    I had a feeling this was not an isolated event and she

23   was not taking her medicine.  That would present a problem

24   since the medicine was designed to keep at bay the

25   schizophrenic problems that she was having.

1    THE COURT:  And that phone call was some two

2  years after the incident?

3    THE WITNESS:  That was actually right near the

4  time of trial.

5    THE COURT:  Which is about two years after the

6  incident?

7    THE WITNESS:  Yes.

8    Q.   How did that affect Dr. Berrill's -- your opinion of

9  Dr. Berrill's opinion?

10   A.   He had come to a conclusion that she would need

11  treatment which I took to mean medicine, either inpatient or

12  outpatient for the rest of her life so that the symptoms of

13  the schizophrenia wouldn't be manifest.

14       But that conversation made it appear that she wasn't

15  taking her medicines and all the conversations that were

16  being -- when she was discussing with everyone she was very

17  lucid.  So, she was very lucid while she was not taking her

18  medicine.  That's the difficulty.

19       THE COURT:  Did you find her at any time leading

20  up to like in the weeks before the trial that she was

21  acting any differently from the time you had -- was there

22  any change in her behavior over the two years you

23  represented her prior to the trial?

24       THE WITNESS:  Well, when I met her she was on

25  this medicine.  So supposedly on the medicine -- so I

AP

Renfroe-People-Direct                                              111

1     didn't see any changes.  So, that's the answer.

2     Q.   You are saying there was no change really in her

3   demeanor or behavior from the first time you met her till

4   trial?

5     A.   That's correct.

6     Q.   You thought it was because she was on medication?

7     A.   That's correct.

8     Q.   But then based on this phone call she wasn't taking

9   the medication, is that what you are saying?

10          MR. SMALLMAN:   Objection.

11          THE COURT:   You suspected she might not be taking

12   her medication?

13          THE WITNESS:   Yes.

14          THE COURT:   Did she say anywhere in that

15   conversation, I stopped taking my medication?

16          THE WITNESS:   I don't know if there is an exact

17   reference to the fact that she is never taking her

18   medicine but there were several instances where there was

19   that.  There was an indication that she said that, you

20   know, I know how to get around the doctors.  I will be

21   out of here in one year.  It's better if I'm in the mental

22   observation unit.  It's better for my case.

23          There were some issues with those tapes where we

24   have the burden of proving the insanity defense by a

25   preponderance of the evidence and you know.

Renfroe-People-Direct

1

2          Q.      So all of those calls, spitting out her medicine, I

3    know how to get out hospital, I would love to be in GP and have

4    a job but being in a mental unit is good for my case, the sum

5    total of those calls, how did those compare in your mind to

6    Dr. Schneider's opinion?

7          A.      They would reinforce the opinion of Dr. Schnieder.

8          Q.      That?

9          A.      That she was not schizophrenic.

10         Q.      But was?

11         A.      Malingering.

12                 MS. GRADY:  Judge, I would like to play --

13                 THE COURT:  Have we heard the essence of it?

14    Heard the actual tape?

15                 MS. GRADY:  Beg your pardon.

16                 THE COURT:  Mr. Renfroe summarized.  Do you

17    need to play the tape?  If you want to, go ahead.

18                 MS. GRADY:  I don't know if that would be of

19    assistance, the call about spitting out medication.  Do

20    you think that's not necessary.

21                 THE COURT:  If you believe that would show --I am

22    going to assume this was one day where she said she was

23    spitting out her medication.

24                 MS. GRADY:  May I tell your Honor which call I

25    was going to play.  You have the CDs in evidence.

Renfroe-People-Direct

113

1

2          THE COURT:  Sure.

3          MS. GRADY:  October 24.  The call that ended at

4    11:04 a.m. with file number 2008100410442.

5          THE COURT:  Okay, thank you.

6          MS. GRADY:  It was at minute four and ten seconds

7    that it began.

8          THE COURT:  All right.  I will review that.

9    Q.    Thank you.

10   Q.    Were there other calls that gave you pause?  Other

11   types of conversations that you had that caused you concern if

12   they were to be played in front of the jury?

13   A.    There were calls where she said that I gave -- I've

14   given the questions or I've given the testimony to the

15   witness and I'm going to talk to them later.  That was

16   troubling also.

17   Q.    Did she say I gave questions or did she say she had

18   given answers?

19   A.    I think it was answers.

20   Q.    And what did that make it seem?  What caused

21   concern -- what did you find significant about that?

22   A.    In the normal process of a trial or when you speak to

23   a witness, you ask them questions and get the answer from the

24   witness.  It's never a situation where you tell the witness

25   what they should say.  That's not how it's supposed to happen.

26   So that was problematic to me.

AP

Renfroe-People-Direct                                                    114

1           THE COURT:  That would be in regard to the lay

2  witnesses?

3           THE WITNESS:  That's correct.

4     Q.    Did you speak to Dr. Wang after listening to the

5  calls?

6     A.    Yeah.  I think -- now doing this from memory I think

7  when we adjourned we told Dr. Wang to come back the next day.

8  And then, you know, as I went over these tapes with Mr. Araujo

9  he and I came to the conclusion that, you know, we had a better

10 shot of saving Taliyah Taylor's life if I went with an

11 intoxication defense.

12    Q.    So when you say, I think Dr. Wang came the next day,

13 was he there, was he in the hallway?

14    A.    Yes.

15           THE COURT:  An intoxication defense based on the

16 testimony that had been elicited during the People's

17 direct case?

18           THE WITNESS:  That is correct.

19    Q.    When you came back to the courthouse, did you speak to

20 Dr. Wang on what you heard on the calls?

21    A.    Yes.  I can't tell you what degree I talked to him

22 about it, I mean.

23           THE COURT:  Was Dr. Wang going to be called as

24 an expert witness or simply as the treating --

25           THE WITNESS:  Treating.

AP

Renfroe-People-Direct

1       THE COURT:  An expert in general psychology to

2  the extent he could give a diagnosis but he was not going

3  to give an opinion?

4       THE WITNESS:  He was a fact witness because he

5  had seen her all those times.

6       THE COURT:  I get it.

7  Q.   He only seen her after the crime; is that right?

8  A.   Yes.

9  Q.   So, you remember speaking to Mr. Wang but not the

10 contents of those conversations?

11 A.   Yes.

12 Q.   Did you speak to Dr. Berrill?

13 A.   Yes.

14 Q.   Was that in person or over the phone?

15 A.   I called Dr. Berrill.

16 Q.   When did you call him?

17 A.   It would have been that day.

18      THE COURT:  Can I just interrupt.

19  Mr. Renfroe, do you recall what Dr. Wang's

20  reaction was to your disclosure of these tapes to him or

21  at least the substance?  Did he say now my diagnosis would

22  be in doubt?

23      THE WITNESS:  No.

24      THE COURT:  No.

25      THE WITNESS:  No.  I think he was more just

AP

115

Renfroe-People-Direct                                                        116

1    relieved that he wasn't going to have to be cross-examined

2    again.

3    Q.   Did you seek to Dr. Berrill?

4    A.   Yes.

5    Q.   That was over the phone?

6    A.   Yes.

7    Q.   And did you ask him -- did you convey to him what you

8    heard on the calls?

9    A.   I can't remember.   I don't remember.   I know I let

10   him know that, you know, I think we had a problem with the

11   defense and what direction I was going in and you know.

12   Q.   Did you ask his opinion?

13   A.   I don't know if I asked his opinion on that.   I don't

14   want to say I asked his opinion.

15   Q.   Did you ask him if he learned X, Y or Z from it, the

16   calls, would that affect his opinion?

17   A.   I did not.   I don't remember asking him that because

18   when I -- when I listened to the tape, you know, somebody,

19   right or wrong, somebody's got to drive the car.   I'm the guy

20   that drives the car.   So, when I listened to those tapes, you

21   know, I -- whether you believe it or not, my thought process

22   was what's the best way to try to win this case for Taliyah

23   Taylor.

24        THE COURT:   Now, can I assume and I think I

25   looked at Dr. Berrill's report and I don't know the

AP

Renfroe-People-Direct 117

1    answer.   Dr. Berrill did not speak to either Tricia

2    Matthews or Maliyah Rowe in formulating his -- I think he

3    lists the source of his information in the report.  I did

4    not see he had spoken to either of them.

5         THE WITNESS:  I am looking.   It's something I'm

6    not sure of.   If they were a source, I guess I would

7    assume he would put it in the report.

8         THE COURT:  Right.  And there, again, I didn't

9    look at Dr. Wang's report in detail.  Do you recall

10   whether he had interviewed Ms. Rowe or Ms. Matthews?

11        THE WITNESS:  I think Dr. Wang spoke with the

12   family.  If I can take a quick look.   I am not sure which

13   family members he spoke to.

14        I believe he spoke to family members but I

15   wouldn't be able to say who he spoke to.

16        THE COURT:  Thank you.

17   Q.   Drawing your attention to that next day, the day

18   after, October 22.  Did you speak to Ms. Taylor about the

19   content of the calls?

20   A.   Yes.

21   Q.   Did she try to give an explanation of their content to

22   you?

23   A.   I don't recall.

24   Q.   What happened when the case was called?

25   A.   I think I informed the Court that I would not be

Renfroe-People-Direct

1    proceeding with an insanity defense and the next issue was

2    whether Ms. Taylor was going to testify.

3         Q.    And then did you ask for time to speak to your client

4    about that?

5         A.    I think I did.    Yeah, I know I did.

6         Q.    Was the Judge -- did the Judge rule on the

7    admissibility of the CDs?

8         A.    Yeah.    I think I told him that I think they were --

9    that the service of these CDs were late, that I want them

10   precluded and I didn't win that issue.

11        Q.    So the People were going to be able to use the CDs?

12        A.    That's correct.

13        Q.    The People were going to be able to use it to cross

14   examine your doctors?

15        A.    Yes.    And the defendant if she testified and the

16   witnesses if they testified.

17        Q.    So then you spoke to your client and the case was

18   recalled.    Did your client -- had she decided whether or not to

19   testify?

20        A.    I think she decided not to testify.

21        Q.    Do you remember speaking to her about that decision

22   during the break?

23        A.    Yes, I, did.

24        Q.    What was the content of that conversation?

25        A.    I mean, I think she said if I don't have my witnesses

AP

118

Renfroe-People-Direct

1    I'm not going to testify.  I can tell you that neither

2    Taliyah Taylor or myself were happy that day.  It's the day

3    where, you know, the preparations for the defense had taken a

4    direct hit.

5         Q.    Okay.  Now, as you decided whether or not to proceed,

6    was there anything besides the phone calls that you took into

7    consideration in deciding to forego the defense?

8         A.    Well, the defense was tough to begin with in light

9    of -- especially the issue about the prior case where she had

10   been intoxicated.  So, I know I took that into consideration.

11        Q.    What were the facts of that case?

12        A.    That she ran a couple of lights and hit a house.

13        Q.    She ran a couple of lights and hit a house while

14   intoxicated?

15        A.    Yes.

16        Q.    And that was on Staten Island?

17        A.    Yes.

18              THE COURT:  But you knew that before --

19              THE WITNESS:  Uh-huh.

20              THE COURT:  -- the case began?

21              THE WITNESS:  Yes.

22        Q.    That prior crime -- before the case began, Judge

23   Garnett was asking, was that prior crime going to be admissible

24   during your cross examination of your witnesses?

25        A.    Yes.

Renfroe-People-Direct

1    Q.    That was already going to be part of the cross

2    examination of the doctors?

3    A.    Yes.

4    Q.    But then as you analyzed the viability of the defense

5    what went into that?

6    A.    It's not an exact science.  You are trying to figure

7    out -- for example, if this case went up to the Court of

8    Appeals if they -- if the defense had -- if the defense had

9    been the majority we wouldn't be here.

10   Q.    What are you referring to?

11   A.    Justice Smith.

12         THE COURT:  Justice Reid.  Not Justice, Judge I

13   mean.

14   Q.    Imagine I don't know anything about it.

15         THE COURT:  I know about it, Mr. Renfroe knows

16   about it, Mr. Smallman knows about it.

17   Q.    Let's put on the record what you are alluding to.  Let

18   me ask you this:  At the time you are deciding to forego the

19   defense of mental disease, were you left without a defense?

20   A.    No.

21   Q.    What was the defense?

22   A.    That she was intoxicated.  That she never intended to

23   drive the car.  That when she got into the car, you know, she

24   wasn't -- she was intoxicated.  She didn't know what she was

25   doing and drove at a high rate of speed causing this but she

120

AP

Renfroe-People-Direct

121

1  was intoxicated, that's why it happened.

2  Q.  And were there facts already in the record to already

3  establish all of that?

4  A.  Yes.

5  Q.  Did you argue that to the jury?

6  A.  Yes.

7  Q.  Did that succeed?

8  A.  No.

9  Q.  She got convicted?

10  A.  Yes.

11  Q.  Did the case go on appeal?

12  A.  Yes.

13  Q.  Where did it go to appeal?

14  A.  To the Court of Appeals.

15  Q.  What was the outcome of the Court of Appeals.

16  A.  We lost in the Court of Appeals.

17  Q.  Was it on that issue?

18  A.  Yes.

19  Q.  Was that the issue before the Court of appeals?

20  A.  Yes.

21  Q.  Based upon all the facts in the case?

22  A.  Yes.

23  Q.  And your arguments on summation?

24  A.  Yes.

25  Q.  Let me ask you this:  Did you get a jury instruction

AP

1  from Justice Collini on the issue of intoxication?

2      A.   Yes.

3           THE COURT:   The intention of arguing that was to

4  have the jury, if they did not find her not guilty of

5  everything, to consider Manslaughter in the Second Degree?

6           THE WITNESS:   Yes.

7           THE COURT:   Rather than murder, depraved murder?

8           THE WITNESS:   Yes.

9      Q.   Why didn't you ask for a continuation?

10     A.   Sometimes you have to make decisions.   Based on those

11 decisions you go with it.   If we put it over for another day,

12 how was the issue going to change?   We were confronted with

13 an issue late in the game.   I guess maybe with another two

14 hours sleep maybe my summation might have been better but, you

15 know.

16          THE COURT:   In your opinion, a request for a

17 longer continuation would not have changed your opinion --

18          THE WITNESS:   No.

19          THE COURT:   -- as to how you were going to

20 proceed?

21          THE WITNESS:   No.   Maybe someone else sees it

22 different than me.   If I had to try this case again I

23 would try it exactly like I tried it.   I would not put in

24 the insanity defense because my experts would have been

25 hammered.   Some of the witnesses had mutinied at this

Renfroe-People-Direct                                    123

1          point because of what had happened and they had some

2     reservations about being called as witnesses.

3          Q.   Which witnesses were they when you say some of the

4     witnesses had mutinied?  Were they not interested in coming in

5     any more?

6          A.   Listen, I got subpoena power.  I could get witnesses

7     in but there is a difference between witnesses who are coming

8     in and -- you know what I mean, and it's just the cross

9     examination they are going to endure.

10         As to the insanity defense, greater minds than me

11    have to make decisions on this.  I think the insanity defense

12    had been really seriously damaged to the point that I thought

13    that the best trial strategy was to use the intoxication

14    defense.

15         Q.   Was there any damage that would have been done to the

16    intoxication defense if you had gone and called the doctors and

17    the witnesses and let them be examined?

18         A.   Now I am giving you my opinion.  I believe so.

19              THE COURT:  Mr. Renfroe, when you initially

20    objected to Judge Collini and asked the tapes be

21    precluded, and this was a surprise at the People's case --

22    first of all, did you ever contemplate making a mistrial

23    motion before Judge Collini and if not why not?

24              THE WITNESS:  Your Honor --

25              THE COURT:  Did you think it was -- in terms of

AP

Renfroe-People-Direct

124

1    the gravity, the significance of the tapes to the case,

2    was it so significant that it should have justified a

3    mistrial motion?

4        THE WITNESS:  I am trying to look back --

5        THE COURT:  I know.  I respect you and I

6    understand.

7        THE WITNESS:  As I stand there now, there are a

8    couple of issues.  These are all things which are actually

9    happening outside of the purview of the jury.

10       One of the first things I tried to do, based on

11   the sensitive nature of this case, was to get it out of

12   Staten Island because this case in Staten Island, I mean

13   why was I here?  Why did they find me?  They found me

14   because there was no lawyer who would take this case in

15   Staten Island.  So I said, you know we got to get out of

16   here.  Unfortunately the appellate division disagreed

17   with me so I was here.

18       THE COURT:  I understand your position.  I really

19   do.

20       THE WITNESS:  And so, usually, and I may be

21   wrong, usually when there is something that affects the

22   jury you ask for a mistrial.  The only effect on the jury

23   on this, which is something that, you know, there is an

24   instruction for the jurors not to read the newspapers.

25   But this being an insular place, the fact that she wasn't

Renfroe-People-Direct

125

1    putting on an insanity defense which was on the front

2    page of whatever.  But at that point I thought I was in

3    the soup.  Should I have asked for a mistrial based on

4    newspapers, maybe that was something.  But other than

5    that, that's where I am.

6                THE COURT:  As I recall you had opened to the

7    jury and told the jury that you were going to call lay

8    witnesses and you told the jury -- I don't know if you

9    referred to them by name but doctors would testify as to

10   your client's insanity or state of mind at the time of

11   the commission of the crime; is that right?

12               THE WITNESS:  I'm sure I did.

13               THE COURT:  So, I am just trying to put this in

14   the framework.  So, you open to the jury and you knew Wang

15   might be a problematic witness in light of the fact that

16   he hadn't done well at the fitness proceeding, right?

17   That he was like susceptible to being attacked or rattled

18   on cross examination?

19               THE WITNESS:  Yes, but you could deal with that

20   because he was only a fact witness.  What did you observe?

21   What did you see?  What's this?  What's that?  The

22   conclusions were going to come from Dr. Berrill.

23               THE COURT:  But we don't know what -- you

24   announced Berrill.  After all is said and done Berrill

25   still stood.

AP

Renfroe-People-Direct

1   THE WITNESS:  Okay.

2   THE COURT:  Is that all right?  Is that right?  I

3   recall you couldn't remember what you told him about the

4   case.

5   THE WITNESS:  I can't answer that.  I don't want

6   to -- I mean, I can't say that I said doctor, come and

7   listen to these tapes and, you know, tell me what you

8   think.  Listen to these tapes.  I can say that didn't

9   happen.  So, it would be unfair for me to do that without

10  saying Dr. Berrill listens to these tapes.  I wouldn't

11  feel comfortable with it.

12  THE COURT:  I am going to try to -- tell me if I

13  am wrong or I'm right.  The way you sized this up as a

14  seasoned criminal defense attorney was that going in you

15  had a problematic defense of insanity?

16  THE WITNESS:  Uh-huh.

17  THE COURT:  And that upon revelation of the tapes

18  and the phone conversations from Rikers Island that was

19  the straw that broke the camel's back in regard to the

20  insanity defense, would that be fair?

21  THE WITNESS:  Yes.

22  THE COURT:  And your alternative then was to rest

23  and go with the testimony that had been elicited during

24  the People's direct case of intoxication in the hope that

25  if the jury convicted your client they would only convict

Renfroe-People-Direct

1    her of the lesser charge of Manslaughter in the Second

2    Degree; is that a fair summary?

3          THE WITNESS:  Yes.

4    Q.   Just to follow-up on a couple of things.

5    The defense of mental disease or defect, was that

6    going to be a -- was that going to be offered by the defense as

7    negating depraved indifference only?

8    A.   No.

9    Q.   Reckless also?

10   A.   Yes.

11   Q.   Whereas the intoxication defense only would --

12   A.   Negate some of the charges.

13   Q.   As far as Justice Collini, in your opinion having

14   appeared before him, do you think a motion for a mistrial would

15   have been granted?

16         MR. SMALLMAN:  Objection.

17         THE COURT:  Overruled.

18   A.   I don't think so.  That's, you know --

19         THE COURT:  I think that's a little speculative.

20         THE WITNESS:  I am sorry.

21         THE COURT:  As an attorney you can tell me if

22   you made the motion what do you think the chances were

23   that it would have been granted?

24         THE WITNESS:  Absolutely not.

25         MS. GRADY:  No further questions.

127

AP

Renfroe-Defense-Cross

128

1        THE COURT:  I am just going to ask, the next

2   question would be; if you asked for a continuance for

3   say -- I don't know what day of the week this was.  Say,

4   for example, this was a Tuesday and you asked Judge

5   Collini, Judge, could I have until Monday to go through

6   this thoroughly, discuss it with all my witnesses and give

7   you a decision, what do you expect Judge Collini would

8   have said or based upon your experience?

9        THE WITNESS:  He seemed to like me as a person

10  but the rulings were not going well so I think the answer

11  would have been no.

12       THE COURT:  No further questions?

13       MS. GRADY:  No.

14       THE COURT:  Mr. Smallman?

15       MR. SMALLMAN:  Thank you, Judge.

16  CROSS EXAMINATION

17  BY MR. SMALLMAN:

18  Q.   Good afternoon, Mr. Renfroe?

19  A.   Good afternoon.

20  Q.   How are you?

21  A.   Good.

22  Q.   Never said it would be easy, right?

23  A.   No.  But that's our job, keep swinging, right.

24  Q.   You have been at it awhile?

25  A.   Yes.

AP

Renfroe-Defense-Cross

1    Q.    We know each other over 30 years, right?

2    A.    Yes.

3    Q.    You have tried a 100 cases, 150?

4    A.    Yes.

5    Q.    Would you agree with me that everything or a lot of

6    what we do is interpreted?

7    A.    Yes.

8    Q.    I would like to take you back to the first time you

9    reviewed the facts of this case with Ms. Taylor or whoever it

10   was that gave them to you.

11   Q.    Would you agree with me they were pretty shocking?

12   A.    Yes.

13   Q.    And Ms. Taylor was described as having driven a

14   vehicle at an excessive rate of speed naked?

15   A.    Yes.

16   Q.    And other points in time there were references to

17   her consuming alcohol and/or using drugs as part of her life

18   style?

19   A.    Yes.

20   Q.    Any other time where she had been described, to your

21   knowledge, of having done any of those things naked?

22   A.    No.  Not that I am aware.

23   Q.    Subsequent or at some point in your preparation for

24   trial you said you had conversations with her mother and/or the

25   other eye witnesses to this event?

129

AP

Renfroe-Defense-Cross

130

1   A.   Yes.

2   Q.   And they began to describe or confirm for you some

3   type of a psychotic episode?

4   A.   Yes.

5   Q.   A mental breakdown of sorts?

6   A.   Yes.

7   Q.   And as a professional you had objective facts to go

8   along with that, right?

9   A.   That's correct.

10  Q.   She was being treated psychologically at Elmhurst

11  General?

12  A.   Yes.

13  Q.   As a prisoner?

14  A.   Yes.

15  Q.   When she was removed from that setting she was taken

16  to Rikers in a hospital setting?

17  A.   Yes.

18  Q.   And presumably continued to be medicated, right?

19  A.   I am going to say okay.

20       THE COURT:   Presumably maybe not actually.  We

21  will say presumably that would have been the normal

22  course?

23       THE WITNESS:   Yes.

24  Q.   You have no reason to feel otherwise, right?

25  A.   No.

Renfroe-Defense-Cross

1  Q.   Get any reports from Rikers saying your client is

2  refusing to take medication?

3  A.   No.

4  Q.   Let me go to the tapes.

5       You were given a tape that says Ms. Taylor spit her

6  medication out?

7  A.   Yes.

8  Q.   That's a very significant event at least as it applies

9  to your entire trial strategy, right?

10  A.   Yes.  That's one of them, yes.

11  Q.   Any opportunity to either confirm that or determine

12  whether it's just another inmate talking b.s.?

13  A.   No.  That was Taliyah talking to someone and there is

14  a colloquy where the guard says, Oh, you spit on me.  And she

15  is explaining that I had spit out my medicine so I had

16  something on my hand that -- saliva that I got on the guard.

17  So it was -- that was my client saying this.

18  Q.   I understand.

19  A.   Okay.

20  Q.   But my question is, do you -- let me ask you a

21  different way.  Is everything any of your clients ever told

22  you, whether on tape or in person, ever proven to be the

23  truth?  Ever been lied to by a client?

24  A.   Yes.

25  Q.   Ever been puffed up by a client?

Renfroe-Defense-Cross

132

1    A.    Yes.

2    Q.    Tell you things that are really incredible?

3    A.    Yes.

4    Q.    But you had really no opportunity at this point in

5    time to confirm or check out whether or not the accuracy of

6    this spitting event was, in fact, true, right?

7    A.    Okay.

8    Q.    Let me phrase it another way.

9          Did you have an opportunity to talk to Ms. Taylor and

10   say, I heard you say that on the phone but did you actually do

11   that?

12             THE COURT:    After you heard the tapes.

13   Q.    After you heard the tapes?

14   A.    You are talking about just that specific incident,

15   right?

16   Q.    Just that incident?

17   A.    No, I did not confirm that with her.

18   Q.    Moving forward on that vein.

19         Any of the other stuff that you considered to be

20   damaging or potentially damaging to the witnesses you were

21   going to put on, did you have an opportunity to sit down with

22   Ms. Taylor and walk through them, go through them point by

23   point and say, what was your intention, things of that nature?

24   A.    I am going to keep it short.    No.

25   Q.    Now, you were asked some questions by Ms. Grady about

AP

Renfroe-Defense-Cross

133

1  witnesses being prompted or given a script and things of that

2  nature, correct?

3     A.    Uh-huh.

4     Q.    And in particular two civilians witnesses -- I will

5  call your attention to the two civilian witnesses who were with

6  Ms. Taylor on the onset of this event?

7     A.    Right.

8     Q.    Were those the two people that Ms. Taylor was trying

9  to talk to about the questions?

10    A.    I would be lying to you if I knew exactly, you know

11 what I mean.    I know there were different individuals she was

12 speaking to along the way.

13    Q.    Did Ms. Taylor tell you she had an incomplete

14 recollection of these events, certain aspects of it were

15 unclear to her or she couldn't recall?

16    A.    Yes.

17    Q.    Did she also tell you there were other people at the

18 scene who could give you their version of events?

19    A.    I spoke to all of them, yes.

20    Q.    This were three different people who had their own

21 version of those events, right?

22    A.    Yes.

23    Q.    And as with any other event that we humans look at,

24 any witness could remember or forget certain aspects of an

25 event, right?

AP

Renfroe-Defense-Cross

134

1    A.    Yes.

2    Q.    Did you ever get the impression from representing

3    Ms. Taylor that she was trying to put words in witness's

4    mouths?

5    A.    No.   You mean other than what's on the tape?

6    Q.    Right.   The tape speaks for itself.   You heard them.

7          But my question to you is, in the course of

8    representing her, did she ever suggest to you to tell a witness

9    what to say?

10   A.    Not that I recall.

11   Q.    You certainly weren't the home team in this process,

12   were you?   You were the visiting team here on Staten Island?

13         MS. GRADY:   Objection.

14   A.    Yes, definitely.

15         THE COURT:   That's okay.   Now I understand.

16   Q.    This was perhaps the single most reported criminal

17   incident on Staten Island for some time?

18   A.    That's correct.

19   Q.    And you have been practicing a long time as a defense

20   attorney.   As a defense attorney is this a borough you want to

21   be in on a good day?

22         MS. GRADY:   Objection.

23         THE COURT:   Sustained.   That's stricken.

24   Q.    You had a tough road, didn't you?

25   A.    Yes.

Renfroe-Defense-Cross

135

1    Q.   You felt you were swimming upstream all the way?

2    A.   Yeah.

3    Q.   Now, you mentioned one of your witnesses being

4    significantly browbeat on cross examination.  Dr. Wang I

5    believe at the hearing?

6    A.   Yes.

7    Q.   And Judge Collini started to get upset because he

8    didn't have his notes?

9    A.   Yeah, I remember that.

10   Q.   And you remember that distinctly?

11   A.   That's pretty much what it was about.  He didn't have

12   something, you know.

13   Q.   And Judge Collini let his displeasure be known, right?

14   A.   That is correct.

15   Q.   Was Ms. Taylor in the courtroom for that?

16   A.   Yes.

17   Q.   She observed Judge Collini in that attitude, shall we

18   say?

19   A.   Yes.

20   Q.   And were there other times when he might have asserted

21   his authority during the course of the proceedings?

22   A.   I guess the answer to that is yes.

23   Q.   And clearly Ms. Taylor was present for all of that?

24   A.   Yes.

25   Q.   Did you have any idea -- withdrawn.

AP

Renfroe-Defense-Cross

1      I am assuming you know, in the course of practicing,

2  that client's calls are recorded at Rikers Island, right?

3      A.   My advice to all clients is -- when I get them on

4  cases is, do not talk about your case on the phone.  That's

5  been my advice for the last thirty years which I constantly

6  repeat to the clients.

7      Q.   Fair to say you would have given that same advice or

8  do you have a recollection?

9      A.   I can't say -- I know that is my habit, that's what I

10  do.

11      Q.   Okay, any reason to think you wouldn't have done it in

12  this case?

13      A.   I would have done it a lot in this case.

14      Q.   Ms. Taylor was an active participant in preparing her

15  case?

16      A.   Yes.

17      Q.   Spent some time in the law library did she, to your

18  knowledge?  Did Ms. Taylor spend time in the law library in

19  Rikers?

20      A.   Okay, I would assume so.  But you are asking about

21  hearsay, now, right.  But yeah.

22          THE COURT:   Well, did she give you any

23  indication?  Well, did she say --

24          THE WITNESS:   She said I am working on my case.

25          THE COURT:   Did she give you legal materials or

Renfroe-Defense-Cross

```
 1    statutes or anything like that?

 2              THE WITNESS:  I don't recall that.

 3    Q.    But did she give you the general impression she was up

 4    to speed on the facts or the law as it applied to her case?

 5    A.    Yes.

 6    Q.    And it involved time?

 7    A.    Yes.

 8    Q.    Would it be fair to say then that you had no advance

 9    warning whatsoever of these tapes prior to the time that you

10    were handed them by the prosecutor?

11    A.    Nope.

12    Q.    Was it ever disclosed to you that a panel of

13    prosecutors may have been working on this ahead of the time

14    that it was given to you?

15    A.    No.

16    Q.    Did you feel as though you were ambushed?

17    A.    Yeah.

18    Q.    How many times has that happened to you with Rikers

19    Island calls in the past -- well, prior to 2008?

20              MS. GRADY:  Objection.

21              THE COURT:  Sustained.

22    Q.    The tapes, were they handed to you with any kind of a

23    message or suggestion by the prosecutor?

24    A.    No.  It's been awhile.  When we approached it was,

25    you know, before he puts on his witness.  Judge, we have these
```

Renfroe-Defense-Cross

138

1    tapes.  He better listen to the tapes.  You know that's -- you

2    and I have been around a long title.  There is nothing going to

3    be good on those tapes then, right.  You don't have to yell at

4    me.  It's not going to be good for me there.

5        Q.    I know the Judge asked you and I got to follow-up on

6    it for completeness of the record, Mr. Renfroe.

7              At that juncture and with those tapes would it not

8    have been prudent to ask for a continuance?

9        A.    I guess I stand by -- I stand by my statement which is

10   that, you know, I have been in battle before.  At this moment I

11   got to try and win this battle.  And that's where I was at.  I

12   mean, I had to make the call I am not putting on the insanity

13   defense.  That was an easy one because there were things in

14   there that I wouldn't be able to fight.  I wouldn't be able to

15   fight.  So you give me two weeks, whatever, I can't go with

16   that defense.

17       Q.    Okay.

18       A.    There is another defense I can go with.  So, you know

19   this is kind of like when we used to do marshall arts.  This

20   is, You just punched me.  I roll and come back at you.  That's

21   what this is.

22       Q.    And I guess the same analysis would have been

23   applicable for asking for a mistrial, right?

24       A.    You know, 20/20 hindsight I guess I should have done

25   that.

AP

Renfroe-Defense-Cross

139

1    Q.    If the sentencing minutes in this proceeding indicated

2    that you might have chosen a different path, would you agree

3    with that?

4    A.    I mean -- okay, you ask me a question, I am going to

5    answer the question.  As we stood in that hallway there was

6    an offer of fifteen years.  I said to my client, I think we

7    should take this.  We cannot go forward with this insanity

8    defense.

9          I don't know what I said at sentencing.  Although, you

10   know, I'm sorry that it ended up that she got convicted cause I

11   have been doing this a long time and I try to save People's

12   lives and that's why we do this job.  There are many things I

13   regret about this case.  One of the things I regret is that I

14   couldn't convince her that I was on her side and she should

15   take those fifteen years.

16          THE COURT:  Mr. Renfroe, did you find -- there

17   again I don't know what your reaction is.  It appears

18   from reading the transcript that the People rested their

19   direct case, then you were informed of the tapes and then

20   the People turned around and offered you the same plea

21   offer they had made at the beginning of the case?

22          THE WITNESS:  Yes.

23          THE COURT:  What is your reaction to that?  Did

24   that surprise you?

25          THE WITNESS:  No.  I think -- you know, either

Renfroe-Defense-Cross

140

1    way I go I'm in trouble on this case.  I think they were

2    being decent human beings and trying to come with a fair

3    resolution to a very difficult case where they knew at

4    this moment that we'd been wounded badly.

5            THE COURT:  Thank you.

6    Q.    And I would ask you the same questions -- well,

7    withdrawn.

8            Ms. Taylor filed an appeal?

9    A.    Yes.

10   Q.    You recall being contacted by an attorney representing

11   her prosecuting her appeal?

12   A.    I'm sure.

13   Q.    Do you happen to recall telling that attorney that

14   maybe it should have been done different?

15   A.    I don't remember that.

16   Q.    Okay.  You were asked I think on direct examination by

17   the prosecutor about experts, right, and often times cases come

18   down to an expert.

19           Was it a surprise to you when Dr. Schneider, the

20   People's doctor, came back and said Ms. Taylor is perfectly fit

21   to proceed and she is, in fact, malingering after your doctor

22   had a completely different diagnosis?

23   A.    I'm not sure if he was the same doctor that I had on

24   the Troy Batson case.  I'm not sure.  The short answer is no,

25   it doesn't surprise me.

AP

Renfroe-Defense-Cross                                                    141

1    Q.    You wouldn't expect to find a People's doctor agreeing

2    with your doctor, would you?

3    A.    It's happened now and again but it's a rarity.

4    Q.    And given the standing or the pasture of this case,

5    the nature of who the victim was, you certainly anticipated

6    getting a different opinion from the prosecution, did you

7    not?

8               MS. GRADY:   Objection.

9               THE COURT:   Sustained.

10              There again, maybe this is the same question just

11   in another way.

12              Having Dr. Schneider's report didn't deter you

13   from opening to the jury that you were still going to

14   present Dr. Berrill's opinion to them; is that correct?

15              THE WITNESS:   That's correct.   Now, if I had the

16   tapes before I opened that might have been a different

17   story.

18              THE COURT:   That's a different question.

19   Q.    But again, in following up on Judge Garnett's

20   question.   You had spoken to Ms. Taylor prior to opening, you

21   had spoken to your witnesses prior to opening, and whether or

22   not there was a strong or even weak likelihood of success, did

23   you consider that at least you were going to be in the hunt of

24   advancing that defense?

25   A.    Yes, in the beginning.

AP

Renfroe-Defense-Cross

142

1    Q.    Now, do you recall the decision having to be made as

2    to whether or not Ms. Taylor was going to offer testimony?

3    A.    Yes.

4    Q.    And the record clearly states what the colloquy was

5    before Judge Collini and the decision that ultimately

6    Ms. Taylor spoke those words.

7          Can you give the Court any flavor of the dialogue that

8    took place between yourself and Ms. Taylor before that decision

9    was announced in court?

10   A.    I would be lying if I can tell you the exact words.

11   We were going over the facts of what had happened with the

12   tapes.   Some of it -- I thought some more damaging ones and

13   why you know -- I think she was expressing that she still

14   wanted me to go forward with the defense.   I was telling her I

15   thought it was, you know, not a defense that we could go

16   forward with.   I'm making the choice not to do that but she had

17   the right to testify or not.

18   Q.    Again, without asking you to put a value on

19   Ms. Taylor's legal knowledge or anything like that, was it your

20   impression that she felt what she said on the tapes was not

21   inappropriate?   That she had her own explanation for what was

22   contained on those tapes?

23   A.    I don't think our conversation got to that point where

24   she said, What I said -- I mean there were a lot of tapes --

25   What I said was perfectly fine.   You know, I mean, I don't

AP

Renfroe-Defense-Cross

1    believe that was covered.

2    Q.   Well, she had not had the opportunity to listen to the

3    tapes, correct?

4    A.   That is correct.

5    Q.   But she still wanted to advance her defense?

6    A.   That's correct.

7         MR. SMALLMAN: Thank you very much, Mr. Renfroe.

8         THE COURT: Any redirect?

9         MS. GRADY: Briefly.

10   REDIRECT EXAMINATION

11   BY MS. GRADY:

12   Q.   With record to the objective facts of her driving

13   naked, for example, and having other symptoms which might

14   indicate a psychotic episode as Mr. Smallman phrased it, in

15   your opinion were those external signs consistent with a

16   potential mental disease or defect?

17   A.   Yes, I thought they could be.

18   Q.   Were they also consistent with intoxication?

19   A.   They could be, yes.

20   Q.   With regard to whether you verified the truth of

21   whether or not she was taking her medication, did you feel it

22   was necessary to verify whether she was taking her medication

23   or not or was it more just the fact that it was said on a

24   tape and the jury would hear it?  Which was more relevant to

25   you?

AP

143

Renfroe-People-Redirect

1    A.    The fact that the jury would hear it.

2    Q.    Again, with regard to your decision that the insanity

3    defense was no longer viable, was there any need for a

4    continuance to make that decision?

5    A.    No, I had made that decision.

6    Q.    You said with 20/20 hindsights perhaps you should have

7    asked for a mistrial?

8    A.    I can say that.    But I can also tell you with 20/20

9    hindsight that it wasn't going to be granted.    We were in the

10   fire.    That's where we were.

11   Q.    Did you have any other doctors examine her besides

12   Dr. Berrill?

13   A.    I don't believe so.    I know there was another,

14   Dr. Pabon, who also examined her along with Dr. Wang.

15   Q.    Aside from that no?

16   A.    No.

17           THE COURT:    Any recross?

18   RECROSS EXAMINATION

19   BY MR. SMALLMAN:

20   Q.    We don't live in a perfect world, Mr. Renfroe.    With

21   20/20 hindsight and even some Monday morning quarterbacking

22   would it have been appropriate to demand from Judge Collini a

23   continuance?

24   A.    Maybe a mistrial but not a continuance.

25           MR. SMALLMAN:    Thank you very much.

144

AP

Renfroe-Defense-Recross

1    THE COURT:  Anything further?

2    MS. GRADY:  No, Judge.

3    THE COURT:  Thank you very much, Mr. Renfroe.  I

4    appreciate you taking the time out of your busy practice

5    to come down --

6    THE WITNESS:  Thank you, your Honor.

7    THE COURT:  -- to Staten Island and testify.

8    Thank you so much.  You are excused.

9    (Witness excused).

10   THE COURT:  Are there any other witnesses that

11   the People would like to present as part of this hearing?

12   MR. SMALLMAN:  No.

13   MS. GRADY:  No, your Honor.

14   THE COURT:  Mr. Smallman, any further witnesses

15   by the defense?

16   MR. SMALLMAN:  No, your Honor.

17   THE COURT:  Okay, I assume you are going to want

18   to submit something on this case?

19   MR. SMALLMAN:  I do need to ask to be provided

20   with a copy of the minutes.

21   THE COURT:  Sure, that's granted.

22   MR. SMALLMAN:  Thank you.

23   THE COURT:  I also asked for them.

24   MR. SMALLMAN:  Judge, so everybody is clear, I

25   know normally we are only entitled to one copy but

145

AP

Renfroe-Defense-Recross

1 Ms. Taylor is asking if she can get a copy.

2 THE COURT: I will authorize it. I will

3 authorize a copy of the minutes to Ms. Taylor.

4 MR. SMALLMAN: Thank you.

5 THE COURT: All right, before we set a schedule,

6 will you step up.

7 (Whereupon, there was a discussion held off the

8 record.)

9 THE COURT: We will discuss a motion schedule.

10 This is a situation where the burden is upon the

11 defendant. So, with that, Mr. Smallman, I ask you to

12 submit first and give me a date when you believe

13 after -- how long will the minutes be? Assuming you get

14 the minutes in two weeks, when do you think you could have

15 a submission to the Court?

16 MR. SMALLMAN: Judge, I am on vacation March 21

17 to 28. If I had the minutes prior to being on vacation I

18 could certainly hope to get something to you say the

19 second week of April. I just don't see getting it before

20 the 21.

21 THE COURT: So, the second week of April?

22 MR. SMALLMAN: Get it to you by Friday, April 8.

23 THE COURT: Is that okay? You sure you got

24 enough time? Do you want to file this will with your

25 taxes?

AP

146

Renfroe-Defense-Recross                                                                  147

1          MR. SMALLMAN:  About as much fun for both.  How

2    about the 12th?

3          THE COURT:  Okay, the defense to file by the

4    12th.

5          Now, Ms. Grady, how much time would you like to

6    reply?

7          MS. GRADY:  May I have two weeks?

8          THE COURT:  Sure, that would take us to the 26th

9    of April.

10         Do you have any problems that week?  I don't know

11   anybody's situation.  I am just involved with the public

12   school system.  I know that's a week that the public

13   schools are closed in New York.  I am going to be here.

14   Is that okay?

15         MS. GRADY:  I think that's fine.  If I have a

16   problem with that I will submit it early.

17         THE COURT:  So, I will expect the People's

18   response by the 26th and then I'll be working.  I think my

19   notes are pretty good.  So, how about May 12th for the

20   Court's decision?  How is that?

21         MR. SMALLMAN:  May I check that, sir?

22         THE COURT:  Yes.

23         MR. SMALLMAN:  Sure.

24         MS. GRADY:  That's fine.

25         THE COURT:  Thank you both very much.

Renfroe-Defense-Recross                                    148

1    I assume Ms. Taylor wants to return to Bedford

2    Hills?

3         THE DEFENDANT:  Yes, thank you.

4         THE COURT:  And we will prepare whatever order is

5    appropriate to bring her back on the 12th.

6         MS. GRADY:  Shall I leave the exhibits with the

7    Court or take them and submit them with my papers?

8         THE COURT:  Would you step up for a second and

9    just compare.

10        (Whereupon, there was a discussion held off the

11   record.)

12        THE COURT:  Okay, thank you very much.

13        MR. SMALLMAN:  Thank you.

14        MS. GRADY:  Thank you.

15                     *      *      *

16

17   It is hereby certified that the foregoing is a true and

18   accurate transcript of the proceedings.

19   (Certification valid only when signed in blue ink.)

20

21   _____

22   ANGELA PUNTORNO
23   SENIOR COURT REPORTER

24

25

AP

149

Renfroe-Defense-Recross

INDEX TO WITNESSES:

|  | DIRECT | CROSS | REDIRECT | CROSS |
|---|---|---|---|---|

FOR THE PEOPLE:

1 Christopher Renfroe          87      128      143      144

FOR THE DEFENDANT:

1 Taliyah Taylor          10      50      84

INDEX TO EXHIBITS:

For the People:

|  | I.D. | Evd. |
|---|---|---|

1 Report          91      91

2 Report          96      97

3 Report          99      100

For the Defendant:

|  | I.D. | Evd. |
|---|---|---|

None

COURT EXHIBITS:

| Number | Page |
|---|---|
| 1 CD | 8 |
| 2 CD | 8 |

AP